# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE CEREVEL THERAPEUTICS HOLDINGS, INC. SECURITIES LITIGATION | Case No. 25-cv-417-GBW<br><br>**JURY TRIAL DEMANDED**<br><br>**CLASS ACTION**<br><br>**FILED UNDER SEAL** |

## CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## FILED UNDER SEAL

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION ........................................................................... 2

II.    JURISDICTION AND VENUE ...................................................................... 8

III.   PARTIES ......................................................................................................... 9

       A.    Lead Plaintiffs ...................................................................................... 9

       B.    Corporate Defendants .......................................................................... 9

       C.    Director Defendants ........................................................................... 10

IV.    FACTUAL ALLEGATIONS ........................................................................ 11

       A.    Bain and Pfizer Form Cerevel Therapeutics in 2018 ........................ 11

       B.    Cerevel Goes Public Through a De-SPAC Transaction and Enters into Shareholder Rights Agreements ................................................................................. 12

       C.    Bain and Pfizer Maintain Control of Cerevel Following the De-SPAC Transaction ........................................................................................................ 15

       D.    Bain Appoints Its Partner Ron Renaud as Cerevel's CEO and Manages Cerevel's Search for Regional Partners, Which Included Discussions with AbbVie ........... 16

       E.    In September 2023, the Cerevel Board Learns of and Reacts to AbbVie's Interest in a Whole-Company Acquisition ............................................................... 19

       F.    Bain and Perceptive Engage in Unlawful Insider Trading ................. 22

       G.    AbbVie and Cerevel Continue to Negotiate and Ultimately Agree that AbbVie Will Acquire Cerevel at Nearly Double the October Offering Price ........................... 26

       H.    Bain and Pfizer Cause Cerevel to Issue a False and Misleading Proxy Statement in Order to Garner Shareholder Support for the Merger .......................... 28

V.     ADDITIONAL ALLEGATIONS RELATING TO DEFENDANTS' SCIENTER .......... 31

VI.    FALSE AND MISLEADING STATEMENTS ............................................. 33

       A.    October 11, 2023 Press Release .......................................................... 33

       B.    October 11, 2023 Preliminary Prospectus Supplement ...................... 33

       C.    October 12, 2023 Form 8-K and Press Release .................................. 34

       D.    October 12, 2023 Prospectus Supplement .......................................... 35

E.      November 1, 2023 Earnings Call ................................................................ 36

F.      December 6, 2023 Merger Announcement ................................................ 36

G.      January 18, 2024 Proxy ............................................................................. 37

VII.    LOSS CAUSATION .............................................................................................. 39

VIII.   CLASS ACTION ALLEGATIONS ....................................................................... 41

IX.     APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ............................................................................................ 43

X.      NO SAFE HARBOR ............................................................................................... 45

COUNT I Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated
        Thereunder Against Cerevel and Renaud ......................................................... 46

COUNT II Violation of Section 20A of The Exchange Act Against Bain and Perceptive .......... 48

COUNT III Violation of Section 14(a) of The Exchange Act Against Cerevel ........................... 50

COUNT IV Violation of Section 20(a) of The Exchange Act Against Bain, Pfizer, and the
        Director Defendants ......................................................................................... 51

PRAYER FOR RELIEF ..................................................................................................... 53

JURY TRIAL DEMANDED .............................................................................................. 53

Lead Plaintiffs SM Merger/Arbitrage, LP, Associated Capital Group, Inc. and Atlas Diversified Master Fund, Ltd. ("Lead Plaintiffs"), by and through their attorneys, bring this action pursuant to the Securities Exchange Act of 1934 ("Exchange Act") against Defendants Cerevel Therapeutics Holdings, Inc. ("Cerevel" or "Company"), Cerevel's majority shareholders, Bain Capital Investors, Inc. ("Bain"), Pfizer, Inc. ("Pfizer"), Perceptive Advisors LLC ("Perceptive") and certain members of the Cerevel Board of Directors ("Board") appointed by Bain, Pfizer and Perceptive (collectively with Cerevel, Bain, Pfizer and Perceptive, "Defendants"), on behalf of themselves and all other persons or entities that:

(a)     sold or otherwise disposed of the publicly traded common stock of Cerevel during the period from October 11, 2023 through August 1, 2024, inclusive ("Class Period") and thus were damaged by Defendants' violations of Section 10(b) of the Exchange Act ("Fraud Claim Class");

(b)     held shares of Cerevel common stock as of the January 8, 2024 record date ("Record Date") and were entitled to vote on the merger of Cerevel and AbbVie Inc. ("AbbVie") and thus were damaged by Defendants' violations of Section 14(a) of the Exchange Act ("Proxy Claim Class"); and

(c)     sold shares of Cerevel common stock contemporaneously with Bain and Perceptive's purchases of shares on or about October 16, 2023 and thus were damaged by Bain and Perceptive's violations of Section 20A of the Exchange Act ("Insider Trading Claim Class," and collectively with the Fraud Claim Class and the Proxy Claim Class, the "Class").

Lead Plaintiffs allege upon personal knowledge with respect to their own actions and upon information and belief with respect to all other allegations, which is based upon, among other

things, Lead Plaintiffs' counsel's investigation.   Lead Plaintiffs' counsel's investigation has included, without limitation, a review and analysis of:  (a) regulatory filings concerning Cerevel with the U.S. Securities and Exchange Commission ("SEC"); (b) press releases and investor information issued and disseminated by Cerevel; (c) other publicly available information concerning Cerevel, including, without limitation, securities analyst reports and media reports; and (d) verified pleadings and other filings in *SEIU Pension Plans Master Trust v. Bain Capital Investors, LLC*, C.A. No. 2024-1274-JTL, currently pending in the Delaware Court of Chancery.

Lead Plaintiffs believe that substantial additional evidentiary support exists for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## I.    NATURE OF THE ACTION

1.    This action seeks to recover damages on behalf of shareholders harmed by Defendants' omissions of material facts and other wrongdoing in connection with Cerevel's October 16, 2023 secondary stock offering ("October Offering") and related false and misleading statements and omissions concerning AbbVie's acquisition of Cerevel for $45 per share ("Merger"), including misstatements and omissions in Cerevel's January 18, 2024 Definitive Proxy Statement filed with the SEC on Schedule 14A ("Proxy").

2.    The October Offering was orchestrated by the Cerevel Board knowing it gave insiders Bain and Perceptive the opportunity to increase their investment in the Company at a deeply discounted price while both entities were in possession of material non-public information regarding AbbVie's imminent offer to acquire Cerevel at a significant premium.  In this regard, Bain and Perceptive collectively purchased 6,356,860 shares of Cerevel common stock in the October Offering for just $22.81 per share, reaping over ***$141 million in illicit profits***.

*        *        *

2

3.      Cerevel was a Massachusetts-based biopharmaceutical company co-founded in 2018 by Defendants Bain and Pfizer.  In 2020, Cerevel went public through a merger with a Special Purpose Acquisition Company ("SPAC"), Arya Sciences Acquisition Corp. II ("Arya II"), which was sponsored by Defendant Perceptive.

4.      In connection with the 2020 transaction, Bain, Pfizer and Perceptive (and certain Cerevel management) entered into various agreements with Cerevel that provided them with, among other things, the right to nominate certain of Cerevel's directors, to cause Cerevel to register and issue additional stock, and to purchase their pro-rata share of any additional Cerevel stock offered.

5.      Though it was a public company, Cerevel was controlled by Bain and Pfizer through their voting stock and representation on the Cerevel Board of Directors.  Specifically, Bain and Pfizer, which, according to SEC rules, constituted a "group" in connection with their ownership of Cerevel, collectively owned 51.3% of the voting stock of Cerevel (as of January 8, 2024) and thus had the right to, and did, nominate the majority of Cerevel's Board of Directors. In addition, in May 2023, Bain installed its partner Ron Renaud as Chief Executive Officer of Cerevel.  For its part, Perceptive owned 10,965,193 shares of Cerevel common stock as of January 8, 2024 (approximately 6% of the outstanding shares) and nominated one of its managing directors to the Cerevel Board.

6.      Also in May 2023, Cerevel's ongoing search for oversees partners led it to engage in discussions with bioscience-giant AbbVie to act as its Japanese regional partner.  As part of that process, AbbVie signed a confidentiality agreement with Cerevel and completed "meaningful diligence" into the Company, particularly regarding two of Cerevel's leading drug candidates.

Following its due diligence, AbbVie shifted its interest from a partnership to acquiring *all* of Cerevel.

7.       In late September and early October 2023, Cerevel's Board acknowledged internally that AbbVie was now pursuing a whole-company acquisition of Cerevel. Specifically:

- According to an internal Cerevel document attached to a September 23, 2023 email from Cerevel Chief Business Development & Strategic Operations Officer Paul Burgess to Frank Fekete, a Managing Director at Cerevel's financial advisor, Centerview Partners ("Centerview"), ██████████████████████████████████████████

- On September 27, 2023, the Cerevel Board met with Centerview *to discuss strategic options, including merger and acquisition opportunities*. At the meeting, Centerview advised that in the biopharmaceutical industry, a ████████████████████████████████████████████████████;

- Indeed, the discussions at the September 27, 2023 Board meeting regarding strategic alternatives were so serious that the Pfizer-appointed Board members agreed to be *recused* from that portion of the meeting because Pfizer could also be interested in a potential transaction;

- On September 29, 2023, Centerview emailed Cerevel CEO (and Bain Partner) Defendant Renaud "talking points" for a follow up meeting with AbbVie, and Centerview recommended for Renaud to acknowledge that he had ████████████████████████████████████ and

- By October 4, 2023, Cerevel employees were ████████████████████████████████

8.       On October 10, 2023, on the heels of the above events, Cerevel's Bain- and Pfizer-controlled Board initiated the October Offering. The next day, October 11, 2023, Cerevel publicly announced the offering of 19,728,189 shares at a price of $22.81 per share. The offering was

ultimately increased to 22,687,417 shares and raised a total of approximately $500 million when it closed on October 16, 2023.

