# EXHIBIT 5

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

## SCHEDULE 14A

**Proxy Statement Pursuant to Section 14(a) of the
Securities Exchange Act of 1934
(Amendment No.     )**

---

Filed by the Registrant ☒

Filed by a party other than the Registrant ☐

Check the appropriate box:

☐     Preliminary Proxy Statement

☐     **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒     Definitive Proxy Statement

☐     Definitive Additional Materials

☐     Soliciting Material under §240.14a-12

# Cerevel Therapeutics Holdings, Inc.

**(Name of Registrant as Specified In Its Charter)**

**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check all boxes that apply):

☒     No fee required

☐     Fee paid previously with preliminary materials

☐     Fee computed on table in exhibit required by Item 25(b) per Exchange Act Rules 14a-6(i)(1) and 0-11

## CERTAIN RELATIONSHIPS AND RELATED PERSON TRANSACTIONS

Other than compensation and employment-related arrangements, including those described under the sections entitled "*Executive Compensation*," "*Executive Compensation Tables*" and "*Director Compensation*" in this proxy statement, and the transactions described below, since January 1, 2022, there has not been and there is not currently proposed, any transaction or series of similar transactions to which:

- we were, or will be, a participant;

- the amount involved exceeded, or will exceed, $120,000; and

- in which any director, executive officer, holder of 5% or more of any class of our capital stock or any member of the immediate family of, or entities affiliated with, any of the foregoing persons, had, or will have, a direct or indirect material interest.

As used in this proxy statement, the term "Business Combination" refers to the acquisition of Cerevel Therapeutics, Inc. by ARYA Sciences Acquisition Corp II pursuant to a business combination agreement dated July 29, 2020, as amended on October 2, 2020, or the Business Combination Agreement, and pursuant to which Cerevel Therapeutics, Inc. became a wholly owned subsidiary of ARYA Sciences Acquisition Corp II and ARYA Sciences Acquisition Corp II was renamed Cerevel Therapeutics Holdings, Inc.

### Pfizer License Agreement

In August 2018, we entered into a license agreement with Pfizer Inc., which owns more than 5% of our common stock. We refer to the license agreement in this proxy statement as the Pfizer License Agreement. Pursuant to the Pfizer License Agreement, we were granted an exclusive, sublicensable, worldwide license under certain Pfizer patent rights, and a non-exclusive, sublicensable, worldwide license under certain Pfizer know-how, to develop, manufacture and commercialize certain compounds and products, which currently constitute substantially all of our asset portfolio, in the field of treatment, prevention, diagnosis, control and maintenance of all diseases and disorders in humans, subject to the terms and conditions of the Pfizer License Agreement. For additional details regarding the Pfizer License Agreement, see "*Business—Pfizer License Agreement*" of our Annual Report.

As partial consideration for the licensed assets, we issued to Pfizer Inc., 3,833,333.33 shares of Series A-2 Preferred Stock of Cerevel Therapeutics, Inc., a predecessor entity, with an estimated fair value of $100.4 million or $26.20 per share. The 3,833,333.33 shares of Series A-2 Preferred Stock were converted into 26,149,211 shares of common stock upon the closing of our Business Combination. We also reimbursed Pfizer Inc. for $11.0 million of direct expenses related to the Pfizer License Agreement, bringing the total initial consideration to $111.4 million.

Under the terms of the Pfizer License Agreement, we are required to make regulatory approval milestone payments to Pfizer Inc., ranging from $7.5 million to $40.0 million on a compound-by-compound basis, upon the first regulatory approval in the United States for the first product containing or comprised of a given compound, with the amount of the payments determined by which designated group the compound falls into and with each such group generally characterized by the compounds' stage of development. Each such regulatory approval milestone is payable only once per compound. If all of our applicable product candidates are approved in the United States, the total aggregate amount of such regulatory approval milestones payable to Pfizer Inc. would be approximately $190.0 million.

In addition, we are required to pay Pfizer Inc. commercial milestone payments up to an aggregate of $170.0 million per product when aggregate net sales of products under the Pfizer License Agreement in a calendar year first reach various thresholds ranging from $500.0 million to $2.0 billion. Each commercial milestone payment is payable only once upon first achievement of the applicable commercial milestone. If all of our applicable product candidates achieve all of the commercial milestones, the total aggregate amount of such commercial milestones payable to Pfizer Inc. would total approximately $1.4 billion.

