# EXHIBIT 8

DEFM14A 1 d649735ddefm14a.htm DEFM14A

**Table of Contents**

---

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# SCHEDULE 14A

**Proxy Statement Pursuant to Section 14(a) of the
Securities Exchange Act of 1934**

---

Filed by the Registrant  ☒

Filed by a Party other than the Registrant  ☐

Check the appropriate box:

☐   Preliminary Proxy Statement

☐   **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒   Definitive Proxy Statement

☐   Definitive Additional Materials

☐   Soliciting Material under § 240.14a-12

# CEREVEL THERAPEUTICS HOLDINGS, INC.
**(Name of Registrant as Specified in its Charter)**

**N/A**
**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check all boxes that apply):

☐   No fee required.

☒   Fee paid previously with preliminary materials

☐   Fee computed on table in exhibit required by Item 25(b) per Exchange Act Rules 14a-6(i)(1) and 0-11.

---

**Table of Contents**

## THE MERGER

*This discussion of the Merger does not purport to be complete and is qualified in its entirety by reference to the Merger Agreement, which is attached to this proxy statement as Annex A and incorporated by reference into this proxy statement. You should read the entire Merger Agreement carefully as it is the legal document that governs the Merger.*

### Certain Effects of the Merger on Cerevel

If the Merger Agreement is adopted by Cerevel stockholders and the other conditions to the closing of the Merger are either satisfied or waived, Merger Sub will be merged with and into Cerevel, with Cerevel continuing as the surviving corporation and a wholly owned subsidiary of AbbVie.

At the Effective Time, each Company Share issued and outstanding immediately prior to the Effective Time (other than Canceled Company Shares and Dissenting Company Shares) will be canceled and extinguished and automatically converted into the right to receive the Merger Consideration.

The Company Shares are listed and trade on Nasdaq under the symbol "CERE." As a result of the Merger, Cerevel will cease to be a publicly traded company and will become a wholly owned subsidiary of AbbVie. Prior to the Effective Time, we will reasonably cooperate with AbbVie to delist the Company Shares from Nasdaq and deregister the Company Shares under the Exchange Act, provided that such delisting and termination will not be effective until after the Effective Time. Upon such delisting and deregistration, we will no longer be a publicly traded company and will no longer be required to file periodic reports with the SEC, in each case in accordance with applicable law, rules and regulations. If the Merger is consummated, you will not own any shares of the capital stock of the surviving corporation or AbbVie.

### Effect on Cerevel if the Merger Is Not Consummated

If the Merger Agreement is not adopted by the holders of a majority of the issued and outstanding Company Shares entitled to vote thereon as of the Record Date or if the Merger is not consummated for any other reason, Cerevel stockholders will not receive any payment for their Company Shares pursuant to the Merger Agreement. Instead, Cerevel will remain a public company, the Company Shares will continue to be listed and traded on Nasdaq and registered under the Exchange Act, and we will continue to file periodic reports with the SEC.

Furthermore, if the Merger is not consummated, depending on the circumstances that caused the Merger not to be consummated, the price of the Company Shares may decline significantly. If that were to occur, it is uncertain when, if ever, the price of the Company Shares would return to the price at which it trades as of the date of this proxy statement.

Accordingly, if the Merger is not consummated, there can be no assurance as to the effect of these risks and opportunities on the future value of your Company Shares. If the Merger is not consummated, the Board will continue to evaluate and review our business operations, assets, operating results, financial condition, prospects and business strategy, among other things, and make such changes as are deemed appropriate and continue to seek to enhance stockholder value. If the Merger Agreement is not adopted by the holders of a majority of the issued and outstanding Company Shares entitled to vote thereon as of the Record Date or if the Merger is not consummated for any other reason, there can be no assurance that any other transaction acceptable to Cerevel will be offered or that our business, prospects or results of operations will not be adversely impacted.

In addition, upon termination of the Merger Agreement, under specified circumstances, Cerevel may be required to pay AbbVie a termination fee, and under other specified circumstances, AbbVie may be required to pay Cerevel a termination fee, as described under "*The Merger Agreement— Termination Fee; Certain Expenses*" beginning on page 104 of this proxy statement.

40

Table of Contents

**Merger Consideration**

In the Merger, each Company Share issued and outstanding immediately prior to the Effective Time (other than as described herein) will be canceled and extinguished and automatically converted into the right to receive the Merger Consideration.

Each Company Share issued and outstanding immediately prior to the Effective Time that is held by AbbVie, Intermediate Holdco, Merger Sub or Cerevel, or by any direct or indirect wholly owned subsidiary of Cerevel, AbbVie, Intermediate Holdco or Merger Sub shall be canceled and extinguished without any consideration paid therefor at the Effective Time.

"*Dissenting Company Shares*" refers to each Company Share issued and outstanding as of immediately prior to the Effective Time and held by a stockholder of Cerevel who is entitled to demand and who has properly and validly demanded his, her or its statutory rights of appraisal in respect of such Dissenting Company Share in compliance in all respects with Section 262 of the DGCL. Dissenting Company Shares shall not be converted into, or represent the right to receive the Merger Consideration. Please see "*The Merger—Appraisal Rights*" beginning on page 69 of this proxy statement for more information.

After the Merger is consummated, under the terms of the Merger Agreement, you will have the right to receive the Merger Consideration, but you will no longer have any rights as a Cerevel stockholder as a result of the Merger (except that any holder of Dissenting Company Shares will have those rights granted under Section 262), nor will you be entitled to receive any shares in AbbVie or the surviving corporation.

Each of the paying agent, the surviving corporation, Merger Sub, Intermediate Holdco and AbbVie will be entitled to deduct and withhold from any amounts payable pursuant to the Merger Agreement such amounts as are required to be deducted and withheld therefrom under applicable tax laws. If the paying agent, the surviving corporation, Merger Sub, Intermediate Holdco or AbbVie, as the case may be, so deducts and withholds amounts and timely and properly remits such amounts to the applicable governmental authority, such amounts shall be treated for all purposes under the Merger Agreement as having been paid to the person to whom such amounts would otherwise have been paid.

**Background of the Merger**

The terms of the Merger Agreement were the result of extensive negotiations between Cerevel, AbbVie and their respective affiliates and representatives. The following is a brief description of the background of the Merger and related transactions.

Cerevel is a clinical-stage pre-revenue biopharmaceutical company which was formed on July 23, 2018 and began operations following a contribution of pre-commercial neuroscience assets from Pfizer Inc. ("*Pfizer*") and a monetary investment and equity commitment by BC Perception Holdings, LP ("*Bain*"). Cerevel became a public company via a merger with a special purpose acquisition company in October 2020, and in connection therewith, entered into the Amended and Restated Registration and Shareholder Rights Agreement, dated October 27, 2020, by and among Bain, Pfizer, Cerevel and certain other Cerevel stockholders (the "*A&R Shareholder Rights Agreement*"), pursuant to which Bain has a right to nominate, and has nominated, six representatives to Cerevel's current 12-person board of directors (the "*Board*"), with two such representatives required to be independent and subject to Pfizer's prior written consent, and Pfizer has a right to nominate, and has nominated, two representatives to the Board. Based on their most recent filings with the SEC, Bain and Pfizer beneficially own 51.3% of the voting stock of Cerevel as of January 8, 2024. Cerevel has numerous late-stage clinical trials underway or planned, with multiple mid- to late-stage clinical trial data readouts anticipated in 2024. In this context, the Board, together with members of senior management of Cerevel, regularly reviews and assesses the performance, future growth prospects, clinical trial risks, business plans and the overall strategic direction of Cerevel, and considers a variety of strategic alternatives that may be available to Cerevel, including continuing to pursue its strategy as a standalone company or pursuing potential strategic, business development or financing transactions with third parties, in each case, with the goal of maximizing stockholder value.

41

Table of Contents

As part of that review, Cerevel regularly engages with other industry leaders regarding potential business development opportunities. In early 2023, Cerevel engaged in discussions regarding a potential Japanese regional partnership for emraclidine, its M4-selective positive allosteric modulator in development for schizophrenia and Alzheimer's disease psychosis and lead asset. In connection therewith, representatives of Cerevel contacted 17 potential counterparties who might be interested in a Japan partnership for emraclidine, including AbbVie, and executed confidentiality agreements with eight of such parties, including with AbbVie on March 28, 2023, one of which (which was not the confidentiality agreement entered into with AbbVie) included a standstill provision containing standard fall-away rights. Also in early 2023, Cerevel engaged in discussions regarding a potential global partnership for tavapadon, its D1/D5 partial agonist currently in Phase 3 development for the treatment of Parkinson's disease, and, in connection therewith, representatives of Cerevel executed confidentiality agreements with two such parties, neither of which included a standstill provision.

On May 3, 2023, Cerevel announced the appointment of Ron Renaud as President, Chief Executive Officer and a member of the Board, effective June 12, 2023, to succeed Tony Coles, who continued in his role as Chairperson of the Board. On May 10, 2023, Cerevel announced the appointment of Susan Altschuller as Chief Financial Officer, effective May 15, 2023. On June 15, 2023, Cerevel announced the appointment of Paul Burgess as Chief Business Development and Strategic Operations Officer, effective June 20, 2023.

Following the appointment of these executive officers, Cerevel continued to pursue a potential regional partnership in Japan, and in connection therewith, members of Cerevel management held meetings in Japan with AbbVie and two other potential counterparties for a Japan partnership for emraclidine and one potential counterparty for a global partnership for tavapadon in July 2023. Discussions between Cerevel and AbbVie regarding a potential regional partnership in Japan continued until August 2023, at which point Cerevel indicated to AbbVie that its non-binding indicative terms were not sufficient for AbbVie to continue participating in the process and communicated that Cerevel was terminating discussions with AbbVie unless AbbVie enhanced its economic terms. Cerevel continued to negotiate non-binding indicative terms with two other parties regarding the potential regional partnership in Japan through early November 2023.

On September 25, 2023, representatives of AbbVie contacted representatives of Cerevel to inform them that AbbVie would not be capable of enhancing its bid for the potential regional partnership in Japan; however, representatives of AbbVie stated that AbbVie would ascribe value to the Japan region if Cerevel retained the commercial rights to that region. The conversation focused on Cerevel's retention of commercial rights in Japan and AbbVie did not indicate that an offer to acquire Cerevel would be forthcoming.

On September 27, 2023, the Board met, along with representatives of Cerevel management, at a regularly scheduled meeting to discuss Cerevel's strategic plan, clinical program updates, financial outlook and cash needs, enterprise risk management and business development options. The Board discussed Cerevel's then-current cash balance that would support operations into 2025, together with potential options to extend its operating cash runway, including a regional partnership in Japan; a royalty financing transaction; and/or an equity financing transaction. The Board conducted an executive session and invited representatives of Centerview Partners LLC ("*Centerview*"), Cerevel's financial advisor, to discuss certain business development topics. Given the assessment of Cerevel management that Pfizer could be an interested party if Cerevel were to engage in a strategic process for the potential acquisition of Cerevel, the Board (inclusive of the directors nominated by Pfizer) determined that Deborah Baron and Suneet Varma, directors nominated to serve on the Board by Pfizer, should be recused from the executive session, and Ms. Baron and Mr. Varma then recused themselves from the meeting. Centerview discussed with the Board the status of the biopharmaceutical market, perspectives on Cerevel's value and outlook, considerations around asset out-licensing, financing alternatives to fund Cerevel's strategic plan, and the challenges of finding a potential acquiror who would consummate an acquisition of Cerevel that recognized the intrinsic value of Cerevel in advance of pivotal data. Following such discussions, the Board directed Cerevel management to continue to execute on its strategic plan and develop options to extend Cerevel's cash runway into 2026, which would be expected to provide Cerevel with at least 12 months of capital beyond the anticipated data readout of the Phase 2 trials of emraclidine for the treatment of

42

**Table of Contents**

schizophrenia in the second half of 2024. The Board further directed representatives of Cerevel management to make clear to AbbVie given their September 25, 2023 outreach that Cerevel was focused on a potential regional partnership in Japan and was not considering other strategic transactions, and on October 2, 2023, a representative of Cerevel communicated to representatives of AbbVie the same.

On October 10, 2023, the Board, along with members of Cerevel management, met to continue prior discussions on market conditions and Cerevel's strategic plans, including alternatives to fund its clinical and non-clinical programs, including the four ongoing clinical trials for tavapadon in Parkinson's, three ongoing clinical trials for emraclidine in schizophrenia, two ongoing clinical trials for darigabat, its $\alpha2/3/5$-selective $GABA_A$ receptor positive allosteric modulator, in focal epilepsy and one ongoing clinical trial for darigabat in panic disorder. After considering a royalty financing, a regional partnership in Japan and an equity financing, the Board determined that extending the cash runway for Cerevel into 2026 by way of a public equity offering would best position Cerevel for future success. On October 11, 2023, Cerevel announced the pricing of a follow-on public offering of Company Shares at a price to the public of $22.81 per Company Share, raising approximately $498.7 million in aggregate net proceeds, inclusive of the full exercise of the underwriters' option to purchase additional Company Shares.

On October 19, 2023, representatives of AbbVie contacted representatives of Cerevel and made an unsolicited offer to acquire all of the outstanding Company Shares at a price of $35.00 per Company Share, and later that day, representatives of AbbVie submitted to representatives of Cerevel a written non-binding indication of interest on the same terms (the "*October 19 Proposal*"). The October 19 Proposal was subject to customary conditions, including completion of diligence.

The Board met on October 24, 2023 with representatives of Cerevel management, Centerview and Latham & Watkins LLP ("*Latham*"), Cerevel's outside legal counsel, in attendance. The directors nominated to the Board by Pfizer were recused from the meeting. Mr. Renaud described the terms of the October 19 Proposal and representatives of Centerview gave their perspectives on AbbVie as a potential acquirer and other market information. Representatives of Latham then discussed the Board's fiduciary obligations in assessing the October 19 Proposal and any potential sale process. The Board engaged in discussions with representatives of Cerevel management and its legal and financial advisors regarding the October 19 Proposal, including the timeline for a potential transaction, various regulatory and value considerations, other potential strategic alternatives, including remaining as a standalone company, other potential acquirers who might be interested in and capable of acquiring Cerevel, the challenges of consummating an acquisition of Cerevel that recognized the intrinsic value of Cerevel in advance of pivotal data, and how best to respond to the October 19 Proposal. Following discussion, the Board determined that the price per Company Share in the October 19 Proposal provided insufficient value to Cerevel stockholders; however, the Board determined to investigate whether AbbVie would consider a meaningfully higher offer. The Board instructed Cerevel management to inform representatives of AbbVie that the October 19 Proposal provided insufficient value to Cerevel stockholders and that AbbVie would need to meaningfully increase its offer for the Board to consider a strategic transaction. The Board also instructed Centerview to reach out to additional third parties who might be interested in a potential strategic transaction, including Pfizer.

On October 27, 2023, representatives of Cerevel management communicated to representatives of AbbVie that the October 19 Proposal provided insufficient value to Cerevel and its stockholders to warrant further discussions regarding a potential strategic transaction. Representatives of AbbVie followed up on October 28, 2023 to communicate that AbbVie was willing to consider an increased offer price and requested to schedule a meeting between Mr. Renaud and Richard Gonzalez, Chairman of the Board of Directors and Chief Executive Officer of AbbVie.

On October 30, 2023, at the direction of the Board, representatives of Centerview contacted representatives of Pfizer to discuss Pfizer's interest in a potential strategic transaction with Cerevel, and on November 2, 2023, representatives of Pfizer informed representatives of Centerview that Pfizer was not interested in pursuing a

43

Table of Contents

potential strategic transaction in advance of Cerevel's 2024 clinical trial results. Pfizer confirmed that it would not submit a competing offer to acquire Cerevel prior to 2024 clinical trial results if a third party made an offer to acquire Cerevel during that time period.

On November 6, 2023, at the direction of the Board, representatives of Centerview contacted representatives of a large pharmaceutical company that we refer to as "Party A" to discuss Party A's interest in a potential strategic transaction; however, representatives of Party A stated that Party A would not be interested in pursuing a potential strategic transaction in advance of Cerevel's 2024 clinical trial results.

Also on November 6, 2023, Messrs. Renaud and Burgess met with Mr. Gonzalez and Nicholas Donoghoe, Chief Business and Strategy Officer of AbbVie, to discuss, among other things, potential next steps with respect to the October 19 Proposal.

On November 7, 2023, representatives of AbbVie sent to representatives of Cerevel a revised written non-binding indication of interest to acquire all of the outstanding Company Shares at a price of $40.00 per Company Share, subject to customary conditions, including completion of diligence (the "*November 7 Proposal*").

