**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| IN RE CEREVEL THERAPEUTICS HOLDINGS, INC. SECURITIES LITIGATION | ) ) ) ) ) ) ) ) |

Case No. 25-cv-417-GBW
PUBLIC VERSION FILED
NOVEMBER 6, 225

## <u>OPENING BRIEF IN SUPPORT OF MOTION TO DISMISS</u>

OF COUNSEL:

Peter L. Welsh
Daniel V. McCaughey
Elena Weissman Davis
ROPES & GRAY LLP
800 Boylston Street
Boston, MA 02199
(617) 951-7000

Martin J. Crisp
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036-8704
(212) 596-9000

A. Thompson Bayliss (#4379)
Christopher Fitzpatrick Cannataro (#6621)
Clara Hubbard (#7320)
ABRAMS & BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, DE 19801
(302) 778-1000

*Counsel for Defendants Bain Capital Investors,
LLC, Adam Koppel, and Christopher Gordon*

Dated:  October 30, 2025

# TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDINGS .............................................................1

SUMMARY OF ARGUMENT ........................................................................................1

BACKGROUND ...........................................................................................................4

    **A.**   Overview of Cerevel Therapeutics, Inc. ............................................................4

    **B.**   Cerevel's Need to Extend Its Cash Runway ......................................................5

    **C.**   Cerevel Conducts A Follow-On Offering to Raise Cash.....................................6

    **D.**   After the Offering, AbbVie Makes An Unsolicited Acquisition Offer ..................................................................................................................6

    **E.**   Plaintiff Files This Action...............................................................................7

ARGUMENT.................................................................................................................7

**I.**    PLAINTIFFS FAIL TO PLEAD A SECTION 20A CLAIM (COUNT II).........................7

    **A.**   Plaintiffs Fail to Plead a Predicate Violation. ..................................................7

        **1.**   Plaintiffs Do Not Plead Materiality or Possession By Bain of the Alleged MNPI......................................................................8

        **2.**   Plaintiffs Fail to Plead that Bain's Purchase in the Offering Constituted Deceptive Conduct or Breached Any Duty...........................11

        **3.**   The Complaint Fails to Give Rise to a Strong Inference of Scienter. .............................................................................13

            **a.**   The Complaint Gives Rise to a More Compelling Opposing Non-Fraudulent Inference. .............................................14

            **b.**   The Offering Diluted Bain's Equity Stake in Cerevel. ....................................................................18

            **c.**   The Complaint Alleges No Other Facts Giving Rise to a Strong Inference of Scienter. ....................................21

    **B.**   Plaintiffs Fail to Allege That They Traded Contemporaneously with Bain.....................................................................................................22

**II.**   THE COMPLAINT FAILS TO STATE A SECTION 20(a) CLAIM (COUNT IV).................................................................................................22

**A.** Plaintiffs Fail to Allege an Underlying Violation...................................................23

**B.** Bain Was Not a Controlling Person of Cerevel or Renaud Under Section 20(a). ......................................................................................................23

**C.** Bain Was Not A "Culpable Participant" Under Section 20(a). .............................24

CONCLUSION.........................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Able Lab'ys. Sec. Litig.*,
2008 WL 1967509 (D.N.J. Mar. 24, 2008)..................................................................22

*In re Advance Auto Parts, Inc., Sec. Litig.*,
2020 WL 599543 (D. Del. Feb. 7, 2020)................................................................24, 25

*Alaska Elec. Pension Fund v. Asar*,
768 F. App'x 175 (5th Cir. 2019) ...............................................................................14

*Albert v. Alex. Brown Mgmt. Servs., Inc.*,
2005 WL 2130607 (Del. Ch. Aug. 26, 2005) ...............................................................11

*Belmont v. MB Inv. P'rs, Inc.*,
708 F.3d 470 (3d Cir. 2013)........................................................................................24

*Brophy v. Cities Serv. Co.*,
70 A.2d 5 (Del. Ch. 1949)...........................................................................................17

*Buban v. O'Brien*,
1994 WL 324093 (N.D. Cal. June 22, 1994)...............................................................22

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*,
497 F.3d 546 (5th Cir. 2007) .......................................................................................21

*Charal Inv. Co. v. Rockefeller*,
131 F. Supp. 2d 593 (D. Del. 2001).............................................................................16

*Chiarella v. United States*,
445 U.S. 222 (1980).....................................................................................................12

*City of Edinburgh Council v. Pfizer, Inc.*,
754 F.3d 159 (3d Cir. 2024).............................................................................8, 13, 22

*Copland v. Grumet*,
88 F. Supp. 2d 326 (D.N.J. 1999) ...............................................................................22

*In re Digit. Island Sec. Litig.*,
223 F. Supp. 2d 546 (D. Del. 2002)..................................................................23, 24, 25

*Dirks v. SEC*,
463 U.S. 646 (1983)......................................................................................................7

iii

*In re Flag Telecom, Ltd. Sec. Litig*,
  308 F. Supp. 2d 249 (S.D.N.Y. 2004) ...................................................................... 24

*In re Gupta Corp. Sec. Litig.*,
  900 F. Supp. 1217 (N.D. Cal. 1994) ...................................................................... 24

*In re Kosmos Energy Ltd. Sec. Litig.*,
  955 F. Supp. 2d 658 (N.D. Tex. 2013) .......................................................... 11, 24

*Lipton v. Pathogenesis Corp.*,
  284 F.3d 1027 (9th Cir. 2002) .............................................................................. 21

*Martin v. GNC Holdings, Inc.*,
  2017 WL 3974002 (W.D. Pa. Sept. 8, 2017), *aff'd*, 757 F. App'x 151 (3d Cir.
  2018) ...................................................................................................................... 14

*Matrix Parent, Inc. v. Audax Mgmt. Co.*,
  319 A.3d 909 (Del. Super. Ct. 2024) ..................................................................... 18

*Mill Bridge V, Inc. v. Benton*,
  2010 WL 5186078 (E.D. Pa. Dec. 21, 2010) ............................................................ 9

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
  834 F.3d 481 (3d Cir. 2016) .................................................................................... 4

*Phillips v. LCI Int'l, Inc.*,
  190 F.3d 609 (4th Cir. 1999) .................................................................................. 20

*Radiation Dynamics, Inc. v. Goldmuntz*,
  464 F.2d 876 (2d Cir. 1972) .................................................................................... 13

*In re Refco, Inc. Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007) ...................................................................... 7

*Rochez Bros. v. Rhoades*,
  527 F.2d 880 (3d Cir. 1975) .................................................................................... 25

*Salman v. United States*,
  580 U.S. 39 (2016) .................................................................................................... 7

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
  485 F. Supp. 3d 1113 (N.D. Cal. 2020) ................................................................... 22

*SEC v. Tex. Gulf Sulphur Co.*,
  401 F.2d 833 (2d Cir. 1968) .................................................................................... 13

*SEIU Pension Plans Master Trust v. Bain Capital Investors, LLC*,
  No. 2024-1274-JTL (Del. Ch.) ............................................................................ 2, 7

*Shah v. Zimmer Biomet Holdings, Inc.*,
    348 F. Supp. 3d 821 (N.D. Ind. 2018) ...................................................................10

*Shapiro v. UJB Fin. Corp.*,
    964 F.2d 272 (3d Cir. 1992)...................................................................................23

*Sheehan v. Little Switzerland, Inc.*,
    136 F. Supp. 2d 301 (D. Del. 2001)........................................................................23

