# EXHIBIT A

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

SEIU PENSION PLANS MASTER TRUST,          :
                                          :
              Plaintiff,                   :
                                          :
        v                                  : C. A. No.
                                          : 2024-1274-JTL
BAIN CAPITAL INVESTORS, LLC,               :
BC PERCEPTION HOLDINGS, LP, PERCEPTIVE:
ADVISORS LLC, PERCEPTIVE LIFE SCIENCES:
MASTER FUND, LTD., DOUG GIORDANO,          :
CHRISTOPHER GORDON, ADAM KOPPEL, and   :
RON RENAUD,                                :
                                          :
              Defendants.                  :

- - -

Chancery Court Chambers
Leonard L. Williams Justice Center
500 North King Street
Wilmington, Delaware
Thursday, October 2, 2025
10:00 a.m.

- - -

BEFORE: HON. J. TRAVIS LASTER, Vice Chancellor

- - -

TELEPHONIC RULINGS OF THE COURT ON DEFENDANTS' MOTIONS
TO DISMISS

CHANCERY COURT REPORTERS

2

APPEARANCES:

       WILLIAM G. PASSANNANTE II, ESQ.
       Grant & Eisenhofer P.A.
              -and-
       ANDREW E. BLUMBERG, ESQ.
       BENJAMIN M. POTTS, ESQ.
       DANIEL E. MEYER, ESQ.
       Bernstein Litowitz Berger & Grossmann LLP
              -and-
       JAMES JANISON, ESQ.
       of the New York Bar
       Bernstein Litowitz Berger & Grossmann LLP
         for Plaintiff

       A. THOMPSON BAYLISS, ESQ.
       CHRISTOPHER FITZPATRICK CANNATARO, ESQ.
       CLARA HUBBARD, ESQ.
       Abrams & Bayliss LLP
              -and-
       PETER L. WELSH, ESQ.
       DANIEL V. McCAUGHEY, ESQ.
       ELENA WEISSMAN DAVIS, ESQ.
       of the Massachusetts Bar
       Ropes & Gray LLP
         for Defendants Bain Capital Investors, LLC,
         BC Perception Holdings, LP, Christopher Gordon,
         and Adam Koppel

       J. MATTHEW BELGER, ESQ.
       DANIEL M. RUSK, IV, ESQ.
       Potter, Anderson & Corroon LLP
         for Defendants Perceptive Advisors LLC,
         Perceptive Life Sciences Master Fund, Ltd.,
         and Doug Giordano

       ROGER S. STRONACH, ESQ.
       HOLLY E. NEWELL, ESQ.
       Ross Aronstam & Moritz LLP
         for Defendant Ron Renaud

                         - - -

3

THE COURT:  Good morning, everyone. This is Travis Laster.

Do we have a court reporter on?

THE COURT REPORTER:  Yes, Your Honor. It's Debi.

THE COURT:  Great, Debi.  Thanks for being here.  I appreciate it.

Welcome, everyone.  I'm not going to ask for appearances.  We're here so that I can give you a ruling in Civil Action No. 2024-1274-JTL. Please do me the favor of muting your lines.  That's a courtesy to not just me, but everyone on the call. Sometimes there's noise in the background, sirens maybe driving by your building, or something of that ilk.  Of course, we hope they're not coming for you. But it's disturbing to everyone if that type of noise is there.  I'm grateful if you could mute your lines and bear with me as I give you this ruling.

This case involves alleged insider trading in the common stock of Cerevel Therapeutics Holdings, Inc., which I will call the "company," based on the acquisition of the company by AbbVie, which occurred shortly thereafter.

I'm going to give you some answers up

4

front.  I'm basically going to do what I forecast that I was thinking about at the motion to dismiss argument.  I think this case is a close call.  At the pleading stage, close calls go to the plaintiff.  I'm therefore denying the motions to dismiss.

But I also am restricting the parties to limited discovery.  After that discovery is complete, I think people are going to have a good sense of whether this case has any legs or not.  There may be an opportunity for some type of motion at that point.  There may simply be the ability to have a discussion.  It may even be that the plaintiff decides to cut their losses, depending on what happens.  I will talk about that later in my ruling.

Let's start with a brief statement of facts.

At this stage of the case, I have to rely on the allegations of the complaint.  I'm applying the *Central Mortgage* standard, which means I have to credit those allegations as true.  I can also consider documents that are incorporated by reference in the complaint.  In this situation, the plaintiff obtained documents from the company using Section 220.  The plaintiff also relies on the company's SEC

5

filings.

The company was founded in 2018 by Pfizer Inc. and Bain Capital Investors, LLC. Bain used two entities, BC Perceptive Holdings, LP, and its principal entity, Bain Capital Investors, LLC. I'm just going to call them "Bain."