9.      The October Offering was orchestrated by the Cerevel Board in order to give insiders Bain and Perceptive the opportunity to increase their Cerevel stock positions in advance of the lucrative—and at the time non-public—anticipated Merger with AbbVie, without making conspicuous open-market purchases.  Specifically, Bain acquired 5,480,052 shares of common stock in the October Offering for $22.81 per share, while Perceptive acquired an additional 876,808 shares for the same amount per share.  Both Bain and Perceptive's purchases in the October Offering were made while in possession of material non-public information regarding AbbVie's advanced interest in a whole-company acquisition of Cerevel and Cerevel's related discussions with Centerview regarding responding to AbbVie and considering other potential strategic alternatives—information that was indisputably known to Bain and Perceptive through their significant ownership of Cerevel stock and Board representatives but wholly concealed from the Insider Trading Claim Class and the Fraud Claim Class.

10.     The October Offering documents did not disclose *anything* related to a potential AbbVie transaction or Cerevel's ongoing sales process despite the fact that, by that point: (i) AbbVie had engaged in months of due diligence related to a potential regional partnership and had informed Cerevel that it had shifted its interest to a whole-company acquisition; (ii) Cerevel was awaiting a term sheet from AbbVie; (iii) Cerevel's Board had met with its financial advisors to discuss AbbVie's interest and to discuss launching a sales process and, at that meeting, even recused the Pfizer-affiliated Board members because Pfizer could also be interested in a potential transaction with Cerevel; (iv) Centerview had emailed Renaud suggesting "talking points" to respond to AbbVie's interest; and (v) Cerevel was pulling together a whole-company data room

for AbbVie to perform additional due diligence related to a transaction. The material omissions regarding AbbVie's advanced whole-company acquisition interest and Cerevel's sales process artificially deflated the price of Cerevel's stock, permitting Bain and Perceptive to acquire shares from the October Offering at a deep discount, immediately harming the Insider Trading Claim Class that sold shares of Cerevel common stock contemporaneously with Bain and Perceptive's purchases.

11.    Cerevel's discussions related to AbbVie and launch of a sales process were understandably initially confidential and undisclosed to Cerevel's non-insider shareholders and the market. However, the federal securities laws require that insider shareholders with material non-public information must either abstain from trading or disclose the information to the investing public. Bain and Perceptive, and Cerevel as a controlled entity, violated this rule to disclose or abstain when Bain and Perceptive purchased more than six million shares without disclosing or causing Cerevel to disclose to the public AbbVie's merger interest and Cerevel's launch of a sales process.

12.    Just three days after the October Offering, on October 19, 2023, AbbVie made a written, nonbinding indication of interest to acquire Cerevel for $35 per share. The $35 per share offer was a 53% premium to the October Offering price of which Bain and Perceptive had just collectively purchased more than six million shares.

13.    Less than two months after the October Offering, on December 6, 2023, Cerevel announced it had indeed agreed to be acquired by AbbVie for $45 per share, a 97% premium to the $22.81 per share October Offering price. At the $45 per share Merger price, the 5,480,052 shares Bain acquired in the October Offering were worth $246,602,340, giving Bain an approximate ***$121.6 million unlawful profit*** on the shares it had acquired from the October

Offering.  At the same time, Perceptive recognized an approximate ***$19 million unlawful profit*** on the 876,808 shares it purchased in the October Offering.

14.    On December 6, 2023, Cerevel formally announced the Merger.  The December 6, 2023 Merger announcement partially corrected Cerevel's October omission of advanced talks with AbbVie and the related launch of a sales process.  But the Merger announcement, as well as the Proxy issued on January 18, 2024, made misrepresentations and omitted material facts concerning Cerevel's sales process, the real reason for the October Offering, and the truth regarding the timing of AbbVie's interest in acquiring Cerevel.  Indeed, Defendants never disclosed—despite a detailed "Background of the Merger" section in the Proxy—that AbbVie had expressed interest in a whole-company acquisition prior to Bain and Perceptive's unlawful purchases in the October Offering.

15.    Nor did the Proxy disclose, despite including pages and pages of "financial analyses" performed by Centerview supporting the $45 Merger price, that at least three Centerview analyses presented to the Cerevel Board indicated that the deal price was inadequate, including: from September 2023 (valuing Cerevel at ███ per share); from November 8, 2023 (valuing Cerevel at ███████ per share); and from November 11, 2023 (indicating a large pharmaceutical company like AbbVie had the ability to pay up to ███ per share for Cerevel).

16.    Significantly, because of the extra profit that Bain and Perceptive stood to gain from their insider purchases in the October Offering, Bain and Perceptive's interests were not fully aligned with Cerevel public shareholders.  Bain and Perceptive were incentivized to lock in their profits before Cerevel received additional test data that could drastically impact Cerevel's stock price.  Selling the Company and locking in their profits quickly was more important to Bain and Perceptive than securing the highest possible price for non-insider shareholders.  Provided that the

AbbVie transaction closed, Bain and Perceptive would collectively receive billions of dollars, including a 97% profit on the shares they purchased in the October Offering.

17.     The Fraud Claim Class and Proxy Claim Class were damaged by the misleading statements and omissions of material facts in Cerevel's Proxy statement and other Cerevel public statements in the run up to the Merger.

## II.    JURISDICTION AND VENUE

18.     The claims asserted herein arise under Sections 10(b), 14(a), 20A and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, giving this Court jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

19.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this judicial district, as Cerevel was incorporated in this district.  Many of the acts charged herein, including the omissions of material facts and dissemination of materially false or misleading information, occurred in substantial part in this judicial district.

20.     In connection with the acts, transactions and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications and the facilities of a national securities exchange.

### III.    PARTIES

#### A.  Lead Plaintiffs

21.     SM Merger/Arbitrage, LP ("SM Merger/Arbitrage") is a private hedge fund overseen by its investment manager, S. Muoio & Co. LLC.  SM Merger/Arbitrage's principal place of business is located at 509 Madison Avenue, New York, NY.

22.     Associated Capital Group, Inc. ("Associated Capital") is a private hedge fund overseen by its investment manager, S. Muoio & Co. LLC.  Associated Capital's principal place of business is located at 191 Mason Street, Greenwich, CT.

23.     Atlas Diversified Master Fund, Ltd. ("Atlas Fund") is a private investment fund overseen by its investment manager, Balyasny Asset Management, L.P.  Atlas Fund's principal place of business is 444 W. Lake Street, 50th Floor, Chicago, IL.

24.     As set forth in the attached certifications, the three Lead Plaintiffs sold shares of Cerevel common stock during the October 11, 2023 through August 1, 2024 Class Period, sold shares of Cerevel common stock contemporaneously with Bain and Perceptive's purchases of Cerevel shares on or about October 16, 2023, and/or held shares on the January 8, 2024 Record Date, and suffered damages as a result of the Defendants' violations of the federal securities laws alleged herein.

#### B.  Corporate Defendants

25.     Defendant Cerevel Therapeutics Holdings, Inc. was a Delaware corporation with its principal executive offices located in Cambridge, Massachusetts.  On August 1, 2024, Cerevel was acquired by AbbVie Inc.  Prior to the acquisition, Cerevel's stock traded on the NASDAQ under the symbol "CERE."

26.     Defendant Bain Capital Investors, LLC, which includes its subsidiary BC Perception Holdings, LP (collectively referred to herein as "Bain"), is a multi-asset alternative

investment firm based in Boston, Massachusetts. As detailed in the Proxy, "Bain Capital Investors, LLC is the ultimate general partner of BC Perception Holdings, LP" and, thus, "Bain Capital Investors, LLC may be deemed to exercise voting and dispositive power" of BC Perception Holdings, LP's Cerevel shares. The Proxy also states that "[v]oting and investment decisions with respect to securities held by BC Perception Holdings, LP are made by the Partners of Bain Capital Investors, LLC."

27.     Defendant Pfizer, Inc. is a pharmaceutical company headquartered in New York, New York. Pfizer co-founded Cerevel with Bain in 2018 and, alongside Bain, maintained significant control over the Company at all times during the Class Period.

28.     Defendant Perceptive Advisors LLC, which includes Perceptive Life Sciences Master Fund Ltd. and C2 Life Sciences, LLC (collectively referred to herein as "Perceptive"), is an investment advisor specializing in the life sciences industry based in New York, New York. As detailed in the Proxy, Perceptive Advisors LLC serves as the investment advisor to Perceptive Life Sciences Master Fund Ltd.

**C.  Director Defendants**

29.     Defendant Ron Renaud was a partner at Bain. Renaud was installed by Bain as Cerevel's President, CEO, and a member of the Board, effective June 12, 2023.

30.     Defendant Adam Koppel was a member of Cerevel's Board of Directors from Cerevel's formation in 2018 until the Merger. Defendant Koppel was Managing Director of Bain Capital Life Science.

31.     Defendant Chris Gordon was a member of Cerevel's Board of Directors from Cerevel's formation in 2018 until the Merger. Defendant Gordon was Co-Head of Bain's North America Private Equity Business and Global Head of the Healthcare Vertical.

32.     Defendant Deval Patrick was a member of Cerevel's Board of Directors from January 2021 through the Merger.  Defendant Patrick was previously the governor of Massachusetts and a Managing Director at Bain Capital.

33.     Defendant Deborah Baron was a member of Cerevel's Board of Directors from January 2021 through the Merger.  Defendant Baron is Senior Vice President, Worldwide Business Development at Defendant Pfizer.

34.     Defendant Suneet Varma was a member of Cerevel's Board of Directors from June 15, 2022 until the Merger.  Defendant Varma is Global President, Rare Diseases at Pfizer.  Prior to that, Defendant Varma served as Global President, Hospital Business Unit at Pfizer.

35.     Defendant Dr. Ruth McKernan was a member of Cervel's Board of Directors from December 2020 until the Merger.  Defendant Dr. McKernan held various roles at Pfizer from 2005 to 2015, most recently as Chief Scientific Officer.

36.     Defendant Doug Giordano was a member of Cerevel's Board of Directors from Cerevel's formation in 2018 until the Merger.  From 2018 to 2021, Defendant Giordano served as Senior Vice President of Worldwide Business Development at Defendant Pfizer.  In 2021, Defendant Giordano became a Managing Director of Defendant Perceptive, and Defendant Giordano became Perceptive's nominee to the Cerevel Board.

37.     Defendants Renaud, Koppel, Gordon, Patrick, Baron, Varma, McKernan, and Giordano are collectively referred to herein as the "Director Defendants."

## IV.    FACTUAL ALLEGATIONS

### A.  Bain and Pfizer Form Cerevel Therapeutics in 2018

38.     On July 23, 2018, Bain and Pfizer formed Cerevel as a biopharmaceutical company focused on developing drug candidates to treat disorders of the central nervous system ("CNS").