We are also required to pay Pfizer tiered royalties on the aggregate net sales during each calendar year, determined on a product-by-product basis with respect to products under the Pfizer License Agreement, at percentages ranging from the low-single digits to mid-teens, with the royalty rate determined by which designated group the applicable compound for such product falls into and with each such group generally characterized by the compounds' stage of development, and subject to certain royalty deductions for the expiration of patent, regulatory and data exclusivity, generic competition and third-party royalty payments as set forth in the Pfizer License Agreement.

50

**Amended and Restated Registration and Shareholder Rights Agreement**

On the closing date of the Business Combination, we entered into an Amended and Restated Registration and Shareholder Rights Agreement with BC Perception Holdings, LP, Pfizer Inc., Perceptive Life Sciences Master Fund Ltd, ARYA Sciences Holdings II and certain individual investors, which agreement was amended by a waiver dated as of January 20, 2021, or as so amended, the Registration and Shareholder Rights Agreement, pursuant to which, among other things, BC Perception Holdings, LP, Pfizer Inc., Perceptive Life Sciences Master Fund Ltd and ARYA Sciences Holdings II, or collectively, the Sponsor Holders, agreed not to effect any sale or distribution of any of our equity securities held by any of them during the lock-up period described therein and were granted certain registration rights and preemptive rights with respect to their respective shares of common stock, and BC Perception Holdings and Pfizer Inc. agreed to cast their votes such that our board of directors would be constituted as set forth in the Business Combination Agreement and the Registration and Shareholder Rights Agreement and would have certain rights to nominate directors to serve on our board of directors, in each case, on the terms and subject to the conditions therein. Pfizer Inc. and BC Perception Holdings, LP each own more than 5% of our common stock.

In particular, the Registration and Shareholder Rights Agreement provides for the following registration rights:

- *Demand registration rights.* We are required, upon the written request of any Sponsor Holder, to file a registration statement and use our reasonable best efforts to effect the registration of all or part of such Sponsor Holder's registrable securities. Promptly upon our receipt of a demand registration request from a Sponsor Holder, we are required to notify all other Sponsor Holders then holding registrable securities of such request and offer each such other Sponsor Holder the opportunity to include its registrable securities in the demand registration statement to be filed.

- *Shelf registration rights.* We are required, upon the written request of any Sponsor Holder, to file a shelf registration statement pursuant to Rule 415 under the Securities Act of 1933, as amended, or the Securities Act, and use our reasonable best efforts to effect the registration of all or a portion of their registrable securities. ARYA Sciences Holdings II and Perceptive Life Sciences Master Fund Ltd were deemed to have given such a request as of the date of the Registration and Shareholder Rights Agreement with respect to all their registrable securities. Promptly upon our receipt of a shelf registration request from a Sponsor Holder, we are required to notify all other Sponsor Holders then holding registrable securities of such request and offer each such other Sponsor Holder the opportunity to include its registrable securities in the shelf registration statement to be filed. At any time that we have an effective shelf registration statement with respect to a Sponsor Holder's registrable securities, such Sponsor Holder may make a written request to effect a public offering, including pursuant to an underwritten shelf takedown. Upon our receipt of an underwritten shelf takedown request from such Sponsor Holder, we are required to notify the other Sponsor Holders with registrable securities covered by the applicable registration statement and offer each such other Sponsor Holder the opportunity to include its registrable securities in the underwritten shelf takedown.

- *Piggyback registration rights.* If we propose to file a registration statement to register any of our equity securities under the Securities Act or to conduct a public offering, either for our own account or for the account of any other person, subject to certain exceptions, the Sponsor Holders are entitled to include their registrable securities in such registration statement.

- *Expenses and indemnification.* All fees, costs and expenses of underwritten registrations will be borne by us and underwriting discounts and selling commissions will be borne by the holders of the shares being registered. The Registration and Shareholder Rights Agreement contains customary cross-indemnification provisions, under which we are obligated to indemnify holders of registrable securities in the event of material misstatements or omissions in the registration statement attributable to us, and holders of registrable securities are obligated to indemnify us for material misstatements or omissions attributable to them.

- *Registrable Securities.* Our securities cease to be registrable securities when a registration statement with respect to the sale of such securities has become effective under the Securities Act and such securities have been disposed of in accordance with such registration statement, such securities have been transferred pursuant to Rule 144 under the Securities Act or such securities have ceased to be outstanding.