On November 8, 2023, the Board met, with representatives of Cerevel management, Centerview and Latham in attendance. The Board was informed that Pfizer had confirmed to representatives of Centerview that it would not pursue a strategic opportunity and as a result, Ms. Baron and Mr. Varma would participate in further Board discussions regarding a potential strategic transaction. Gabrielle Sulzberger, a member of the Board, elected to recuse herself from additional meetings until the Board had clarity on which additional parties would be participating in any process, and Ms. Sulzberger did not participate in any Board meetings in which the potential strategic transaction was considered from the November 8, 2023 meeting through the execution of the Merger Agreement. Mr. Renaud then reviewed with the Board the November 7 Proposal and updated the Board regarding communications between Cerevel management and representatives of AbbVie since the prior Board meeting. Representatives of Cerevel management and Centerview provided their preliminary perspectives on the November 7 Proposal and other potential strategic alternatives, including remaining as a standalone company. Representatives of Latham provided their preliminary assessment of the likely regulatory approvals required in connection with a strategic transaction. Representatives of Cerevel management and, at the direction of the Board, Centerview then reviewed with the Board Cerevel management's preliminary business plan and projections, including the material assumptions included therein. Following these discussions, the Board instructed representatives of Cerevel management and Centerview to continue their outreach to certain third parties and to continue discussions with AbbVie.

On November 9, 2023, Mr. Renaud met with representatives of a large pharmaceutical company that we refer to as "Party B" and discussed Party B's potential interest in a strategic transaction. Party B expressed interest in exploring the opportunity further and, following negotiation between the legal representatives of Cerevel and Party B, entered into a confidentiality agreement with Cerevel on November 11, 2023, which included a customary standstill provision containing standard fall-away rights, including upon execution of the Merger Agreement.

Also on November 9, 2023, and at the direction of the Board, representatives of Centerview contacted representatives of a large pharmaceutical company that we refer to as "Party C" to evaluate Party C's potential interest in a strategic opportunity. Party C expressed interest in exploring the opportunity further and, following negotiation between the legal representatives of Cerevel and Party C, entered into a confidentiality agreement with Cerevel on November 16, 2023, which included a customary standstill provision containing standard fall-away rights, including upon execution of the Merger Agreement.

On November 10, 2023, Mr. Renaud met with representatives of AbbVie to further discuss the November 7 Proposal. During the meeting, the parties discussed the potential timeline for entering into a transaction if definitive terms could be agreed to, including AbbVie's desire to announce a transaction expeditiously.

44

Table of Contents

The Board met on November 11, 2023, with representatives of Cerevel management, Centerview and Latham in attendance. Mr. Renaud updated the Board on his communications with AbbVie since the prior Board meeting and on the discussions with each of Party B and Party C. Representatives of Centerview provided their perspectives on the November 7 Proposal, the valuation of Cerevel and other potential strategic alternatives, including remaining as a standalone company. Representatives of Centerview then provided an overview of potential additional acquirers, biopharmaceutical mergers and acquisitions market dynamics and their preliminary financial analysis based on the November 7 Proposal and discussed with the Board and representatives of Cerevel management Cerevel management's business plan and projections, including the material assumptions included therein. Next, representatives of Latham reviewed the Board's fiduciary obligations in assessing the November 7 Proposal and any potential sale process and summarized the legal process for further exploring a potential change of control transaction. The Board, along with members of Cerevel management and its advisors, discussed the appropriate response to AbbVie and certain timing, regulatory and value considerations. Following the discussion, the Board instructed representatives of Cerevel management to communicate to representatives of AbbVie that its offer to acquire all of the outstanding Company Shares at a price of $40.00 per Company Share provided insufficient value to Cerevel stockholders, and that AbbVie would need to increase its offer to a price per Company Share in the mid-$40 range to justify Cerevel providing confidential information to AbbVie. Representatives of Cerevel management communicated this message to representatives of AbbVie on November 14, 2023.

On November 12, 2023, representatives of Cerevel management discussed with representatives of Party B Party B's potential interest in a strategic transaction and provided Party B with certain confidential information regarding Cerevel. Following these discussions, on November 13, 2023, representatives of Party B informed representatives of Cerevel that Party B did not intend to submit a bid to acquire Cerevel.

The Board met on November 15, 2023, with representatives of Cerevel management, Centerview and Latham in attendance. Mr. Renaud updated the Board on his communications with AbbVie since the prior Board meeting as well as feedback from Party B that it would not be submitting a bid to acquire Cerevel. Representatives of Centerview provided further perspectives on the November 7 Proposal and a broader market update, and representatives of Latham also reviewed the Board's fiduciary obligations in assessing strategic alternatives. The Board engaged in discussions with members of Cerevel management and their legal and financial advisors regarding the November 7 Proposal, other potential acquirers and other potential strategic alternatives, including the regulatory, clinical trial, commercial and market risks associated with moving forward as a standalone company.

On November 17, 2023, Mr. Renaud met with Mr. Gonzalez to discuss potential next steps with respect to the November 7 Proposal. Mr. Gonzalez informed Mr. Renaud that AbbVie was sending a revised written offer to acquire all the Company Shares at $41.50 per Company Share. Mr. Renaud informed Mr. Gonzalez that the price of $41.50 per Company Share would not provide enough value to Cerevel and that Cerevel would not move forward with a strategic transaction at that price. Mr. Gonzalez indicated that AbbVie could be willing to increase its offer to $45.00 per Company Share, subject to completion of legal and business diligence and announcing a transaction with Cerevel prior to the Christmas holiday (the "*November 17 Proposal*"). Mr. Gonzalez agreed to further discuss the $45.00 offer with the AbbVie board of directors and to update Mr. Renaud on their determination. Later that day, representatives of AbbVie sent to representatives of Cerevel the revised written non-binding indication of interest to acquire all of the outstanding Company Shares at a price of $41.50 per Company Share, subject to customary conditions, including completion of diligence.

Later on November 17, 2023, the Board met, with representatives of Cerevel management, Centerview and Latham in attendance. Mr. Renaud updated the Board regarding the most recent written offer received from AbbVie and the November 17 Proposal. Mr. Renaud also summarized for the Board the conversations with Party C since the prior Board meeting and informed the Board that Party C had indicated its continued interest in a potential transaction, but that they were not yet prepared to make a formal offer. The Board discussed with representatives of Cerevel management and its legal and financial advisors Cerevel management's business plan

45

Table of Contents

and projections, execution risk in a standalone scenario, including risks of successfully completing key clinical trials and obtaining regulatory approval in key markets. Representatives of Latham then outlined for the Board the process and timeline for negotiating transaction documents, the key terms that would be subject to negotiation and gave their view on the likely regulatory approvals required and likely timeline to obtain such approvals in connection with a strategic transaction. Following discussions, the Board authorized representatives of Cerevel management to inform AbbVie that Cerevel would provide it with additional confidential information and engage in further discussions. The Board also instructed representatives of Cerevel management to communicate to AbbVie that closing speed and certainty would be critical factors for the Board in ultimately determining whether to approve any transaction with AbbVie. Finally, the Board instructed representatives of Cerevel management to provide additional confidential information of Cerevel to Party C and instructed Latham to deliver a draft merger agreement containing customary terms for the sale of a public company to AbbVie.

On November 17, 2023, representatives of Cerevel met with representatives of AbbVie to discuss the timeline for the potential transaction. Representatives of AbbVie indicated that they wanted to accelerate the signing timeline such that the transaction would be announced the week of December 11, 2023.

On November 18, 2023, Cerevel and AbbVie amended their confidentiality agreement to, among other things, account for a potential change of control transaction and to include a customary standstill provision containing standard fall-away rights, including upon execution of the Merger Agreement.

Also on November 18, 2023, AbbVie and its advisors were given access to a virtual data room containing confidential information of Cerevel. Thereafter and through the date of the Merger Agreement, AbbVie engaged in an extensive review of the virtual data room and participated in numerous diligence calls with members of Cerevel management regarding business, clinical and non-clinical programs, chemistry and manufacturing, regulatory, quality assurance, intellectual property, commercial profile, benefits and legal matters. Also on November 18, 2023, representatives of Latham and representatives of Kirkland & Ellis LLP ("*Kirkland*"), outside counsel to AbbVie, held a call to discuss certain legal matters regarding the potential strategic transaction, and representatives of Latham emphasized, as directed by the Board, the importance of deal certainty to Cerevel given the clinical trial data readouts anticipated in the second half of 2024 and the anticipated regulatory process for the potential strategic transaction. Representatives of Kirkland raised that AbbVie expected certain key stockholders of Cerevel to execute support agreements in favor of the Merger.

On November 20, 2023, Party C was given access to a virtual data room containing confidential information of Cerevel. From November 20, 2023 through December 4, 2023, Party C engaged in an extensive review of the virtual data room, participated in a management presentation with representatives of Cerevel management and participated in numerous diligence calls with members of Cerevel management regarding business, clinical and non-clinical programs, chemistry and manufacturing regulatory and quality assurance matters.

On November 26, 2023, representatives of Latham delivered an initial draft of the Merger Agreement to representatives of Kirkland. The draft Merger Agreement contemplated, among other things, (1) a seller-favorable definition of Company Material Adverse Effect, (2) a "hell or high water" standard for regulatory efforts with no reverse termination fee and (3) a termination fee of 1.5% of the equity value of Cerevel if Cerevel terminated the Merger Agreement to accept a superior offer from a third party within 60 days of the Merger Agreement, increasing to 2.5% of the equity value of Cerevel after 60 days.

On November 28, 2023, representatives of Kirkland delivered an initial draft of the Support Agreement to representatives of Latham. The draft Support Agreement contemplated that Bain and other stockholders would execute the agreement and that the agreement would not terminate upon the Board changing its recommendation in favor of the Merger. On November 29, 2023, representatives of Kirkland delivered a revised draft of the Merger Agreement to representatives of Latham, which contemplated, among other things, (1) buyer-favorable revisions to the representations, warranties and covenants and the definition of Company Material Adverse Effect, (2) no obligation on AbbVie to divest assets, agree to remedies or litigate with any governmental

46

**Table of Contents**

authority in order to obtain regulatory approval, but a reverse termination fee of 5.0% of the equity value of Cerevel if either party terminates due to failure to obtain regulatory approval and (3) a Cerevel termination fee of 3.75% of the equity value of Cerevel if Cerevel terminated the Merger Agreement to accept a superior offer from a third party. Through the following week, representatives of Latham and representatives of Kirkland exchanged multiple drafts of the Merger Agreement, the Support Agreement and the various schedules thereto and attended several calls to negotiate the key open points in the drafts. Latham also engaged with representatives of Bain and other stockholders to address their comments and concerns on the draft Support Agreement.

On November 30, 2023, AbbVie announced that it had entered into a definitive acquisition agreement to acquire all of the outstanding shares of ImmunoGen, Inc. ("*ImmunoGen*") for $31.26 per share, for a total equity value of approximately $10.1 billion. On December 1, 2023, Mr. Renaud and other members of Cerevel management engaged in multiple discussions with representatives of AbbVie regarding the impact of the ImmunoGen acquisition on a strategic transaction between the parties. Representatives of AbbVie assured representatives of Cerevel management that AbbVie's diligence to date had not identified any material issues, that AbbVie remained interested in a potential strategic transaction and confirmed that AbbVie would support a transaction to acquire Cerevel at a price of $45.00 per Company Share. Representatives of AbbVie expressed confidence in their ability to obtain regulatory approval for each transaction and indicated a willingness to increase the reverse termination fee payable by AbbVie if regulatory approval could not be obtained. Representatives of AbbVie also proposed accelerating the announcement of a potential transaction to the week of December 4, 2023.

On December 1, 2023, the Board met, with representatives of Cerevel management, Centerview and Latham in attendance. Mr. Renaud updated the Board on discussions with AbbVie since the prior Board meeting, including discussions regarding AbbVie's announced transaction with ImmunoGen. Mr. Renaud also updated the Board on the status of Party C's diligence review. Representatives of Latham then outlined to the Board the process and timeline for negotiating transaction documents and certain key open issues in the draft Merger Agreement and draft Support Agreement, including (1) the appropriate carveouts to the definition of Company Material Adverse Effect, (2) AbbVie's obligations to obtain regulatory approval and the corresponding reverse termination fee if regulatory approval is not obtained, (3) the size of the Cerevel termination fee, (4) certain employee protections and retention benefits and (5) the Cerevel stockholders to execute the Support Agreement in favor of the Merger and the conditions upon which the Support Agreement will terminate. The Board then discussed the terms of the draft Merger Agreement and draft Support Agreement with representatives of Cerevel management and its legal and financial advisors. Following discussion, the Board instructed representatives of Latham and Cerevel management to continue to negotiate the terms of the transaction documents with a focus on closing certainty. Cerevel management and Cerevel's advisors were also instructed to provide Party C with a draft merger agreement containing customary terms for the sale of a public company, and to continue to engage with Party C.

Later on December 1, 2023, representatives of Latham sent an initial draft merger agreement to outside counsel to Party C, and on December 4, 2023, representatives of Latham and representatives of Party C's outside counsel held a call to discuss the draft merger agreement. Counsel to Party C indicated that Party C expected key stockholders of Cerevel to execute support agreements with customary terms.

On December 4, 2023, representatives of Party C reached out to representatives of Centerview to inform them that while they were impressed with the Cerevel business, any formal bid Party C would make would not exceed $40.00 per Company Share and asked whether such a bid would be sufficient. At the direction of the Board, representatives of Centerview informed representatives of Party C that such an offer would be inadequate and as a result, representatives of Party C communicated that Party C would not make a formal offer. Later that day, Party C's access to the virtual data room was terminated.

Also on December 4, 2023, Centerview submitted a relationship disclosure letter to the Board, and the Board later determined on this basis that there were no conflicts of interest that would affect the ability of Centerview to fulfill its responsibilities as financial advisor to Cerevel. On December 5, 2023, Cerevel and Centerview executed an engagement letter.

47

Table of Contents

On December 5, 2023, the Board met, with representatives of Cerevel management, Centerview and Latham in attendance. Representatives of Cerevel management updated the Board that Party C no longer intended to make an offer to acquire Cerevel. Representatives of Cerevel management also discussed with the Board and their legal and financial advisors the status of the negotiation process with AbbVie, remaining material open points in the draft transaction documents, and the increase in the trading price per Company Share on Nasdaq since the market opened on December 4, 2023. The closing price per Company Share increased from $24.64 per Company Share on November 17, 2023, the last trading day before AbbVie was provided access to Cerevel's virtual data room and commenced fulsome diligence, to $35.59 per Company Share at the close of trading on December 5, 2023, though no major media outlet publicly speculated or reported a potential deal was pending until Reuters published a report regarding the potential transaction with AbbVie less than an hour prior to the public announcement of the Merger by AbbVie and Cerevel following the closing of trading on December 6, 2023. Representatives of Centerview reviewed the process conducted by Cerevel to explore alternative bids to date, including contacting five parties, including AbbVie, signing three confidentiality agreements, including with AbbVie, and that certain third parties indicated they were unwilling to make a compelling offer prior to the release of 2024 clinical trial results. Centerview presented to the Board regarding their preliminary financial analyses and, at the direction of the Board, Cerevel management and Centerview discussed with the Board Cerevel management's final Unaudited Prospective Financial Information, including the material assumptions included therein. For a detailed discussion regarding the Unaudited Prospective Financial Information, please see "*The Merger—Certain Unaudited Prospective Financial Information*" beginning on page 61 of this proxy statement. Representatives of Latham then updated the Board on the negotiated terms of the Merger Agreement and related ancillary agreements, including the remaining open points: (1) the percentages of both the Cerevel termination fee and the reverse termination fee payable by AbbVie if parties were unable to obtain regulatory approvals, including whether there would be a reduced Cerevel termination fee for a certain number of days following the signing of the Merger Agreement; (2) the extent of AbbVie's obligations to obtain regulatory approval; (3) whether the Support Agreement to be executed with Bain would terminate upon the Board changing its recommendation in favor of the Merger Agreement; and (4) certain employee protections and retention benefits. Latham then discussed with the Board their fiduciary obligations under Delaware law in connection with considering and approving a sale transaction. The Board considered the risks and benefits in engaging in a potential sale transaction with AbbVie as compared to the other available strategic alternatives, including remaining as a standalone company. Following discussion, the Board instructed Latham and management to negotiate final terms on the remaining open points in the transaction documents.

Throughout the evening of December 5, 2023 and into the morning of December 6, 2023, representatives of Cerevel management and AbbVie management, along with their respective advisors, had a number of calls to complete diligence and finalize the remaining open points in the transaction documents. Following extensive discussion, the parties reached agreement that (1) the Cerevel termination fee would be 3.25% of Cerevel's equity value and the fee payable by AbbVie if parties were unable to secure regulatory approval would be 7.50% of Cerevel's equity value, each valued at the proposed Merger Consideration price, (2) that AbbVie would be obligated to litigate if the transaction was challenged by regulatory authorities, (3) that Bain, who held 36.4% of the outstanding Company Shares as of December 1, 2023, would execute the Support Agreement and that such agreement would terminate if the Board validly exercised its right to terminate the Merger Agreement, and (4) that AbbVie would agree to certain employee protections and retention benefits.