*In re Silver Lake Grp., LLC Sec. Litig.*,
    108 F.4th 1178 (9th Cir. 2024) ...............................................................................9

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
    2000 WL 1727405 (N.D. Cal. Sept. 29, 2000) ...............................................24, 25

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006)...................................................................................11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).........................................................................3, 8, 14, 17

*United Ass'n Nat'l Pension Fund v. Carvana Co.*,
    759 F. Supp. 3d 926 (D. Ariz. 2024) ......................................................................11

*United States v. O'Hagan*,
    521 U.S. 642 (1997)........................................................................................8, 12

*Wilson v. Comtech Telecomms. Corp.*,
    648 F.2d 88 (2d Cir. 1981)......................................................................................13

*Winer Fam. Tr. v. Queen*,
    503 F.3d 319 (3d Cir. 2007)....................................................................................16

*Winshall v. Viacom Int'l, Inc.*,
    76 A.3d 808 (Del. 2013) .........................................................................................17

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994) ..................................................................................20

## Statutes and Rules

15 U.S.C. § 78j.................................................................................................................12

15 U.S.C. § 78t-1 ...............................................................................................................7

Fed. R. Civ. P. 9(b) .............................................................................................8, 11, 18

Fed. R. Civ. P. 12(b)(6).......................................................................................................4

## NATURE AND STAGE OF THE PROCEEDINGS

On August 13, 2025, SM Merger/Arbitrage, LP, Associated Capital Group, Inc., and Atlas Diversified Master Fund, Ltd. (collectively, "Plaintiffs") filed a consolidated amended complaint (the "Complaint"), which alleges violations of Sections 10(b), 20A, 14(a), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5. *See* D.I. 19. Defendants Bain Capital Investors, LLC ("Bain") and Christopher Gordon and Adam Koppel (collectively, the "Bain Directors" and together with Bain, the "Bain Defendants") respectfully submit this brief in support of their motion to dismiss the Complaint.

## SUMMARY OF ARGUMENT

1.      The Complaint theorizes that a host of different individuals and entities associated with Cerevel all took part in a coordinated plot to (i) cause Cerevel to make an unnecessary secondary offering in October of 2023 (the "Offering"), (ii) allow Bain and Perceptive to acquire company shares while in possession of material nonpublic information about alleged interest by AbbVie, Inc. in a whole-company acquisition, and (iii) make a series of misstatements and omissions to hide AbbVie's interest and cover up Bain and Perceptive's supposed insider trading. But that theory is nonsensical—and accordingly cannot support Plaintiffs' Section 20A "insider trading" claim against Bain under the rigorous pleading standards of the PSLRA. Most obviously, far from alleging the required strong inference of scienter, Plaintiffs' story describes what would have been the most ham-handed insider trading conspiracy of all time because Bain and Perceptive were *diluted* in the Offering, and therefore received *less* profit in the sale to AbbVie than they would have had the Offering never occurred. Nor could Bain's purchases in the Offering have been a deceptive breach of any duty—the cornerstone element of the federal securities laws' prohibition on insider trading—because Bain purchased its shares *from the Company*, which was

the alleged source of any (immaterial) information that Bain could have possessed about the AbbVie expression of interest in the first place.

2.      Plaintiffs may attempt to tout the Delaware Court of Chancery's recent denial of Bain's motion to dismiss in *SEIU Pension Plans Master Trust v. Bain Capital Investors, LLC*, No. 2024-1274-JTL, the case on which this action is based and which involves the same facts (but different legal claims) as those pled here, as somehow compelling denial of this motion as well.  But the holding of Vice Chancellor J. Travis Laster regarding the *SEIU* plaintiff's claims for breaches of fiduciary duties under Delaware state law has little bearing here, where the federal securities laws require, among other things, manipulation or deception in breach of a duty to one's trading counterparty, and a strong and compelling inference of scienter.  In particular, the Vice Chancellor's repeated statement that whether the *SEIU* plaintiff had pled scienter was a "close call" all but confirms that scienter is not sufficiently pled under the far more exacting PSLRA standard applicable here.  Binding Third Circuit precedent regarding materiality also compels a different result than the Vice Chancellor's assessment of that issue under Delaware law.

3.      For these and other reasons, Plaintiffs fall far short of pleading a Section 20A claim against Bain.  ***First***, Plaintiffs have not pled any predicate Section 10(b) insider trading violation.  Plaintiffs have not sufficiently pled that the information allegedly possessed by Bain was material, as the Complaint contains no well-pled facts suggesting that the Cerevel Board considered AbbVie's alleged expression of interest to be actionable, let alone the beginning of any meaningful negotiations for a sale of the Company.  Moreover, Section 10(b) requires manipulation or deception in breach of some legal duty.  Neither is present here: Bain traded with the Company, which knew that Bain was participating in the Offering and had all the same information that Bain supposedly did, including all alleged material nonpublic information.  Finally, "causing" and

2

participating in a *dilutive* offering that reduced Bain's net proceeds from the eventual sale to AbbVie does not come close to the strong inference of scienter required under the exacting standards of the PSLRA.  To the contrary, the Offering's dilutive impact generates the opposite inference of non-fraudulent intent, which this Court is required to weigh under *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).  That opposite inference is that Bain supported and participated in the dilutive Offering because raising capital was in the best long-term interests of the Company and its stockholders (with which Bain was fully aligned given its significant existing investment), and that neither Bain nor anyone else thought there was any meaningful prospect of an eventual sale to AbbVie at the time of the Offering.

4.      ***Second***, for the same reason that Plaintiffs cannot establish any deception by Bain or that Bain had any duty (as required for the predicate violation), Plaintiffs cannot allege that they traded contemporaneously with Bain.  The contemporaneity requirement was intended to permit recovery to plaintiffs who might conceivably have traded at an informational disadvantage with the defendant.  That is inapplicable here, where Bain traded only with the Company.

5.      Plaintiffs' Section 20(a) claim against Bain fares no better.  ***First***, Plaintiffs fail to allege an underlying Section 10(b) violation by Cerevel or Renaud, as detailed in Cerevel's and Renaud's briefing.  ***Second***, Plaintiffs fail to adequately plead that Bain was a control person of Cerevel or Renaud under Section 20(a), as they rely only on conclusory claims and insufficient allegations of stock ownership and other investor rights to suggest that Bain had actual control over the content of the allegedly false and misleading statements.  ***Finally***, in any event, Plaintiffs' boilerplate allegations about Bain's involvement in the relevant documents and influence over the content and dissemination of the statements do not suffice to meet the heavy burden to plead that Bain substantially participated in any of the allegedly fraudulent acts.

6.     Ultimately, Plaintiffs have not come close to meeting the high bar mandated by the federal securities laws for imposing liability on Bain, which lost money as a result of its supposed scheme to profit from material, nonpublic information, and which is not alleged to have had any role in the challenged statements and omissions, let alone one that suggests conscious misbehavior. The claims against the Bain Defendants should be dismissed with prejudice.