The company is a biopharmaceutical company that was focused on developing drugs to treat disorders of the central nervous system. Its lead asset was emraclidine, which was a drug still in development for schizophrenia and Alzheimer's dementia.

The company was expected to receive data from ongoing Phase 2 clinical trials in late 2024. The Phase 2 data was going to be pivotal for the company's valuation and its ultimate success.

In October 2020, the company had gone public through a de-SPAC transaction with a SPAC sponsored by Perceptive Advisors LLC. They are also a defendant. That's an investment firm that invested in the company through an affiliated fund, Perceptive Life Sciences Master Fund, Ltd. I'm just going to call those entities "Perceptive."

In connection with the SPAC, Bain and

6

Perceptive entered into a governance agreement.  It granted Bain and Perceptive various director nomination rights and preemptive rights.

The plaintiff alleges, and it's reasonable to infer, that Bain, individually or with Pfizer, controls the company.  Bain has its board representation and its contractual rights.  Bain also controls approximately 36.2 percent of the company's voting power, or at least did as of January 8th, 2024. The company also describes itself as a controlled company for purposes of Nasdaq listing standards.

In early 2023, the company began to explore a potential regional partnership for the development of emraclidine in Japan.  The regional partnership was one option for extending the company's operating cash runway.  The company contacted AbbVie about the potential partnership.  They executed a confidentiality agreement in March 2023 and moved forward with discussions.

In May, Defendant Ron Renaud joined the company as its new president, CEO, and a member of the board.

On May 18th, AbbVie made an initial proposal for a Japanese partnership.  The board

7

discussed the proposal.  And on July 20, AbbVie made a final proposal.

On August 31st, the board met to discuss various financing options, including a royalty financing proposal and a potential equity financing. As part of those discussions, there was information provided to the board that the company had a capital runway that extended until May 2025.

There's competing indications in the record about to what degree the company had near-term capital needs.  There's some documents indicating that the company did have near-term capital needs of $125 million.  But even then, the documents support a reasonable inference that the money didn't have to be raised immediately.  There's a statement saying that the $125 million only had to be raised before August 2024 .

The board created a special transaction committee to consider the various financing options.

There's a document dated September 23rd that suggests that AbbVie had indicated interest in more than just a Japanese partnership. The company's chief business development officer and

8

strategic operations officer, Paul Burgess -- so the guy who would know if some type of overture had been made -- emailed a tracker to Centerview, who was the company's financial advisor for its finance raising options.  The tracker said that AbbVie had "[i]ndicated interest in [a] whole co" acquisition. It actually says "indicated interest in whole co."  I added a few words so it makes a little more sense.  He also reported that AbbVie's chief commercial officer was the internal champion driving this interest.  And it said that company management was awaiting a term sheet from AbbVie and planned to discuss next steps once received.

What we have here is someone who is a credible bidder, with the ability to finance a deal, indicating that it has interest in an acquisition. It's a statement attributed to somebody within the company who has real heft.  It's directed to the likely person at the company to whom a serious inquiry would be made.  And there's a reference to the idea that a term sheet would be forthcoming.

Two days later, AbbVie informed the company that it wouldn't be improving its bid for the regional partnership.  During that same conversation,

9

AbbVie reiterated its interest in a whole company acquisition. I think at this stage one can infer that when you combine that with a signal that you're interested in a wholeco, you are sending the message that you are more interested in the wholeco acquisition.

The board met on September 27th. The board's financial advisor, Centerview, discussed recent M&A trends in the pharmaceutical industry. They noted that AbbVie had both the financial resources and the desire to engage in M&A. They also noted that a significant number of M&A transactions had resulted from partnership discussions. In other words, what was happening here was consistent with a meaningful approach from a credible bidder.

Centerview did note that there were historical challenges to consummating an acquisition before a company had received pivotal data results. Centerview also presented an illustrative M&A scenario that assumed the company would raise $400 million in equity financing before being acquired and that the price of an acquisition would be $53 per share. That price is important. It was more than double the company's then-current stock price of $20.26 per

10

share.

On September 29th, Centerview gave Renaud and Burgess talking points for an upcoming conversation with AbbVie's executive vice president and chief business and strategy officer, which included referencing that they discussed the communication of a wholeco proposal with the board. That's more evidence that the proposal was inbound. The talking points, though, stated that the company "do[es] not believe this is the appropriate time to undergo any strategic discussions that would distract both our management team and the board during a critical time for our company," and that "[v]alue to our shareholders will be significantly higher post-2024 events." The talking points also stated that the "Board is very supportive of our standalone path and is thinking long-term."