39.     Cerevel was created by the contribution of pre-commercial neuroscience assets from Pfizer and a monetary investment by Bain.  Specifically, Pfizer contributed a portfolio of pre-commercial neuroscience assets to Cerevel, which included three clinical-stage compounds and several pre-clinical compounds designed to target a broad range of CNS disorders, including Parkinson's, Alzheimer's, epilepsy, schizophrenia, and addiction.  Funds affiliated with Bain Capital Private Equity and Bain Capital Life Sciences committed $350 million to Cerevel and indicated they had the ability to provide additional capital should it be needed in the future.

40.     At its inception, Bain held a 75% equity interest in Cerevel, and Pfizer held a 25% equity interest in Cerevel.

41.     Cerevel's initial Board consisted of four directors, two appointed by Bain (Defendants Koppel and Gordon) and two appointed by Pfizer (Dr. Morris Birnbaum and Defendant Giordano).

**B.  Cerevel Goes Public Through a De-SPAC Transaction and Enters into Shareholder Rights Agreements**

42.     On July 30, 2020, Cerevel announced it would merge with Arya Sciences Acquisition Corp II, a SPAC sponsored by Defendant Perceptive Advisors.  A SPAC is a "blank-check" company that raises money from public investors for the purpose of acquiring or merging with another company.  Merging with a SPAC is widely considered an alternative method for private companies to go public without conducting an initial public offering ("IPO").

43.     Defendant Perceptive is a private equity and private credit investment management company focused on the life sciences industry with approximately $8 billion in assets under management.  In 2022, the SEC charged Perceptive with certain wrongdoing related to its management of SPACs, including Arya II.[1]  Specifically, the SEC found that: Perceptive failed to

---

[1] https://www.sec.gov/files/litigation/admin/2022/34-95673.pdf

disclose conflicts of interest; made material misstatements and omissions; failed to adopt reasonably designed written policies and procedures regarding Perceptive personnel's ownership interest in SPAC sponsors and Perceptive's practice of investing client assets in affiliated SPACs; and failed to timely report certain stock acquisitions on Schedule 13D.

44.     Upon the closing of the transaction on October 27, 2020 ("De-SPAC Transaction"), Arya II redomiciled as a Delaware corporation, was renamed Cerevel Therapeutics Holdings, Inc., and Arya II's common stock was listed on NASDAQ under the ticker symbol "CERE."

45.     Cerevel received proceeds of approximately $467 million from the De-SPAC Transaction, which included cash proceeds of about $147 million from Arya II's trust account and $320 million from a private investment in public equity ("PIPE") conducted alongside the De-SPAC Transaction.  The PIPE investors included Bain, Perceptive, Pfizer and other institutional investors.  Defendant Bain contributed $100 million through the PIPE, Defendant Perceptive contributed $30 million and Defendant Pfizer contributed $12 million.

46.     Immediately following the De-SPAC Transaction, the prior owners of Cerevel (i.e., Defendant Bain, Defendant Pfizer, and certain Cerevel management), owned approximately 68.63% of the outstanding Cerevel publicly traded stock, and Bain and Pfizer's collective ownership through the Merger with AbbVie at all times remained above 50%.  Defendant Perceptive owned about 6% of Cerevel's publicly traded stock immediately following the De-SPAC Transaction.

47.     In connection with the De-SPAC Transaction, Cerevel entered into an Amended and Restated Registration and Shareholder Rights Agreement, dated October 27, 2020, as well as certain other related shareholder agreements (collectively, the "Shareholder Rights Agreements").

48.     The Shareholder Rights Agreements provided Bain and Pfizer with the right to nominate directors to the Cerevel Board based on their percentage ownership of Cerevel's securities (with decreasing rights if Bain and Pfizer's ownership percentages decreased).  In effect, Bain had the right to nominate six representatives to Cerevel's 12-person Board of Directors (with two such representatives required to be independent and subject to Pfizer's prior written consent), while Pfizer had the right to nominate two additional representatives to the Board.

49.     The Shareholder Rights Agreements also provided Bain and Pfizer with the right to require Cerevel to offer additional shares to the public.  Specifically, the Shareholder Rights Agreement provided Bain and Pfizer with the right to direct Cerevel to file a registration statement and use reasonable best efforts to cause the registration of all or part of their registrable securities. The Shareholder Rights Agreements also provided Bain and Pfizer with the right to cause Cerevel to file a shelf registration statement pursuant to Rule 415 of the Securities Act and use reasonable best efforts to cause the registration of all or a portion of their registrable securities.

50.     The Shareholder Rights Agreements further provided Bain and Pfizer with preemptive rights to purchase their *pro rata* proportion of any newly issued Cerevel common stock. This effectively guaranteed Bain and Pfizer could maintain their control of Cerevel.

51.     Finally, the Shareholder Rights Agreements provided Bain and Perceptive with certain rights to receive expense reimbursement and indemnification in connection with underwritten sales of their Company common stock.

52.     For these reasons, Arya II's proxy statement seeking shareholder approval of the De-SPAC Transaction warned that "The Bain Investor and Pfizer will have significant influence over us after completion of the Business Combination."

**C. Bain and Pfizer Maintain Control of Cerevel Following the De-SPAC Transaction**

53.    Bain and Pfizer collectively controlled Cerevel following the De-SPAC Transaction based on their majority ownership of Cerevel's outstanding stock and the nomination of the majority of Cerevel's Board of Directors.

54.    Bain and Pfizer's control of Cerevel continued at all relevant times from Cerevel's formation through the close of the August 1, 2024 Merger with AbbVie.  Indeed, Cerevel disclosed in its SEC filings that it is a "controlled company" under the applicable NASDAQ rules.  Cerevel's 2023 Form 10-K (filed February 27, 2024) also warned that Bain Investors and Pfizer "have significant influence over us and may have interests different from yours."  The warning continued, noting:

> As of December 31, 2023, Bain Investors and Pfizer own, collectively, approximately 51.3% of the outstanding shares of our common stock. Furthermore, so long as they own certain specified amounts of our equity securities, Bain Investor and Pfizer have certain rights to nominate our directors. As long as such entities each own or control a significant percentage of outstanding voting power, they will have the ability to strongly influence all corporate actions requiring stockholder approval, including the election and removal of directors and the size of our board of directors, any amendment of our certificate of incorporation or bylaws, or the approval of the Merger or any other merger or other significant corporate transaction, including a sale of substantially all of our assets.

55.    Eleven of the twelve-person Cerevel Board at the time of the Proxy were nominated by or were affiliated with Bain, Pfizer, and/or Perceptive:

| **Director** | **Affiliation** |
|---|---|
| 1.  Ron Renaud | Former Bain employee |
| 2.  Chris Gordon | Bain employee |
| 3.  Adam Koppel | Bain employee |

| 4.   Deval Patrick | Former Bain employee |
|---|---|
| 5.   Dr. Ruth McKernan | Bain nominee and former Pfizer executive |
| 6.   Gabrielle Sulzberger | Bain nominee and worked at Bain as an associate |
| 7.   Marijn Dekkers | Bain nominee and has served as a director for other Bain-funded companies, such as Gingko Bioworks Holdings, Inc. and Soaring Eagle Acquisition Corp. |
| 8.   Norbert Riedel | Bain nominee |
| 9.   Douglas Giordano | Managing Director of Perceptive (former Pfizer employee) |
| 10. Deborah Baron | Pfizer employee |
| 11. Suneet Varma | Pfizer employee |
| 12. N. Anthony Coles | N/A |

**D. Bain Appoints Its Partner Ron Renaud as Cerevel's CEO and Manages Cerevel's Search for Regional Partners, Which Included Discussions with AbbVie**

56.     As of Cerevel's 2022 annual report dated February 22, 2023, Cerevel had four "lead" drug programs: (i) emraclidine (a potential treatment for schizophrenia and Alzheimer's disease psychosis); (ii) darigabat (a potential treatment for both epilepsy and panic disorder); (iii) tavapadon (a potential treatment for Parkinson's disease); and (iv) CVL-871 (a potential treatment for dementia-related apathy).

57.     In early 2023, Cerevel commenced discussions regarding various regional partnerships for its lead asset, emraclidine, a M4-selective positive allosteric modulator in development for schizophrenia and Alzheimer's disease psychosis.  As part of the partnership search process, representatives of Cerevel contacted 17 potential counterparties, including AbbVie, who might be interested in a Japanese partnership for emraclidine and executed confidentiality

agreements with eight potential partners, including with AbbVie. After Cerevel and AbbVie executed a confidentiality agreement on March 28, 2023, AbbVie commenced a lengthy due diligence process into the Company and emraclidine in particular. The discussions regarding potential regional partnerships and due diligence also later expanded to include another of Cerevel's leading drug candidates, tavapadon, a D1/D5 partial agonist that was at the time in Phase 3 development for the treatment of Parkinson's disease.

58.     On May 3, 2023, Cerevel announced the appointment of Ron Renaud as President, Chief Executive Officer, and a member of the Board, effective June 12, 2023. Renaud was previously a partner at Defendant Bain and following his appointment as Cerevel CEO, remained at Bain as a Senior Advisor.

59.     Under Renaud's leadership, Cerevel continued to pursue a potential regional partnership in Japan, including with AbbVie. AbbVie eventually made a non-binding offer to serve as Cerevel's Japanese partner for emraclidine in May 2023.

60.     On a May 3, 2023 earnings call for the first quarter of 2023, coinciding with the announcement of the appointment of Renaud as CEO, an analyst at Evercore ISI Institutional Equities asked about Cerevel's potential pursuit of a strategic transaction, noting that an "SEC filing recently surfaced which said that your SPAC sponsor is currently engaging in preliminary discussions about a potential strategic transaction. Tony, if you could offer any color on this, and is this in any way related to your stepping down as CEO?"

61.     Mr. Anthony Coles, the then-CEO and Chairman of Cerevel, responded, "Thanks for the question, Mike. And on the SEC filing from one of our investors, this was a filing that Perceptive made. There are no strategic transaction conversations underway, so I can dispense with that."

62.     On Cerevel's August 2, 2023 earnings call for the second quarter of 2023, Cerevel and Renaud likewise indicated that Cerevel was evaluating "partnerships and regional collaborations in service of meaningful value creation for our patients and our shareholders" but did not discuss nor indicate the possibility of more comprehensive strategic transactions, such as a sale of the whole Company.