- *Lock-up.* In connection with any registration pursuant to any of the registration rights described above that is conducted as an underwritten public offering, each Sponsor Holder, we and our directors and officers will, if requested, execute and deliver a customary lock-up agreement with the underwriter(s) of such underwritten public offering, subject to certain customary exceptions.

Furthermore, under the Registration and Shareholder Rights Agreement, each of BC Perception Holdings, LP and Pfizer Inc. have agreed to cast all votes to which such entities are entitled such that our board of directors would consist of 11 directors, divided into three classes (being Class I, II and III) with Class I consisting of three directors and Class II and III each consisting of four directors.

Case 1:25-cv-00417-GBW     Document 42-5     Filed 10/30/25     Page 5 of 10 PageID #: 542

For as long as BC Perception Holdings, LP holds an amount of our equity securities that is equal to 50% or more of the amount of securities it held at the closing of the Business Combination, it shall be entitled to nominate four directors, with such right (i) decreasing to three directors at such time when BC Perception Holdings, LP holds 35% or more but less than 50% of the amount of securities it held at the closing of the Business Combination; (ii) decreasing to two directors at such time when BC Perception Holdings, LP holds 20% or more but less than 35% of the amount of securities it held at the closing of the Business Combination; (iii) decreasing to one director at such time when BC Perception Holdings, LP holds 5% or more but less than 20% of the amount of securities it held at the closing of the Business Combination; and (iv) terminating at such time when BC Perception Holdings, LP holds less than 5% of the amount of securities it held at the closing of the Business Combination.

For as long as Pfizer Inc. holds an amount of our equity securities that is equal to 50% or more of the amount of securities it held at the closing of the Business Combination, it shall be entitled to nominate two directors, with such right (i) decreasing to one director at such time when Pfizer Inc. holds 20% or more but less than 50% of the amount of securities it held at the closing of the Business Combination; and (ii) terminating at such time when Pfizer Inc. holds less than 20% of the amount of securities it held at the closing of the Business Combination.

Additionally, for as long as BC Perception Holdings, LP holds an amount of our equity securities that is equal to 60% or more of the amount of securities it held at the closing of the Business Combination, it shall be entitled, with the prior written consent of Pfizer Inc. (which consent may not be unreasonably withheld, conditioned or delayed), to nominate two unaffiliated directors to our board of directors. Finally, for as long as Pfizer Inc. holds at least 20% of the amount of securities it held at the closing of the Business Combination, Pfizer Inc. has the right to designate one non-voting observer to attend each meeting of our board of directors or its committees.

As of the date of this proxy statement, N. Anthony Coles was nominated to serve on our board of directors as our chief executive officer; Deborah Baron and Suneet Varma were nominated to serve on our board of directors by Pfizer Inc.; Christopher Gordon, Adam Koppel, Ruth McKernan and Gabrielle Sulzberger were nominated to serve on our board of directors by BC Perception Holdings, LP; Marijn Dekkers and Norbert Riedel were nominated to serve on our board of directors as unaffiliated directors by BC Perception Holdings, LP, with the prior written consent of Pfizer Inc.; and Doug Giordano was nominated to serve on our board of directors as the director mutually agreed by us and ARYA Sciences Holdings II pursuant to the Business Combination Agreement.

In addition, under the Registration and Shareholder Rights Agreement, subject to certain exceptions, in the event that we propose to issue any capital stock or rights, options or warrants to purchase capital stock or other securities convertible into or exchangeable or exercisable for capital stock, or New Securities, each Sponsor Holder has the right to purchase, in lieu of the person to whom we proposed to issue such New Securities, its pro rata proportion of such New Securities. Such preemptive rights will terminate on the earlier to occur of the seventh anniversary of the closing date of the Business Combination and (i) in the case of BC Perception Holdings, LP, the date on which BC Perception Holdings, LP beneficially owns less than 50% of the amount of securities it held at the closing of the Business Combination, (ii) in the case of Pfizer Inc., the date on which Pfizer Inc. beneficially owns less than 50% of the amount of securities it held at the closing of the Business Combination or BC Perception Holdings, LP beneficially owns less than 50% of the amount of securities it held at the closing of the Business Combination and (iii) in the case of ARYA Sciences Holdings II and Perceptive Life Sciences Master Fund Ltd, the date on which ARYA Sciences Holdings II and Perceptive Life Sciences Master Fund Ltd beneficially own less than 80% of the amount of securities they held at the closing of the Business Combination or BC Perception Holdings, LP beneficially owns less than 50% of the amount of securities it held at the closing of the Business Combination.