Later on December 6, 2023, the Board convened, with Cerevel management and representatives of Centerview and Latham in attendance. Representatives of Latham reviewed the proposed final terms of the Merger Agreement and the ancillary agreements with the Board as negotiated with AbbVie and presented to the Board regarding their fiduciary obligations under Delaware law in connection with considering and approving the Merger. Members of Cerevel management reviewed with the Board the process undertaken to reach out to additional potential bidders and that no other bidder, including Party C, had made a formal offer to acquire Cerevel. The Board discussed with its legal and financial advisors and representatives of Cerevel management, among other things, the terms of the Merger Agreement and the Merger Consideration. That same day and at the request of the Board, representatives of Centerview reviewed with the Board financial analysis of the Merger

48

Table of Contents

Consideration, and rendered to the Board an oral opinion, which was subsequently confirmed by delivery of a written opinion dated such date that, as of such date and based upon and subject to various assumptions made, procedures followed, matters considered, and qualifications and limitations upon the review undertaken in preparing its opinion, the Merger Consideration to be paid to the holders of Company Shares (other than as specified in such opinion) pursuant to the Merger Agreement was fair, from a financial point of view, to such holders. For a detailed discussion of Centerview's opinion, please see below under the caption "*Opinion of Centerview Partners LLC*". Representatives of Cerevel management also informed the Board that, based upon, among other things, their views of Cerevel's prospects on a standalone basis, their consideration of all the alternatives available to Cerevel and the information and advice provided by Centerview and Latham, it was the recommendation of Cerevel management that the Board approve the transaction as proposed by AbbVie upon the terms negotiated by the parties and as set forth in the Merger Agreement. The Board then discussed the various reasons to approve the Merger and certain countervailing factors. For a detailed description of the various reasons considered by the Board, see "*The Merger—Recommendation of the Board and Reasons for the Merger*" beginning on page 50 of this proxy statement. After further discussion, including on the process that led to the proposed Merger, the alternatives available to Cerevel, including remaining as a standalone public company, and the risks and benefits associated with the proposed transaction, the Board, by the unanimous vote of those directors voting at the meeting, (i) determined that the Merger Agreement and the transactions contemplated thereby, including the Merger, were advisable, fair to and in the best interests of Cerevel and its stockholders, and declared it advisable for Cerevel to enter into the Merger Agreement, (ii) approved and declared advisable the execution and delivery by Cerevel of the Merger Agreement, the performance by Cerevel of its covenants and agreements contained in the Merger Agreement and the consummation of the Merger and the other transactions contemplated by the Merger Agreement upon the terms and subject to the conditions contained therein, (iii) directed that the adoption of the Merger Agreement be submitted to a vote at a meeting of the Cerevel stockholders and (iv) resolved, subject to the terms and conditions set forth in the Merger Agreement, to recommend that the Cerevel stockholders adopt the Merger Agreement at such meeting of the Cerevel stockholders.

Immediately following the conclusion of the Board meeting, Latham and Kirkland finalized all transaction documents and Cerevel, AbbVie, Intermediate Holdco and Merger Sub executed the Merger Agreement, and Bain, AbbVie, Intermediate Holdco and Merger Sub executed the Support Agreement. Following the closing of trading on December 6, 2023, AbbVie and Cerevel issued a joint press release announcing their entry into the Merger Agreement.

**Board Recommendation**

The Board, after considering the various factors more fully described under "*The Merger—Recommendation of the Board and Reasons for the Merger*" beginning on page 50 of this proxy statement, by the unanimous vote of those directors voting at the meeting (i) determined that the Merger Agreement and the transactions contemplated thereby, including the Merger, are advisable, fair to and in the best interests of Cerevel and its stockholders and declared it advisable for Cerevel to enter into the Merger Agreement, (ii) approved and declared advisable the execution and delivery by Cerevel of the Merger Agreement, the performance by Cerevel of its covenants and agreements contained therein and the consummation of the Merger and the other transactions contemplated thereby upon the terms and subject to the conditions contained therein, (iii) directed that the adoption of the Merger Agreement be submitted to a vote at a meeting of Cerevel's stockholders and (iv) resolved, subject to the terms and conditions set forth in the Merger Agreement, to recommend that the Merger Agreement be adopted by Cerevel's stockholders (the matters described in clauses (i) through (iv), the "*Company Board Recommendation*").

The Board, by the unanimous vote of those directors voting at the meeting, recommends that you vote "**FOR**" the Merger Proposal. In addition, the Board unanimously recommends that you vote "**FOR**" the Merger Compensation Proposal and "**FOR**" the Adjournment Proposal.

49

Table of Contents

**Recommendation of the Board and Reasons for the Merger**

*Recommendation of the Board*

The Board, by the unanimous vote of those directors voting at the meeting, has: (i) determined that the Merger Agreement and the transactions contemplated thereby, including the Merger, are advisable, fair to and in the best interests of Cerevel and its stockholders, and declared it advisable for Cerevel to enter into the Merger Agreement; (ii) approved and declared advisable the execution and delivery by Cerevel of the Merger Agreement, the performance by Cerevel of its covenants and agreements contained therein and the consummation of the Merger and the other transactions contemplated thereby upon the terms and subject to the conditions contained therein; (iii) directed that the adoption of the Merger Agreement be submitted to a vote at a special meeting of the holders of Company Shares; and (iv) resolved, subject to the terms and conditions set forth in the Merger Agreement, to recommend that the Merger Agreement be adopted by Cerevel stockholders.

**The Board, by the unanimous vote of those directors voting at the meeting, recommends that Cerevel stockholders vote "FOR" the Merger Proposal. In addition, the Board unanimously recommends that Cerevel stockholders vote "FOR" the Merger Compensation Proposal and "FOR" the Adjournment Proposal.**

*Reasons for the Merger*

In evaluating the Merger Agreement and the transactions contemplated thereby, the Board consulted with members of Cerevel's senior management, representatives of Cerevel's legal advisor, Latham & Watkins LLP, and representatives of Cerevel's financial advisor, Centerview. In the course of reaching its determination and recommendation, the Board reviewed, evaluated and considered a significant amount of information and numerous factors and benefits, including those listed below (which are not listed in any relative order of importance), all of which the Board viewed as supporting its: (i) determination that the Merger Agreement and the transactions contemplated thereby, including the Merger, are advisable, fair to and in the best interests of Cerevel and its stockholders and its direction that Cerevel enter into the Merger Agreement; (ii) approval and declaration that it is advisable for Cerevel to execute and deliver the Merger Agreement; (iii) direction that the adoption of the Merger Agreement be submitted to a vote of Cerevel's stockholders at the Special Meeting; and (iv) resolution, subject to the terms and conditions set forth in the Merger Agreement, to recommend that the Merger Agreement be adopted by Cerevel's stockholders:

- *Implied Premium*. The Board considered the relationship of the Merger Consideration to the price of the Company Shares immediately prior to the execution of the Merger Agreement and the recent historical market price and volatility of the Company Shares, including the fact that the Merger Consideration represents (i) a premium of approximately 73% to the $26.00 closing price per Company Share on Nasdaq on December 1, 2023, the last full trading day prior to the subsequent increase in trading price and volume of the Company Shares (the "*Reference Date*"), (ii) a premium of approximately 80% to the trailing volume-weighted average price per share of $25.07 for the thirty (30) calendar day period ended the Reference Date, (iii) a premium of approximately 26% to the $35.59 closing price per Company Share on Nasdaq on December 5, 2023, the last trading day prior to the date on which the Merger Agreement was executed, (iv) a premium of approximately 98% to the $22.71 closing price per Company Share on Nasdaq on October 18, 2023, the trading day prior to the date on which Cerevel received AbbVie's $35.00 written proposal, (v) a premium of approximately 83% to the $24.65 closing price per Company Share on Nasdaq on November 16, 2023, the trading day prior to the date on which Cerevel received AbbVie's $41.50 written proposal and (vi) a premium of approximately 53% to the trailing volume-weighted average price per share of $29.32 for the thirty (30) calendar day period ended December 5, 2023. The Board believed that the Merger Consideration represents the highest value reasonably available for the Company Shares for the foreseeable future, taking into account the Board's familiarity with the business strategy, assets and prospects of Cerevel and the recent historical market price of the Company Shares.

50

**Table of Contents**

- *Cash Consideration; Certainty of Value.* The Board considered the all-cash at closing nature of the Merger Consideration to be received by Cerevel's stockholders in the Merger, which would provide liquidity and certainty of value to our stockholders while avoiding exposure to Cerevel's clinical, non-clinical, regulatory, commercialization and other business risks. Taking into account the business, operations, prospects, strategic and short- and long-term operating plans, access to capital to fund operating plans and cost of such capital, assets, liabilities and financial condition of Cerevel, the Board weighed the certainty of realizing compelling value for Company Shares by virtue of the Merger against the uncertain prospect that the trading value of Company Shares would approach the Merger Consideration in the foreseeable future and the risks and uncertainties associated with our business generally, including those described below and those discussed in Cerevel's public filings with the SEC. See "*Where You Can Find More Information*" beginning on page 121 of this proxy statement.

- *Possible Strategic Alternatives.* The Board considered the process conducted by Cerevel, with the assistance of representatives of Centerview, to identify whether other potential parties might be interested in pursuing an acquisition of Cerevel, taking into account the expected interest of such parties generally, their financial capability to consummate a transaction of this size, their ability to provide deal certainty, and their ability to move expeditiously and efficiently to enter into a definitive agreement with respect to an acquisition of Cerevel and consummate such transaction. After a thorough review of strategic alternatives and discussions with management and Cerevel's financial and legal advisors, the Board determined that the Merger Consideration is more favorable to Cerevel stockholders than the potential value that might result from other strategic options available, including, but not limited to, remaining a standalone company.

- *Full and Fair Value.* The Board believed that the Merger Consideration of $45.00 per Company Share represents full and fair value for our Company Shares, taking into account the Board's familiarity with the business strategy, assets, capital requirements and prospects of Cerevel on a standalone basis and the relative certainty of the cash consideration payable in the Merger as compared to the risks and uncertainties of continuing on a standalone basis as an independent publicly-traded biopharmaceutical company.

- *Highest Value Reasonably Obtainable.* The Board believed that the Merger Consideration of $45.00 per Company Share represents the highest value reasonably obtainable for our Company Shares for the foreseeable future, taking into account the business, operations, prospects, product development and commercialization risks, business strategy, assets, liabilities and general financial condition of Cerevel. The Board also considered the progress and the outcome of Cerevel's negotiations with AbbVie, including the increase in the consideration offered by AbbVie from the time of its initial expression of interest to the end of the negotiations, a number of changes in the terms and conditions of the Merger Agreement from the version initially proposed by AbbVie that were more favorable to Cerevel, and the fact that a number of other strategic parties that had been contacted with respect to a potential acquisition of Cerevel had determined not to engage with Cerevel, had determined that they would not be capable of entering into a strategic transaction with Cerevel at such time, or had otherwise failed to submit a proposal that the Board considered compelling relative to the terms of the Merger and the Merger Consideration of $45.00 per Company Share. Further, the Board believed, based on these negotiations, that the Merger Consideration was the highest price per share that AbbVie was willing to pay and that the Merger Agreement contained the most favorable terms to Cerevel to which AbbVie was willing to agree.

- *Product Development and Commercialization Risks.* The Board considered the uncertain nature of the development of pharmaceutical products to treat neuropsychiatric and neurological diseases, acknowledging that product candidates may fail to reach the market for several reasons, including: clinical trial results may show the product candidates to be less effective than expected or have an unacceptable safety or tolerability profile; uncertainties inherent in the product development process (including with respect to the timing of results and whether such results will be predictive of future results); and failure to receive the necessary regulatory approvals or a delay in receiving such

51

Table of Contents

approvals, which, among other things, may be caused by unexpected safety or manufacturing issues. In addition, the Board considered the fact that Cerevel has no prior marketing, sales and distribution experience and capabilities, and, if Cerevel's product candidates receive regulatory approval, Cerevel would need to develop or access such capabilities within the United States and globally, which it may fail to do successfully or at reasonable cost, along with the risks related to competition, market acceptance, pricing and reimbursement and other factors affecting the revenues and profitability of product candidates generally.

- *Likelihood of Consummation*. The Board considered the anticipated timing of the consummation of the transactions contemplated by the Merger Agreement, including the likelihood of consummation, based upon the scope of the conditions to the consummation of the Merger, the relative likelihood of obtaining required regulatory approvals, the remedies available to Cerevel under the Merger Agreement in the event of various breaches by AbbVie, including specific performance, and AbbVie's reputation in the biopharmaceutical industry, its track record in successfully acquiring other companies and its financial capacity to complete an acquisition of this size, which the Board believed supported the conclusion that a transaction with AbbVie could be completed relatively expeditiously and in an orderly manner.

- *Centerview's Opinion and Related Analysis*. The Board considered the opinion of Centerview rendered to the Board on December 6, 2023, which was subsequently confirmed by delivery of a written opinion dated such date that, as of such date and based upon and subject to the assumptions made, procedures followed, matters considered, and qualifications and limitations upon the review undertaken by Centerview in preparing its opinion, the Merger Consideration to be paid to the holders of Company Shares (other than as specified in such opinion) pursuant to the Merger Agreement was fair, from a financial point of view, to such holders, as more fully described below under the caption "*Opinion of Centerview Partners LLC*".

- *Voting Agreement*. The Board considered the fact that BC Perception Holdings, LP, the holder of approximately 36.4% of the Company common stock as of December 1, 2023, was willing to enter into the voting and support agreement, as described under "*The Support Agreement*" beginning on page 107 and the fact that the voting agreement terminates upon the termination of the Merger Agreement.

- *Terms of the Merger Agreement*. The Board considered the terms and conditions of the Merger Agreement, which was the product of arm's-length negotiations with the assistance of Cerevel's advisors, including the structure of the transaction, the all-cash form of the Merger Consideration, the limited scope of the conditions to the consummation of the Merger, and the customary nature of the representations, warranties, and the covenants and agreements of the parties. For the reasons noted below, the Board believed that the provisions of the Merger Agreement were advisable and fair to, and in the best interests of, Cerevel and our stockholders. In particular:

  - *No Financing Condition*. The Board considered the representation of AbbVie that AbbVie would have available sufficient funds for the satisfaction of all of its obligations under the Merger Agreement and to pay all related fees and expenses required to be paid by AbbVie, Intermediate Holdco or Merger Sub pursuant to the terms of the Merger Agreement, and that the consummation of the Merger is not subject to a financing condition.

  - *No Solicitation Covenants and Fiduciary Outs*. The Board considered the non-solicitation covenants and "fiduciary out" provisions of the Merger Agreement, which, subject to the terms and conditions thereof and limitations set forth therein, permit Cerevel to furnish information to, and to engage in discussions with, third parties that make unsolicited Acquisition Proposals meeting certain criteria, permit the Board to change its recommendation to Cerevel stockholders regarding the Merger Agreement under certain circumstances and permit Cerevel to terminate the Merger Agreement in order to enter into a definitive agreement relating to a Superior Proposal, subject to, among other things, payment of a termination fee to AbbVie. The Board further considered its ability to change its

52

Table of Contents

recommendation to Cerevel stockholders regarding the Merger Agreement in response to an Intervening Event if the failure to do so would reasonably be expected to be inconsistent with the fiduciary duties of the Board under applicable law. The Board further considered the fact that the Cerevel Termination Fee, in the opinion of the Board, (i) is reasonable in light of the overall terms of the Merger Agreement and the benefits of the Merger, (ii) is consistent with the amount of such fees payable in comparable transactions on a relative basis, (iii) would not be a substantial impediment or preclude another party from making a competing proposal to acquire Cerevel, and (iv) fair in light of the AbbVie Termination Fee in the event that the Merger Agreement is terminated due to a failure to effect the Merger prior to the Termination Date because of an inability to obtain the necessary competition approvals or due to the entry of a final, non-appealable antitrust law or order permanently restraining, enjoining, preventing, or prohibiting or making illegal the Merger.

- *Termination Date*. The Board considered the fact that the Termination Date under the Merger Agreement, on which either party, subject to certain exceptions, can terminate the Merger Agreement, allows for sufficient time to consummate the transactions contemplated by the Merger Agreement, but also prevents the Merger Agreement from being extended for an unreasonable amount of time, which could adversely impact operations.

- *Enforcement*. The Board considered Cerevel's ability to obtain specific enforcement of the obligations of AbbVie, Intermediate Holdco and Merger Sub under the Merger Agreement, thereby ensuring that Cerevel has an appropriate remedy in the event AbbVie, Intermediate Holdco and Merger Sub were to decline to comply with their obligations under the Merger Agreement.

- *Stockholder Approval; Appraisal Rights*. The Board considered that the adoption of the Merger Agreement would be subject to the approval of our stockholders, that stockholders would be free to vote against the adoption of the Merger Agreement, and that stockholders who do not vote to adopt the Merger Agreement and who properly exercise their appraisal rights under Delaware law will be entitled to such appraisal rights in connection with the Merger.

- *Conditions to Closing; Interim Operations*. The Board considered the fact that the terms and conditions of the Merger Agreement minimize, to the extent reasonably practical, the risk that a condition to consummation of the Merger would not be satisfied and also provide reasonable flexibility to operate Cerevel's business during the pendency of the Merger.

The Board, in consultation with members of Cerevel's senior management, also assessed Cerevel's prospects for substantially increasing stockholder value as a standalone company in excess of the Merger Consideration given the risks and uncertainties in Cerevel's business, including, but not limited to, the following (which are not listed in any relative order of importance) and those discussed in Cerevel's public filings with the SEC (see "*Where You Can Find More Information*" beginning on page 121 of this proxy statement):

- Cerevel's programs are all in the clinical, preclinical or discovery stage and if Cerevel is unable to successfully develop, obtain regulatory approval and ultimately commercialize its product candidates, or experience significant delays in doing so, Cerevel's business will be materially harmed.