## BACKGROUND[1]

### A.     Overview of Cerevel Therapeutics, Inc.

Bain and Pfizer Inc. ("Pfizer") co-founded biopharmaceutical company Cerevel in 2018. ¶ 38.[2]  In 2020, in connection with the de-SPAC transaction through which Cerevel became a public company, Bain entered into an Amended and Restated Registration and Shareholder Rights Agreement ("Shareholders' Agreement") that granted Bain, Pfizer, and Perceptive Advisors LLC ("Perceptive") preemptive rights to purchase their pro rata portions of any newly issued Cerevel common stock.  ¶ 50; Ex. 1 (Shareholders' Agreement) § 4.5.[3]  At the time of the Company's founding, Bain owned 75% of Cerevel's equity.  ¶ 40.  But by the time of the merger with AbbVie ("Merger"), Bain's ownership had dropped to approximately 36.2%.  ¶ 87.

---

[1] Bain joins in full and incorporates Cerevel's concurrently filed brief in support of its motion to dismiss (the "Cerevel Motion"), as well as the briefs of Pfizer, Perceptive, Renaud, and the Director Defendants.  Bain restates here for the Court's convenience certain allegations relevant to the arguments presented in this Brief.

[2] Unless otherwise noted, all emphases have been added and all internal citations and quotation marks have been omitted.  Citations to "¶ __" refer to the Complaint.  Citations to "Ex. _" refer to exhibits attached to the Transmittal Affidavit of Christopher Fitzpatrick Cannataro, Esq., filed contemporaneously herewith.

[3] As required at this stage, the facts as summarized herein are derived from the Complaint, documents it incorporates by reference, and judicially noticeable documents.  Under the PSLRA, the Court "must consider the [C]omplaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the [C]omplaint by reference, and matters of which a court may take judicial notice." *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 490 (3d Cir. 2016).  Here, Exhibits 1 – 6 and 8 – 9 are incorporated into the Complaint by reference.  The Bain Defendants seek judicial notice of Exhibits 1, 7, and 9 – 13 in their concurrently filed Request for Judicial Notice.

### B.        Cerevel's Need to Extend Its Cash Runway

At all times before the Merger, Cerevel was a clinical-stage pre-revenue company that had not yet obtained FDA approval for any of its treatments or brought any products to market.  *See* Ex. 9 (Jan. 18, 2024 Schedule 14A) (the "Proxy") at 41.  In 2023, Cerevel was awaiting key data readouts for its lead drug candidate emraclidine in late 2024.  ¶ 73; *see* Ex. 9 at 41.  Because the Company's cash runway at that time extended only to May 2025, the Company explored various paths to raising capital to increase its financial independence.  ¶¶ 73, 77; Ex. 2 (Aug. 31, 2023 Board Materials) at -0988-89.

Beginning in early 2023, Cerevel engaged in discussions with several potential counterparties regarding one such capital-raising strategy: a possible Japanese regional partnership for emraclidine (the "Japanese Partnership").  ¶ 57; Ex. 9 at 42.  One of the potential counterparties was AbbVie.  ¶¶ 57, 64, 68.  Cerevel also explored other opportunities to raise capital in 2023, including a potential equity financing.  *See* Ex. 2 at -0989, -0990-94; ¶¶ 65, 77.  On August 31, 2023, the Board formed a special transaction committee to further explore the potential financing alternatives.  ¶ 65; Ex. 3 (Aug. 31, 2023 Board Minutes) at -0639.

On September 25, 2023, AbbVie informed Cerevel that it was withdrawing from consideration of the potential Japanese Partnership.  ¶ 68; Ex. 9 at 42.  During that conversation, AbbVie obliquely expressed interest in a potential broader transaction.  ¶ 68; Ex. 9 at 42.  The Complaint does not allege that AbbVie discussed any potential price, timing, valuation, or transaction structure, or that it even discussed a process or expected next steps for exploring the viability of any such transaction.  On September 27, 2023, the Board directed management to inform AbbVie that the Company was focused on the Japanese Partnership and was not considering other strategic transactions.  ¶ 74.

### C.    Cerevel Conducts A Follow-On Offering to Raise Cash

The Board approved the Offering on October 10, 2023, after months of work evaluating various alternatives to raise capital and "determin[ing] that extending the cash runway for Cerevel into 2026 by way of a public equity offering would best position Cerevel for future success." ¶ 77; Ex. 9 at 43.  The Offering closed on October 16, 2023, and raised $498.7 million in aggregate net proceeds.  ¶ 8; *see* Ex. 9 at 43.  As noted above, the Shareholders' Agreement granted Bain preemptive rights to purchase its pro rata portion of any newly issued shares.  ¶ 50; *see* Ex. 1 § 4.5.  But Bain did not exercise those rights in connection with the Offering, requesting and purchasing a lower percentage of the equity offering than its existing pro rata shares.  ¶¶ 50, 87.  As a result, the Offering ***diluted*** Bain's ownership stake in the Company.  ¶ 87.

### D.    After the Offering, AbbVie Makes An Unsolicited Acquisition Offer

On October 19, 2023, AbbVie submitted a written proposal to acquire the Company for $35 per share.  ¶ 93.  After the Board rejected that proposal, AbbVie increased its offer to $40 per share on November 7, 2023, and the parties engaged in meaningful negotiations over the course of November (including the Cerevel Board's rejection of an additional offer from AbbVie for $41.50 per share).  Ex. 9 at 44-47.  On December 6, 2023, the Board unanimously approved the Merger at a price of $45 per share, which the Company announced the next day.  ¶ 103; Ex. 9 at 47-49.  The Merger unquestionably benefited Cerevel stockholders: although the Complaint fails to mention it, on November 11, 2024, AbbVie announced negative results from emraclidine's Phase 2 clinical trial, resulting in a *$40 billion–plus decline* in AbbVie's market capitalization.[4]

---

[4] *See* Ex. 11 (AbbVie Inc. Historical Stock Prices, Yahoo Finance) (AbbVie's unadjusted closing stock price on (i) November 8, 2024 of $199.50 and (ii) November 11, 2024 of $174.43).  AbbVie's Form 10-Q for the quarterly period ended September 30, 2024, reported that as of October 28, 2024, AbbVie had 1,767,140,323 shares of common stock outstanding.  *See* Ex. 10 (AbbVie's Form 10-Q).

Ex. 12 (AbbVie Nov. 11, 2024 Press Release).

### E.      **Plaintiff Files This Action**

Plaintiffs filed this action on April 3, 2025, *see* D.I. 1, asserting substantially similar factual allegations as those in a case filed a few months earlier in the Delaware Court of Chancery, while reformulating the Delaware plaintiff's breach of fiduciary duty claims into alleged violations of the Exchange Act. *See SEIU Pension Plans Master Tr. v. Bain Cap. Invs., LLC*, No. 2024-1274-JTL (Del. Ch.) (the "Chancery Action"). The Complaint asserts (i) Section 10(b) and Rule 10b-5 claims against Cerevel and its CEO, Defendant Ron Renaud; (ii) Section 20A claims against Bain and Perceptive; (iii) a Section 14(a) claim against Cerevel; and (iv) Section 20(a) claims against Bain, Pfizer, and the Director Defendants.[5] ¶¶ 169-98.

## ARGUMENT

## I.      PLAINTIFFS FAIL TO PLEAD A SECTION 20A CLAIM (COUNT II)

### A.      **Plaintiffs Fail to Plead a Predicate Violation.**

Section 20A provides contemporaneous traders with a private right of action against investors who commit insider trading in violation of the Exchange Act (most obviously Section 10(b) and Rule 10b-5 thereunder). 15 U.S.C. § 78t-1. In addition to pleading that they traded contemporaneously with the defendant, a plaintiff must plead facts sufficient to constitute a predicate insider trading violation against the defendant. *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 664 (S.D.N.Y. 2007) (Section 20A predicate violation "must be an act of insider trading."). To plead a violation of Section 10(b) or Rule 10b-5, Plaintiffs must plead facts that show (among other things) materiality of the nonpublic information, a deceptive breach of a duty, and scienter. *Dirks v. SEC*, 463 U.S. 646, 653, 663 n.23 (1983); *Salman v. United States*, 580 U.S.