At this point, it's not clear what the topspin was on this. One possible inference is that this was sincere and that they were saying no to a deal. Another possible inference is that this was simply the expected next move in the negotiation dance. When somebody makes an initial proposal, the good negotiating strategy is to initially say you're

11

not interested.  That then results, ideally, in the other side bidding against themselves or improving the offer to try to get you interested.  At least at this stage, I don't think that their comments about refusing the proposal establish that there was no interest in the proposal or that the company was necessarily remaining in stand-alone mode.  That would be a defense-friendly inference.  The plaintiff-friendly inference is that this was simply an initial move in the negotiation process.

Consistent with that latter interpretation, on October 5th, the company's employees began to pull together a wholeco data room in anticipation of having to provide due diligence for an outright acquisition.  You don't do that if you're not actually thinking about it.  Again, the plaintiffs get the inference on that at this stage.

On October 10th, the board took the action that brings us here today, which was to approve a secondary public offering of just under 20 million shares at a price of $22.81 per share.  That was the market price.  I will call this the "October offering."

That offering was announced on

12

October 11th. It closed on October 16th.

In that offering, Bain purchased 5,480,052 shares, investing a total of just under $125 million. That purchase increased the number of its company shares from 60.2 million, approximately, to 65.7 million, approximately. But although Bain's total number of shares increased, the offering as a whole reduced Bain's ownership percentage from approximately 35.5 percent to 34.2 percent.

Bain had not participated in the company's public offerings in July 2021 or August 2022. For Bain to participate in this offering was at least a change in its recent practice.

Perceptive also purchased shares in the offering. It bought a total of 876,808 shares, investing just under $20 million. As with Bain, that increased its total number of company shares. For Perceptive, it was an increase from basically 10 million flat to approximately 11 million. As with Bain, though, the offering as a whole reduced its ownership percentage from approximately 6 percent to approximately 5.7 percent.

On October 17th, literally the day after the offering closed, AbbVie's chief business and

13

strategy officer emailed Burgess to "follow up." Burgess forwarded the email to Centerview and Renaud. And Renaud responded, "We will see!"  That is obviously consistent with the idea that everyone knew an offer was coming.

Just two days later, on October 19th, AbbVie sent a letter to Renaud offering to acquire the company for $35 per share in cash.  AbbVie framed the letter as "following up on previous conversations regarding AbbVie's interest in [the company]."

On October 24th, the board discussed the possibility of the acquisition.  They talked about the challenges of pricing a deal in advance of the pivotal data that was not expected until December 2024.  The board nevertheless directed management to prepare and refine its business plan and update its projections for the board to review so they could be used for discussions with AbbVie concerning a sale.  The board also authorized Centerview to reach out to other parties who might be interested in a transaction.

On November 7th, AbbVie increased its offer to $40 per share.  The next day, Centerview presented a discounted cash flow analysis based on the

14

information it had asked management to prepare.  The DCF implied that the company was worth between $50 per share and $62 per share.

During a meeting on November 11th, Centerview estimated that a large pharmaceutical company like AbbVie could pay up to $67 per share for the company.  The board, rather than using that price point or something close to it, instructed management to communicate to AbbVie that AbbVie would need to get into the mid $40 range to justify providing any further information.

On November 15th, Centerview advised the board that few buyers would take on the clinical trial risk before receiving data.  Centerview also advised that a transaction in the mid-40s was likely to be in the top of the range of a strategic buyer like AbbVie.  They also said that the company faced significant risks remaining as a stand-alone company.

On November 17th, Renaud met with AbbVie, who provided a revised written proposal for a deal at $41.50 per share.  Renaud passed that along to the full board.  He also reported that AbbVie had signaled that it would go up to $45 per share conditioned on diligence and a quick deal.

15

On December 5th, the board and Centerview discussed financial analyses based on the updated financial information that management had provided.  The projections, though, were virtually unchanged from what had been relied on in November, when Centerview valued the company at $50 to $62 per share.

The next day, the board approved a deal with AbbVie at $45 per share.

When the deal closed, the shares of the company common stock that Bain and Perceptive purchased in the October offering for approximately $145 million were worth approximately $286 million at the merger price.

The plaintiff alleges that the merger proxy contained material misleading omissions and disclosures.  For example, the proxy states that on September 25th, 2023, representatives of AbbVie and the company discussed the Japanese partnership, and that "[t]he conversation focused on [the company's] retention of commercial rights in Japan and AbbVie did not indicate that an offer to acquire would be forthcoming."

The merger proxy said that on

16

September 27th, 2023, the board directed the company's management to make clear to AbbVie, given their September 25 outreach, that the company was focused on a potential regional partnership in Japan and was not considering other strategic alternatives.

The plaintiff casts that as misleading because it doesn't give the real tenor of the discussions, which was that AbbVie wasn't raising its bid on the regional partnership, was interested in the whole company sale, and that management understood that they were really interested, with a strong internal champion, and that a term sheet would be forthcoming.