63.     Also during the August 2, 2023 earnings call, Renaud indicated that Cerevel had $825 million in cash and marketable securities on its balance sheet, which provided the Company with "runway comfortably into 2025." Renaud stated that "opportunistically bolstering the balance sheet remains a priority for the company to ensure we maintain the financial strength to maximize the value of our broad pipeline."

64.     Following AbbVie's non-binding offer in May 2023 to form a partnership in Japan, discussions between Cerevel and AbbVie regarding the potential partnership continued until August 2023, including AbbVie conducting certain due diligence related to Cerevel's leading drug candidates, emraclidine and tavapadon, and meeting with Cerevel management in Japan. In August 2023, Cerevel indicated to AbbVie that its non-binding, indicative terms were not sufficient for AbbVie to continue participating in the regional partnership process.

65.     Cerevel also had ongoing discussions regarding a Japanese partnership with other parties. In connection with the discussions with AbbVie and other parties, on August 31, 2023, the Cerevel Board created a special transaction committee (the "Special Committee"). The Special Committee was "established for the express purpose of overseeing the process and considering the terms and conditions associated with a potential royalty or royalty-like financing transaction (which may be structured as a true sale, synthetic royalty or otherwise and may require the granting of security interest in all or a portion of the Company's assets) with respect to the Company's

emraclidine program." The Special Committee included Defendants Koppel and Giordano, who were appointed to the Cerevel Board by Bain and Perceptive, respectively.

### E. In September 2023, the Cerevel Board Learns of and Reacts to AbbVie's Interest in a Whole-Company Acquisition

66.     By no later than the end of September 2023, the Cerevel Board knew that AbbVie had shifted its interest from a Japanese partnership to a whole-company acquisition. AbbVie's interest in acquiring Cerevel was the culmination of the months of diligence that it had conducted into two of Cerevel's leading drug candidates in connection with the Japanese partnership.

67.     On September 23, 2023, Paul Burgess (Cerevel Chief Business Development & Strategic Operations Officer) emailed Frank Fekete, a Managing Director at Centerview (Cerevel's financial advisor) an "Updated Tracker" titled "Cerevel BD Contact Log_2023.09.15_CD comments." Mr. Burgess's cover email stated that it was a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The Excel tracker included a row for AbbVie and, under a "Commentary" column, stated that AbbVie had ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮▮▮▮ Under the column labeled "Next Steps," the document stated for AbbVie: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

68.     On September 25, 2023, AbbVie formally notified Cerevel that it was withdrawing its interest in a Japanese regional partnership with Cerevel. That is, AbbVie reinforced its pivot to an outright acquisition of Cerevel by formally informing the Company that it would not improve its July 20, 2023 bid for the Japanese partnership. According to the Proxy, during the September 25, 2023 exchange, AbbVie did not indicate its interest in a whole-company acquisition. However, this statement in the Proxy is misleading because, as detailed above, just two days before that, Mr. Burgess had emailed Cerevel's financial advisors at Centerview, informing them that AbbVie had

completed meaningful diligence, had indicated it was indeed interested in a whole-company acquisition, and that Cerevel was awaiting a term sheet.

69.     On September 27, 2023, Cerevel held a board meeting where it invited its financial advisors at Centerview to discuss, among other things, "potential strategic paths forward" including "M&A themes and trends."

70.     All Board members, as well as two additional Bain Capital representatives (Will Cozean and Ricky Sun), attended the September 27, 2023 meeting.  Following discussion acknowledging the Centerview presentation would include strategic paths forward where Pfizer may have a conflict, the Cerevel Board, inclusive of Pfizer's designees Defendants Baron and Varma, determined that Pfizer "could be an interested party if Cerevel were to engage in a strategic process for the potential acquisition of Cerevel" and decided to recuse Pfizer's two directors from a portion of the meeting.

71.     At the September 27, 2023 meeting, Centerview advised Cerevel's Board that a sale of the Company would be difficult prior to the Company's highly anticipated emraclidine results, which were expected in December 2024.  However, Centerview highlighted that in the industry a "significant majority of M&A transactions have been initiated through partnership discussions in the last few years," such as the Japanese partnerships conversations with AbbVie.

72.     Also at the September 27, 2023 Board meeting, Centerview presented a preliminary "Illustrative M&A Scenario," which calculated that, if Cerevel completed a $400 million follow-on equity offering (it ultimately completed a $500 million offering), Cerevel's implied merger-and-acquisition ("M&A") value would be ███ per share.  Centerview also noted that ███████████
████████████████████████████

73.     According to the Proxy, at the September 27, 2023 meeting, the Board directed Cerevel management to continue to execute on its strategic plan and develop options to extend Cerevel's cash runway into 2026, which would be expected to provide Cerevel with at least 12 months of capital beyond the anticipated data readout of the Phase 2 trials of emraclidine for the treatment of schizophrenia in the second half of 2024.

74.     According to the Proxy, the Board also directed Cerevel management to advise AbbVie "that Cerevel was focused on a potential regional partnership in Japan and was not considering other strategic transactions."  However, in reality, in a September 29, 2023 email from Centerview Managing Director Frank Fekete to Defendant Renaud in preparation for an upcoming conversation with Nicholas Donoghue (AbbVie's Executive Vice President Chief Business Strategy Officer), Centerview's proposed talking points included stating that Renaud was ████████████████████████ and that he █████████████████████████████████ ███████████████ Significantly, that Cerevel was planning to have Renaud—and not the Special Committee (which was formed to negotiate partnerships for emraclidine)—respond to AbbVie indicates that Cerevel fully understood that AbbVie was focused on a whole-company acquisition, not just a regional partnership.

75.     Moreover, by October 5, 2023, in response to AbbVie's indication of interest, Cerevel had started to put together a data room for a potential whole-company sales process with AbbVie.

76.     By early October 2023, Bain and Perceptive—through their significant ownership of Cerevel, their appointments of members of the Cerevel Board of Directors, and the appointment of a Bain partner as CEO of Cerevel—knew: that AbbVie had conducted several months of due diligence on Cerevel and its lead assets; that after this extensive diligence, AbbVie had shifted its

focus from the Japanese Partnership to a "whole co" acquisition of Cerevel; that AbbVie expected to imminently submit a formal term sheet for such an acquisition: management was "await[ing]" the term sheet's arrival; and that Cerevel's Board had met to launch a sales process and had prepared "talking points" for responding to AbbVie while directing the Company to prepare a data room for the sales process.  In other words, Bain and Perceptive knew that AbbVie's interest in acquiring Cerevel was serious, well-informed, and imminent.  Bain and Perceptive also knew that the Company's sale price in a whole-company acquisition scenario was likely to be substantially above—perhaps more than double—Cerevel's then-current trading price.

### F.  Bain and Perceptive Engage in Unlawful Insider Trading

77.    On October 10, 2023, Cerevel's Board, still controlled by Bain and Pfizer, approved the October Offering of common stock.  According to the Proxy, "the Board determined that extending the cash runway for Cerevel into 2026 by way of a public equity offering would best position Cerevel for future success."  However, just over a month earlier at an August 31, 2023 meeting of the Cerevel Board of Directors, the Board had discussed that it had not urgently needed cash and that it had a capital runway until May 2025.

78.    The October Offering was one of several capital raise options considered by the Cerevel Board.  ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████    Once the AbbVie transaction arose, the October Offering was Bain and the Cerevel Board's best option because it allowed Bain to, risk free: (1) raise money for the Company to make it more valuable and attractive to AbbVie; (2) grab $100+ million in extra profit; and (3) ████████████████████████████████████████

███ by diluting shareholders in the October Offering while maintaining its and Pfizer's collective relative percentage ownership enough to retain control.

79.    On October 11, 2023, Cerevel publicly announced the October Offering of $450 million of its shares, which ultimately was increased to Cerevel offering 22,687,417 shares at a price of $22.81 per share, raising a total of just under $500 million.

80.    The October Offering was announced on October 11, 2023 through a press release ("October 11, 2023 Press Release") and the filing of a preliminary prospectus supplement to a registration statement on Form S-3 (known as a "shelf" registration) dated November 18, 2022 ("October 11, 2023 Preliminary Prospectus Supplement").

81.    In a section titled "Use Of Proceeds," the October 11, 2023 Preliminary Prospectus Supplement stated, "We currently intend to use the net proceeds from this offering, together with our existing cash, cash equivalents and marketable securities, to support our ongoing and planned clinical trials and other research and development activities, and for working capital and other general corporate purposes, including to extend our cash runway into 2026."

82.    Neither the October 11, 2023 Preliminary Prospectus Supplement nor the October 11, 2023 Press Release disclosed that Cerevel was in discussions with AbbVie regarding a whole-company sale nor that, just days earlier, the Cerevel Board had met with its financial advisors at Centerview regarding AbbVie's interest and other potential strategic transactions nor that Cerevel was pulling together a data room and "awaiting a term sheet" from AbbVie.

83.    On October 12, 2023, Cerevel filed a Form 8-K with the SEC, which attached copies of Cerevel's underwriting agreement with Goldman Sachs & Co. LLC ("Goldman Sachs") and a copy of the October 11, 2023 Press Release.

84.    Also on October 12, 2023, Cerevel filed a prospectus supplement regarding the offering ("October 12, 2023 Prospectus Supplement"). The October 12, 2023 Prospectus Supplement also failed to disclose the ongoing discussions with AbbVie, the related Board meeting

with Centerview, the process of pulling together a data room, and that Cerevel was awaiting a term sheet from AbbVie.

85.    The October Offering closed on October 16, 2023.  In total, Cerevel offered 22,687,417 shares for $22.81 per share, raising just shy of $500 million after transaction expenses.

86.    Bain acquired 5,480,052 shares of common stock from the October Offering for $124,999,986.  Bain filed a Schedule 13D on October 18, 2023, disclosing the purchase of shares from the October Offering.  The public attention from Bain's purchase in the secondary offering was substantially muted in comparison to the attention that would have resulted from an open-market purchase on that magnitude.