Finally, pursuant to the Registration and Shareholder Rights Agreement, to the fullest extent permitted by law, the doctrine of corporate opportunity and any analogous doctrine will not apply to (i) any Sponsor Holder, (ii) any member of our board of directors, non-voting observer or any officer who is not our or any of our subsidiaries' full-time employee or (iii) any affiliate, partner, advisory board member, director, officer, manager, member or shareholder of any Sponsor Holder who is not our or any of our subsidiaries' full-time employee (any such person listed in (i), (ii) or (iii) being referred to herein as an External Party). Therefore, we have renounced any interest or expectancy in, or in being offered an opportunity to participate in, business opportunities that are from time to time presented to any External Party.

**Funding Agreement**

In April 2021, through Cerevel Therapeutics, Inc., our wholly-owned subsidiary, we entered into separate funding agreements with BC Pinnacle Holdings, LP and another investor, or collectively, the Funding Agreements, pursuant to which BC Pinnacle Holdings, LP and the other investor will provide funding to support our development of tavapadon for the treatment of Parkinson's disease. BC Pinnacle Holdings, LP is an affiliate of BC Perception Holdings, LP, a holder of 5% or more of our common stock. The funding agreement was reviewed and approved by both a special committee of our board of directors comprised solely of independent and uninterested directors and our audit committee.

52

Pursuant to the Funding Agreements, we will receive up to $62.5 million in funding from each of BC Pinnacle Holdings, LP and the other investor, for a combined total of up to $125 million in funding, or the Total Funding Commitment, of which approximately $31.3 million (25% of the Total Funding Commitment), $37.5 million (30% of the Total Funding Commitment) and approximately $31.3 million (25% of the Total Funding Commitment) have been received to date and $25.0 million (20% of the Total Funding Commitment) will be received in April 2024, subject to certain customary funding conditions.

In return we agreed to pay to BC Pinnacle Holdings, LP and the other investor (i) upon approval of tavapadon by the FDA, a combined $187.5 million (1.5x of the Total Funding Commitment), or the Approval Milestone Payment, with 50% of the Approval Milestone Payment due within 30 days of FDA approval and 12.5% of the Approval Milestone Payment due on each of the first four anniversaries of FDA approval, (ii) upon first reaching certain cumulative U.S. net sales thresholds, certain sales milestone payments and (iii) combined tiered, mid-single digit to low-double digit royalties on annual net sales of tavapadon in the United States.

At the time that BC Pinnacle Holdings, LP and the other investor collectively receive an aggregate of approximately $531.3 million (4.25x of the Total Funding Commitment), our payment obligations under the Funding Agreements will be fully satisfied. We have the option to satisfy our payment obligations to BC Pinnacle Holdings, LP and the other investor upon the earlier of FDA approval or May 1, 2025, by paying an amount equal to the Total Funding Commitment multiplied by a certain factor (which will initially be 3.00x and will increase over time to a maximum of 4.25x), less amounts previously paid to BC Pinnacle Holdings, LP and the other investor.

During the term of the Funding Agreements, we will use commercially reasonable efforts to develop and commercialize tavapadon in the United States, except that, upon the occurrence of certain significant safety, efficacy and regulatory technical failures of the program, or each, a Technical Failure, we will have the right to terminate the development of tavapadon and, upon such termination, will not be obligated to make any payments to BC Pinnacle Holdings, LP and the other investor. If we suspend or terminate the development of tavapadon or fail to perform certain diligence obligations for any reason other than a Technical Failure, we will pay BC Pinnacle Holdings, LP and the other investor a combined amount equal to the total amount funded by BC Pinnacle Holdings, LP and the other investor up to the date of termination, plus 12% interest compounded annually.

The foregoing are not, and do not purport to be, complete descriptions of the Pfizer License Agreement, the Registration and Shareholder Rights Agreement and the Funding Agreements, as applicable, and are subject to, and qualified by, the full text of such agreements, as applicable, each of which agreements has been filed with the SEC.

**Policies and Procedures for Related Person Transactions**

Our board of directors has adopted a written policy with respect to related person transactions, setting forth the policies and procedures for the review and approval or ratification of related person transactions.