- Preclinical and clinical development involves a lengthy and expensive process with an uncertain outcome, and the results of preclinical studies and early clinical trials are not necessarily predictive of future results and Cerevel's product candidates may not have favorable results in clinical trials, if any, or receive regulatory approval on a timely basis, if at all.

- Any difficulties or delays in the commencement or completion, or termination or suspension, of Cerevel's ongoing or planned clinical trials or due to the failure of third-party manufacturers to comply with manufacturing regulations, could result in increased costs to Cerevel, delay or limit Cerevel's ability to generate revenue and adversely affect Cerevel's commercial prospects.

53

**Table of Contents**

- Cerevel's limited operating history, the fact that Cerevel has incurred significant operating losses since its inception and expects to incur significant losses for the foreseeable future, and the fact that Cerevel may not be able to generate sufficient revenue to achieve and maintain profitability.

- Cerevel will require substantial additional financing to achieve its goals, which may cause stockholder dilution and certain other challenges, and a failure to obtain this necessary capital when needed on acceptable terms, or at all, could force Cerevel to delay, limit, reduce or terminate its product discovery and development programs, commercialization efforts or other operations.

- Cerevel has entered into, and may in the future seek to enter into, collaborations, licenses and other similar arrangements and may not be successful in doing so, and even if successful, Cerevel may relinquish valuable rights and may not realize the benefits of such relationships.

- Cerevel relies on third parties to assist in conducting many of its clinical trials, and these third parties may not perform satisfactorily.

- Cerevel faces significant competition, and if Cerevel's competitors develop product candidates more rapidly than Cerevel does or their product candidates are more effective and/or safe, Cerevel's ability to develop and successfully commercialize products may be adversely affected.

- If Cerevel is unable to obtain and maintain patent protection for any product or technology it may develop, or if the scope of the patent protection obtained is not sufficiently broad, Cerevel's competitors could develop and commercialize products similar or identical to Cerevel's, and Cerevel ability to successfully commercialize any product candidates it may develop may be adversely affected.

- Cerevel may not be able to protect its intellectual property and proprietary rights throughout the world.

- If Cerevel fails to comply with its obligations under its intellectual property licenses, if the licenses are terminated or if disputes regarding these licenses arise, Cerevel could lose significant rights that are important to its business.

- The current state of the U.S. and global economies, increased volatility resulting from macroeconomic factors such as interest rates and inflation, escalating political and global trade tensions, and the current and potential impact in both the near term and long term on the biopharmaceutical industry and the future commercialization efforts required with respect to Cerevel's products or product candidates that may become approved for sale, including the numerous risks, costs and uncertainties associated with research, development and commercialization of Cerevel's pipeline programs.

In the course of its deliberations, the Board, in consultation with members of Cerevel's senior management and representatives of Cerevel's outside financial and legal advisors, also considered a variety of uncertainties, risks and other potentially negative factors concerning the Merger Agreement and the transactions contemplated by the Merger Agreement, including, but not limited to, the following (which are not listed in any relative order of importance):

- *No Stockholder Participation in Future Earnings or Growth*. The Board considered that the nature of the Merger as an all-cash transaction means that, if the Merger is consummated, our stockholders will not participate in future earnings or growth of Cerevel and will not benefit from any appreciation in the value of Cerevel's business, the success of any of Cerevel's product candidates or any appreciation in the shares of the surviving corporation.

- *Risk Associated with Failure to Consummate the Merger*. The Board considered the possibility that the transactions contemplated by the Merger Agreement, including the Merger, might not be consummated, and that consummation of the Merger is subject to the satisfaction of certain conditions that may not be within our control, including receipt of the necessary regulatory clearances and approvals and that no Company Material Adverse Effect with respect to Cerevel has occurred that is continuing. The Board considered the fact that there can be no assurance that all conditions to the parties' obligations to consummate the Merger will be satisfied and, as a result, it is possible that the Merger may not be consummated even if the Merger Agreement is adopted by our stockholders. The

54

Table of Contents

Board considered the fact that if the Merger is not consummated (i) Cerevel will have incurred significant transaction and opportunity costs, including the possibility of disruption to our operations, diversion of management and employee attention, employee attrition and a potentially negative effect on our business relationships, (ii) the trading price of the Company Shares may be adversely affected, and (iii) the market's perceptions of our prospects could be adversely affected.

- *Interim Operating Covenants*. The Board considered the restrictions on the conduct of our business during the pendency of the Merger, which may delay or prevent Cerevel from undertaking potential business opportunities that may arise, may have a material adverse effect on our ability to respond to changing market and business conditions in a timely manner (or at all), or may negatively affect our ability to attract, retain and motivate key personnel. The Board also considered that the focus and resources of Cerevel's management may become diverted from other important business opportunities and operational matters while working to consummate the Merger, which could adversely affect our business.

- *No Solicitation Covenants and Termination Fee*. The Board considered the fact that, subject to certain exceptions, the Merger Agreement precludes Cerevel and its representatives from soliciting, or entering into or participating in discussions or negotiations relating to, alternative acquisition proposals, and requires Cerevel to pay to AbbVie the Cerevel Termination Fee if the Merger Agreement is terminated under certain circumstances, including a termination of the Merger Agreement by Cerevel to enter into a definitive agreement for a Superior Proposal, as described in "*The Merger Agreement—Termination Fee; Certain Expenses*" beginning on page 104 of this proxy statement. The Board also considered, but did not consider preclusive, the fact that the right afforded to AbbVie under the Merger Agreement to propose amendments or modifications to the terms and conditions of the Merger Agreement in response to a Superior Proposal may discourage other parties that might otherwise have an interest in a business combination with, or an acquisition of, Cerevel. The Board also considered that the amount of the Cerevel Termination Fee, as compared to termination fees in transactions of a similar size, in the opinion of the Board, was reasonable and would not likely deter competing bids. The Board also recognized that the provisions in the Merger Agreement relating to non-solicitation and the termination fee were required by AbbVie as conditions to entering into the Merger Agreement.

- *Effect of Transaction Announcement*. The Board considered the potential effect of the announcement of the Merger Agreement, including effects on our stock price and operations, including our relationships with suppliers, collaborators and employees, and our ability to attract and retain key personnel during the pendency of the transactions contemplated by the Merger Agreement, as well as the possibility of a suit, action or proceeding in respect of the Merger Agreement or the transactions contemplated thereby.

- *Transaction Costs*. The Board considered the fact that we have incurred and will continue to incur significant transaction costs and expenses in connection with the Merger, regardless of whether the Merger is consummated.

- *Taxable Transaction*. The Board considered that receipt of the all-cash Merger Consideration would be taxable to our stockholders that are treated as U.S. Holders (as defined in "*The Merger—Material U.S. Federal Income Tax Consequences of the Merger to Holders of Company Shares*" beginning on page 73 of this proxy statement) for United States federal income tax purposes.

- *Interests of Directors and Executive Officers*. The Board considered the possibility that Cerevel's directors and executive officers may have interests in the transactions contemplated by the Merger Agreement that may be different from, or in addition to, those of Cerevel's stockholders generally. See "*The Merger—Interests of the Directors and Executive Officers of Cerevel in the Merger*" beginning on page 64 of this proxy statement.

After considering the foregoing potentially negative factors, the Board concluded that the potential benefits of the Merger substantially outweighed the risks or potential negative consequences.

The foregoing discussion of the information and factors considered by the Board is intended to be illustrative and not exhaustive, but includes the material reasons and factors considered by the Board in reaching

55

Table of Contents

its conclusions and recommendation in relation to the Merger, the Merger Agreement and the transactions proposed thereby. In light of the variety of reasons and factors considered and the complexity of these matters, the Board did not find it practicable to, and did not, quantify or otherwise assign relative weights to the specific reasons or factors considered in reaching their determinations and recommendations. The Board based its recommendation on the totality of the information presented, including thorough discussions with, and questioning of, members of our senior management and representatives of our outside financial advisors and legal counsel. Individual directors may have given differing weights to different factors or may have had different reasons for their ultimate determination. In addition, the Board did not reach any specific conclusion with respect to any of the factors or reasons considered. Instead, the Board conducted an overall analysis of the factors and reasons described above and determined in its business judgment that, in the aggregate, the potential benefits of the Merger to the stockholders of Cerevel outweighed the risks or potential negative consequences. It should be noted that this explanation of the reasoning of the Board and certain information presented in this section is forward-looking in nature and should be read in light of the factors set forth in "*Cautionary Statement Regarding Forward-Looking Statements*" beginning on page 38 of this proxy statement.

**Opinion of Centerview Partners LLC**

On December 6, 2023, Centerview rendered to the Board its oral opinion, subsequently confirmed in a written opinion dated such date, that, as of such date and based upon and subject to various assumptions made, procedures followed, matters considered, and qualifications and limitations upon the review undertaken by Centerview in preparing its opinion, the Merger Consideration to be paid to the holders of Company Shares (other than Excluded Shares) pursuant to the Merger Agreement was fair, from a financial point of view, to such holders.

The full text of Centerview's written opinion, dated December 6, 2023, which describes the assumptions made, procedures followed, matters considered, and qualifications and limitations upon the review undertaken by Centerview in preparing its opinion, is attached as Annex B and is incorporated herein by reference. **The summary of the written opinion of Centerview set forth below is qualified in its entirety to the full text of Centerview's written opinion attached as Annex B. Centerview's financial advisory services and opinion were provided for the information and assistance of the Board (in their capacity as directors and not in any other capacity) in connection with and for purposes of its consideration of the Transaction and Centerview's opinion only addressed the fairness, from a financial point of view, as of the date thereof, to the holders of Company Shares (other than Excluded Shares) of the Merger Consideration to be paid to such holders pursuant to the Merger Agreement. Centerview's opinion did not address any other term or aspect of the Merger Agreement or the Transaction and does not constitute a recommendation to any Cerevel stockholder or any other person as to how such stockholder or other person should vote with respect to the Merger or otherwise act with respect to the Transaction or any other matter.**

**The full text of Centerview's written opinion should be read carefully in its entirety for a description of the assumptions made, procedures followed, matters considered, and qualifications and limitations upon the review undertaken by Centerview in preparing its opinion.**

In connection with rendering the opinion described above and performing its related financial analyses, Centerview reviewed, among other things:

- a draft of the Merger Agreement dated December 5, 2023, referred to in this summary of Centerview's opinion as the "Draft Merger Agreement";

- Annual Reports on Form 10-K of Cerevel for the years ended December 31, 2022, December 31, 2021 and December 31, 2020;

- certain interim reports to stockholders and Quarterly Reports on Form 10-Q of Cerevel;

- certain publicly available research analyst reports for Cerevel;

- certain other communications from Cerevel to its stockholders; and

56

Table of Contents

- certain internal information relating to the business, operations, earnings, cash flow, assets, liabilities and prospects of Cerevel, including certain financial forecasts, analyses and projections relating to Cerevel prepared by management of Cerevel and furnished to Centerview by Cerevel for purposes of Centerview's analysis, which are referred to in this summary of Centerview's opinion as the "*Unaudited Prospective Financial Information*" and which are collectively referred to in this summary of Centerview's opinion as the "Internal Data."

Centerview also participated in discussions with members of the senior management and representatives of Cerevel regarding their assessment of the Internal Data. In addition, Centerview conducted such other financial studies and analyses and took into account such other information as Centerview deemed appropriate.

Centerview assumed, without independent verification or any responsibility therefor, the accuracy and completeness of the financial, legal, regulatory, tax, accounting and other information supplied to, discussed with, or reviewed by Centerview for purposes of its opinion and, with Cerevel's consent, Centerview relied upon such information as being complete and accurate. In that regard, Centerview assumed, at Cerevel's direction, that the Internal Data (including, without limitation, the Unaudited Prospective Financial Information) were reasonably prepared on bases reflecting the best currently available estimates and judgments of the management of Cerevel as to the matters covered thereby and Centerview relied, at Cerevel's direction, on the Internal Data for purposes of Centerview's analysis and opinion. Centerview expressed no view or opinion as to the Internal Data or the assumptions on which it was based. In addition, at Cerevel's direction, Centerview did not make any independent evaluation or appraisal of any of the assets or liabilities (contingent, derivative, off-balance-sheet or otherwise) of Cerevel, nor was Centerview furnished with any such evaluation or appraisal, and was not asked to conduct, and did not conduct, a physical inspection of the properties or assets of Cerevel. Centerview assumed, at Cerevel's direction, that the final executed Merger Agreement would not differ in any respect material to Centerview's analysis or opinion from the Draft Merger Agreement reviewed by Centerview. Centerview also assumed, at Cerevel's direction, that the Transaction will be consummated on the terms set forth in the Merger Agreement and in accordance with all applicable laws and other relevant documents or requirements, without delay or the waiver, modification or amendment of any term, condition or agreement, the effect of which would be material to Centerview's analysis or Centerview's opinion and that, in the course of obtaining the necessary governmental, regulatory and other approvals, consents, releases and waivers for the Transaction, no delay, limitation, restriction, condition or other change will be imposed, the effect of which would be material to Centerview's analysis or Centerview's opinion. Centerview did not evaluate and did not express any opinion as to the solvency or fair value of Cerevel, or the ability of Cerevel to pay its obligations when they come due, or as to the impact of the Transaction on such matters, under any state, federal or other laws relating to bankruptcy, insolvency or similar matters. Centerview is not a legal, regulatory, tax or accounting advisor, and Centerview expressed no opinion as to any legal, regulatory, tax or accounting matters.

Centerview's opinion expressed no view as to, and did not address, Cerevel's underlying business decision to proceed with or effect the Transaction, or the relative merits of the Transaction as compared to any alternative business strategies or transactions that might be available to Cerevel or in which Cerevel might engage. Centerview's opinion was limited to and addressed only the fairness, from a financial point of view, as of the date of Centerview's written opinion, to the holders of the Company Shares (other than Excluded Shares) of the Merger Consideration to be paid to such holders pursuant to the Merger Agreement. For purposes of its opinion, Centerview was not asked to, and Centerview did not, express any view on, and its opinion did not address, any other term or aspect of the Merger Agreement or the Transaction, including, without limitation, the structure or form of the Transaction, or any other agreements or arrangements contemplated by the Merger Agreement or entered into in connection with or otherwise contemplated by the Transaction, including, without limitation, the fairness of the Transaction or any other term or aspect of the Transaction to, or any consideration to be received in connection therewith by, or the impact of the Transaction on, the holders of any other class of securities, creditors or other constituencies of Cerevel or any other party. In addition, Centerview expressed no view or opinion as to the fairness (financial or otherwise) of the amount, nature or any other aspect of any compensation to be paid or payable to any of the officers, directors or employees of Cerevel or any party, or class of such

57

Table of Contents

persons in connection with the Transaction, whether relative to the Merger Consideration to be paid to the holders of the Company Shares (other than Excluded Shares) pursuant to the Merger Agreement or otherwise. Centerview's opinion was necessarily based on financial, economic, monetary, currency, market and other conditions and circumstances as in effect on, and the information made available to Centerview as of, the date of Centerview's written opinion, and Centerview does not have any obligation or responsibility to update, revise or reaffirm its opinion based on circumstances, developments or events occurring after the date of Centerview's written opinion. Centerview's opinion does not constitute a recommendation to any Cerevel stockholder or any other person as to how such stockholder or other person should vote with respect to the Merger or otherwise act with respect to the Transaction or any other matter. Centerview's financial advisory services and its written opinion were provided for the information and assistance of the Board (in their capacity as directors and not in any other capacity) in connection with and for purposes of its consideration of the Transaction. The issuance of Centerview's opinion was approved by the Centerview Partners LLC Fairness Opinion Committee.

### Summary of Centerview Financial Analysis

The following is a summary of the material financial analyses prepared and reviewed with the Board in connection with Centerview's opinion, dated December 6, 2023. **The summary set forth below does not purport to be a complete description of the financial analyses performed or factors considered by, and underlying the opinion of, Centerview, nor does the order of the financial analyses described represent the relative importance or weight given to those financial analyses by Centerview. Centerview may have deemed various assumptions more or less probable than other assumptions, so the reference ranges resulting from any particular portion of the analyses summarized below should not be taken to be Centerview's view of the actual value of Cerevel.** In performing its analyses, Centerview made numerous assumptions with respect to industry performance, general business and economic conditions and other matters, many of which are beyond the control of Cerevel or any other parties to the Transaction. None of Cerevel, AbbVie, Intermediate Holdco, Merger Sub or Centerview or any other person assumes responsibility if future results are materially different from those discussed. Any estimates contained in these analyses are not necessarily indicative of actual values or predictive of future results or values, which may be significantly more or less favorable than as set forth below. In addition, analyses relating to the value of Cerevel do not purport to be appraisals or reflect the prices at which Cerevel may actually be sold. Accordingly, the assumptions and estimates used in, and the results derived from, the financial analyses are inherently subject to substantial uncertainty. Except as otherwise noted, the following quantitative information, to the extent that it is based on market data, is based on market data as it existed on or before December 5, 2023 (the last full trading day before the Board approved the Merger) and is not necessarily indicative of current market conditions.