---

[5] The "Director Defendants" are Ron Renaud, Adam Koppel, Christopher Gordon, Deval Patrick, Deborah Baron, Sunet Varma, Ruth McKernan, and Doug Giordano. ¶ 37.

39, 41-42 (2016); *United States v. O'Hagan*, 521 U.S. 642, 651-53 (1997).  Because insider trading claims sound in fraud, plaintiffs must "state with particularity the circumstances constituting fraud" under Rule 9(b).  Fed. R. Civ. P. 9(b).  In addition, the PSLRA requires plaintiffs "to allege facts giving rise to a strong inference of scienter, which must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 176 (3d Cir. 2024); *see Tellabs*, 551 U.S. at 323 ("[A] court must take into account plausible opposing inferences."). The Complaint fails to plead all of these required elements.

### 1. Plaintiffs Do Not Plead Materiality or Possession By Bain of the Alleged MNPI.

Initially, the Complaint fails to state a 20A claim for two interrelated reasons:  it does not allege particularized facts showing what information related to AbbVie was actually "possessed" by Bain prior to its purchase in the Offering, or that any knowable information that Cerevel even could have relayed to Bain prior to the Offering would have been material in the first place.  *See Edinburgh*, 754 F.3d at 177 (plaintiff must allege that the insider was in possession of MNPI).

*Materiality.*  To begin with, none of the information on which Plaintiffs' 20A claim depends—related to AbbVie's alleged indication of interest in a whole-company acquisition—was even material as a matter of law.  As Cerevel describes further in its Motion, which the Bain Defendants incorporate, the Complaint alleges no well-pled facts suggesting that the eventual merger was remotely probable at the time of the Offering.  AbbVie's expression of interest was vague and preliminary: all Plaintiffs can muster, relying on a tracking spreadsheet exchanged between Cerevel's Chief Business Development & Strategic Operations Officer and Centerview, is that an unidentified AbbVie employee conveyed that it was ███████████████ ████████ in the context of discussions about the Japanese Partnership.  ¶ 7.  The Complaint

alleges no facts indicating that AbbVie conveyed a deal structure or price range. Nor does it allege any details around a potential timeline, including whether AbbVie envisioned consummating the transaction before or after the 2024 emraclidine data readouts, or any subsequent near-term steps that the parties might consider taking if they in fact had any interest in exploring a complex public company M&A process. There is also no indication that Cerevel or the Board—let alone anyone at Bain—felt there was any reason to engage with AbbVie regarding this cryptic expression of interest. While the Board allegedly discussed the expression of interest, the Board materials and minutes include no specific references to it, and Cerevel promptly responded to AbbVie by confirming its disinterest. *See* Ex. 4 (Sept. 27, 2023 Board Materials); Ex. 5 (Sept. 27, 2023 Board Minutes).

In *Mill Bridge V, Inc. v. Benton*, the Third Circuit held that merger discussions had not yet become material when "negotiations . . . were only in their infancy." 496 F. App'x 170, 174 (3d Cir. 2012). There, the potential acquirer had asked one of the target's board members about an interest in a strategic transaction, the target then communicated to the potential acquirer that its management wanted to explore a strategic transaction, the two sides had introductory discussions, entered into a confidentiality agreement, and had a formal meeting. *See Mill Bridge V, Inc. v. Benton*, 2010 WL 5186078, at *12 (E.D. Pa. Dec. 21, 2010). Here, the alleged discussions— consisting solely of one alleged, vague expression of interest by AbbVie that the Company promptly rejected—were far less developed, and cannot be described as "negotiations," in their "infancy" or otherwise.

***Actual Possession of MNPI by Bain.*** Plaintiffs also fail to plead particularized facts showing what, if any, information regarding the alleged expression of interest was actually "possessed" by Bain itself prior to its purchase in the Offering. *See In re Silver Lake Grp., LLC*

9

*Sec. Litig.*, 108 F.4th 1178, 1191 (9th Cir. 2024) ("To plead possession, a plaintiff must allege specifically what information [a defendant] obtained, when and from whom he obtained it, and how he used it for his own advantage."); *Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d 821, 849 (N.D. Ind. 2018) (dismissing Section 20A claim where plaintiff "alleged nothing more than that the [defendants] had *potential* access to insider information" and noting that plaintiff needed to "allege actual knowledge on the part of the [defendants]" (emphasis in original)).

As an initial matter, Plaintiffs do not allege what information was shared with Bain's Board designees apart from some generic update given to the Board, which the Board responded to by directing management to confirm to AbbVie the Company's lack of interest given its focus on ongoing capital raising strategies. No well pled fact indicates, for example, that the Board—or anyone at Bain—received any information regarding the opening of a "data room," or the tracking spreadsheet suggesting that AbbVie was preparing a term sheet (which, read in context, would far more likely refer to prior discussions with AbbVie regarding the Japanese partnership, but is not alleged to have been shared with the Board in any event). Plaintiffs also seek to rely on Centerview's September 27, 2023 presentation to the Board, and its statement that a ███████ ████████████████████████████████████████████████████████████ but that statement says nothing about AbbVie's actual statements regarding a broader transaction. ¶ 7. Instead, the same Centerview presentation makes clear that any discussion of M&A opportunities at the September 27 Board meeting had to do with how the near-term financing alternatives could influence a theoretical M&A transaction years in the future, *after* the Company received positive trial results. Indeed, those materials indicate that a sale of the Company before receiving trial results would be ***unlikely***, further undercutting the materiality of any information shared with the Board about any potential transaction with AbbVie. *See* ¶ 119; Ex. 4 at -1020 (Centerview deck

10

noting that ███████████████████████████████████████████████████ *In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 276-77 (3d Cir. 2006) (plaintiffs who allege fraud must comply with Rule 9(b) and allege the "who, what, when, where and how of the events at issue").

The Complaint also fails to allege any basis on which any information allegedly possessed by Bain's Board designees could be imputed to Bain itself. Although a corporation is generally charged with knowledge of an agent acting within the scope of their authority, Plaintiffs offer no allegations that Bain's Board designees acted on Bain's behalf in their capacity as Cerevel Board members. *See In re Kosmos Energy Ltd. Sec. Litig.*, 955 F. Supp. 2d 658, 676 (N.D. Tex. 2013) (dismissing Section 15 claim where there were no allegations that private equity firms' board designees were "acting on behalf" of the firms); *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005) (summarizing Delaware law of imputed knowledge of agents). Plaintiffs therefore do not plead that Bain "possessed" MNPI, which is fatal to their ability to plead a plausible violation of Section 20A. *See United Ass'n Nat'l Pension Fund v. Carvana Co.*, 759 F. Supp. 3d 926, 985 (D. Ariz. 2024) (dismissing Section 20A claim where complaint alleged that defendant attended board meetings where certain issues were discussed, but "lack[ed] any allegations detailing what information [defendant] specifically obtained on those subjects").