The plaintiff was a stockholder until the merger closed. Count I asserts a claim against Bain for breach of fiduciary duty in its capacity as a controlling stockholder. The plaintiff says that Bain wrongfully caused the company to issue equity in the October offering, while possessing material nonpublic information. It says that Bain then breached its duty by purchasing approximately $125 million worth of shares in the October offering, while knowing that the shares were worth materially more. And it says that Bain breached its fiduciary duties by causing the

17

company to agree to the merger with AbbVie at a suboptimal price because Bain was trying to capture a quick profit on the delta and liquidate its interests, as opposed to taking the risk of pursuing the higher-valued outcomes that the company could achieve in stand-alone.

Count II asserts comparable claims for breach of fiduciary duty against the director defendants in their capacities as directors.  The main difference is that it says that the directors allowed Bain and Perceptive to purchase the shares rather than attacking Bain and Perceptive for purchasing the shares.

Count III asserts a claim for breach of fiduciary duty against Renaud in his capacity as an officer of the company.  That claim really focuses on Renaud's knowledge of what was truthful in terms of what should have gone into the proxy statement, as opposed to what did appear in the proxy statement.

The complaint includes two fall-back counts that are pled in the alternative.  Count IV asserts that if the Court doesn't view Bain as a controlling stockholder, then both Bain and Perceptive aided and abetted the breaches of fiduciary duty by

18

the company directors and Renaud.

Then the last claim is for unjust enrichment against Bain and Perceptive to ask them to disgorge any improper benefit that they received from the offering, if, indeed, the plaintiff can prove what it seeks to prove.

All of the defendants moved to dismiss the complaint. They made two principal arguments. They contended that any of the derivative claims for insider trading that the plaintiff wants to bring were derivative, and hence standing was lost when the merger closed. They also contend that as a general matter the complaint fails to state any claims on which relief can be granted.

The principles at issue in this case from a legal standpoint largely track my analysis of similar issues in *Goldstein v. Denner*. The real question is the application of those principles to the facts. A court typically addresses standing first, particularly when there's derivative claims involved and a merger. That's because corporation law draws a sharp distinction between direct and derivative claims. The Delaware Supreme Court has made clear on multiple occasions that if a plaintiff only asserts a

19

derivative claim, then a merger that converts the plaintiff's shares into a different form of property deprives the plaintiff of standing to sue.  At the same time, however, in *Parnes*, the Delaware Supreme Court recognized that a stockholder who directly attacks the fairness or validity of a merger alleges an injury to the stockholders, not the corporation, and may pursue a claim even after the merger at issue has been consummated.

When considering whether the plaintiff has standing to challenge a merger based on the extinguishment of an underlying derivative claim, Delaware looks in the first instance to whether the conduct giving rise to the underlying claim states a viable wrong.  Delaware law would then consider whether the existence of that claim for purposes of the merger somehow tainted the process such that it translates into a *Parnes* claim.

I will therefore first address whether the insider trading claim under *Brophy* states a claim on which relief can be granted.  Because I think it's reasonably conceivable at this stage of the case that there is a viable *Brophy* claim there, I'll then talk about whether the plaintiff can use those claims to

20

challenge the merger.

The main underlying wrong invokes the doctrine recognized in *Brophy*, a decision from 1949. The Delaware Supreme Court has framed the elements of a *Brophy* claim as follows:  The plaintiff has to allege and later prove that the company fiduciary possessed material nonpublic company information and that the fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information.

The first question is materiality. Information is material under the Delaware standard if it would have assumed actual significance in the deliberations of a person deciding whether to buy, sell, vote, or tender stock.  That's from the *Rosenblatt v. Getty Oil* case in 1985.  Whether merger discussions in any particular case are material depends on the facts.  That's from the *Alessi* case in 2004.  When evaluating materiality for purposes of an individual engaging in insider trading, the court has to evaluate the information in the fiduciary's possession compared to what the market knew and then identify whether the nondisclosed information would have been of consequence to a rational investor in

21

light of the total mix.

The second element is scienter. There has to be facts that are pled and evidence that later proves that the trading was intentional based on, to some degree, the material nonpublic information.

At the pleading stage, a *Brophy* claim usually rests on circumstantial facts, and a successful claim typically includes allegations of some type of suspicious trading that allows a reasonable inference of scienter. That's from the *Clovis* case. I would simply add that because I, at least, can't read minds, even at the trial stage, a scienter finding is necessarily based on circumstantial evidence. I guess you could have a confession, but even that is, to some degree, circumstantial, since we can't actually see what was happening in the person's head.