87.    Bain's October 18, 2023 Schedule 13-D disclosed that, following the October Offering, Bain held 65,679,781 shares of Cerevel, representing approximately 36.2% of Cerevel's outstanding stock, and Pfizer owned 27,349,211 shares of Cerevel, or 15.1% of the Cerevel's outstanding stock.  The Schedule 13D noted that, as a result of certain "voting arrangements," Bain and Pfizer "may be deemed to be a group for purposes of Section 13(d) under the Securities Exchange Act of 1934, as amended."  Together, Bain and Pfizer continued to control the Company, including together owning approximately 51.6% of Cerevel's outstanding stock.

|  | Shares Held Before October Offering | Percent Ownership | Shares Held After October Offering | Percent Ownership |
|---|---|---|---|---|
| **Bain** | 60,199,729 | 38.2% | 65,679,781 | 36.4% |
| **Pfizer** | 27,349,211 | 17.4% | 27,349,211 | 15.2% |
| **Total Bain + Pfizer** | 87,548,940 | 55.6% | 93,028,992 | 51.6% |
| **Total Cerevel Shares Outstanding** | 157,487,636 | | 180,278,078 | |

88.     Bain's October 18, 2023 Schedule 13D also disclosed that it had entered into a lock-up agreement ("October Lock-Up Agreement") "pursuant to which the Reporting Person agreed, subject to certain exceptions, not to sell or offer to sell any shares of Common Stock or securities convertible into or exercisable or exchangeable for, shares of Common Stock for a period of 45 days after the date of the prospectus relating to the October 2023 Offering without the prior written consent of the representative."   The October Lock-Up Agreement, thus, was set to expire on November 26, 2023.

89.     Bain had material non-public information regarding the status of the ongoing negotiations with AbbVie for a whole-company acquisition and Cerevel's launch of a sales process at the time it purchased shares from the October Offering through its control of Cerevel, including through its stock ownership, appointment of Renaud as CEO, and control of the Board.

90.     Notably, Goldman Sachs allocated Bain the entire 5,480,052 shares it requested in connection with the October Offering.  According to a Goldman Sachs document, Goldman Sachs did not allocate to certain other large investors all the shares those investors requested.  ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Of course, Goldman Sachs, the underwriter for the October Offering, worked for Cerevel, which was controlled by Bain and Pfizer.

91.     Perceptive acquired an additional 876,808 shares in the October Offering for approximately $20 million cash.  Perceptive also knew about the imminent AbbVie acquisition and Cerevel's launch of a sales process through its Managing Director and Cerevel Board member, Defendant Giordano.

**G. AbbVie and Cerevel Continue to Negotiate and Ultimately Agree that AbbVie Will Acquire Cerevel at Nearly Double the October Offering Price**

92.    On October 17, 2023, Nicholas Donoghue of AbbVie emailed Paul Burgess of Cerevel ▮▮▮▮▮▮ regarding their previous discussions.  Centerview advised Burgess and Renaud that, for their discussion with AbbVie regarding a potential deal, they recommend the ▮▮▮▮▮▮▮▮▮▮ as Centerview had advised in the September 29th "talking points" email.

93.    On October 19, 2023, AbbVie made a written, nonbinding indication of interest to acquire Cerevel for $35 per share.  The $35 per share offer was a premium of 53% to the October Offering price set less than one week prior.

94.    On October 24, 2023, the Cerevel Board met to consider AbbVie's $35 per share proposal.  According to the Proxy, after discussion with Centerview and legal counsel, the Cerevel Board decided to respond to AbbVie that the $35 per share offer was insufficient and that AbbVie would need to meaningfully increase its offer for the Board to consider a strategic transaction.

95.    Cerevel and Bain continued to hide AbbVie's interest and the real reason for the October Offering during Cerevel's November 1, 2023 earnings call.  Specifically, when asked "what drove the decision to proactively raise equity capital ahead of your multiple clinical data events in 2024," CEO Renaud responded, "on the capital raise . . . I think largely, this was one thing that we have been talking to a number of investors about over the last few months.  And there was significant amount of interest in doing the raise from outside investors.  And so we thought it was a good time to do that so that we could really be focused on execution in 2024."  Cerevel CFO Altschuller added to Renaud's response on the capital raise, reiterating that the purpose of the cash raise was to "get[] us into 2026."  Cerevel and Renaud wholly omitted that the October Offering

was conducted to provide Bain and Perceptive the opportunity to purchase shares and to remove the "finance overhang," increasing Cerevel's value for a potential whole-company transaction.

96.     Despite again omitting from investors the interest from AbbVie, Defendants internally continued to push full force ahead on a sale of the Company.  On November 6, 2023, Bain Senior Advisor and Cerevel CEO Renaud met with Richard Gonzalez, chairman of the AbbVie Board and AbbVie's CEO, regarding potential next steps following AbbVie's October 19, 2023 proposal.

97.     The next day, November 7, 2023, AbbVie made a revised indication of interest to acquire Cerevel for $40 per share.

98.     On November 8, 2023, the Board met with Centerview to discuss the sales process. During this meeting, Centerview showed the Board a discounted cash flow analysis, based on management's model, implying the Company was worth between ██ per share and ██ per share. The Board then met to review the Company's preliminary business plan and "refine" the projections.  Notably, the Company's financial projections did not meaningfully change from November 8, 2023 through the date of the Proxy, despite Centerview, Cerevel, and the Cerevel Board stating that the significantly deflated $45 per share Merger price was fair and in the best interests of Cerevel stockholders.

99.     On November 10, 2023, Renaud again met with representatives from AbbVie to discuss the latest $40 per share proposal.

100.     On November 11, 2023, the Cerevel Board determined to advise AbbVie that its offer of $40 per share was insufficient and that AbbVie would need to increase its offer to a price per share in the mid-$40 range to justify Cerevel providing additional confidential information to AbbVie.  During this meeting, Centerview opined that, accepting the Company's value of $39 per

share implied by the "Preliminary Management Case," large pharmaceutical companies like AbbVie had the ability to pay up to ▮ per share for Cerevel.

101.    On November 17, 2023, AbbVie increased its offer to $41.50 per share, which Renaud immediately advised was insufficient.  AbbVie then indicated it would be willing to increase its offer to $45 per share, subject to the completion of due diligence and being able to announce the transaction prior to the Christmas holiday.

102.    On December 6, 2023, at 4:34 p.m. eastern time, *Reuters* reported that AbbVie and Cerevel were nearing a potential transaction.

103.    About an hour later, AbbVie and Cerevel issued a joint press release announcing the companies had reached an agreement where AbbVie would acquire Cerevel for $45 per share.

104.    On December 7, 2023, AbbVie held an investor call to discuss its strategic rationale for the Cerevel acquisition.

105.    The price of Cerevel's stock increased from $36.93 per share at close on December 6, 2023 (the end of the trading day prior to the deal announcement) to $41.13 per share at close on December 7, 2023.  That day alone created a profit for Bain of more than $23 million on the shares it purchased through the October Offering.

## H. Bain and Pfizer Cause Cerevel to Issue a False and Misleading Proxy Statement in Order to Garner Shareholder Support for the Merger

106.    Cerevel issued its Definitive Merger Proxy on January 18, 2024.  Cerevel's Board recommended in the Proxy that shareholders vote to approve the Merger with AbbVie.  The Proxy also indicated that Defendant Bain had entered into a support agreement and would vote for the proposed Merger.

107.    Bain and Pfizer were in full control of Cerevel at the time of the Proxy.  Indeed, as of the January 8, 2024 Record Date, Bain held voting power over 65,679,781 Company shares

(approximately 36.2% of the outstanding Company shares), and the Proxy indicated that Bain and Pfizer collectively held 51.3% of the Company's outstanding shares.  At least half of the Cerevel Board also had some affiliation with Bain, and Bain had recently installed one of its former partners, Renaud, as CEO of the Company.

108.    Significantly, the Proxy misled investors regarding the timing of AbbVie's interest in a whole-company acquisition and the timing of Cerevel's launch of a sales process.  Remarkably, the Proxy indicated that the September 25, 2023 conversation between Cerevel and AbbVie "focused on Cerevel's retention of commercial rights in Japan and AbbVie did not indicate that an offer to acquire Cerevel would be forthcoming."  Likewise, the Proxy stated that AbbVie's initial offer on October 19, 2023 was an "unsolicited offer," misleadingly implying that it was the first indication of interest.

109.    In reality, no later than September 23, 2033, AbbVie had indicated to Cerevel that it was interested in a whole-company acquisition; on September 27, 2023, the Cerevel Board met to discuss the AbbVie interest and launch a sales process; on September 29, 2023, Centerview and Renaud emailed about "talking points" for responding to AbbVie's interest; and by October 4, 2023, Cerevel had started pulling together a data room for a sale transaction.

110.    The misleading statements and omissions of facts in the Proxy regarding the timing of AbbVie's indication of interest and Cerevel's response of launching a sales process were material because they hid from investors that Bain and Perceptive purchased shares from the October Offering with material non-public information regarding an anticipated sale of the Company, and Bain and Perceptive knew their profits on the shares purchased in the October Offering were baked in if the Merger closed.

111.    The misleading statements regarding the timing of AbbVie's indication of interest also hid from investors that AbbVie was significantly ahead of other potential bidders, who Cerevel did not begin reaching out to until October 24, 2023, and that, as a result, the Cerevel Board did not fairly and fully explore all potential strategic options.  Indeed, the Proxy indicated that the October 19, 2023 AbbVie offer was "unsolicited," leaving out that Cerevel had been "awaiting" a term sheet from AbbVie for nearly a month.

112.    The Proxy also contained misstatements and omitted material facts regarding Centerview's financial analysis.  Pages 58-59 of the Proxy included a Discounted Cash Flow Analysis that "calculated a range of implied equity values per Company Share" of $35.20 to $43.45 per share.  The Proxy also included other analyses by Centerview, including a "Historical Stock Trading Price Analysis," "Analyst Price Target Analysis," and "Precedent Premium Paid Analysis."

113.    However, the Proxy excluded important financial analyses by Centerview that did not support the Merger price.  *First*, the Proxy omitted that in September 2023—days before the October Offering—Centerview had presented to the Board an "Illustrative M&A Scenario" that valued the Company at █ per share.  *Second*, the Proxy omitted that on November 8, 2023, when discussing with the Board AbbVie's $40 per share proposal, Centerview presented a financial analysis to the Board that included a discounted cash flow model based on management's financial projection implying the Company was worth between █ and █ per share.  *Third*, the Proxy omitted that on November 11, 2023, Centerview calculated that, based on the Company's "Preliminary Management Case," which implied the Company's value of $38 per share, a large pharmaceutical company like AbbVie had the ability to pay up to █ per share for Cerevel.

## V.    ADDITIONAL ALLEGATIONS RELATING TO DEFENDANTS' SCIENTER

114.    In addition to the facts set forth above, the following paragraphs set forth additional indicia of Defendants' scienter relating to the fraud alleged in this Complaint.