For purposes of the policy, a "related person transaction" is a transaction, arrangement or relationship in which we or any of our subsidiaries was, is or will be a participant, the amount of which involved exceeds or will exceed $120,000, and in which any related person had, has or will have a direct or indirect material interest. A "related person" means:

- any person who is, or at any time during the applicable period was, one of our executive officers or one of our directors or director nominees;

- any person who is known by us to be the beneficial owner of more than 5% of our voting stock;

- any immediate family member of any of the foregoing persons; and

- any firm, corporation or other entity in which any of the foregoing persons is a partner or principal or in a similar position or in which such person has a 10% or greater beneficial ownership interest.

An "immediate family member" means any child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law or any other person (other than a tenant or employee) sharing the household of the related person (as defined above).

Under the policy, the audit committee of our board of directors must review in advance, the material facts of all related person transactions. If advance review by our audit committee is not feasible, then the related person transaction must be reviewed at the audit committee's next regularly scheduled meeting. In reviewing any related person transaction, our audit committee will take into account, among other factors that it deems appropriate, whether the related person transaction is on terms no less favorable to us than terms generally available in a transaction with an unaffiliated third party under the same or similar circumstances and the extent of the related person's interest in the transaction.

Pursuant to the policy, our audit committee has reviewed certain types of related person transactions and determined that such transactions are to be deemed pre-approved. Under the policy, such transactions are not subject to further review by our audit committee. The list of applicable transactions is set forth in the policy. In connection with each regularly scheduled meeting of our audit committee, a summary of any new related person transactions deemed pre-approved (other than director and executive compensation arrangements) will be provided to audit committee for its review.

If a related person transaction will be ongoing, our audit committee may establish guidelines for our management to follow in its ongoing dealings with the related person, and thereafter, our audit committee will periodically review and assess such ongoing transaction and confirm that the ongoing dealings with the related person have been in compliance with the guidelines established by our audit committee.

## DELINQUENT SECTION 16(A) REPORTS

Section 16(a) of the Exchange Act requires our directors and officers and holders of more than 10% of our common stock to file with the SEC initial reports of ownership of our common stock and other equity securities on a Form 3 and reports of changes in such ownership on a Form 4 or Form 5. Directors and officers and holders of 10% of our common stock are required by SEC regulations to furnish us with copies of all Section 16(a) forms they file. To our knowledge, based solely on a review of our records and representations made by our directors and officers regarding their filing obligations, all Section 16(a) filing requirements were satisfied with respect to 2022.

## AUDIT COMMITTEE REPORT

This report is submitted by the audit committee of the board of directors of the Company. The audit committee currently consists of the three directors whose names appear below. None of the members of the audit committee is an officer or employee of the Company, and the board of directors has determined that each member of the audit committee is "independent" for audit committee purposes as that term is defined under Rule 10A-3 under the Exchange Act and the applicable rules of Nasdaq. Each member of the audit committee meets the requirements for financial literacy under the applicable rules and regulations of the SEC and Nasdaq. The board of directors has designated each member of the audit committee as an "audit committee financial expert," as defined under the applicable rules of the SEC. The audit committee operates under a written charter adopted by the board of directors.

The audit committee's general role is to assist the board of directors in monitoring the Company's financial reporting process and related matters. Its specific responsibilities are set forth in its charter.

The audit committee has reviewed the Company's audited consolidated financial statements for the fiscal year ended December 31, 2022 and met with management, as well as with representatives of Ernst & Young LLP, the Company's independent registered public accounting firm, to discuss the audited consolidated financial statements. The audit committee also discussed with members of Ernst & Young LLP the matters required to be discussed by applicable requirements of the Public Company Accounting Oversight Board and the SEC.

In addition, the audit committee received the written disclosures and the letter from Ernst & Young LLP required by applicable requirements of the Public Company Accounting Oversight Board regarding the independent accountant's communications with the audit committee concerning independence, and discussed with members of Ernst & Young LLP its independence.

Based on the review and discussions referenced above, and other matters it deemed relevant, the audit committee recommended to the board of directors that the Company's audited consolidated financial statements for the fiscal year ended December 31, 2022 be included in our Annual Report for filing with the SEC.

Respectfully submitted by the
Audit Committee,

Gabrielle Sulzberger, J.D., M.B.A. (Chairperson)
Doug Giordano, M.B.A.
Norbert Riedel, Ph.D.

April 28, 2023