### Discounted Cash Flow Analysis

Centerview performed a discounted cash flow analysis of Cerevel based on the Unaudited Prospective Financial Information, as set forth in the Internal Data as further described below under the section entitled "*The Merger—Certain Unaudited Prospective Financial Information*" beginning on page 61 of this proxy statement and the calculations of after-tax unlevered free cash flows based thereon, which reflect certain assumptions, including projected future financing needs of Cerevel. A discounted cash flow analysis is a traditional valuation methodology used to derive a valuation of an asset or set of assets by calculating the "present value" of estimated future cash flows of the asset or set of assets. "Present value" refers to the current value of future cash flows and is obtained by discounting those future cash flows by a discount rate that takes into account macroeconomic assumptions and estimates of risk, the opportunity cost of capital, expected returns and other appropriate factors.

In performing this analysis, Centerview calculated a range of equity values for the Company Shares by (a) discounting to present value as of December 31, 2023 using discount rates ranging from 12.0% to 14.0% (based on Centerview's analysis of Cerevel's weighted average cost of capital) and using a mid-year convention: (i) the forecasted risk-adjusted, after-tax unlevered free cash flows of Cerevel over the period beginning on January 1, 2024 and ending on December 31, 2045, as set forth in the Unaudited Prospective Financial

58

**Table of Contents**

Information, utilized by Centerview at the direction of Cerevel management and as approved by the Board for use by Centerview as set forth in the section captioned "*The Merger—Certain Unaudited Prospective Financial Information*", (ii) an implied terminal value of Cerevel, calculated by Centerview by assuming that (as directed by Cerevel management) Cerevel's unlevered free cash flows would decline in perpetuity after December 31, 2045 at a rate of free cash flow decline of 50% year over year, and (iii) tax savings from usage of Cerevel's estimated federal net operating losses and Cerevel's estimated future losses, as provided by Cerevel management, (b) adding to the foregoing results, Cerevel's estimated net cash balance of as of December 31, 2023, as provided by Cerevel management, and (c) subtracting from the foregoing results the present value of the impact of assumed equity raises, as set forth in the Unaudited Prospective Financial Information and as instructed by Cerevel management.

Centerview then calculated a range of implied equity values per Company Share by dividing the result of the foregoing calculations by Cerevel's fully diluted outstanding Company Shares calculated on a treasury stock method basis (taking into account outstanding in-the-money stock options, unvested RSUs and unvested PSUs) as of December 1, 2023 and as set forth in the Internal Data, as instructed by Cerevel management. The resulting range of implied equity values per Company Share was $35.20 to $43.45, rounded to the nearest $0.05. Centerview then compared the results of the above analysis to the $45.00 per Company Share value of the Merger Consideration to be paid to the holders of Company Shares (other than Excluded Shares) pursuant to the Merger Agreement.

### Other Factors

Centerview noted for the Board certain additional factors solely for reference and informational purposes only, including, among other things, the following:

- *Historical Stock Trading Price Analysis*. Centerview reviewed historical closing trading prices of the Company Shares during the 52-week period ended December 5, 2023 (the last full trading day before the Board approved the Merger), which reflected low and high stock closing prices for Cerevel during such period of approximately $20.26 to $35.59 per Company Share;

- *Analyst Price Target Analysis*. Centerview reviewed stock price targets for the Company Shares in publicly available Wall Street research analyst reports, which indicated low and high stock price targets for Cerevel ranging from $24.00 to $42.00 per Company Share; and

- *Precedent Premium Paid Analysis*. Centerview performed an analysis of premiums paid in selected transactions involving publicly traded biopharmaceutical companies for which premium data were available. The premiums in this analysis were calculated by comparing the per share acquisition price in each transaction (excluding contingent consideration, if any) to: (i) the closing price of the target company's common stock as of the Reference Date and (ii) the unaffected 30 calendar day volume weighted average price prior to the Reference Date. Based on the foregoing analysis and other considerations that Centerview deemed relevant in its professional judgment and experience, Centerview applied a range of 55% to 80% to (i) the Company Share price on the Reference Date of $26.00 and (ii) Cerevel's unaffected 30 calendar day volume weighted average price prior to the Reference Date of $29.32, which resulted in an implied price range of (i) $40.30 to $46.80 and (ii) $45.45 to $52.75 (each rounded to the nearest $0.05), respectively, per Company Share.

### General

The preparation of a financial opinion is a complex analytical process involving various determinations as to the most appropriate and relevant methods of financial analysis and the application of those methods to the particular circumstances and, therefore, a financial opinion is not readily susceptible to summary description. In

59

**Table of Contents**

arriving at its opinion, Centerview did not draw, in isolation, conclusions from or with regard to any factor or analysis that it considered. Rather, Centerview made its determination as to fairness on the basis of its experience and professional judgment after considering the results of all of the analyses.

Centerview's financial analyses and opinion were only one of many factors taken into consideration by the Board in its evaluation of the Transaction. Consequently, the analyses described above should not be viewed as determinative of the views of the Board or management of Cerevel with respect to the Merger Consideration or as to whether the Board would have been willing to determine that a different consideration was fair. The consideration for the transaction was determined through arm's-length negotiations between Cerevel and AbbVie and was approved by the Board. Centerview provided advice to Cerevel during these negotiations. Centerview did not, however recommend any specific amount of consideration to Cerevel or the Board or that any specific amount of consideration constituted the only appropriate consideration for the transaction.

Centerview is a securities firm engaged directly and through affiliates and related persons in a number of investment banking, financial advisory and merchant banking activities. In the two years prior to the date of its written opinion, except for its current engagement with respect to the Transaction, Centerview had not been engaged to provide financial advisory or other services to Cerevel, and Centerview did not receive any compensation from Cerevel during such period. In the two years prior to the date of its written opinion, Centerview had been engaged to provide and, in certain cases, was providing, as of the date of its written opinion, financial advisory services to entities in which certain affiliates of Bain Capital, a significant stockholder of Cerevel, held a controlling or significant minority ownership interest, in connection with matters unrelated to Cerevel, including to Diversey Holdings, Ltd. in connection with its sale to Solenis International LLC in 2023 and to Nexi S.p.A. on its merger with Nets A/S, and Centerview has received, and may in the future receive, compensation for certain of the foregoing services. In the two years prior to the date of its written opinion, Centerview received aggregate fees of between $40,000,000 and $45,000,000 in connection with the foregoing services. In addition, in the two years prior to the date of its written opinion, Centerview had been engaged to provide financial advisory services unrelated to Cerevel to two financial creditor groups (of which one or more affiliates of Bain Capital was a member) in connection with restructurings or potential restructurings involving the relevant issuer, and Centerview received aggregate compensation of between $10,000,000 and $15,000,000 for such services. In the two years prior to the date of its written opinion, Centerview had been engaged to provide financial advisory services to Pfizer Inc. ("*Pfizer*"), a significant stockholder of Cerevel, in connection with matters unrelated to Cerevel, including its acquisition of Arena Pharmaceuticals, Inc. in 2021 and other strategic matters. In the two years prior to the date of its written opinion, Centerview received aggregate fees of between $30,000,000 and $35,000,000 in connection with the foregoing services provided to Pfizer. In the two years prior to the date of its written opinion, Centerview had not been engaged to provide financial advisory or other services to AbbVie, Intermediate Holdco or Merger Sub, and Centerview did not receive any compensation from AbbVie, Intermediate Holdco or Merger Sub during such period. Centerview may provide financial advisory and other services to or with respect to Cerevel, AbbVie, Bain Capital, Pfizer or their respective affiliates, including portfolio companies of Bain Capital, in the future, for which Centerview may receive compensation. Certain (i) of Centerview's and Centerview's affiliates' directors, officers, members and employees, or family members of such persons, (ii) of Centerview's affiliates or related investment funds and (iii) investment funds or other persons in which any of the foregoing may have financial interests or with which they may co-invest, may at any time acquire, hold, sell or trade, in debt, equity and other securities or financial instruments (including derivatives, bank loans or other obligations) of, or investments in, Cerevel, AbbVie, Bain Capital, Pfizer or any of their respective affiliates, including portfolio companies of Bain Capital, or any other party that may be involved in the Transaction.

The Board selected Centerview as its financial advisor in connection with the Transaction based on Centerview's familiarity with Cerevel, their reputation as an internationally recognized investment banking firm and their substantial experience in similar transactions. Centerview is an internationally recognized investment banking firm that has substantial experience in transactions similar to the Transaction.

60

Table of Contents

In connection with Centerview's services as the financial advisor to the Board, Cerevel has agreed to pay Centerview an aggregate fee of approximately $80 million, $3 million of which was payable upon the rendering of Centerview's opinion and approximately $77 million of which is payable contingent upon consummation of the Transaction. In addition, Cerevel has agreed to reimburse certain of Centerview's expenses arising, and to indemnify Centerview against certain liabilities that may arise, out of Centerview's engagement.

**Certain Unaudited Prospective Financial Information**

Cerevel does not, as a matter of course, make public projections as to our future financial performance, due to, among other reasons, the uncertainty, unpredictability and subjectivity of the underlying assumptions and estimates and the inherent difficulty of predicting financial performance for future periods for a clinical-stage biopharmaceutical company. However, Cerevel's management regularly prepares and reviews with the Board estimates regarding the success and timing of the development of, regulatory filings and approvals for and the commercialization of our products and product candidates. In connection with our strategic planning process and the Board's evaluation of the Merger, as described further in the section captioned "*The Merger—Background of the Merger*" beginning on page 41 of this proxy statement, Cerevel's management prepared and reviewed with the Board certain unaudited prospective financial information of Cerevel as an independent company for the fiscal years 2024 through 2045, as prepared and used as described below (referred to as the "*Unaudited Prospective Financial Information*").

The Unaudited Prospective Financial Information was prepared for internal use only and not for public disclosure and was provided to the Board for the purposes of considering, analyzing and evaluating the Merger. The Unaudited Prospective Financial Information was also provided to, approved by Cerevel for use by, and relied upon by, Centerview, Cerevel's financial advisor, for use in connection with rendering the fairness opinion in connection with the Merger and performing its related financial analyses (as described in more detail in the sections captioned "*The Merger—Opinion of Centerview Partners LLC*" beginning on page 56 of this proxy statement), and were the only financial projections with respect to the Company used by Centerview in performing such financial analysis. The Unaudited Prospective Financial Information was not provided to AbbVie or any other prospective bidder. The Unaudited Prospective Financial Information includes estimates of Cerevel's financial performance on a risk-adjusted basis. With Cerevel's consent and at Cerevel's direction, Centerview assumed that the Unaudited Prospective Financial Information was reasonably prepared on bases reflecting the best then-available estimates and judgments of our management as to our future financial performance, and relied on Cerevel's assessments as to the validity of, and risks associated with, our products and product candidates.

The Unaudited Prospective Financial Information was developed based on Cerevel's management's knowledge of and assumptions with respect to Cerevel's business, including with respect to the development and potential commercialization of its pipeline drug candidates tavapadon for the treatment of Parkinson's disease, emraclidine for the treatment of schizophrenia, Alzheimer's disease psychosis, bipolar disorder and tardive dyskinesia, darigabat for the treatment of focal epilepsy and panic disorder and CVL-871 and CVL-354 for the treatment of dementia-related apathy and major depressive/substance use disorders, respectively. The Unaudited Prospective Financial Information was developed without giving effect to the Merger, including any impact of the negotiation or execution of the Merger Agreement or the Merger, the expenses that have already or may be incurred in connection with completing the Merger or any changes to Cerevel's operations or strategy that may be implemented during the pendency of or following the consummation of the Merger. The Unaudited Prospective Financial Information also does not consider the effect of any failure of the Merger to be completed and it should not be viewed as accurate or continuing in that context.

The Unaudited Prospective Financial Information was not prepared with a view toward public disclosure or complying with accounting principles generally accepted in the United States (which we refer to as "*GAAP*"). In addition, the Unaudited Prospective Financial Information was not prepared with a view toward complying with the guidelines established by the SEC or the American Institute of Certified Public Accountants with respect to prospective financial information. Neither our independent registered public accounting firm nor any other independent accountants have (1) compiled, reviewed, audited, examined or performed any procedures with

61

Table of Contents

respect to the Unaudited Prospective Financial Information, (2) expressed any opinion or any other form of assurance on such information or the achievability of the Unaudited Prospective Financial Information or (3) assumed any responsibility for the Unaudited Prospective Financial Information.

**Because the Unaudited Prospective Financial Information reflects estimates and judgments, it is susceptible to sensitivities and assumptions, as well as multiple interpretations based on actual experience and business developments. The Unaudited Prospective Financial Information also covers multiple years, and such information by its nature becomes less predictive with each succeeding year. The Unaudited Prospective Financial Information is not, and should not be considered to be, a guarantee of future operating results. Further, the Unaudited Prospective Financial Information is not fact and should not be relied upon as being necessarily indicative of our future results.**

Although the Unaudited Prospective Financial Information is presented with numerical specificity, it reflects numerous assumptions and estimates as to future events. The Unaudited Prospective Financial Information will be affected by, among other factors, our ability to achieve our goals for the development, regulatory approval and commercialization of our products and product candidates, including on the timeline assumed for purposes of the Unaudited Prospective Financial Information. The Unaudited Prospective Financial Information reflects assumptions and uncertainties that are subject to change. Important factors that may affect actual results and cause the Unaudited Prospective Financial Information not to be achieved are described in various risk factors described in the section captioned "*Cautionary Statement Regarding Forward-Looking Statements*" beginning on page 38 of this proxy statement, and in our other filings with the SEC, including those listed under the section captioned "*Where You Can Find More Information*" beginning on page 121 of this proxy statement. All of these factors are difficult to predict, and many of them are outside of our control. As a result, there can be no assurance that the Unaudited Prospective Financial Information will be realized, and actual results may be materially better or worse than those contained in the Unaudited Prospective Financial Information, whether or not the Merger is consummated. The Unaudited Prospective Financial Information also reflects assumptions as to certain business decisions that are subject to change. The Unaudited Prospective Financial Information may differ from publicized analyst estimates and forecasts and does not consider any events or circumstances after the date that it was prepared, including the announcement of the entry into the Merger Agreement. The Unaudited Prospective Financial Information has not been updated or revised to reflect information or results after the date it was prepared or as of the date of this proxy statement. Except to the extent required by applicable federal securities laws, we do not intend to update or otherwise revise the Unaudited Prospective Financial Information to reflect circumstances existing after the date that such information was prepared or to reflect the occurrence of future events. Cerevel has or may report results of operations for periods included in the Unaudited Prospective Financial Information that were or will be completed following the preparation of the Unaudited Prospective Financial Information. Stockholders and investors are urged to refer to Cerevel's periodic filings with the SEC for information on Cerevel's actual historical results.

Certain of the financial measures included in the Unaudited Prospective Financial Information are "non-GAAP financial measures." These are financial performance measures that are not calculated in accordance with GAAP. These non-GAAP financial measures should not be viewed as a substitute for GAAP financial measures, and may be different from non-GAAP financial measures used by other companies. Furthermore, there are limitations inherent in non-GAAP financial measures because they exclude charges and credits that are required to be included in a GAAP presentation. In certain circumstances, including those applicable to the Unaudited Prospective Financial Information, financial measures included in forecasts provided to a financial advisor and a board of directors in connection with a business combination transaction are excluded from the definition of "non-GAAP financial measures" under applicable SEC rules and regulations. As a result, the Unaudited Prospective Financial Information is not subject to SEC rules regarding disclosures of non-GAAP financial measures, which would otherwise require a reconciliation of a non-GAAP financial measure to a GAAP financial measure. Reconciliations of non-GAAP financial measures were not provided to or relied upon by the Board or Centerview. Accordingly, no reconciliation of the financial measures included in the Unaudited Prospective Financial Information is provided in this proxy statement.

62

Table of Contents

The Unaudited Prospective Financial Information constitutes forward-looking statements. By including the Unaudited Prospective Financial Information in this proxy statement, neither we nor any of our affiliates, advisors, officers, directors, partners or representatives (including Centerview) has made or makes any representation to any person regarding our ultimate performance as compared to the information contained in the Unaudited Prospective Financial Information. The inclusion of the Unaudited Prospective Financial Information should not be regarded as an indication that the Board, Cerevel or any other person considered, or now considers, the Unaudited Prospective Financial Information to be predictive of actual future results. Further, the inclusion of the Unaudited Prospective Financial Information in this proxy statement does not constitute an admission or representation by Cerevel that the information presented is material. The Unaudited Prospective Financial Information is included in this proxy statement solely to give our stockholders access to the information that was provided to the Board and Centerview. The Unaudited Prospective Financial Information is not included in this proxy statement in order to influence any Cerevel stockholder to make any investment decision with respect to the Merger, including whether or not to seek appraisal rights with respect to their shares.