### 2. Plaintiffs Fail to Plead that Bain's Purchase in the Offering Constituted Deceptive Conduct or Breached Any Duty.

Not only do Plaintiffs fail to plead that anybody at the Company—including Bain's Board designees—actually possessed any MNPI, and not only is Plaintiffs' scienter theory implausible as described below, but Plaintiffs also cannot allege an underlying Section 10(b) violation because the relevant trades were only between Bain and the Company. As the Complaint alleges, Bain purchased its shares *from* the Company in a public underwritten offering that the Company's Board

11

approved.  In that transaction, Bain did not have access to any relevant confidential information not possessed by its counterparty, because any information available to Bain about the discussions with AbbVie came from the Company itself.  Plaintiffs try to shoehorn those facts into a statutory insider trading claim under Section 10(b).  But Section 10(b) is "not an all-purpose breach of fiduciary duty ban; rather, it trains on conduct involving manipulation or deception."  *O'Hagan*, 521 U.S. at 655; *see* 15 U.S.C. § 78j.  Here, Plaintiffs fail to allege any deception in connection with the Offering: Cerevel was Bain's counterparty, it knew that Bain was participating in the Offering, and as the only alleged source of confidential information available to Bain, Cerevel knew whatever confidential information had been shared with Bain related to AbbVie.

Although Plaintiffs claim that Bain and Perceptive "had a duty to disclose" confidential information related to AbbVie, Supreme Court precedent—which bases insider trading liability on a deceptive breach of a duty of trust or confidence—makes clear that Section 10(b) does not create a "parity of information rule" or a "general duty between all participants in market transactions to forgo actions based on material, nonpublic information."  *Chiarella v. United States*, 445 U.S. 222, 228 n.10, 233, 252 n.2 (1980).  Instead, Section 10(b) liability for insider trading must necessarily be tied to a deceptive breach of a specific duty owed to either an "insider's" transactional counterparty (under the classical theory of insider trading), or to a trader's source of confidential information (under the misappropriation theory).  *See id.* at 230 (under the classical theory, "such liability is premised upon a duty to disclose arising from a relationship of trust and confidence *between parties to a transaction*"); *O'Hagan*, 521 U.S. at 652, 655 (classical theory "targets a corporate insider's breach of duty to shareholders *with whom the insider transacts*"; under the misappropriation theory, there can be no "deceptive device," and thus no Section 10(b) violation, where trader "discloses to the source that he plans to trade on the nonpublic information").

12

Plaintiffs do not (and could not) assert that Bain breached any duty to Cerevel as the source of its information under the misappropriation theory, given Plaintiffs' acknowledgement that Cerevel was fully aware of Bain's participation in the Offering. Nor can Plaintiffs' claim survive under the classical theory of insider trading, because Cerevel—not any of the Plaintiffs—was Bain's transactional counterparty, and by Plaintiffs' own admission, Cerevel knew at least as much (if not more) confidential information related to AbbVie as Bain did. *See SEC v. Tex. Gulf Sulphur Co.*, 401 F.2d 833, 848 (2d Cir. 1968) (the "essence" of Rule 10b-5 prohibits traders from "tak[ing] advantage of [information intended to be available only for a corporate purpose] knowing it is unavailable to those with whom he is dealing"); *Wilson v. Comtech Telecomms. Corp.*, 648 F.2d 88, 94-95 (2d Cir. 1981) (insider trading laws were meant to protect those who "suffer the disadvantage of trading with someone who has superior access to information"); *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 887 (2d Cir. 1972) ("Rule 10b-5 was intended to prevent those in possession of material inside information from using that information to their own advantage *when dealing with others not possessing the same information*.").[6]

### 3. The Complaint Fails to Give Rise to a Strong Inference of Scienter.

Next, Plaintiffs do not come close to satisfying the heightened pleading standard for scienter under the PSLRA, as they must to allege a predicate insider trading claim. *See Edinburgh*, 754 F.3d at 176 (affirming dismissal where "insider trading allegations [were not] sufficient to meet the heightened pleading standards for scienter under the PSLRA"). Plaintiffs claim that Bain "possessed material non-public knowledge about ongoing merger negotiations that Bain knew or recklessly disregarded would cause the Company's share price to skyrocket when publicly

---

[6] Bain also was not an "insider" for the reasons articulated in Perceptive's Motion. While Plaintiffs claim Bain formed a control group with Pfizer, the Complaint does not plead facts to support that claim for the reasons detailed in Section II.B, including that Pfizer did not trade in the Offering.

13

disclosed, and used the October Offering to purchase shares at deflated prices before the non-public information was revealed." ¶ 183.  But the Complaint's own allegations and judicially noticeable facts establish that Bain did not receive any benefit from the transaction that would support an inference of scienter, as the Offering *diluted* Bain's equity stake in the Company.  Nor do the other allegations, taken as a whole, support the required strong inference of scienter.  To the contrary, the dilution to Bain and other facts pled in the Complaint point to a much more compelling and plausible opposing inference (which the Court must weigh against Plaintiffs' theory of scienter under the Supreme Court's decision in *Tellabs*): that Bain supported and participated in the Company-endorsed Offering simply because of Cerevel's need to raise capital and extend its cash runway, and that AbbVie's vague and offhanded comments about a theoretical "wholeco" transaction did not factor into Cerevel's decision-making.  *See, e.g.*, ¶¶ 63, 73, 77, 81, 124, 132; Ex. 4 at -1009, -1012 (Centerview advised that ███████████████████████ ████████████████████████████████████████████ and █████████████████ ███████████████████████).

        a.      **The Complaint Gives Rise to a More Compelling Opposing Non-Fraudulent Inference.**

A securities fraud claim will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324; *see Martin v. GNC Holdings, Inc.*, 2017 WL 3974002, at *13-15 (W.D. Pa. Sept. 8, 2017) (no scienter where "one could draw the opposing inference that it is common business practice" to act as defendant did), *aff'd*, 757 F. App'x 151 (3d Cir. 2018); *Alaska Elec. Pension Fund v. Asar*, 768 F. App'x 175, 181-82 (5th Cir. 2019) (no scienter in part because of a "plausible, nonculpable explanation" for the trades: to cover tax expenses).  Here, Plaintiffs' allegations overwhelmingly indicate a more cogent and

14

compelling non-fraudulent explanation for the Offering: Cerevel's goal to raise capital and extend its cash runway—a goal Cerevel was focused on for months before the Offering.

References to Cerevel's need to raise cash and extend its cash runway in 2023 are rampant throughout the Complaint and the documents integral to it.[7] *See, e.g.*, ¶ 63 (on August 2, 2023, Cerevel's CEO stated that "opportunistically bolstering the balance sheet remains a priority for the company to ensure we maintain the financial strength to maximize the value of our broad pipeline"); Ex. 2 at -0988-89 (August 31, 2023 Board meeting materials stating that the Company ███████████████████████████████ and that ██████████████████████████ ████████████████████████████████████████████ ██████████████████████████ and ████████████████████ ███); Ex. 4 at -1009, -1012 (September 27, 2023 Board meeting materials in which Centerview cautioned that ██████████████████████████████ ██████████████ and ████████████████████████████ *see also* ¶ 81 (quoting October 11, 2023 Preliminary Prospectus, which noted that the Offering would allow Cerevel to "support [its] ongoing and planned clinical trials and other research and development activities, and [use the proceeds] for working capital and other general corporate purposes, including to extend [Cerevel's] cash runway into 2026").[8]

---

[7] While Plaintiffs claim that Cerevel did not "urgently" need cash "and that it had a capital runway until May 2025," the use of that subjective adverb is beside the point: The Complaint acknowledges extensive facts in the record that establish the Board's desire to extend the Company's existing cash runway until well beyond when it expected to receive trial results for emraclidine, ¶¶ 73, 81, 95, and Plaintiffs cite no facts that could call into question the sincerity of that business judgment. To the contrary, the Board's desire to raise cash in order to support the Company's long-term business plan following emraclidine trial results defeats any inference that any of the defendants viewed AbbVie's offer as serious or actionable.