The complaint supports a reasonable inference that AbbVie's proposal to acquire the company was material nonpublic information and that the pricing of the October offering failed to take into account that material nonpublic information. As a result, it supports an inference that Bain and Perceptive were motivated to buy shares in the

22

offering, at least in part, by the fact that they knew the value of the company was materially higher than the market price at which the shares were being sold.

Why is that inferably material?  Well, the defendants say it's not material because it was simply an overture.  They point to the September 23rd tracker and the September 29th talking points, and they argue that the AbbVie approach was not definitive enough to support a *Brophy* claim.  They point out that the talking points suggest that the company rebuffed the overture.  They also point to Centerview's comments that an acquisition before pivotal data had been obtained presented significant historical challenges.

That type of argument and other evidence might well be persuasive at a later stage. At this point, however, the complaint alleges a number of other facts that support an inference that the AbbVie approach, in fact, was material.

First, AbbVie is a sophisticated player in the pharmaceutical industry.  It was a credible bidder that could finance a deal.

Second, Centerview had advised that a significant majority of M&A transactions in the space

23

come through partnership discussions and that large pharma companies like AbbVie had a desire to engage in M&A at the time.

That seems to fit with the pattern here. AbbVie had been in discussions with the company regarding a potential Japanese partnership. That gave AbbVie an opportunity to research and understand the company and decide, at least preliminarily, whether it wanted to be involved in a whole company acquisition. High-level representatives of AbbVie made the decision to engage with the company about a whole company acquisition. There's contemporaneous evidence that the approach was made. There are indications that it was by a high-level person who was the logical internal champion for the deal.

Third, there's a statement that the company was, in fact, awaiting a term sheet. The company then acted on that expectation by setting up a data room.

Fourth, after the offering was completed, AbbVie immediately reached out to the company to follow up.

When you put all this together, this looks like the AbbVie approach was real and that the

24

company and its management team knew it was real. It supports an inference at this stage that the rebuffing of AbbVie's initial approach was, as I suggested earlier, just as likely to be the initial step in the negotiation dance as it was a real and solid no.

Now, again, at the later stage of the case, it may turn out that it was a solid no. But at this stage of the case, it is reasonably conceivable that it wasn't a solid no, it was an initial step in the negotiations, and that everyone knew that this was a serious approach and a serious bid.

Now let's move to the concept of scienter. This is, I think, the closest call at the pleading stage. Counsel on both sides have made good arguments. In particular, the defendants have advanced an argument about the dilutive effect of the secondary offering, and hence why it wouldn't make sense for Bain and Perceptive to have pursued the offering when it would dilute their overall interests.

Along those lines, the defendants argue that Bain and Perceptive suffered net losses because the October offering diluted their overall equity stake. They argue that one cannot infer, therefore, that Bain and Perceptive drove the October

25

offering as a way to profit for themselves, and presumably that that inference flows through to their participation in the offering.

The plaintiff responds that defendants' approach to dilution is overly simplistic and based on flawed assumptions. They say that it's a flawed assumption to assume that the cash raised in the October offering would have been valued dollar for dollar in a merger. They also say that it is reasonably conceivable that the offering added more value by improving the company's negotiating leverage vis-a-vis an acquisition party or an acquiring party like AbbVie.

The plaintiff, therefore, says it's reasonably conceivable that Bain and Perceptive determined that they would make more money by completing the October offering and participating in it than simply going forward with merger discussions without completing the October offering.

The plaintiff also says that it's not true that Bain and Perceptive simply had a binary choice either to participate in the October offering to the extent they did or to participate more. A third option was for Bain and Perceptive to not

26

participate at all, particularly since Bain did not participate in the company's public offering in July 2021 or its public offering in August 2022.

As I think about this, I have a couple of reactions. First of all, I think it's difficult to decide between these competing arguments at the pleading stage. It's tempting to accept the defendants' assertions about what a rational economic actor would do. But I have some humility about my knowledge of complex financial transactions and how super-sophisticated financial folks at places like Bain and Perceptive figure out ways to make money.

I think we, as judges, too often accept simplistic claims about the rational actor model based on one dimension of potential financial benefit and act as if that's all that's going on in the case. We see that most prominently in cases that blithely say options always align the interests of their holders with the interests of the common as a whole, or that preferred stock is generally aligning with the interests of the common as a whole. There can be alignment under specific conditions and circumstances, but there also can be misalignment because these are different securities with different

27

return profiles.  In short, I think there could be more going on here than meets the eye.  I'm not willing at this point to dismiss a close case based on an argument that, as I say, may be too simplistic.

I also think it's possible to break apart the steps in this transaction, which is something that the plaintiff has alluded to.  It may well be that the decision to pursue the secondary offering was something that made sense in terms of positioning the company both for the long-term and to negotiate with AbbVie.