115.    Defendant Bain, who at all times controlled Cerevel with Pfizer, was highly motivated to identify and close a sale to exit its position in Cerevel while it stood to make an enormous profit.  Bain's investment in Cerevel totaled about $475 million—the $250 million initial investment, the $100 million PIPE investment, and the $125 million investment through the October Offering.  At the $45 per share Merger price, Bain received approximately $2.7 billion, *more than five times its investment*.  Given that Bain unfairly, significantly increased its position through the October Offering, Bain's profit was so extraordinary that it did not need to squeeze every dollar for shareholders; the important thing to Bain was that the transaction was consummated.

116.    Notably, Bain acquired the $125 million worth of additional Cerevel shares from the October Offering essentially without risk.  At the time, Bain had material non-public information regarding AbbVie's acquisition interest, and Bain knew that, with Pfizer, it controlled Cerevel and could (and did) ensure that an agreement was reached with AbbVie.  Bain's Board designees also had, just weeks before, sat in meetings in which Centerview advised that most biopharmaceutical mergers are the result of partnership discussions such as the ones ongoing with AbbVie and that Cerevel's M&A value was significantly higher than its market price.  Thus, Bain knew the shares it was purchasing were shortly thereafter going to be acquired at a significant premium.

117.    The same goes for Perceptive.  Perceptive acquired $20 million worth of shares in the October Offering while having, through its Board designee, material non-public information

that AbbVie was imminently going to provide a term sheet to acquire Cerevel at a significant premium.

118.    Bain and Perceptive also understood that the $500 million October Offering would have an outsized impact on Cerevel's overall valuation, increasing its M&A value by significantly more than the cash raised from the offering itself.  Indeed, Centerview advised the Board in September 2023 that a follow-on offering would be a valuation catalyst because, among other things, it would remove the "financing overhang."  Centerview also advised the Board that Cerevel's M&A price per share after a follow-on offering could range from █ to █ per share.

119.    Following the October Offering, Bain held approximately 65 million Cerevel shares at a cost basis of approximately just $7.30 per share.  Accordingly, Bain was highly motivated to agree to and close the Merger with AbbVie as quickly as possible.  After boosting its position and Cerevel's overall value through the October Offering, Bain wanted to quickly exit its position before Cerevel's trial data was received and had the potential to plummet the Company's value. Selling to AbbVie was Bain's best option, as Centerview had repeatedly advised Cerevel's Board that a sale of the Company before receiving trial results would be unlikely, not to mention that before the October Offering AbbVie had already completed meaningful diligence in connection with the potential Japanese partnership, which led to its interest in a whole-company acquisition.

120.    Defendant Renaud was also highly motivated to sell Cerevel.  Despite only being the CEO from June 2023 until August 1, 2024, Renaud received nearly $74 million in compensation in connection with his time at Cerevel and the sale of the Company, consisting of approximately $1.8 million in cash, $47.8 million in equity, $43,000 in benefits, and $24.3 million in tax reimbursement.  Renaud was also at all times affiliated with Bain and incentivized to maximize Bain's profit from its investment in Cerevel.

## VI.    FALSE AND MISLEADING STATEMENTS

### A.  October 11, 2023 Press Release

121.    On October 11, 2023, Cerevel issued the October 11, 2023 Press Release, announcing that it had commenced the October Offering, a secondary offering of approximately $450 million worth of shares of its common stock at a price of $22.81 per share.  The October 11, 2023 Press Release was attached to a Form 8-K filed with the SEC and referred investors to a registration statement relating to the offering of common stock dated November 8, 2022 and noted the "offering of common stock is being made only by means of a prospectus supplement and accompanying prospectus."

122.    The October 11, 2023 Press Release was false and misleading and omitted material facts regarding: (a) AbbVie's interest in a whole-company acquisition; (b) Cerevel's launch of a related sales process, including working with Centerview and pulling together a data room; and (c) that the October Offering was being conducted to provide Bain and Perceptive the opportunity to increase their positions in advance of the anticipated AbbVie Merger.

### B.  October 11, 2023 Preliminary Prospectus Supplement

123.    Also on October 11, 2023, Cerevel filed with the SEC the October 11, 2023 Preliminary Prospectus Supplement, a Preliminary Prospectus Supplement to its Prospectus dated November 18, 2022.

124.    In a section titled "Use Of Proceeds," the October 11, 2023 Preliminary Prospectus Supplement stated, "We currently intend to use the net proceeds from this offering, together with our existing cash, cash equivalents and marketable securities, to support our ongoing and planned clinical trials and other research and development activities, and for working capital and other general corporate purposes, including to extend our cash runway into 2026."

125.    The October 11, 2023 Preliminary Prospectus Supplement also included information regarding Cerevel's business, "corporate history" – including its 2020 merger with Arya II – and incorporated the "Risk Factors" contained in Cerevel's most recent annual report.

126.    The October 11, 2023 Preliminary Prospectus Supplement, including the language in the "Use of Proceeds" section, was false and misleading and omitted material facts regarding: (a) AbbVie's interest in a whole-company acquisition; (b) Cerevel's launch of a related sales process, including working with Centerview and pulling together a data room; and (c) that the October Offering was being conducted to allow Bain and Perceptive the opportunity to increase their positions in advance of the anticipated AbbVie Merger.

### C.  October 12, 2023 Form 8-K and Press Release

127.    On October 12, 2023, Cerevel issued a Form 8-K announcing it had entered into an underwriting agreement with Goldman Sachs in connection with the October Offering and that it was offering 19,729,189 shares at a public offering price of $22.81 per share (or 22,687,417 shares if the underwriters exercised in full their option to purchase additional shares).

128.    The October 12, 2023 Form 8-K also attached a press release issued late on October 11, 2023, announcing the price of the offering was $22.81 per share.

129.    The Form 8-K and attached press release were false and misleading and omitted material facts regarding (a) AbbVie's interest in a whole-company acquisition; (b) Cerevel's launch of a related sales process, including working with Centerview and pulling together a data room; and (c) that the October Offering was being conducted to allow Bain and Perceptive the opportunity to increase their positions in advance of the anticipated AbbVie Merger.

130.    The pricing of the October Offering at $22.81 per share was also misleading because, at the time, Cerevel already knew that AbbVie, which had already conducted meaningful due diligence relating to two of Cerevel's key drug candidates, was interested in acquiring the

Company at a significant premium to the offering price. Moreover, Centerview had already advised the Board in September 2023 that an "Illustrative M&A Scenario" valued the Company at ▮ per share.

### D. October 12, 2023 Prospectus Supplement

131. On October 12, 2023, Cerevel filed the October 12, 2023 Prospectus Supplement, a Prospectus Supplement regarding the October Offering.

132. The October 12, 2023 Prospectus Supplement repeated the statement in the October 11, 2023 Preliminary Prospectus Supplement regarding "Use Of Proceeds," which stated, "We currently intend to use the net proceeds from this offering, together with our existing cash, cash equivalents and marketable securities, to support our ongoing and planned clinical trials and other research and development activities, and for working capital and other general corporate purposes, including to extend our cash runway into 2026."

133. The October 12, 2023 Prospectus Supplement also repeated information from the October 11, 2023 Preliminary Prospectus Supplement regarding Cerevel's business, "corporate history" – including its 2020 merger with Arya II – and incorporated the "Risk Factors" contained in Cerevel's most recent annual report.

134. The October 12, 2023 Prospectus Supplement similarly failed to disclose the ongoing discussions with AbbVie and the related Board meeting with Centerview to launch a sales process.

135. The October 12, 2023 Prospectus Supplement was also false and misleading because, at the time, Cerevel already knew that AbbVie was interested in acquiring the Company at a significant premium over the offering price. Moreover, Centerview had already advised the Board in September 2023 that an "Illustrative M&A Scenario" valued the Company at ▮ per share.

### E.  November 1, 2023 Earnings Call

136.    Cerevel held its third quarter 2023 earnings call on November 1, 2023.  During the call, an analyst asked, "what drove the decision to proactively raise equity capital ahead of your multiple clinical data events in 2024?"  Cerevel CEO Renaud responded, "on the capital raise… I think largely, this was one thing that we have been talking to a number of investors about over the last few months.  And there was significant amount of interest in doing the raise from outside investors.  And so we thought it was a good time to do that so that we could really be focused on execution in 2024."  Cerevel CFO Altschuller added to Renaud's response on the capital raise, reiterating that the cash "gets us into 2026."

137.    Renaud and Altschuller's response was false and misleading and omitted material facts regarding: (a) AbbVie's interest in a whole-company acquisition, including that by this point AbbVie had already sent a formal letter offering to buy Cerevel for $35 per share; (b) Cerevel's launch of a related sales process, including working with Centerview, pulling together a data room, and reaching out to other potential purchasers of the Company; and (c) the purpose of the October Offering, which was to allow Bain and Perceptive the opportunity to increase their positions in advance of the anticipated AbbVie Merger.

### F.  December 6, 2023 Merger Announcement

138.    On December 6, 2023, Cerevel filed a Form 8-K announcing that it had entered into an Agreement and Plan of Merger with AbbVie whereby AbbVie would acquire all outstanding shares of Cerevel's common stock for $45 per share.  The Form 8-K also stated that BC Perception Holdings, LC, a subsidiary of Bain, entered into a Voting and Support Agreement where it agreed to support the Merger and the adoption of the Merger Agreement.

139.    Also on December 6, 2023, Cerevel and AbbVie jointly issued a press release regarding the proposed transaction.

140.    Both the December 6, 2023 Form 8-K and the press release were false and misleading and omitted material facts about the process whereby Cerevel agreed to be sold to AbbVie.  Specifically, Cerevel hid from investors that AbbVie was interested in a whole-company acquisition prior to the October Offering, thereby obscuring the real reason for the fraudulent October Offering and misleading investors regarding the timeline of the transaction and Cerevel's efforts to reach out to other potential bidders for the Company.  Cerevel also omitted the fact that the Merger price of $45 per share was materially below certain important valuations by Centerview, including the September 2023 "Illustrative M&A Scenario" that valued the Company at █ per share, the November 8, 2023 discounted cash flow analysis that valued the Company between █ per share and █ per share, and the November 11, 2023 calculation that AbbVie had the ability to pay up to █ per share.

### G.  January 18, 2024 Proxy

141.    Cerevel issued the Definitive Proxy Statement on Schedule 14A on January 18, 2024.  The Proxy was issued "By Order of the Board of Directors," and the cover letter accompanying the Proxy was signed by Defendant Ron Renaud and N. Anthony Coles.  In the Proxy, the Board recommended voting "FOR" the adoption of the Merger agreement.