### Unaudited Prospective Financial Information

Various judgments and assumptions were made when preparing the Unaudited Prospective Financial Information, including, among others: Cerevel's ability to raise an aggregate of approximately $1.85 billion in gross proceeds of capital in equity financing transactions in order to bring its product candidates through clinical trials, manufacturing and commercialization and to continue operating its business; the probability of success of clinical development and FDA approval of its product candidates and the timing of clinical trials, regulatory approval and commercial launch of these products; market demand for, and pricing of, its products; market size; market share; competition; reimbursement; distribution; estimated costs and expenses; contractual relationships, including upfront, royalty and milestone payments from assumed potential ex-U.S. partnerships; effective tax rate; utilization of net operating losses; and other relevant factors relating to Cerevel's long-term operating plan, as well as future economic, competitive and regulatory conditions and financial market conditions, all of which are highly uncertain, difficult or impossible to predict and many of which are beyond Cerevel's control.

The following table presents estimates of Cerevel's total revenue, gross profit, EBIT and unlevered free cash flow, in each case, on a risk-adjusted basis and for the fiscal years 2024 through 2045, as reflected in the Unaudited Prospective Financial Information, as approved by Cerevel management.

**Projected Non-GAAP**
**($ in millions, Unaudited)**

| | Fiscal Year Ending December 31, | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 |
| Total Revenue | $ 25 | $ 516 | $ 390 | $ 631 | $1,365 | $1,847 | $2,768 | $3,920 | $4,769 | $5,579 | $6,350 |
| Gross Profit | $ 25 | $ 516 | $ 255 | $ 508 | $1,089 | $1,387 | $2,251 | $3,214 | $3,922 | $4,574 | $5,218 |
| EBIT[1] | ($442) | ($215) | ($650) | ($517) | $ 146 | $ 381 | $1,271 | $2,189 | $2,877 | $3,499 | $4,121 |
| Unlevered Free Cash Flow[2] | ($442) | ($215) | ($657) | ($526) | $ 94 | $ 271 | $ 930 | $1,613 | $2,137 | $2,604 | $3,071 |

| | Fiscal Year Ending December 31, | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2035 | 2036 | 2037 | 2038 | 2039 | 2040 | 2041 | 2042 | 2043 | 2044 | 2045 |
| Total Revenue | $6,882 | $7,331 | $7,600 | $6,890 | $5,903 | $5,636 | $5,633 | $1,657 | $736 | $418 | $279 |
| Gross Profit | $5,697 | $6,080 | $6,309 | $5,725 | $4,901 | $4,665 | $4,656 | $1,372 | $620 | $356 | $245 |
| EBIT[1] | $4,595 | $4,979 | $5,236 | $4,776 | $4,120 | $3,977 | $3,978 | $1,267 | $573 | $330 | $228 |
| Unlevered Free Cash Flow[2] | $3,433 | $3,723 | $3,920 | $3,600 | $3,115 | $2,990 | $2,984 | $1,050 | $453 | $255 | $174 |

(1) "EBIT" refers to Cerevel's gross profit, *less* total operating expenses.

(2) "Unlevered Free Cash Flow" refers to EBIT, *less* tax expenses, capital expenditures and changes in net working capital, *plus* depreciation and amortization.

63

Table of Contents

**Treatment of the Convertible Notes**

The closing of the Merger will constitute a "Make-Whole Fundamental Change" under the Convertible Notes Indenture. Following the closing of the Merger, the cash Merger Consideration will become the reference property into which the Convertible Notes are convertible. Under the terms of the Convertible Notes Indenture, holders of the Convertible Notes may convert their Convertible Notes in connection with the Make-Whole Fundamental Change during the 35-trading day period after the closing of the Merger (the "*Make-Whole Fundamental Change Conversion Period*") and if converted during the Make-Whole Fundamental Change Conversion Period, holders will receive, for each $1,000 principal amount of Convertible Notes converted, an amount in cash equal to (i) the per share Merger Consideration multiplied by (ii) Conversion Rate in effect on the applicable conversion date, as adjusted by the make-whole table in the Convertible Notes Indenture. Holders of Convertible Notes that do not elect to convert their Convertible Notes during the Make-Whole Fundamental Change Conversion Period will continue to hold such Convertible Notes, which will remain outstanding subject to the terms and conditions of the Convertible Notes Indenture.

**Interests of the Directors and Executive Officers of Cerevel in the Merger**

Members of the Board and Cerevel's executive officers may have various interests in the Merger that may be in addition to, or different from, the interests of Cerevel's stockholders generally. The members of the Board were aware of these potential interests and considered them, among other matters, at the time they approved the Merger Agreement and in making their recommendation that Cerevel's stockholders adopt the Merger Agreement. These potential interests are described below.

*Treatment of Equity Awards*

Pursuant to the Merger Agreement, outstanding Cerevel equity awards held by our directors and executive officers will be treated as follows:

- *Company Options*. Effective as of immediately prior to the Effective Time, each Company Option that is outstanding and unexercised immediately prior to the Effective Time, whether or not vested, will be automatically cancelled and converted into the right to receive cash, without interest, in an amount equal to the product of (i) the aggregate number of Company Shares underlying such Company Option immediately prior to the Effective Time, multiplied by (ii) an amount equal to the Merger Consideration less the applicable per share exercise price of such Company Option, subject to applicable withholding taxes. Each Company Option that has a per share exercise price that is equal to or greater than the Merger Consideration will be cancelled without consideration.

- *Company RSU Awards.* The treatment of Company RSU Awards is as follows:

  - *Existing Company RSU Awards*. Effective as of immediately prior to the Effective Time, each Existing Company RSU Award that is outstanding immediately prior to the Effective Time will be automatically cancelled and converted into the right to receive cash, without interest, in an amount equal to the product of (i) the aggregate number of Company Shares underlying such Existing Company RSU Award immediately prior to the Effective Time, multiplied by (ii) the Merger Consideration, subject to any applicable withholding taxes.

  - *New Company RSU Awards*. Effective as of immediately prior to the Effective Time, fifty percent (50%) of each New Company RSU Award that is outstanding immediately prior to the Effective Time will be assumed by AbbVie and converted into an Assumed RSU Award on the same terms and conditions as applied to each such New Company RSU Award immediately prior to the Effective Time, except that each Assumed RSU Award will cover that number of whole shares of AbbVie common stock equal to the product of (i) the number of unvested Company Shares underlying such New Company RSU Award immediately prior to the Effective Time, multiplied by (ii) the Equity Award Exchange Ratio, with the result rounded down to the nearest whole

64

**Table of Contents**

number of shares of AbbVie's common stock. The other fifty percent (50%) of each New Company RSU Award that is outstanding immediately prior to the Effective Time will be automatically cancelled and converted into the right to receive cash, without interest, in an amount equal to the product of (i) the aggregate number of Company Shares underlying such New Company RSU Award immediately prior to the Effective Time, multiplied by (ii) the Merger Consideration, subject to any applicable withholding taxes.

- *Company PSU Awards*. Effective as of immediately prior to the Effective Time, each Company PSU Award that is outstanding immediately prior to the Effective Time will be automatically cancelled and converted into the right to receive cash, without interest, in an amount equal to the product of (i) the aggregate number of Company Shares subject to such Company PSU Award, determined assuming that the applicable performance goals have been deemed to be achieved at the greater of target and actual level of performance as determined by the Board (or committee administering the Company's Equity Incentive Plan) in its reasonable discretion, by (ii) the Merger Consideration, subject to any applicable withholding taxes.

The following table sets forth, for each of Cerevel's directors and executive officers, (i) the number of Company Shares underlying the Company Options (whether vested or unvested), Company RSU Awards, and Company PSU Awards held by each Cerevel executive officer and director as of December 31, 2023, the latest practicable date to determine these numbers before the filing of this proxy statement, and (ii) the value of such equity awards as of such date, determined in each case by multiplying (a) the number of Company Shares subject to the Cerevel equity award, by (b) the Merger Consideration (or in the case of Company Options, the Merger Consideration less the applicable exercise price for such Company Option). All such amounts actually payable to each of Cerevel's directors and executive officers will be subject to any applicable withholding taxes and will be payable without interest. These amounts do not attempt to forecast any New Company RSU Awards that may be granted following the date of this proxy statement. As a result of the foregoing assumptions, which may or may not actually occur or be accurate on the relevant date, the actual amounts to be received by Cerevel's directors and executive officers may materially differ from the amounts set forth below.

This table also does not include any outstanding rights to purchase shares under the Company ESPP held by our executive officers. For additional information regarding the Company ESPP, see "*The Merger Agreement—Treatment of Equity Awards and the Company ESPP*" beginning on page 80 of this proxy statement.

| Name | Company Options (#) | Value of Company Options ($) | Company RSU Awards (#)(2) | Value of Company RSU Awards ($) | Company PSU Awards (#)(1) | Value of Company PSU Awards ($) | Total Value of Company Options, Company RSU Awards, and Company PSU Awards ($) |
|---|---|---|---|---|---|---|---|
| **_Non-Employee Directors_** | | | | | | | |
| N. Anthony Coles, M.D. | 5,134,418 | 179,124,641 | 61,762 | 2,779,290 | — | — | 181,903,931 |
| Suneet Varma, M.B.A. | — | — | — | — | — | — | — |
| Christopher Gordon, M.B.A. | 80,189 | 1,989,757 | 3,282 | 147,690 | — | — | 2,137,447 |
| Deborah Baron, M.B.A. | — | — | — | — | — | — | — |
| Doug Giordano, M.B.A. | 95,242 | 2,457,454 | 3,282 | 147,690 | — | — | 2,605,144 |
| Adam Koppel, M.D., Ph.D. | 80,189 | 1,989,757 | 3,282 | 147,690 | — | — | 2,137,447 |
| Ruth McKernan, Ph.D., CBE, FMedSci | 92,986 | 2,249,107 | 3,282 | 147,690 | — | — | 2,396,797 |
| Marijn Dekkers, Ph.D. | 95,242 | 2,457,454 | 3,282 | 147,690 | — | — | 2,605,144 |
| Deval Patrick, J.D. | 49,794 | 1,061,831 | 3,282 | 147,690 | — | — | 1,209,521 |
| Norbert Riedel, Ph.D. | 95,242 | 2,457,454 | 3,282 | 147,690 | — | — | 2,605,144 |
| Gabrielle Sulzberger, J.D., M.B.A. | 95,242 | 2,457,454 | 3,282 | 147,690 | — | — | 2,605,144 |

65

Table of Contents

| Name | Company Options (#) | Value of Company Options ($) | Company RSU Awards (#)[2] | Value of Company RSU Awards ($) | Company PSU Awards (#)[1] | Value of Company PSU Awards ($) | Total Value of Company Options, Company RSU Awards, and Company PSU Awards ($) |
|---|---|---|---|---|---|---|---|
| *Executive Officers* | | | | | | | |
| Ronald Renaud, M.B.A. | 215,749 | 2,649,398 | 160,452 | 7,220,340 | 841,947 | 37,887,615 | 47,757,353 |
| Ramiro "Raymond" Sanchez, M.D. | 1,393,153 | 45,648,004 | 24,825 | 1,117,125 | — | — | 46,765,129 |
| Kenneth DiPietro | 711,827 | 23,492,402 | 13,913 | 626,085 | — | — | 24,118,487 |
| John Renger, Ph.D. | 778,418 | 21,584,529 | 20,081 | 903,645 | — | — | 22,488,174 |
| Kathleen Tregoning, M.A. | 614,428 | 17,859,552 | 13,804 | 621,180 | — | — | 18,480,732 |
| Scott Akamine, J.D. | 367,126 | 9,525,606 | 13,796 | 620,820 | — | — | 10,146,426 |
| Susan Altschuller, Ph.D., M.B.A. | 124,168 | 1,545,892 | 30,721 | 1,382,445 | — | — | 2,928,337 |
| Paul Burgess, J.D. | 95,931 | 1,299,865 | 23,847 | 1,073,115 | — | — | 2,372,980 |
| Mark Bodenrader | 277,817 | 8,867,703 | 19,284 | 867,780 | — | — | 9,735,483 |
| Abraham Ceesay, M.B.A.[3] | — | — | — | — | — | — | — |

(1) For purposes of this table, the value of the Company PSU Award is determined based on an estimate of actual performance based on the expected closing of the Merger, which would currently be expected to result in the maximum achievement of all performance-based vesting conditions.

(2) Amounts reported are inclusive of Existing Company RSU Awards that were accelerated in December 2023 to eliminate or mitigate the potential impact of Sections 280G and 4999 of the Code in connection with the Merger, as described below under "*280G Mitigation Actions.*"

(3) Mr. Ceesay is no longer an employee and executive officer of Cerevel as he resigned from his position as President of Cerevel on February 22, 2023.

### Stock Ownership

Certain non-employee directors and executive officers hold Company Shares. For additional information, see the section entitled "*Security Ownership of Certain Beneficial Owners and Management*" beginning on page 117 of this proxy statement.

### Change in Control Severance Benefits

*Employment Agreement with Mr. Renaud.*

On May 1, 2023, Cerevel entered into an employment agreement with Mr. Renaud, which governs the terms of his employment with Cerevel as Chief Executive Officer. In the event Cerevel terminates Mr. Renaud without "cause" or he resigns for "good reason" (as both terms are defined therein) within the period that commences three months prior to, and ends 12 months following, the occurrence of the first event constituting a "sale event" (referred to for purposes of this disclosure as a "change in control") subject to his execution and non-revocation of a separation agreement, which includes a general release of claims, a 12-month post-employment non-competition provision and certain other post-employment restrictive covenants substantially as set forth in his restrictive covenant agreement, Mr. Renaud will be entitled to (i) two times his base salary (or two times his base salary in effect immediately prior to the change in control, if higher), reduced by any garden leave pay he is paid in the same calendar year of such severance payment, which will be payable in substantially equal installments over the 12-month period immediately following the date of termination, or if later, the change in control, (ii) a lump sum payment equal to his target cash bonus for the calendar year in which his date of termination occurs, (iii) if timely elected, subsidized COBRA continuation coverage for a period of 18 months, and (iv) accelerated vesting of any unvested equity awards subject to time-based vesting conditions, and the potential for accelerated vesting of any unvested equity awards subject to performance-based vesting in the

66

**Table of Contents**

Board's discretion or to the extent specified in the applicable award agreement. Mr. Renaud's restrictive covenant agreement includes a (i) 12-month post-employment non-competition provision (applicable on certain terminations, excluding a termination due to a layoff or a termination without "cause") and (ii) two-year post-employment non-solicitation of customers and employees provision applicable on any termination.

*Cerevel's Severance Benefits Policy for Specified C-Suite Executives.*

Executive officers eligible to participate under Cerevel's Severance Benefits Policy for Specified C-Suite Executives (which includes all current executive officers other than Mr. Renaud and Mr. Bodenrader and excludes former executive officers Dr. Coles and Mr. Ceesay) may be entitled to receive the following severance pay and benefits if Cerevel terminates such executive officer's employment without "cause," or if the executive officer terminates his or her employment for "good reason" (as such terms are defined in each eligible executive officer's respective employment agreement) within the period that commences three months prior to, and ends 12 months following, the occurrence of the first event constituting a change in control: (i) continuation of their base salary over the 12-month period following the date of their termination, (ii) their target cash bonus for the calendar year in which the date of their respective termination occurs, both of which amounts in clauses (i) and (ii) will be payable in substantially equal installments over the 12-month period following the date of their termination in accordance with Cerevel's payroll practices, (iii) if elected, subsidized COBRA continuation coverage for a period of 12 months, and (iv) accelerated vesting of any unvested equity awards subject to time-based vesting conditions, and the potential for accelerated vesting of any unvested equity awards subject to performance-based vesting in the Board's discretion or to the extent specified in the applicable award agreement. The receipt of severance pay and benefits under this severance program is subject to the execution and non-revocation of a separation agreement, which includes a general waiver and release and certain post-employment restrictive covenants. The executive officers are also subject to restrictive covenant agreements, which generally include a (i) 12-month post-employment non-competition provision (applicable on certain terminations, excluding a termination due to a layoff or a termination without "cause") and (ii) two-year post-employment non-solicitation of customers and employees provision applicable on any termination.

*Cerevel's Severance Benefits Policy for Senior Vice Presidents and Vice Presidents.*

Mr. Bodenrader is eligible to participate under Cerevel's Severance Benefits Policy for Senior Vice Presidents and Vice Presidents, pursuant to which he may be entitled to receive the following severance pay and benefits if Cerevel terminates his employment without "cause," or if Mr. Bodenrader terminates his employment with Cerevel for "good reason" (each both terms are defined therein) within the period that commences three months prior to, and ends 12 months following, the occurrence of the first event constituting a change in control: (i) continuation of his base salary over the nine-month period following the date of his termination, (ii) the product of (a) 0.75, multiplied by (b) his target cash bonus for the calendar year in which the date of his termination occurs, both of which amounts in clauses (i) and (ii) will be payable in substantially equal installments over the nine-month period following the date of his termination in accordance with Cerevel's payroll practices, (iii) if elected, subsidized COBRA continuation coverage for a period of nine months, and (iv) accelerated vesting of any unvested equity awards subject to time-based vesting conditions, and the potential for accelerated vesting of any unvested equity awards subject to performance-based vesting in the Board's discretion or to the extent specified in the applicable award agreement. The receipt of severance pay and benefits under this severance program is subject to the execution and non-revocation of a separation agreement, which includes a general waiver and release and certain post-employment restrictive covenants. Mr. Bodenrader is subject to a restrictive covenant agreement, which includes a (i) 12-month post-employment non-competition provision (applicable on certain terminations, excluding a termination due to a layoff or a termination without "cause") and (ii) a 12-month post-employment non-solicitation of customers and employees provision applicable on any termination.