[8] For the reasons described in the Cerevel Motion, Plaintiffs fail to allege that any statements made about the Offering were false or misleading.

15

Moreover, the Cerevel Board had been evaluating strategies to raise additional cash well before AbbVie's alleged expression of interest, including evaluating potential "regional partnerships" by "early 2023," and evaluating a possible equity raise by at least August 2023. ¶¶ 57, 65; Ex. 3 at -0639 (August 31, 2023 Board Minutes noting that the Board created a special transaction committee to ██████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████[9]

The opposing inference to which these facts give rise—that the Cerevel Board approved the Offering simply to extend the Company's cash runway for necessary operations and its financial health, and that Bain's participation in it was driven by a desire to support the Company in light of Bain's already-existing significant investment[10]—is even stronger because, as detailed below, the Offering diluted Bain. As Plaintiffs allege, Cerevel considered other financing options that would not have diluted Bain, such as a "potential royalty or royalty-like financing transaction." ¶¶ 65, 78. That the Board (including the Bain director designees) approved the option that diluted Bain is entirely consistent with the inference that Bain was not motivated by profiting on the supposed MNPI it possessed. To the contrary, if Bain had taken AbbVie's vague indication of interest seriously (and wielded the control Plaintiffs claim), it would have scrapped the Offering

---

[9] Plaintiffs' Complaint omits the language in this document regarding the committee's consideration of "a potential issuance of common stock." ¶ 65. But the document is integrated into the Complaint, which a court can properly "probe[]" when considering a motion to dismiss. *See Winer Fam. Tr. v. Queen*, 503 F.3d 319, 328 (3d Cir. 2007); *see also Charal Inv. Co. v. Rockefeller*, 131 F. Supp. 2d 593, 604 (D. Del. 2001).

[10] Plaintiffs cite the fact that "Bain received approximately $2.7 billion" in the Merger for its entire stake in Cerevel as somehow indicative of Bain's scienter with respect to the Offering. ¶ 115. To the contrary, this fact weighs against an inference of scienter because it highlights the relative immateriality of the shares Bain purchased in the Offering to any profits it would have expected to make from a sale.

16

and gone straight to pursuing a sale.  As noted above, the Board materials belie Plaintiffs' claim that AbbVie's expression of interest was taken seriously, as they focus on the prospect of running the Company long-term through the emraclidine data results, and they contemplate a potential M&A transaction *after* these results.  *See* Ex. 4 at -1009, -1018, -1020 (Centerview deck noting ███████████████████████████████████████████████████ and acquisition was █████████████████████████████

That Plaintiffs cannot plead facts sufficient to support a compelling inference of scienter under *Tellabs* is all but confirmed by the Delaware Court of Chancery's recent decision in the Chancery Action.  Vice Chancellor Laster ruled that the plaintiff stated a breach of fiduciary duty claim under *Brophy v. Cities Serv. Co.*, 70 A.2d 5 (Del. Ch. 1949) based on Bain's purchases in the Offering, but repeatedly described the case as a "close call," with the "closest call" being whether the plaintiff had pled scienter.  *See* Ex. 13 (Oct. 2, 2025 Telephonic Ruling) at 4, 24. Ultimately, the Court of Chancery held that "the close call goes to the plaintiff" given the relevant standard of review.  *Id.* at 24, 29.[11]  That standard, however, asks merely whether the plaintiff alleged a reasonably conceivable inference of scienter, *id.* at 21—not whether Plaintiffs alleged a strong and cogent inference at least as compelling as any opposing inference, as required here by the PSLRA and *Tellabs*.  If the Chancery Action plaintiff's allegations of scienter resulted in a "close call," the same allegations here cannot survive under the *Twombly/Iqbal* plausibility standard, let alone the more rigorous pleading standard set by the PSLRA.  *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 813 & n.12 (Del. 2013), *as corrected* (Oct. 8, 2013) ("The Twombly/Iqbal plausibility standard is more rigorous than Delaware's counterpart pleading

---

[11] Indeed, Vice Chancellor Laster considered the case such a "close call" that he ruled that the plaintiff may take only limited document discovery from Bain (and Perceptive)—and not full-blown plenary discovery. *Id.* at 4.

standard."); *Matrix Parent, Inc. v. Audax Mgmt. Co.*, 319 A.3d 909, 934 (Del. Super. Ct. 2024) (Delaware's "plaintiff friendly" pleading standard "explicitly exempt[s]" scienter from Rule 9(b)'s heightened requirements).

### b.    The Offering Diluted Bain's Equity Stake in Cerevel.

Plaintiffs attempt to allege scienter based on Bain's supposed motivation to increase its holdings in the Company at an artificially deflated price ahead of the sale to AbbVie, so that it could make "extraordinary" profits through the sale.  ¶ 115.  But this alleged motive falls apart in light of the fact that the Offering *diluted* Bain's stake in Cerevel and resulted in net *losses* for Bain.

The Complaint affirmatively admits that the Offering diluted Bain, alleging that Bain held 38.2% of Cerevel's voting stock before the Offering, and only 36.4% after the Offering. ¶ 87.[12] Consequently, Bain sustained a net loss due to the Offering.  The chart below shows the value of Bain's shares in (i) the Merger, which occurred after the Offering;[13] and (ii) a hypothetical sale before the Offering—that is, if the Offering had never occurred.  Comparing (a) the hypothetical merger consideration Bain would have received without the Offering to (b) the actual consideration it received from the Merger after the Offering, and (c) accounting for the cost of the shares it purchased in the Offering, Bain lost approximately $64 million as a result of the Offering.[14]

---

[12] These amounts equate to 35.6% and 34.2%, respectively, when accounting for options and restrictive stock units that were converted to common stock in connection with the merger, and which were reflected in the share count used in AbbVie's term sheet communicating its offer to acquire Cerevel.  *See* Ex. 8 (AbbVie Term Sheet).  Because stock options and RSUs were included for purposes of calculating the total Merger consideration, Defendants' figures presented below are based on that higher total number of stock units.

[13] The chart assumes that, in a hypothetical sale to AbbVie pre-offering, AbbVie would have paid the same approximately $8.7 billion price, *less* the approximately $499 million in proceeds that the Company raised in the Offering.  *See* Ex. 7 (Cerevel's Form 10-Q) (aggregate net proceeds from the Offering totaled approximately $498.7 million).

[14] *See* Appendix 1 for the calculations supporting this analysis.