That doesn't necessarily answer the question of whether Bain and Perceptive participated in the offering because of material nonpublic information.  Bain had not participated in two prior offerings.  I think it's reasonable to infer that in a fairly priced offering, Bain wasn't going to participate.  It had its stake.  It didn't feel like it needed to add to it.

What you have here is an offering that Bain and Perceptive inferably knew was underpriced — and not just underpriced, but seriously underpriced. They had a credible indication from a sophisticated third-party bidder suggesting that the company's

28

value, at least in a whole company sale situation, was significantly higher.  So they may have participated in this offering knowingly as a defensive measure.  In other words, they wanted to minimize the amount of their dilution so as to protect themselves and capture the maximum amount of value they could.

Now, the defendants say that, oh, well, if that was the plan, then Bain and Perceptive should have bought more.  That's the argument that was trotted out and credited in *Clovis*, which is if somebody is going to insider trade, they are going to insider trade big.  That's just not what we see.  When you insider trade really big, you get caught.  So what people generally do with insider trading is they engage in a pattern of skimming.  They trade enough to make profits, but not enough so that it looks really bad.  And here, I can at least infer that one possibility for Bain and Perceptive to participate in this offering was that they knew that the offering materially undervalued the company and wanted their share.

I come back to the idea that there are competing inferences here, and I don't feel sufficiently confident at the motion to dismiss stage

29

that I'm able to reject the inferences that the plaintiff seeks. At the motion to dismiss stage, the close call goes to the plaintiff. Therefore, I think that there's an inference of materiality here.

As I look down at my notes, I also want to observe that the Bain and Perceptive ability not to participate in the offering negates the defendants' argument that there's nothing to see here because the company was already in cash-raising mode. That's another way of saying that going out with the October offering may well have been a legitimate decision. The question then becomes whether fiduciaries holding material nonpublic information can trade without disclosing the information. It may well be that disclosing information would have been the wrong thing to do. And in that situation, under a disclose or abstain model, the duty is to abstain. It is inferable, in my view, that the October offering itself could be proven to have been legitimate and that Bain and Perceptive's participation in that offering still could support a *Brophy* claim.

For all those reasons, I'm drawing an inference of scienter, and I think the *Brophy* claim is viable.

30

Once the *Brophy* claim is viable, the rest of the case falls into place as a matter of course.  The aiding and abetting breach of fiduciary duty becomes less interesting.  We already have a pled breach.  We certainly have a fiduciary relationship. And we have facts to infer knowledge up to Bain and Perceptive that this offering and their ability to buy in it were wrongful.  So that one follows.

The sale process claim is one step removed, but that follows fairly readily also.  The question is whether the sale process fell within a range of reasonableness.  Delaware decisions generally presume that a large holder like Bain, when it takes the same consideration as other holders, has aligned interests.  But here, the ability to capture a near-term benefit from the October offering creates a divergent interest.  What you also have here is a relatively fast single-bidder process.  There's some outreach, but it's basically a single-bidder process. And you have a price that's well below the indications that were given in stand-alone.

If there wasn't any basis to think that Bain and Perceptive had a divergent interest, I would view their participation and the receipt of the

31

same consideration as aligning, and I wouldn't think that there was a reasonably conceivable *QVC* claim here. But once you point to that type of divergent interest, then otherwise debatable choices about whether to go single bidder or whether to do something different, et cetera, take on a different cast, at least at the pleading stage.

The other big part of the case is the disclosure claims. As you probably gathered from my discussion of the facts, I think that the complaint adequately states disclosure claims against the director defendants and against Renaud. Directors have a fiduciary duty to disclose all material information that's within their control when they seek stockholder action. They have to disclose that information fully and fairly. Once they travel down the road of partial disclosure, they have to disclose all of the information. They can't provide a misleading partial disclosure that omits other information, even if it wouldn't be independently material, that is nevertheless necessary to make the information that was disclosed not materially misleading.

Plaintiff in this setting is going to

32

have to establish that the disclosures were made culpably -- in other words, with scienter -- to be able to recover damages. I think it's reasonably conceivable that the folks who signed off on the disclosure here knew that the September disclosures were wrong. It's reasonably conceivable that the omission was material. And by the omission, I mean a candid discussion about AbbVie's approach. It's reasonably conceivable that the omission would have been material because its inclusion would have suggested that the fast sale process was an effort to capture value through the October offering. It's inferable that this disclosure would have revealed a conflict about the defendants and their decision to approve the merger and recommend it to stockholders, which is something that stockholders should have known.

I don't buy the defendants' arguments that the disclosures that were given were such that a reasonable stockholder should have inferred from the language that an approach was made. I think that requires far too much reading between the lines. And at a minimum, at the pleading stage, it's reasonably conceivable that a material omission was made and that

33

it was done knowingly.