142.    Cerevel's January 18, 2024 Proxy indicated that on September 25, 2023, AbbVie and Cerevel had a conversation and that "[t]he conversation focused on Cerevel's retention of commercial rights in Japan and AbbVie did not indicate that an offer to acquire Cerevel would be forthcoming."

143.    The Proxy stated that AbbVie's initial offer on October 19, 2023 was an "unsolicited offer."

144.    The above two statements wholly misled investors regarding the timeline of AbbVie's interest in a whole-company acquisition of Cerevel.  By no later than September 23,

2023, AbbVie had indicated to Cerevel that it was interested in a whole-company acquisition, and on September 27, 2023, the Cerevel Board met to discuss the AbbVie offer and start a sales process. The omissions of these material facts rendered the above statements in the Proxy false and misleading.

145. The Proxy also omitted the material fact that AbbVie's initial interest in a whole-company acquisition came *prior* to the October Offering. Not only did the lack of disclosure regarding the true timing of AbbVie's interest mislead investors about the real reason for the October Offering, but it also created the false impression that AbbVie was on a level playing field with other bidders, when in reality it had an unfair head-start that made it extremely difficult for other bidders to compete. Again, the omission of the true timing of AbbVie's interest rendered the Proxy false and misleading.

146. The Proxy also contained misstatements and omitted material facts regarding Centerview's financial analysis, including a section titled "Opinion of Centerview Partners LLC" (at pages 56-61), which included a Discounted Cash Flow Analysis that "calculated a range of implied equity values per Company Share" of $35.20 to $43.45 per share (at pages 58-59). The Proxy also included other analyses by Centerview, including a "Historical Stock Trading Price Analysis," "Analyst Price Target Analysis," and "Precedent Premium Paid Analysis."

147. The Proxy also attached as Appendix B a four-page letter from Centerview opining that "the Agreement is fair, from a financial point of view." The letter explained that Centerview "acted as a financial advisor to the Board of Directors of the Company in connection with the Transaction."

148. The Proxy, despite including a section on the "Opinion of Centerview Partners LLC" and a "fairness opinion" letter from Centerview, wholly excluded important financial

analyses presented to the Board by Centerview that did not support the Merger price. *First*, the Proxy omitted that in September 2023—days before the October Offering—it had presented to the Board an "Illustrative M&A Scenario" that valued the Company at ███ per share. *Second*, the Proxy also omitted that on November 8, 2023, when discussing with the Board AbbVie's $40 per share proposal, Centerview presented a financial analysis to the Board that included a discounted cash flow model, based on management's financial projection, implying the Company was worth between ███ per share and ███ per share. *Third*, the Proxy omitted that on November 11, 2023, Centerview calculated that a large pharmaceutical company like AbbVie had the ability to pay up to ███ per share for Cerevel. It was entirely misleading for the Proxy to include certain analyses, including discounted cash flow analyses—which supported the Merger—*while omitting* other Centerview analyses presented to the Board, including alternative discounted cash flow analyses— which indicated that the Merger price was woefully inadequate.

## VII.   LOSS CAUSATION

149.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused Lead Plaintiffs and the Class to suffer substantial losses.

150.   As described herein, Defendants Cerevel and Renaud made or caused to be made materially false and misleading statements and omissions of material facts during the Class Period, October 11, 2023 through August 1, 2024. These materially false and misleading statements and omissions caused the price of Cerevel's common stock to be artificially deflated. Had the truth been known to the market, Cerevel shares would have traded at higher prices throughout the Class Period. Lead Plaintiffs and members of the Fraud Claim Class that sold Cerevel common stock at such artificially deflated prices were damaged thereby and/or when they tendered their shares in the Merger and did not seek available appraisal rights.

151.    In addition, Bain and Perceptive purchased shares of Cerevel common stock at artificially deflated prices while in possession of material non-public information.  Accordingly, Lead Plaintiffs and members of the Insider Trading Claim Class that sold shares contemporaneously with Bain and Perceptive's insider purchases were immediately harmed.

152.    The price of Cerevel common stock significantly increased when Defendants' misrepresentations and omissions of material facts, and/or the effects thereof, were revealed, and/or the risks that had been fraudulently concealed by the Defendants materialized.

153.    On December 6, 2023, the misrepresentations and omissions were partially corrected when AbbVie and Cerevel jointly announced the proposed transaction at $45 per share. However, the whole truth continued to be concealed, including in the Proxy, through the closing of the Merger, thereby depriving investors of an informed decision whether to assert appraisal rights.  Had investors known the full truth regarding AbbVie's timing advantage in the sales process and that the October Offering was conducted to provide Bain and Perceptive with the opportunity to unfairly increase their position in advance of a likely Merger.  Defendants' materially false and misleading statements and omissions of material facts induced Lead Plaintiffs and the Fraud Claim Class to sell Cerevel shares at prices that were below the actual value of those securities, including by selling their shares into the Merger for inadequate Merger Consideration. In addition, had Lead Plaintiffs and members of the Fraud Claim Class not been induced to sell at deflated prices, they could have secured fair value of their shares through appraisal.

154.    The Proxy Claim Class was harmed by the false and misleading statements and omissions of material facts in the Proxy.  As alleged above, the Proxy created a misleading impression of the timing of AbbVie's interest in an acquisition and the launch of the sales process, concealed the real reason for the October Offering, and omitted critical analyses conducted by

Centerview.  Because of the materially false and misleading Proxy, members of the Proxy Claim Class (*i.e.*, investors who held shares of Cerevel common stock on the Record Date) were deprived of the information necessary to exercise a fully informed vote, as well as a fully informed decision whether to dissent and seek appraisal for the fair value of their Cerevel shares, and other available relief.  As alleged herein, Cerevel was far more valuable than the Merger price.

155.    Accordingly, as a result of their sales and holdings of Cerevel's publicly traded common stock during the Class Period, Lead Plaintiffs and other members of the Class suffered economic loss and damages.

## VIII.   CLASS ACTION ALLEGATIONS

156.    Lead Plaintiffs bring this Action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of individuals or entities that:

(a) sold or otherwise disposed of the publicly traded common stock of Cerevel during the period from October 11, 2023 through August 1, 2024, inclusive, and thus were damaged by Defendants' violations of Section 10(b) of the Exchange Act;

(b) held shares of Cerevel as of the January 8, 2024 Record Date and were entitled to vote on the Merger of Cerevel and AbbVie and thus were damaged by Defendants' violations of Section 14(a) of the Exchange Act; and

(c) sold shares of Cerevel stock contemporaneously with Bain and Perceptive's purchases of shares on or about October 16, 2023 and thus were damaged by Bain and Perceptive's violations of Section 20A of the Exchange Act.

157.    The Class excludes Defendants, and their families and affiliates, as well as all other directors and officers of Cerevel, Bain, Pfizer and Perceptive and their families and affiliates.

158.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to

the parties and the Court.  As of the Record Date, Cerevel had 181,427,590 shares of common stock issued and outstanding.  Upon information and belief, there are thousands of members of the Class.

159.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to members of the Class that predominate over questions that may affect individual Class members include:

i.      Whether Defendants violated the Exchange Act;

ii.     Whether Defendants misrepresented material facts;

iii.    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

iv.     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

v.      Whether Bain and/or Perceptive possessed material non-public information at the time of the October Offering;

vi.     Whether the price of Cerevel common stock was artificially deflated during the Class Period;

vii.    Whether Defendants' conduct caused the members of the Class to sustain damages; and

viii.   The extent of damage sustained by Class members and the appropriate measure of damages.

160.    Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

161.    Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.  Lead Plaintiffs have no interests that conflict with those of the Class.

162.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

163.     The market for Cerevel's common stock was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Cerevel's common stock traded at artificially deflated prices during the Class Period.  On October 11, 2023, the Company's stock closed at $22.81 per share.  Lead Plaintiffs and the other members of the Class sold or otherwise disposed of the Company's common stock relying upon the integrity of the market price of Cerevel's common stock and market information relating to Cerevel and have been damaged thereby.

164.     During the Class Period, the artificial deflation of Cerevel's common stock was caused by the material misrepresentations and/or omissions particularized in this Complaint, causing the damages sustained by Lead Plaintiffs and the other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements and/or omitted material facts about AbbVie's interest in a whole-company acquisition.  These material misstatements and/or omissions caused the Company's stock price to be artificially deflated at all relevant times, and when the truth was disclosed, positively affected the value of the Company's common stock.   Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiffs and the other members of the Class selling the Company's common stock at such artificially deflated prices, and each of them has been damaged as a result.  This is particularly true for members of the Insider Trading Claim Class, who sold shares of Cerevel common stock contemporaneously with Bain and

Perceptive's purchases of Cerevel common stock while in possession of material non-public information and were immediately harmed.

165.   At all relevant times, the market for Cerevel's common stock was an efficient market for the following reasons, among others:

(a)   Cerevel stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)   As a regulated issuer, Cerevel filed periodic public reports with the SEC and/or the NASDAQ;

(c)   Cerevel regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)   Cerevel was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.   Each of these reports was publicly available and entered the public marketplace.

166.   As a result of the foregoing, the market for Cerevel's common stock promptly digested current information regarding Cerevel from all publicly available sources and reflected such information in Cerevel's stock price.   Under these circumstances, all sellers of Cerevel's common stock during the Class Period suffered similar injury through their purchase of Cerevel's common stock at artificially deflated prices and a presumption of reliance applies.

167.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material information identified above, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the material undisclosed facts, *i.e.*, that Cerevel was likely to be acquired, that requirement is satisfied.

## X.    NO SAFE HARBOR

168.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Cerevel or Bain who knew that the statement was false when made.

**COUNT I**
**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against Cerevel and Renaud**

169.    Lead Plaintiffs, on behalf of themselves and the Fraud Claim Class, repeat and re-allege each and every allegation contained above as if fully set forth herein.

170.    During the October 11, 2023 to August 1, 2024 Class Period, Cerevel and Renaud carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did:  (i) deceive the investing public, including Lead Plaintiffs and the other Class members, as alleged herein; and (ii) cause Lead Plaintiffs and the other members of the Fraud Claim Class to sell Cerevel's common stock at artificially deflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

171.    Cerevel and Renaud:  (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the sellers of the Company's common stock in an effort to maintain artificially low market prices for Cerevel's common stock in violation of Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

172.    Cerevel and Renaud, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal Cerevel's merger prospects, as specified herein.