67

Table of Contents

### Non-Employee Director Compensation

Prior to the Effective Time, Cerevel will continue to compensate its non-employee directors for their service on the Board in accordance with Cerevel's Non-Employee Director Compensation Policy, as may be amended from time to time. The equity compensation portion of such compensation will consist solely of Company RSU Awards. Cerevel's Non-Employee Director Compensation Policy provides that upon the occurrence of a change in control (which includes this transaction), all equity retainer awards granted to non-employee directors will become fully vested and exercisable.

### 2024 Bonus Awards

With respect to annual bonuses payable under Cerevel's annual bonus program with respect to fiscal year 2024, if the Effective Time occurs in 2024, each eligible Cerevel employee will be paid their target annual bonus for 2024, prorated for the portion of 2024 elapsed as of the Effective Time.

### 280G Mitigation Actions

Cerevel may, in consultation with AbbVie, implement strategies to mitigate the possible impact of Sections 280G and 4999 of the Code. If such mitigation strategies are insufficient to eliminate the impact of Sections 280G and 4999 of the Code, Cerevel may make gross-up payments up to an aggregate of $25 million to the executive officers for any excise taxes under Sections 280G and 4999 of the Code in connection with the Merger.

Cerevel has taken the following agreed upon steps to eliminate or mitigate the potential impact of Sections 280G and 4999 of the Code in connection with the Merger: (i) accelerating into 2023 the vesting of the Existing Company RSU Awards held by each named executive officer, other than Dr. Coles and Dr. Renger, that would otherwise vest effective upon the Closing Date, and (ii) the payment in December 2023 of the corporate component of the annual incentive plan cash bonus amounts under the 2023 annual incentive plan based on a reasonable, good faith estimate of achievement of actual corporate performance (collectively, the "*280G Mitigation Actions*").

Each of the affected named executive officers entered into a repayment agreement with Cerevel, pursuant to which the executive officer is required to repay the net after-tax amount received in respect of (i) the 2023 annual incentive plan cash bonus payment in the event the executive officer resigned from employment prior to December 31, 2023 and/or (ii) the accelerated Company RSU Awards in the event that the executive officer's employment terminates for any reason prior to the date the accelerated Company RSU Awards otherwise would vest (or, if earlier, the Effective Time) to the extent such Company RSU Awards would have remained unvested under the terms of the applicable award agreement, the executive officer's employment agreement with Cerevel or Cerevel's applicable Severance Benefits Policy.

### Indemnification of Directors and Officers; Insurance

Directors and officers of Cerevel are also entitled to indemnification and covered by insurance in certain circumstances. For a detailed description of these requirements, please see "*The Merger Agreement—Other Covenants and Agreements—Indemnification of Directors and Officers; Insurance*" beginning on page 99 of this proxy statement.

### Financing of the Merger

The Merger Agreement is not conditioned upon receipt of financing by AbbVie. We anticipate that the total amount of funds necessary to consummate the Merger and the related transactions, not including fees and expenses, will be approximately $8.8 billion, including the estimated funds needed to (i) pay our stockholders the Merger Consideration due to them under the Merger Agreement and (ii) make payments in respect of outstanding equity awards of Cerevel pursuant to the Merger Agreement.

68

**Table of Contents**

AbbVie, Intermediate Holdco and Merger Sub have represented in the Merger Agreement that they have available or, with respect to Intermediate Holdco and Merger Sub, will have available as of the Effective Time, sufficient funds for the satisfaction of all of their obligations under the Merger Agreement and to pay all related fees and expenses required to be paid by AbbVie, Intermediate Holdco or Merger Sub pursuant to the terms of the Merger Agreement.

**Closing and Effective Time of the Merger**

The closing of the Merger will take place by electronic exchange of signatures and documents on a date to be specified by the parties, which shall be not later than the second business day after the satisfaction (or waiver, if permitted by applicable law) of the last to be satisfied of the conditions set forth in the Merger Agreement (other than those conditions that, by their nature, are to be satisfied at the closing of the Merger, but subject to the satisfaction (or waiver, if permitted by applicable law) of those conditions), or at such other location, date and time as Cerevel and AbbVie shall mutually agree upon in writing.

On the Closing Date, AbbVie, Cerevel, Intermediate Holdco and Merger Sub will cause the Merger to be consummated under the DGCL by filing a certificate of merger in such form as required by, and executed in accordance with, the DGCL with the Secretary of State of the State of Delaware and will take such further actions as may be required to make the Merger effective on the Closing Date. The Merger will become effective at the time and day of the filing of such certificate of merger with the Secretary of State of the State of Delaware, or such later time and day as may be agreed in writing by Cerevel and AbbVie and specified in the certificate of merger.

**Appraisal Rights**

If the Merger is consummated, persons who do not wish to accept the Merger Consideration are entitled to seek appraisal of their Company Shares under Section 262 and, if all procedures described in Section 262 are strictly complied with, to receive payment in cash for the fair value of their Company Shares exclusive of any element of value arising from the accomplishment or expectation of the Merger, as determined by the Delaware Court of Chancery, together with interest, if any, to be paid upon the amount determined to be the fair value. The "fair value" of your Company Shares as determined by the Delaware Court of Chancery may be more or less than, or the same as, the Merger Consideration that you are otherwise entitled to receive under the Merger Agreement. These rights are known as "appraisal rights". This proxy statement serves as a notice of such appraisal rights pursuant to Section 262.

**Persons who exercise appraisal rights under Section 262 will not receive the Merger Consideration they would otherwise be entitled to receive pursuant to the Merger Agreement. They will receive an amount determined to be the "fair value" of their Company Shares following petition to, and an appraisal by, the Delaware Court of Chancery. Persons considering seeking appraisal should recognize that the fair value of their Company Shares determined under Section 262 could be more than, the same as or less than the Merger Consideration they would otherwise be entitled to receive pursuant to the Merger Agreement. Strict compliance with the procedures set forth in Section 262 is required. Failure to comply strictly with all of the procedures set forth in Section 262 may result in the withdrawal, loss or waiver of appraisal rights. Consequently, and in view of the complexity of the provisions of Section 262, persons wishing to exercise appraisal rights are urged to consult their legal and financial advisors before attempting to exercise such rights.**

A copy of Section 262 may be accessed without subscription or cost at the following publicly available website: https://delcode.delaware.gov/title8/c001/sc09/index.html#262. The following summary is not a complete statement of the law relating to appraisal rights and is qualified in its entirety by reference to Section 262 and any amendments thereto after the date of this proxy statement. Any person who desires to exercise his, her or its appraisal rights should review carefully Section 262 and is urged to consult his, her or its

69

Table of Contents

legal advisor before electing or attempting to exercise such rights. The following summary does not constitute legal or other advice, nor does it constitute a recommendation that persons seek to exercise their appraisal rights under Section 262. A person who loses his, her or its appraisal rights will be entitled to receive the Merger Consideration under the Merger Agreement.

A holder of record of Company Shares and a beneficial owner who (i) continuously holds or beneficially owns, as applicable, such Company Shares through the Effective Time, (ii) has not consented to the Merger in writing or otherwise voted in favor of the Merger or otherwise withdrawn, lost or waived appraisal rights, (iii) strictly complies with the procedures under Section 262, (iv) does not thereafter withdraw his, her or its demand for appraisal of such Company Shares and (v) in the case of a beneficial owner, a person who (A) reasonably identifies in his, her or its demand the holder of record of the Company Shares for which the demand is made, (B) provides documentary evidence of such beneficial owner's beneficial ownership and a statement that such documentary evidence is a true and correct copy of what it purports to be and (C) provides an address at which such beneficial owner consents to receive notices given by the surviving corporation and to be set forth on the Chancery List (as defined below), will be entitled to receive the fair value of his, her or its Company Shares exclusive of any element of value arising from the accomplishment or expectation of the Merger, as determined by the Delaware Court of Chancery, together with interest, if any, to be paid upon the amount determined to be the fair value.

Section 262 requires that where a proposed merger is to be submitted for approval at a meeting of stockholders, the corporation must notify stockholders that appraisal rights will be available not less than twenty (20) days before the meeting to vote on the merger. Such notice must include either a copy of Section 262 or information directing the stockholders to a publicly available electronic resource at which Section 262 may be accessed without subscription or cost. This proxy statement constitutes Cerevel's notice to our stockholders that appraisal rights are available in connection with the Merger, in compliance with the requirements of Section 262. If you wish to consider exercising your appraisal rights, you should carefully review the text of Section 262, which may be accessed without subscription or cost at the following publicly available website: https://delcode.delaware.gov/title8/c001/sc09/index.html#262. Failure to comply timely and properly with the requirements of Section 262 will result in the loss of your appraisal rights under the DGCL.

If you elect to demand appraisal of your Company Shares, you must satisfy each of the following conditions: you must deliver to Cerevel a written demand for appraisal of your Company Shares prior to the Special Meeting, which must (i) reasonably inform us of the identity of the holder of record of Company Shares who intends to demand appraisal of his, her or its Company Shares (and, for beneficial owners only, such demand is accompanied by documentary evidence of such beneficial owner's beneficial ownership and a statement that such documentary evidence is a true and correct copy of what it purports to be, and provides an address at which such beneficial owner consents to receive notices given by Cerevel and to be set forth on the Chancery List) and (ii) that you intend to demand the appraisal of your shares. In addition, as described above, you must not vote or submit a proxy in favor of the proposal to adopt the Merger Agreement; you must hold or beneficially own, as applicable, your Company Shares continuously through the effective date; and you must comply with the other applicable requirements of Section 262.

A Cerevel stockholder who elects to exercise appraisal rights must mail or deliver his, her or its written demand for appraisal to the following address:

Cerevel Therapeutics Holdings, Inc.
222 Jacobs Street, Suite 200
Cambridge, Massachusetts 02141
Attention: Corporate Secretary

Within ten (10) days after the Effective Time, the surviving corporation must give written notice that the Merger has become effective to each stockholder of any class or series of stock of Cerevel who is entitled to appraisal rights that the Merger was approved and that appraisal rights are available for any or all shares of such class or series of stock.

70

**Table of Contents**

Within one hundred twenty (120) days after the Effective Time, but not thereafter, the surviving corporation or any person who has properly and timely demanded appraisal and otherwise complied with Section 262 may commence an appraisal proceeding by filing a petition in the Delaware Court of Chancery, with a copy served on the surviving corporation in the case of a petition filed by a person, demanding a determination of the fair value of the Company Shares held by all persons that have demanded appraisal. There is no present intent on the part of Cerevel or the surviving corporation to file an appraisal petition and persons seeking to exercise appraisal rights should assume that Cerevel and the surviving corporation will not file such a petition or initiate any negotiations with respect to the fair value of Company Shares. Accordingly, persons who desire to have their Company Shares appraised should initiate any petitions necessary for the perfection of their appraisal rights within the time periods and in the manner prescribed in Section 262. If, within one hundred twenty (120) days after the Effective Time, no petition has been filed as provided above, all rights to appraisal will cease and any person that previously demanded appraisal will become entitled only to the Merger Consideration under the Merger Agreement.

At any time within sixty (60) days after the Effective Time, any person who has not commenced an appraisal proceeding or joined a proceeding as a named party may withdraw the demand and accept the Merger Consideration specified by the Merger Agreement for that person's Company Shares by delivering to the surviving corporation a written withdrawal of the demand for appraisal. However, any such attempt to withdraw the demand made more than sixty (60) days after the Effective Time will require written approval of the surviving corporation. Unless the demand is properly withdrawn by the person within sixty (60) days after the effective date, no appraisal proceeding in the Delaware Court of Chancery will be dismissed as to any person without the approval of the Delaware Court of Chancery, with such approval conditioned upon such terms as the Delaware Court of Chancery deems just. If the surviving corporation does not approve a request to withdraw a demand for appraisal when that approval is required, or if the Delaware Court of Chancery does not approve the dismissal of an appraisal proceeding, the person will be entitled to receive only the fair value of such person's Company Shares determined by the Delaware Court of Chancery in any such appraisal proceeding, which value could be less than, equal to or more than the Merger Consideration offered pursuant to the Merger Agreement.

In addition, within one hundred twenty (120) days after the Effective Time, any person who has theretofore complied with the applicable provisions of Section 262 will be entitled, upon written request, to receive from the surviving corporation a statement setting forth the aggregate number of Company Shares not consented in writing or otherwise voted in favor of the Merger and with respect to which demands for appraisal were received by the surviving corporation and the aggregate number of holders of such Company Shares. Such statement must be given within ten (10) days after the written request therefor has been received by the surviving corporation or within ten (10) days after the expiration of the period for the delivery of demands as described above, whichever is later.

Upon the filing of a petition by a person, service of a copy of such petition shall be made upon the surviving corporation. The surviving corporation shall be required to, within twenty (20) days after such service, file in the office of the Register in Chancery in which the petition was filed a duly verified list containing the names and addresses of all persons who have demanded appraisal of their Company Shares and with whom the surviving corporation has not reached agreements as to the value of such Company Shares (the "*Chancery List*"). The Register in Chancery, if so ordered by the Delaware Court of Chancery, shall give notice of the time and place fixed for the hearing of such petition by registered or certified mail to the surviving corporation and to all such persons set forth on the Chancery List.

If a petition for an appraisal is timely filed by a person, at the hearing on such petition, the Delaware Court of Chancery will determine which persons have complied with Section 262 and have become entitled to appraisal rights provided thereby. The Delaware Court of Chancery may require the persons who have demanded an appraisal of their Company Shares and who hold Company Shares represented by certificates to submit their certificates of Company Shares to the Register in Chancery for notation thereon of the pendency of the appraisal proceedings; and if any person fails to comply with such direction, the Delaware Court of Chancery may dismiss the proceedings as to such person.

71

Table of Contents

Upon application by the surviving corporation or any person entitled to participate in the appraisal proceedings, the Delaware Court of Chancery may, in its discretion, proceed to trial upon the appraisal prior to the final determination of the persons entitled to appraisal. Any person whose name appears on the Chancery List and may participate fully in all proceedings until it is finally determined that such person is not entitled to appraisal rights under Section 262.

Where proceedings are not dismissed, the appraisal proceeding shall be conducted in accordance with the rules of the Delaware Court of Chancery, including any rules specifically governing appraisal proceedings. Through such proceedings the Delaware Court of Chancery shall determine the fair value of Company Shares taking into account all relevant factors, exclusive of any element of value arising from the accomplishment or expectation of the Merger, together with interest, if any, to be paid upon the amount determined to be the fair value. Unless the Delaware Court of Chancery, in its discretion, determines otherwise for good cause shown, interest on an appraisal award will accrue and compound quarterly from the Effective Time through the date the judgment is paid at five percent (5%) over the Federal Reserve discount rate (including any surcharge) as established from time to time during the period between the Effective Time and the date of payment of the judgment. At any time before the entry of judgment in the proceedings, the surviving corporation may pay to each person entitled to appraisal an amount in cash, in which case interest shall accrue after such payment only on the sum of (x) the difference, if any, between the amount so paid and the fair value of the Company Shares as determined by the Delaware Court of Chancery, and (y) interest theretofore accrued, unless paid at that time.

When the fair value of the Company Shares is determined, the Delaware Court of Chancery will direct the payment of such value, with interest thereon, if any, to the persons entitled to receive the same.

Although Cerevel believes that the Merger Consideration is fair, no representation is made as to the outcome of the appraisal of fair value as determined by the Delaware Court of Chancery and persons should recognize that such an appraisal could result in a determination of a value higher or lower than, or the same as, the Merger Consideration. Moreover, the surviving corporation does not anticipate offering more than the Merger Consideration to any person exercising appraisal rights and reserves the right to assert, in any appraisal proceeding, that, for purposes of Section 262, the "fair value" of the relevant Company Shares is less than the Merger Consideration.

In determining "fair value", the Delaware Court of Chancery is required to take into account all relevant factors. In *Weinberger v. UOP, Inc.*, the Delaware Supreme Court discussed the factors that could be considered in determining fair value in an appraisal proceeding, stating that "proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court" should be considered and that "[f]air price obviously requires consideration of all relevant factors involving the value of a company." The Delaware Supreme Court has stated that in making this determination of fair value, the court must consider market value, asset value, dividends, earnings prospects, the nature of the enterprise and any other facts which were known or could be ascertained as of the date of the Merger which throw any light on future prospects of the merged corporation. The Delaware Supreme Court has indicated that transaction price is one of the relevant factors the Delaware Court of Chancery may consider in determining "fair value" and that absent deficiencies in the sale process the transaction price should be given "considerable weight." Section 262 provides that fair value is to be "exclusive of any element of value arising from the accomplishment or expectation of the Merger." In *Cede & Co. v. Technicolor, Inc.*, the Delaware Supreme Court stated that such exclusion is a "narrow exclusion [that] does not encompass known elements of value," but which rather applies only to the speculative elements of value arising from such accomplishment or expectation. In *Weinberger*, the Delaware Supreme Court construed Section 262 to mean that "elements of future value, including the nature of the enterprise, which are known or susceptible of proof as of the date of the Merger and not the product of speculation, may be considered."