**Dilution Impact Summary – Bain**

| | **WITH OFFERING** | **WITHOUT OFFERING** | **DIFFERENCE/ NOTES** |
|---|---|---|---|
| Cerevel Aggregate Value (based on AbbVie Purchase Price) | $8,638,605,000[15] | $8,139,605,000 | $499,000,000 (net Cerevel proceeds from the Offering) |
| Cerevel Aggregate Share Count | 191,969,000 | 169,281,583 | 22,687,417 (total number of Offering shares issued by Cerevel) |
| Deal Price Per Share | $45.00<br><br>($8,638,605,000 / 191,969,000) | $48.08<br><br>($8,139,605,000 / 169,281,583) | $3.08 |
| The Bain SPV's Cerevel Shares | 65,679,781 | 60,199,729 | 5,480,052 (number of Offering shares purchased by the Bain SPV) |
| The Bain SPV's Total Proceeds from Sale to AbbVie | $2,955,590,145<br><br>($45.00 * 65,679,781) | $2,894,597,312<br><br>($48.08 * 60,199,729) | $60,992,833 |
| Per Share Cost of Participation in October 2023 Offering | $22.81 | $0.00 | $22.81 |
| Total Cost of the Bain SPV's Participation in October 2023 Offering | ($124,999,986)<br><br>($22.81 * 5,480,052 shares) | $0.00 | ($124,999,986) |
| **The Bain SPV's Total Dilution Impact From October 2023 Offering** | | | **($64,007,153)**<br><br>*($60,992,833 + ($124,999,986))* |

---

[15] This number is derived from multiplying the per share price of the Merger ($45.00) by the aggregate Cerevel share count on which AbbVie's term sheet relied (191,969,000).

19

As the chart confirms, Bain stood to gain *less* in a sale to AbbVie after the Offering than it would have gained had the Offering never happened at all.  And as noted, had Bain been motivated to take advantage of AbbVie's alleged indication of interest, it would have opposed the Offering (rather than "orchestrating" it, as Plaintiffs claim).  Short of that, Bain at least would have sought to maximize its pro rata stake in Cerevel by demanding allocations greater than (or at least equal to) its then-existing pro rata stake.  ¶¶ 8-9.  Instead, Bain's Board designees approved the Offering, and Bain and Perceptive sought a smaller share of the Offering than the percentage of the equity in the Company that they already owned.  *See* Ex. 6 (Oct. 10, 2023 Board Minutes) at -0642 (Board unanimously approved Offering); ¶ 90 (alleging Bain was allocated all of the shares it requested).

The Offering accordingly *diluted* Bain's equity in the Company, leaving it with a smaller pro rata share of the Company's equity, and Bain lost out on more than $64 million as a result of that dilution.  That Bain entered into a money-losing trade does not support an inference of fraudulent intent.  *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1424-45 (9th Cir. 1994) (no scienter of officers because "if, as [p]laintiffs allege, the [o]fficers knew that [the company] was heading for financial disaster, they probably would have bailed out of their substantial holdings," but instead held onto most of their stock and incurred large losses); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 623-24 (4th Cir. 1999) (noting that "one who believes that another has behaved irrationally has to make a *strong case*" and rejecting inference of fraudulent motive where director's behavior was inconsistent with his economic interests).

Plaintiffs allege that Bain "understood that the $500 million October Offering would have an outsized impact on Cerevel's overall valuation, increasing its M&A value by significantly more than the cash raised from the offering itself," because Centerview advised that the Offering would "remove the 'financing overhang.'"  ¶ 118.  But in fact, the Centerview deck to which Plaintiffs

20

refer says nothing about any financial overhang impacting a near-term sale of the Company.  To the contrary, Centerview's discussion materials *negate* an inference of scienter, because the reference to removing the "financing overhang" specifically contemplated that Cerevel would continue to run its business until after the 2024 emraclidine clinical trial readouts—the opposite approach of positioning for a quick sale.  *See* Ex. 4 at -1009 (discussing mitigation of financing overhang ███████████████████████ -1013 (discussing removal of financing overhang ████████████████████████ Plaintiffs allege nothing else to suggest that the Offering plausibly created any immediate additional value to Cerevel beyond the additional $499 million in cash on its balance sheet.

**c.**      **The Complaint Alleges No Other Facts Giving Rise to a Strong Inference of Scienter.**

In addition to failing to allege any plausible motive, Plaintiffs fail to allege any other facts giving rise to the required strong inference of scienter.  For example, Plaintiffs do not allege that Bain's purchase in the Offering increased the absolute size of its holdings of Cerevel by an amount sufficient to support any inference of impropriety or fraud.  *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002) (rejecting inference of scienter where insider's sales "were only a small part of his total holdings").  Bain purchased only 5,480,052 shares, amounting to *one-twelfth* of its then-current stake in the Company, in the Offering.  ¶ 86.  In addition, to the extent Plaintiffs attempt to paint the timing of the Offering as suspicious, the Complaint's own allegations and documents integrated into it belie this theory.  The Complaint and integrated documents *confirm* that Cerevel was considering a capital raise well before AbbVie allegedly expressed interest in a whole-company acquisition.  *See supra* Section I.A.3.a.  Just as pre-scheduled trades pursuant to a 10b5-1 plan weigh against an inference of scienter, *see Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 554 n.4 (5th Cir. 2007) (noting that 10b5-1 plan can

21

"raise an inference that the sales were pre-scheduled and not suspicious"), so too does the undisputed fact that the Board had considered the Offering in August 2023—*before* AbbVie allegedly expressed interest in a whole-company acquisition—negate any plausible inference of scienter related to the timing of Bain's purchase.  Ultimately, because the Complaint lacks the required strong inference of scienter and given the compelling non-fraudulent explanation for the Offering, Plaintiffs' Section 20A claim fails.

### B.       Plaintiffs Fail to Allege That They Traded Contemporaneously with Bain.

Independently fatal to their Section 20A claim, and for similar reasons that Plaintiffs cannot plead that Bain had a duty in connection with the predicate violation, Plaintiffs cannot plead that they traded contemporaneously with Bain.  *See Edinburgh*, 754 F.3d at 177.  The contemporaneous requirement "limits recovery to those plaintiffs who might conceivably have traded at an informational disadvantage with defendant."  *Buban v. O'Brien*, 1994 WL 324093, at *4 (N.D. Cal. June 22, 1994); *see also In re Able Lab'ys. Sec. Litig.*, 2008 WL 1967509, at *27 (D.N.J. Mar. 24, 2008) (agreeing with reasoning in *Buban*); *Copland v. Grumet*, 88 F. Supp. 2d 326, 338 (D.N.J. 1999) (same); *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1135-36 (N.D. Cal. 2020) (no contemporaneity where plaintiffs purchased stock at prices below defendant's selling price, because the requirement "ensures that only private parties who have traded with someone who had an unfair advantage" can bring a Section 20A claim).  There are no such trades here. Plaintiffs could not have possibly traded with Bain.  Bain traded with the Company, and had the same alleged material nonpublic information that the Company did.  *See supra* Section I.A.2.

## II.       THE COMPLAINT FAILS TO STATE A SECTION 20(a) CLAIM (COUNT IV)

Plaintiffs' Section 20(a) claim asserting control person liability against Bain and the Bain Directors also fails.  To plead control person liability, a plaintiff must allege: "(1) an underlying violation by a controlling person or entity; (2) that the defendants are controlling persons; and (3)

22

that the defendants were in some meaningful sense culpable participants in the fraud." *In re Digit. Island Sec. Litig.*, 223 F. Supp. 2d 546, 560 (D. Del. 2002). Moreover, the PSLRA's heightened standard requires that Section 20(a) claims "state with particularity the circumstances of both the defendants' control of the primary violator, as well as the defendants' culpability as controlling persons." *Id.* at 561. Plaintiffs' claim fails on all accounts.