Then last we have unjust enrichment against Bain and Perceptive. I have a hard time seeing how this claim comes into play. I think this case is probably going to rise or fall based on breach of fiduciary duty or aiding and abetting. But unjust enrichment is a viable theory here. And one can envision it being a viable theory as a way to reach up the chain, to the extent it's necessary, to order disgorgement of profits by affiliates where there is no other basis to reach those entities.

Unjust enrichment would be exactly the type of claim that would come into play if Bain and Perceptive somehow obtained confidential information that was material in a way that was wrongful, but under circumstances where they were not otherwise fiduciaries and did not otherwise knowingly participate in the breach of duty. But to the extent that their action in obtaining the information was wrongful, unjust enrichment would apply. It's dominated by the claims for breach of fiduciary duty and aiding and abetting, but it's something that isn't dismissable and that's reasonably conceivable.

Having run through those claims under

34

12(b)(6), I can now circle back to standing and decide whether or not this is a *Parnes* claim or not. Again, I think the outcome follows. There's a viable claim here asserting that the merger process was tainted because of the claim for breach of fiduciary duty that's being asserted and could otherwise be asserted derivatively but for the merger. And that claim is a straightforward one. It's that Bain and Perceptive supported a fast sale, in part to capture the benefits obtained during the October offering. It may not prove out. But at least at this stage of the case, it's enough to give the plaintiff standing and allow them to pursue their theories.

I'm now going to turn to what to do going forward. As I suggested at the outset, although I'm denying the motions to dismiss, I do think this is a close call. And I think there are likely ways to figure out whether there's some "there" there without having to go to full-blown, all-out fact discovery, expert discovery, and a trial.

In my experience, the super-sophisticated folks at places like Bain and Perceptive actually create internal analyses and other records that support their decisions. They do that

35

because there's usually a lead partner or a deal team who is closest to the actual transaction and then who has to pitch that decision to a larger group, be it a higher up or often at a full meeting of all of the members of the firm, if the firm is not too big. Those analyses are usually quite insightful and sophisticated. They go well beyond what lawyers come in and argue rational economic actors would do when they are making motion to dismiss arguments.

At the oral argument, I gave the example from my *ODN* case. I remember the lawyers coming in at the motion to dismiss phase and giving me generalities about how the preferred was aligned with the common and how rational economic actors would never do what the plaintiffs were suggesting that they would do. I asked about break points in the return curve for the preferred and asked, because the private equity firm in that case held some warrants, as well as some common shares, in addition to the preferred, how the private equity firm was likely looking at its securities on a portfolio basis. And the lawyers looked at me like I was speaking Greek or hallucinating.

I denied the motion to dismiss for

36

reasons that you can read about in a written decision. Discovery ensued.  We had a trial.  It turned out that the private equity firm had been doing quarterly and sometimes monthly presentations that analyzed all those things.  They had nice graphs of the return curves that showed the break points for the individual securities as well as the break points for the portfolio as a whole.  Why?  Because there was a deal team that was focusing on this particular investment, and they had to present their analyses and their recommendations on what to do to a larger group, in that case it was all of the partners at the firm.  And this happens again and again.  That's just one example.  This is a standard thing.

I expect something similar happened here.  I think those presentations and related discussions will either support the plaintiff's theory or they won't.  I also think it's highly unlikely that the plaintiff will be able to prevail without documents that provide strong support for their theory.  Let's be realistic.  We've seen that the Supreme Court is willing to make its own factual findings based on a cold appellate record, where you don't get the sense of how the witnesses have

37

testified.  On that type of record, the writings loom large.  And if it isn't in the writings, then it's not something that is easily credited.

Not only that, we've seen that if the information in the writings is somewhat debatable, the Supreme Court is willing to view documents differently than the trial court.  And the different factual findings made on appeal in the *Columbia* case are only the most recent example of that.  Now, I don't say that just to gripe.  I say that because we've got to be realistic about how this case is going to go.  I'm not eager to preside over a case for a year or two and have a trial, only to find out the facts were different than I thought they were.

So unless the analysis is there and the statements are there, I think the plaintiff has to be realistic about their chances.  Even if they do a great cross, and even if it seems like a witness is dancing or not being truthful, that's not going to show up on the trial transcript at the appellate level.  So that makes the actual documents the critical things.  And it makes the Bain and Perceptive presentation and related documents the pivotal evidence that needs to be assessed for purposes of

38

whether there's any "there" there.

The plaintiff used Section 220 to get documents from the company.  It didn't get documents from Bain or Perceptive.  Exercising my case-management authority for purposes of trying to promote the efficient disposition of the case, I'm right now cabining the parties to limited document discovery from Bain and Perceptive.  I want the parties to prioritize the types of analyses that we're all familiar with, be they in memorandum form or presentation form, or however they were given.  I think that the parties need to focus on a narrow period.  I think that you could start sometime in mid-August, maybe August 1st at the earliest, or August 15th, and end at October 31st.