173.    Cerevel and Renaud employed devices, schemes, and artifices to defraud, while in possession of material non-public information and engaged in acts, practices, and a course of conduct as alleged herein to conceal from the public the truth regarding AbbVie's interest in a

whole-company acquisition and Cerevel's launch of a sales process, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Cerevel and its merger prospects not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the sellers of the Company's common stock during the Class Period.

174.    Cerevel (as a controlled company) and Renaud (a Bain Partner) had a duty to disclose the truth regarding AbbVie's merger interest and Cerevel's related launch of a sales process when conducting the October Offering where inside shareholders Bain and Perceptive collectively purchased millions of shares while in possession of the material non-public information.

175.    Cerevel and Renaud had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Cerevel's material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Cerevel's merger prospects and supporting the artificially deflated price of its common stock.

176.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Cerevel's common stock was artificially deflated during the Class Period.  In ignorance of the fact that market prices of the Company's common stock was artificially deflated, and relying directly or indirectly on the false and misleading statements made by Cerevel and Renaud, or upon the integrity of the market in which the common stock trades, and/or in the absence of material

information that was known to or recklessly disregarded by Cerevel and Renaud but not disclosed in public statements by Cerevel during the Class Period, Lead Plaintiffs and the other members of the Fraud Claim Class sold Cerevel's common stock during the Class Period at artificially deflated prices and were damaged thereby.

177.    At the time of said misrepresentations and/or omissions, Lead Plaintiffs and the other members of the Fraud Claim Class were unaware of their falsity and believed them to be true.  Had Lead Plaintiffs and the other members of the Fraud Claim Class and the marketplace known the truth regarding AbbVie's interest in acquiring Cerevel and that Cerevel had initiated a sales process in response, which was not disclosed by Cerevel and Renaud, Lead Plaintiffs and the other members of the Fraud Claim Class would not have sold or otherwise disposed of their Cerevel common stock, or, if they had sold such common stock during the Class Period, they would not have done so at the artificially deflated prices at which they sold.

178.    As a direct and proximate result of Cerevel and Renaud's wrongful conduct, Lead Plaintiffs and the other members of the Fraud Claim Class suffered damages in connection with their respective sales of the Company's common stock during the Class Period.

179.    By virtue of the foregoing, Cerevel and Renaud violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

### COUNT II
### Violation of Section 20A of
### The Exchange Act Against Bain and Perceptive

180.    Lead Plaintiffs, on behalf of themselves and the Insider Trading Claim Class, repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

181.    On or about October 16, 2023, Bain purchased 5,480,052 shares of Cerevel common stock, and Perceptive purchased 876,808 shares of Cerevel common stock.

182.    At the time of their purchases of Cerevel common stock on or about October 16, 2023, Bain and Perceptive each possessed material non-public information regarding AbbVie's interest in a whole-company acquisition.  Indeed, at the time of the October 16, 2023 purchases, Bain and Perceptive, through their ownership of Cerevel and Board designees, knew that: AbbVie had already conducted meaningful due diligence into Cerevel and was interested in a whole-company acquisition; Cerevel was "awaiting a term sheet" from AbbVie; Cerevel's Board had already met with Centerview to discuss AbbVie's interest and strategic alternatives; Defendant Renaud had discussed "talking points" for responding to AbbVie; and Cerevel had begun pulling together a data room for a whole-company transaction.

183.    Simply put, Bain created and controlled Cerevel, possessed material non-public knowledge about ongoing merger negotiations that Bain knew or recklessly disregarded would cause the Company's share price to skyrocket when publicly disclosed, and used the October Offering to purchase shares at deflated prices before the non-public information was revealed. Likewise, Perceptive nominated one of its managing directors, Defendant Giordano, to the Cerevel Board, and thus had non-public information regarding AbbVie's interest in a whole-company acquisition and Cerevel's launch of a sales process when it purchased hundreds of thousands of shares of Cerevel stock through the October Offering.

184.    Inside and controlling shareholders, such as Bain and Perceptive, must either disclose material non-public information to the public or abstain from trading.  By choosing to trade while in possession of material non-public information, Bain and Perceptive had a duty to disclose, or to cause Cerevel to disclose, the non-public information regarding AbbVie's interest in a whole-company acquisition and Cerevel's related launch of a sales process.

185.    Because Bain and Perceptive purchased shares of Cerevel common stock while in possession of material non-public information, Bain and Perceptive are liable pursuant to Section 20A of the Exchange Act to the Insider Trading Claim Class—i.e., persons or entities who sold Cerevel common stock contemporaneously with the purchases by Bain and Perceptive.

186.    By virtue of the foregoing, Bain and Perceptive violated Section 20A of the Exchange Act.  *See* 15 U.S.C. § 78t-1(a).

### COUNT III
### Violation of Section 14(a) of
### The Exchange Act Against Cerevel

187.    Lead Plaintiffs, on behalf of themselves and the Proxy Claim Class, repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein. However, the Proxy claims asserted by Lead Plaintiffs and the Proxy Claim Class do not sound in fraud, and Lead Plaintiffs and the Proxy Claim Class expressly disavow and disclaim any allegations of fraud, scheme, or intentional conduct as part of the Proxy claims.  Any allegations of fraud, fraudulent conduct, or motive are specifically disclaimed from the following allegations for the purposes of this Section 14(a) Proxy claim, which does not have scienter, fraudulent intent, or motive as a required element.  To the extent that these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scienter, or intent of the Defendants to defraud Lead Plaintiffs or members of the Proxy Claim Class.

188.    Cerevel made a series of materially untrue statements and omissions of material facts in the Proxy.  As detailed above, these materially untrue statements and omissions of material facts included, among other things, creating a misleading impression of the timing of AbbVie's interest in a whole-company acquisition and Cerevel's launch of a sales process, and omitting critical financial analyses Centerview provided to the Cerevel Board.  Because of the false and

misleading statements and omissions of material facts in the Proxy, Cerevel abdicated its duty to file and distribute to Lead Plaintiffs and the Class a Proxy that was not misleading.  Accordingly, Cerevel violated §14(a) of the Exchange Act.

189.   As a direct result of Cerevel's negligent preparation, review, and dissemination of the false and/or misleading Proxy, Lead Plaintiffs and the Proxy Claim Class were induced to vote their shares and accept inadequate consideration in connection with the AbbVie Merger, foregoing available appraisal rights.

190.   At all times relevant to the dissemination of the materially false and/or misleading Proxy, Cerevel was aware of and/or had access to the true facts concerning the timing of AbbVie's interest in a whole-company acquisition.   Thus, as a direct and proximate result of the dissemination of the false and misleading Proxy that Cerevel used to obtain shareholder approval, convince Cerevel shareholders to forgo their appraisal rights, and thereby consummate the AbbVie Merger, Lead Plaintiffs and the Proxy Claim Class have suffered damages and actual economic losses in an amount to be determined at trial.

191.   The omissions and false and misleading statements in the Proxy were material in that a reasonable stockholder would have considered them important in deciding how to vote on the Merger and/or in deciding whether to assert appraisal rights.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

192.   By virtue of the foregoing, Cerevel violated Section 14(a) of the Exchange Act.

**COUNT IV**
**Violation of Section 20(a) of The Exchange Act**
**Against Bain, Pfizer, and the Director Defendants**

193.   Lead Plaintiffs, on behalf of all Class members, repeat, and re-allege each and every allegation contained above as if fully set forth herein.

194.     Defendants Bain, Pfizer, and the Director Defendants each acted as controlling persons of Cerevel within the meaning of Section 20(a) of the Exchange Act as alleged herein. Defendants Bain and Pfizer also acted as controlling persons of Renaud within the meaning of Section 20(a) of the Exchange Act as alleged herein.

195.     By virtue of Bain and Pfizer's individual and collective ownership of Cerevel stock, Bain's appointment of six members of the Cerevel Board of Directors, Pfizer's appointment of two additional members of the Cerevel Board of Directors, contractual rights, and installment of a Bain partner as Cerevel's CEO, Bain and Pfizer participated in and/or had specific awareness of the Company's merger prospects and were involved in Cerevel and Renaud's false documents filed by the Company with the SEC and disseminated to the investing public.  Bain and Pfizer had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company and Renaud, including the content and dissemination of the various statements which Lead Plaintiffs contend are false and misleading.  Bain and Pfizer were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

196.     Each of the Director Defendants also acted as control persons of Cerevel's alleged wrongdoing.  Indeed, Defendant Renaud signed the cover page of the Proxy and each of the Director Defendants reviewed and approved the Proxy, which was issued "By Order of the Board of Directors."  The Director Defendants also had access to and understood the true timing of AbbVie's interest in a whole-company acquisition (*i.e.*, before the October Offering) and received and reviewed the Centerview valuation analyses that were excluded from the Proxy.

197.    As set forth above, Cerevel and Renaud violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  Cerevel also violated Section 14(a) of the Exchange Act in connection with false and misleading statements and omissions of material facts in the Proxy.  As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages.

198.    By virtue of their positions as controlling persons, Bain, Pfizer, and the Director Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre- and post- judgment interest;

(c)    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

199.    Lead Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: August 13, 2025

Respectfully submitted,

**FARNAN LLP**

By: *Brian E. Farnan*
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Emails:  bfarnan@farnanlaw.com
            mfarnan@farnanlaw.com

*Counsel for Lead Plaintiffs and the Class*

**ENTWISTLE & CAPPUCCI LLP**
Andrew J. Entwistle (*pro hac vice forthcoming*)
Callie Crispin (*pro hac vice forthcoming*)
500 W. 2nd Street, Suite 1900
Austin, Texas 78701
Tel: (512) 710-5960
aentwistle@entwistle-law.com
ccrispin@entwistle-law.com

**ENTWISTLE & CAPPUCCI LLP**
Vincent R. Cappucci (*pro hac vice forthcoming*)
Robert N. Cappucci (*pro hac vice forthcoming*)
Andrew M. Sher (*pro hac vice forthcoming*)
Jessica A. Margulis (*pro hac vice forthcoming*)
230 Park Avenue, 3rd Floor
New York, New York 10169
Telephone:  (212) 894-7200
Facsimile:  (212) 894-7272
Emails:  vcappucci@entwistle-law.com
            rcappucci@entwistle-law.com
            asher@entwistle-law.com
            jmargulis@entwistle-law.com

*Counsel for Lead Plaintiffs and the Class*