The cost of the appraisal proceeding may be determined by the Delaware Court of Chancery and taxed upon the parties as the Delaware Court of Chancery deems equitable in the circumstances. However, costs do not include attorneys' and expert witness fees. Each person is responsible for his, her or its attorneys' and expert

72

**Table of Contents**

witness fees, although, upon application of a person whose name appears on the Chancery List who participated in the proceeding and incurred expenses in connection therewith, the Delaware Court of Chancery may order that all or a portion of such expenses, including, without limitation, reasonable attorneys' and expert witness fees, be charged pro rata against the value of all Company Shares entitled to appraisal not dismissed pursuant to Section 262(k) of the DGCL or subject to such an award pursuant to a reservation of jurisdiction under Section 262(k) of the DGCL. Determinations by the Delaware Court of Chancery are subject to appellate review by the Delaware Supreme Court.

Any person who has duly demanded appraisal in compliance with Section 262 will not be entitled to vote for any purpose any Company Shares subject to such demand or to receive payment of dividends or other distributions on such Company Shares, except for dividends or distributions payable to Cerevel stockholders of record at a date prior to the Effective Time.

To the extent there are any inconsistencies between the foregoing summary, on the one hand, and Section 262, on the other hand, Section 262 will govern.

***Failure to comply strictly with all of the procedures set forth in Section 262 will result in the loss of a stockholder's statutory appraisal rights.***

**Material U.S. Federal Income Tax Consequences of the Merger to Holders of Company Shares**

The following discussion is a summary of certain material U.S. federal income tax consequences of the Merger that may be relevant to holders of Company Shares whose Company Shares are converted into the right to receive cash pursuant to the Merger. This discussion is based upon the Code, Treasury Regulations promulgated under the Code, court decisions, published positions of the Internal Revenue Service (the "*IRS*"), and other applicable authorities, all as in effect on the date of this proxy statement and all of which are subject to change or differing interpretations at any time, possibly with retroactive effect. This discussion is limited to holders that hold their Company Shares as "capital assets" within the meaning of Section 1221 of the Code (generally, property held for investment purposes). This summary of material U.S. federal income tax consequences is not a complete description of all potential U.S. federal income tax consequences of the Merger. This summary does not describe any of the tax consequences arising under the laws of any state, local or non-U.S. tax jurisdiction and does not consider any aspects of U.S. federal tax law other than income taxation (*e.g.*, state, gift or alternative minimum tax, the Medicare net investment income surtax, or any withholding considerations under the Foreign Account Tax Compliance Act of 2010 (including regulations issued thereunder and intergovernmental agreements entered into pursuant thereto or in connection therewith)). In addition, this summary does not address the U.S. federal income tax consequences to holders of Company Shares that exercise appraisal rights under the DGCL. For purposes of this discussion, a "holder" means either a U.S. Holder or a Non-U.S. Holder or both, as the context may require.

This discussion is for general information only and does not address all of the U.S. federal income tax considerations that may be relevant to holders in light of their particular facts and circumstances, including, but not limited to:

- holders that may be subject to special treatment under U.S. federal income tax laws, such as: financial institutions, tax-exempt organizations, governmental organizations, S corporations, partnerships or any other entities or arrangements treated as pass-through entities or partnerships for U.S. federal income tax purposes or any investor therein, insurance companies, mutual funds, brokers or dealers in stocks, securities, commodities or currencies, traders in securities that elect to use the mark-to-market method of accounting for their securities, regulated investment companies, real estate investment trusts, "controlled foreign corporations," "passive foreign investment companies" or certain former citizens or long-term residents of the United States;

- holders holding their Company Shares as part of a hedging, straddle or other risk reducing transaction or as part of a conversion transaction or other integrated investment;

73

Table of Contents

- holders deemed to sell their Company Shares under the constructive sale provisions of the Code;

- holders that received their Company Shares in compensatory transactions;

- holders that hold their Company Shares through individual retirement or other tax-deferred accounts;

- holders that own an equity interest, actually or constructively, in AbbVie or the surviving corporation;

- U.S. Holders whose "functional currency" is not the U.S. dollar;

- holders that are required to report income no later than when such income is reported in an "applicable financial statement"; or

- holders that own or have owned (directly, indirectly or constructively) 5% or more of the Company Shares (by vote or value).

If a partnership (including an entity or arrangement classified as a partnership for U.S. federal income tax purposes) is a beneficial owner of Company Shares, the U.S. federal income tax treatment of a partner in such partnership will generally depend upon the status of the partner, the activities of the partnership and certain determinations made at the partner level. Partnerships holding Company Shares and partners therein should consult their tax advisors regarding the particular tax consequences to them of the Merger.

We have not sought, and do not intend to seek, any ruling from the IRS with respect to the statements made and the conclusions reached in the following summary. No assurance can be given that the IRS will agree with the views expressed in this summary, or that a court will not sustain any challenge by the IRS in the event of litigation.

THIS DISCUSSION OF MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES IS PROVIDED FOR GENERAL INFORMATION ONLY AND DOES NOT CONSTITUTE LEGAL OR TAX ADVICE TO ANY HOLDER. A HOLDER SHOULD CONSULT ITS TAX ADVISORS CONCERNING THE U.S. FEDERAL INCOME TAX CONSEQUENCES RELATING TO THE MERGER IN LIGHT OF ITS PARTICULAR CIRCUMSTANCES AND ANY CONSEQUENCES ARISING UNDER THE LAWS OF ANY STATE, LOCAL OR NON-U.S. TAXING JURISDICTION OR OTHER TAX LAWS.

*U.S. Holders*

For purposes of this proxy statement, a "*U.S. Holder*" is a beneficial owner of Company Shares who or that is for U.S. federal income tax purposes:

- An individual who is a citizen or resident of the United States;

- A corporation, or other entity taxable as a corporation, created or organized in or under the laws of the United States or any state thereof or the District of Columbia;

- An estate, the income of which is subject to U.S. federal income taxation regardless of its source; or

- A trust (i) that is subject to the primary supervision of a court within the United States and the control of one or more "United States persons" as defined in Section 7701(a)(30) of the Code or (ii) that has a valid election in effect under applicable Treasury regulations to be treated as a United States person for U.S. federal income tax purposes.

The receipt of cash by a U.S. Holder in exchange for Company Shares pursuant to the Merger will be a taxable transaction for U.S. federal income tax purposes. In general, such U.S. Holder will recognize gain or loss equal to the difference, if any, between the amount of cash received and the U.S. Holder's adjusted tax basis in the Company Shares surrendered pursuant to the Merger. A U.S. Holder's adjusted tax basis generally will equal the amount that such U.S. Holder paid for the Company Shares. Any such gain or loss generally will be capital gain or loss and will be long-term capital gain or loss if such U.S. Holder's holding period in such Company

74

**Table of Contents**

Shares is more than one year at the time of the consummation of the Merger. A reduced tax rate on capital gains generally will apply to long-term capital gains of non-corporate U.S. Holders, including individuals. There are limitations on the deductibility of capital losses. If a U.S. Holder acquired different blocks of Company Shares at different times or different prices, such U.S. Holder must determine its adjusted tax basis and holding period separately with respect to each block of Company Shares.

Payments made to a U.S. Holder in exchange for Company Shares pursuant to the Merger may be subject to information reporting to the IRS and backup withholding at a rate of 24%. To avoid backup withholding on such payments, U.S. Holders that do not otherwise establish an exemption should complete and return to the exchange agent a properly executed IRS Form W-9 included in the letter of transmittal certifying that such holder is a United States person for U.S. federal income tax purposes, that the taxpayer identification number provided is correct and that such holder is not subject to backup withholding. Certain types of U.S. Holders (including, with respect to certain types of payments, corporations) generally are not subject to backup withholding or information reporting rules.

Backup withholding is not an additional tax. Any amounts withheld from cash payments to a U.S. Holder pursuant to the Merger under the backup withholding rules generally will be allowed as a refund or a credit against such U.S. Holder's U.S. federal income tax liability, if any, provided the required information is timely furnished to the IRS. U.S. Holders should consult their tax advisors regarding their qualification for an exemption from backup withholding and the procedures for obtaining such an exemption.

*Non-U.S. Holders*

For purposes of this proxy statement, the term "*Non-U.S. Holder*" means a beneficial owner of Company Shares that is neither a U.S. Holder nor an entity or arrangement treated as a partnership for U.S. federal income tax purposes.

Non-U.S. Holders should consult their tax advisors to determine the U.S. federal, state, local, non-U.S. and other tax consequences that may be relevant to them in light of their particular circumstances.

Any gain realized by a Non-U.S. Holder pursuant to the Merger generally will not be subject to U.S. federal income tax unless:

- the gain is effectively connected with a trade or business of such Non-U.S. Holder in the United States (and, if required by an applicable income tax treaty, is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States), in which case such gain generally will be subject to U.S. federal income tax at rates generally applicable to U.S. persons, and, if the Non-U.S. Holder is a corporation, such gain may also be subject to an additional branch profits tax at a rate of 30% (or a lower rate specified under an applicable tax treaty);

- such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of the disposition, and certain other specified conditions are met, in which case such gain will be subject to U.S. federal income tax at a rate of 30% (or a lower rate specified under an applicable tax treaty), which may be offset by U.S.-source capital losses of such Non-U.S. Holder recognized in the same taxable year (if any) provided the Non-U.S. Holder timely files U.S. federal income tax returns with respect to such losses; or

- Company Shares held by such Non-U.S. Holder constitute a United States real property interest (a "*USRPI*") by reason of Cerevel's status as a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code (a "*USRPHC*"), at any time during the shorter of the five-year period ending on the date of the Effective Time or the period that the Non-U.S. Holder held the applicable Company Shares.

75

Table of Contents

With respect to the third bullet point above, Cerevel is not currently, has not been during the preceding five years and prior to or at the time of the Merger does not expect to become a USRPHC. Because the determination of whether Cerevel is a USRPHC depends, however, on the fair market value of its USRPIs relative to the fair market value of its non-U.S. real property interests and other business assets, there can be no assurance Cerevel is not a USRPHC. Even if Cerevel is a USRPHC, gain arising from the sale or other taxable disposition of Cerevel common stock by a Non-U.S. Holder will not be subject to U.S. federal income tax if Cerevel common stock is "regularly traded," as defined by applicable Treasury Regulations, on an established securities market and such Non-U.S. Holder owned, actually and constructively, 5% or less of Cerevel common stock throughout the shorter of the five-year period ending on the date of the sale or other taxable disposition or the Non-U.S. Holder's holding period.

Non-U.S. Holders should consult their tax advisors regarding potentially applicable income tax treaties that may provide for different rules.

Payments made to Non-U.S. Holders in exchange for Company Shares pursuant to the Merger may be subject to information reporting to the IRS and backup withholding at a rate of 24%. Non-U.S. Holders generally can avoid backup withholding by providing the exchange agent with the applicable and properly completed and executed IRS Form W-8 certifying the holder's non-U.S. status or by otherwise establishing an exemption. Copies of information returns that are filed with the IRS may be made available under an applicable tax treaty or information exchange agreement to the tax authorities of the country in which the Non-U.S. Holder resides or is established. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules generally will be allowed as a refund or a credit against a Non-U.S. Holder's U.S. federal income tax liability, if any, provided the required information is timely furnished to the IRS.

## Regulatory Approvals Required for the Merger

### HSR Act and U.S. Antitrust Matters

Under the HSR Act, and the rules promulgated thereunder by the Federal Trade Commission (the "*FTC*"), the Merger cannot be consummated until Cerevel and AbbVie each file a notification and report form with the FTC and the Antitrust Division of the U.S. Department of Justice (the "*DOJ*") under the HSR Act and the applicable waiting period thereunder has expired or been terminated. A transaction notifiable under the HSR Act may not be completed until the expiration of a waiting period following the parties' filing of their respective HSR Act notification forms or the early termination of that waiting period. The DOJ or the FTC may extend the waiting period by issuing a Request for Additional Information and documentary materials (a "*Second Request*"). If either agency issues a Second Request, the waiting period will be extended until after the parties substantially comply with the request. Following discussions with the FTC, the parties voluntarily withdrew the initial HSR Act notification and refiled a new HSR Act notification. The withdrawal and refiling are standard procedural steps that provide the FTC with additional time to complete its review of the proposed Merger. The waiting period under the HSR Act is set to expire at 11:59 p.m., Eastern Time, on February 16, 2024.

At any time before or after consummation of the Merger, notwithstanding the expiration or termination of the waiting period under the HSR Act, the Antitrust Division of the DOJ or the FTC could take such action under applicable antitrust laws as it deems necessary or desirable in the public interest, including seeking to enjoin the consummation of the Merger, seeking divestiture of substantial assets of the parties or requiring the parties to license, or hold separate, assets or terminate existing relationships and contractual rights. At any time before or after the consummation of the Merger, and notwithstanding the expiration or termination of the waiting period under the HSR Act, any state could take such action under its applicable antitrust laws as it deems necessary or desirable in the public interest. Such action could include seeking to enjoin the consummation of the Merger or seeking divestiture of substantial assets of the parties. Private parties may also seek to take legal action under applicable antitrust laws under certain circumstances.

76

**Table of Contents**

*General*

Subject to the terms of the Merger Agreement, Cerevel and AbbVie have agreed to use their respective reasonable best efforts to promptly take any and all actions reasonably necessary to cause the expiration or termination of the applicable waiting periods under the HSR Act and any non-U.S. antitrust laws as soon as practicable (and in any event prior to the Termination Date), and to avoid any impediment to the consummation of the Merger under the HSR Act or any non-U.S. antitrust laws. Notwithstanding the foregoing or anything to the contrary contained in the Merger Agreement, neither AbbVie nor any of its affiliates shall be required to agree to any of the following actions (and the Company shall not agree to any of the following actions without the express written consent of AbbVie): (1) selling, licensing, assigning, transferring, divesting, holding separate, granting any commercial rights to or otherwise disposing of any assets, business or portion of any business (or interests therein) of the Company, the surviving corporation, AbbVie or any of their respective affiliates; (2) proposing, negotiating, committing to or effecting, by consent decree, hold separate order or otherwise, any conduct of business restrictions; (3) amending or terminating (or agreeing to amend or terminate) any existing relationship, contractual right or obligation or venture or other arrangement of AbbVie or its affiliates or the Company or its affiliates; (4) offering, agreeing or consenting to any change (including through a licensing arrangement or the creation of any relationship or contractual right or obligation) to or restriction on, or other impairment of, AbbVie's ability to own or operate the businesses, product lines, fields of use, divisions, business arrangements, contracts, assets or interests therein of AbbVie or its affiliates (including, after the Closing, the surviving corporation and its affiliates); or (5) otherwise taking or committing to take actions after the Closing with respect to one or more of the businesses, product lines, fields of use, or assets of AbbVie and its affiliates (including the surviving corporation and its affiliates), including any obligation to obtain any "prior approval" or other affirmative approval from a governmental authority to carry out any future transaction. AbbVie shall, after reasonable consultation with the Company and consideration in good faith of the views and comments of the Company in connection with the following, have the right to (A) direct, devise and implement the strategy for obtaining any necessary approval of, for responding to any request from, inquiry or investigation by (including coordinating with the Company with respect to the timing, nature and substance of all such responses), and in connection with all meetings and communications (including any negotiations) with, any governmental authority that has authority to enforce any non-U.S. antitrust laws or foreign investment law, (B) control the defense and settlement of any legal proceeding brought by or before any governmental authority that has authority to enforce any antitrust law or foreign investment law and (C) determine whether to pull and refile, on one or more occasions, any filing made under the HSR Act, or any other antitrust law, in connection with the transactions contemplated hereby, prior to the Termination Date; *provided* that neither AbbVie nor the Company may enter into any agreement with the FTC, the Antitrust Division of the DOJ or any other governmental authority not to consummate the transactions contemplated by the Merger Agreement without the prior written consent of the other party (such consent not to be unreasonably withheld, conditioned or delayed). Further, subject to Section 6.2(a) of the Merger Agreement, if any legal proceeding, including any proceeding by a private party, is instituted (or threatened) challenging or seeking to restrain, prohibit or place conditions on the consummation of the transactions contemplated by the Merger Agreement, including the Merger, or the ownership or operation by AbbVie, the Company or any of their respective subsidiaries of all or any portion of their respective businesses as presently conducted and as currently proposed to be conducted, AbbVie (and its subsidiaries) and the Company (and its subsidiaries) shall use their reasonable best efforts to defend or contest, including through litigation or other means, any objection to, or legal proceedings challenging, the consummation of the transactions contemplated by the Merger Agreement, and to have vacated, lifted, reversed or overturned any decree, judgment, injunction or other order, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents or restricts consummation of the transactions contemplated by the Merger Agreement, including the Merger.

Other than the filings required under the HSR Act as described above, we currently do not expect that any clearance, approval or consent would be required under any other applicable antitrust law in connection with the Merger.

77

**Table of Contents**

**Delisting and Deregistration of Company Shares**

If the Merger is consummated, following the Effective Time, the Company Shares will cease trading on Nasdaq and will be deregistered under the Exchange Act. As such, we would no longer file periodic reports with the SEC.

78