### A.        Plaintiffs Fail to Allege an Underlying Violation.

There can be no control person liability when the "controlled person" is not liable. *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272 (3d Cir. 1992), as amended (May 28, 1992). For the reasons set forth in the Cerevel Motion and Ron Renaud's Motion to Dismiss (which the Bain Defendants incorporate), Cerevel and Renaud are not liable under Section 10(b), Rule 10b-5, or Section 14(a), and thus Plaintiffs' Section 20(a) claim must also fail.

### B.        Bain Was Not a Controlling Person of Cerevel or Renaud Under Section 20(a).

To allege that Bain was a "control person," Plaintiffs must establish that Bain had "actual power" to control or influence the primary violators, Cerevel and Renaud. *Sheehan v. Little Switzerland, Inc.*, 136 F. Supp. 2d 301, 315 (D. Del. 2001). Plaintiffs attempt to clear this hurdle by grouping Bain and Pfizer together, but they plead no factual basis for doing so. The Complaint acknowledges that the Pfizer directors were recused from the alleged Board discussion related to AbbVie's supposed expression of interest, ¶ 7, and the Complaint does not allege that Pfizer participated in the Offering. Accordingly, Plaintiffs fail to allege any reason that Pfizer would have coordinated with Bain to allow or cover up Bain's purported insider trading, and there are no allegations that Bain and Pfizer acted as a group with respect to any alleged action at issue.[16] Nor

---

[16] To distract from this fundamental defect, Plaintiffs point to SEC filings. But none of these filings are sufficient to allege control for purposes of Section 20(a), as detailed in Pfizer's Motion to Dismiss, which the Bain Defendants incorporate.

are Bain's individual stock ownership and board representation enough to allege control person liability. *See e.g.*, *In re Flag Telecom, Ltd. Sec. Litig,* 308 F. Supp. 2d 249, 273-74 (S.D.N.Y. 2004) (thirty percent of the voting stock and selecting three of nine board members did not create inference of control); *Kosmos*, 955 F. Supp. 2d at 676 (rejecting claim given no allegations that private equity firms' board designees were "acting on behalf of [the firms] in their capacity as [company] directors"); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 2000 WL 1727405, at *16 (N.D. Cal. Sept. 29, 2000) (no control where "the majority of [the issuer's] officers were former [employees of the alleged control person]," but there was no "corroborating, particular evidence").

That leaves Plaintiffs with only vague and conclusory claims that Bain and Pfizer were "involved in" the allegedly false and misleading statements, compelling dismissal under the PSLRA. ¶ 195; *see Digit. Island*, 223 F. Supp. 2d at 561 ("unsupported allegations regarding management responsibilities" did not plead "actual control over the transactions in question"); *In re Gupta Corp. Sec. Litig.*, 900 F. Supp. 1217, 1243 (N.D. Cal. 1994) (no control based on conclusory claims that defendant "controlled the contents" of financial reports and press releases).

## C.    Bain Was Not A "Culpable Participant" Under Section 20(a).

Even if Plaintiffs sufficiently alleged that Bain was a control person under Section 20(a) (they have not), the Third Circuit requires Bain to have been a "culpable participant" in the alleged illegal activity. *See Belmont v. MB Inv. P'rs, Inc.*, 708 F.3d 470, 484-85 (3d Cir. 2013). Pleading culpability is a "heavy burden," requiring allegations of "*knowing and substantial participation* in the wrongdoing or inaction with the intent to further the fraud or prevent its discovery." *Digit. Island*, 223 F. Supp. 2d at 563; *In re Advance Auto Parts, Inc., Sec. Litig.*, 2020 WL 599543, at

24

*10 (D. Del. Feb. 7, 2020).  Plaintiffs cannot meet this burden here.[17]

Plaintiffs vaguely assert that Bain was "involved in [the] false documents," influenced the "content and dissemination" of the allegedly false and misleading statements, had "access" to these statements, and "[c]ause[d]" Cerevel to issue the Proxy.  ¶ 195, Section H (heading).  But the Complaint is devoid of any details about when or how this occurred.  *See Digit. Island*, 223 F. Supp. 2d at 563 (no culpable conduct where complaint "broadly and vaguely allege[d] that the individual defendants 'participated' in the purported omissions, but [was] utterly lacking in any details as to when or how this occurred"); *Advance Auto*, 2020 WL 599543, at *10 (dismissing 20(a) claims where complaint did not allege that defendants "controlled the drafting or publishing of the press releases at issue, or that the [defendants] reviewed or signed them before publication").  Plaintiffs' conclusory claim that Bain "had the ability to prevent the issuance of the statements," ¶ 195, also is not enough.  *See Rochez Bros. v. Rhoades*, 527 F.2d 880, 890 (3d Cir. 1975) (no culpable participation where there was no evidence that inaction was deliberate and done intentionally to further the fraud).  And allegations of Renaud's involvement cannot be imputed to Bain simply because Renaud was allegedly a Bain Senior Advisor at the time.  *See Splash*, 2000 WL 1727405, at *16.  Plaintiffs' Section 20(a) claim accordingly fails.

## CONCLUSION

For these reasons, the Court should dismiss Plaintiffs' Complaint with prejudice.

---

[17] Nor can they meet this burden as to the Bain Directors, for the same reasons explained in the Director Defendants' Motion to Dismiss, which the Bain Defendants incorporate.

|  |  |
|---|---|
|  | */s/ Christopher Fitzpatrick Cannataro* |
| OF COUNSEL: | A. Thompson Bayliss (#4379) |
|  | Christopher Fitzpatrick Cannataro (#6621) |
| Peter L. Welsh | Clara Hubbard (#7320) |
| Daniel V. McCaughey | Abrams & Bayliss LLP |
| Elena Weissman Davis | 20 Montchanin Road, Suite 200 |
| ROPES & GRAY LLP | Wilmington, DE 19801 |
| 800 Boylston Street | (302) 778-1000 |
| Boston, MA 02199 | Bayliss@AbramsBayliss.com |
| (617) 951-7000 | Cannataro@AbramsBayliss.com |
|  | Hubbard@AbramsBayliss.com |
| Martin J. Crisp |  |
| ROPES & GRAY LLP | *Counsel for Defendants Bain Capital Investors,* |
| 1211 Avenue of the Americas | *LLC, BC Perception Holdings, LP, Christopher* |
| New York, NY 10036-8704 | *Gordon, and Adam Koppel* |
| (212) 596-9000 |  |

Date:  October 30, 2025

26

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

IN RE CEREVEL THERAPEUTICS
HOLDINGS, INC.
SECURITIES LITIGATION

)
)
)
)
)
)
)

Case No. 25-cv-417-GBW

PUBLIC VERSION FILED
NOVEMBER 6, 2025

## <u>APPENDIX 1 TO OPENING BRIEF IN SUPPORT OF MOTION TO DISMISS</u>

OF COUNSEL:

Peter L. Welsh
Daniel V. McCaughey
Elena W. Davis
ROPES & GRAY LLP
800 Boylston Street
Boston, MA 02199
(617) 951-7000

Martin J. Crisp
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036-8704
(212) 596-9000

A. Thompson Bayliss (#4379)
Christopher Fitzpatrick Cannataro (#6621)
Clara Hubbard (#7320)
ABRAMS & BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, DE 19801
(302) 778-1000

*Counsel for Defendants Bain Capital
Investors, LLC, Adam Koppel, and
Christopher Gordon*

Dated:  October 30, 2025

# APPENDIX 1

**REDACTED IN ITS ENTIRETY**