I think the lawyers for the defendants need to confirm that time period.  If it turns out that there was some look-back done two months later that actually is probative where people were doing some type of after-action review, then I think that should be part of the discovery record as well.  But otherwise, I think a tight time period is the way to go.

I do think you need to prioritize

39

formal analyses, but I do think at this stage some level of targeted discovery into emails and other communications is supported.  Figure out who is on the deal team, and who were decision-makers at Bain and Perceptive, and perform limited discovery on those custodians.

Now, doing targeted discovery of this type I think is best achieved with a discovery facilitator.  Whenever I give this initial type of guidance, people then go off and naturally view it from their own perspective.  The defendants will understandably construe things narrowly.  The plaintiff will understandably seek to expand what I've said and interpret it more broadly.

What we're really doing here is trying to figure out a method of efficient information retrieval.  I do not want you to do hit-and-hope search terms.  I do not want you to try to do some type of production without sampling for richness and recall so you actually know if you're getting something meaningful.

I have been using a discovery facilitator who is a lawyer out of D.C. named Tara Emory.  She's particularly skilled at this type of

40

targeted information retrieval and the testing of it. I want the parties to reach out to her and find out if she is available. If she is available, you can prepare a form of order based on models I've used in the past that will get her on the ground to help you-all in terms of figuring out how to get this information efficiently. By that I mean how to get what the plaintiff really needs to evaluate whether there's a case here, rather than some broad, all-encompassing dragnet approach that will be burdensome to the defendants and result in a massive production.

Now, I will flag something for you. I know that in these deal scenarios privilege often comes up. I don't want to hear arguments that just because some lawyer inside of Bain or Perceptive is cc'd on all the deal communications or received a copy of the presentation when it went out, that all of a sudden all this stuff is attorney-client privileged. Let's be realistic. Deal documents and deal analyses and economic analyses are just that. Having a lawyer cc'd doesn't change that fact. And even if somebody had the brilliant idea to make the lawyer the point person for distributing communications relating to

41

this transaction because they thought there was some sort of potential legal risk of follow-on litigation, that doesn't mean that the actual business analysis and the related communications about what to do suddenly become legal advice.

I hope you-all can undertake a meaningful effort to achieve what I think needs to happen here, and that's a targeted information retrieval effort to get at the documents from Bain and Perceptive that are most probative for figuring out what they were thinking.

If those documents come back and are consistent with the defendants' point about economic rationality, and essentially come down to the idea that, look, we've got to do the October offering, we've got to take some kind of loss here, and that's just the way it goes, then the plaintiff ought to think about that and be realistic.

Likewise, if the documents come back and they say that, along the lines of the plaintiff's theory, there really was some way that the sophisticated financial folks at Bain and Perceptive were seeing a path to make money on this, and were doing it in part because they were glad to know that

42

AbbVie was waiting in the wings, well, people ought to think about that too.

But this is an opportunity for initial case assessment.  I think we should have a good sense coming out of this of whether there's a case here that can either survive at trial or survive on appeal, or whether the defendants can win even potentially at an earlier stage of the case through summary judgment.

If people need to have a conference with me to help with this targeted discovery once you've had a chance to think about it, I'm happy to do that.  I don't want to shadow the discovery facilitator's work.  Her job is to get into the weeds with you-all.  But if there's some benefit to me participating in an initial discussion, I am happy to do that.  I am also happy to have a status conference after the initial discovery has been produced.  We can all get together, you-all can show me what you-all have, and then we can talk about what makes sense in terms of the prospects of the case, if any, going forward.

That's my ruling.  That's what I want you-all to do.  I appreciate you-all being on the phone for an hour while I went through that lengthy

43

discussion.  I hope everyone has a good day. Good-bye.

(Proceedings concluded at 10:57 a.m.)

- - -

44

CERTIFICATE

I, DEBRA A. DONNELLY, Official Court Reporter for the Court of Chancery of the State of Delaware, Registered Merit Reporter, Certified Realtime Reporter, and Delaware Notary Public, do hereby certify the foregoing pages numbered 3 through 43, contain a true and correct transcription of the proceedings as stenographically reported by me at the hearing before the Vice Chancellor of the State of Delaware, on the date therein indicated.

IN WITNESS WHEREOF, I have hereunto set my hand at Wilmington this 7th day of October, 2025.

/s/ Debra A. Donnelly
------------------------------
Debra A. Donnelly
Official Court Reporter
Registered Merit Reporter
Certified Realtime Reporter
Delaware Notary Public

CHANCERY COURT REPORTERS