**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE CEREVEL THERAPEUTICS HOLDINGS, INC. SECURITIES LITIGATION | Case No. 25-cv-417-GBW<br><br>**FILED UNDER SEAL** |

## ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS BAIN CAPITAL INVESTORS, LLC, ADAM KOPPEL AND CHRISTOPHER GORDON'S MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT (D.I. 45)

Dated: December 17, 2025

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
**FARNAN LLP**
919 North Market Street, 12th Floor
Wilmington, DE 19801
Tel.: (302) 777-0300
Fax: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

***Counsel for Lead Plaintiffs and the Class***

[Additional counsel listed on signature block]

**TABLE OF CONTENTS**

I.      NATURE AND STAGE OF THE PROCEEDINGS ............................................................. 1

II.     SUMMARY OF ARGUMENT ......................................................................................... 2

III.    STATEMENT OF FACTS ................................................................................................ 5

        A.      Bain and Pfizer Form and Control Cerevel ............................................................ 5

        B.      Pharmaceutical Giant AbbVie Pursues a Regional Partnership with Cerevel
                and Conducts "Meaningful" Due Diligence ........................................................... 6

        C.      Bain Learns AbbVie Shifted its Interest from a Regional Partnership to a
                Whole Company Acquisition of Cerevel ................................................................. 7

        D.      Bain and Perceptive Increase their Positions through the October Offering in
                Advance of the Lucrative AbbVie Acquisition ....................................................... 8

        E.      With Bain's Support, Cerevel Agrees to Be Acquired by AbbVie for Nearly
                Double the October Offering Price .......................................................................... 9

IV.     LEGAL STANDARD ...................................................................................................... 9

V.      ARGUMENT ................................................................................................................ 10

        A.      Plaintiffs Plead a Section 20A Claim (Count II) .................................................. 10

                1.      The AbbVie Merger Interest Was Material ............................................... 10

                2.      Bain Had Actual Possession of the Material, Nonpublic
                        Information .............................................................................................. 12

                3.      Bain's Predicate Violation and Deceptive Conduct Arguments Are
                        Wrong ...................................................................................................... 15

                4.      Although Not Required, Plaintiffs Allege Bain's Scienter ....................... 17

                5.      Plaintiffs Traded Contemporaneously with Bain ..................................... 21

        B.      Plaintiffs Plead a Section 20(a) Claim (Count IV) Against Bain, Gordon, and
                Koppel .................................................................................................................. 22

VI.     CONCLUSION .............................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Albert v. Alex. Brown Mgmt. Servs., Inc.*,
No. Civ.A 762-N, 2005 WL 2130607 (Del. Ch. Aug. 26, 2005) ..................................... 14

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ....................................................................................................... 11

*Basile v. Valeant Pharm. Int'l, Inc.*,
No. SACV 14-2004-DOC (JCGx), 2015 WL 7352005 (C.D. Cal. Nov. 9, 2015) ............ 22

*Belmont v. MB Inv. Partners, Inc.*,
708 F.3d 470 (3d Cir. 2013) ......................................................................................... 14

*BrandRep, LLC v. Ruskey*,
No. 2018-0541-MTZ, 2019 WL 117768 (Del. Ch. Jan. 7, 2019) .................................... 14

*Buban v. O'Brien*,
No. C 94-0331 FMS, 1994 WL 324093 (N.D. Cal. June 22, 1994) ................................ 22

*Carmignac Gestion, S.A. v. Perrigo Co. PLC*,
No. 17-10467, 2019 WL 3451523 (D.N.J. July 31, 2019) ............................................. 18

*City of Southfield Fire & Police Ret. Sys. v. Hayward Holdings, Inc.*,
No. 2:23-CV-04146 (WJM), 2025 WL 1577315 (D.N.J. June 4, 2025) .......................... 24

*Copland v. Grumet*,
88 F. Supp. 2d 326 (D.N.J. 1999) ................................................................................. 22

*Dutton v. Harris Stratex Networks, Inc.*,
270 F.R.D. 171 (D. Del. 2010) ...................................................................................... 25

*Eastwood Enters., LLC v. Farha*,
No. 08-15962, 2009 WL 3157668 (M.D. Fla. Sept. 28, 2009) ....................................... 15

*Fujisawa Pharm. Co. v. Kapoor*,
115 F.3d 1332 (7th Cir. 1997) (J. Posner) .................................................................... 16

*Gordon v. Sonar Cap. Mgmt. LLC*,
92 F. Supp. 3d 193 (S.D.N.Y. 2015) ............................................................................. 16

*GSC Partners CDO Fund v. Washington*,
368 F.3d 228 (3d Cir. 2004) .................................................................................... 10, 18

*In re Able Lab'ys. Sec. Litig.*,
No. 05-2681, 2008 WL 1967509 (D.N.J. Mar. 24, 2008) ............................................... 22

*In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*
    529 F. Supp. 3d 111 (S.D.N.Y. 2021)............................................................. 17, 22

*In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*,
    No. 05-232, 2007 WL 81937 (E.D. Pa. Jan. 9, 2007) ........................................ 23

*In re BioScrip, Inc. Sec. Litig.*,
    95 F. Supp. 3d 711 (S.D.N.Y. 2015) ................................................................ 25

*In re Digital Island Sec. Litig.*,
    223 F. Supp. 2d 546 (D. Del. 2002) .................................................................. 24

*In re Enron Corp. Sec. Derivative & ERISA Litig.*,
    258 F. Supp. 2d 576 (S.D. Tex. 2003)............................................................... 16

*In re Gupta Corp. Sec. Litig*,
    900 F. Supp. 1217 (N.D. Cal. 1994) ................................................................. 24

*In re Kosmos Energy Ltd. Sec. Litig.*,
    955 F. Supp. 2d 658 (N.D. Tex. 2013) ......................................................... 14, 24

*In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*,
    2015 WL 2250472 (D.N.J. May 13, 2015) ....................................................... 22

*In re Moody's Corp. Sec. Litig.,*
    599 F. Supp. 2d 493 (S.D.N.Y. 2009) .............................................................. 18

*In re Openwave Sys. Sec. Litig.*,
    528 F.Supp.2d 236 (S.D.N.Y. 2007) ................................................................ 10

*In re Oxford Health Plans, Inc.*,
    187 F.R.D. 133 (S.D.N.Y. 1999)....................................................................... 16

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007) .............................................................. 15

*In re Silver Lake Grp., LLC Sec. Litig.*,
    108 F.4th 1178 (9th Cir. 2024) ............................................................. 13, 17, 22

*In re SolarWinds Corp. Sec. Litig.*,
    595 F. Supp. 3d 573 (W.D. Tex. 2022),
    *order clarified*, 2022 WL 3699429 (W.D. Tex. Aug. 19, 2022)........................ 24

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
    No. C 99–00109 SBA, 2000 WL 1727405 (N.D. Cal. Sept. 29, 2000) ........... 24

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006) ............................................................................. 19

*In re UTStarcom, Inc. Sec. Litig.*,
    617 F. Supp. 2d 964 (N.D. Cal. 2009) ............................................................. 23

*In re Valeant Pharms. Int'l, Inc., Sec. Litig.*,
    No. 15-7658 (MAS) (LHG), 2019 WL 2724075 (D.N.J. June 30, 2019) ......................... 15

*In re Worlds of Wonder Sec. Litig,*,
    35 F.3d 1407 (9th Cir. 1994) ........................................................................ 21

*Institutional Invs. Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009) ................................................................... 2, 17, 18

*Johnson v. Aljian*,
    490 F.3d 778 (9th Cir. 2007) ........................................................................ 15

*Melcher v. Fried*,
    No. 16-cv-2440-BAS-BGS, 2018 WL 6326334 (S.D. Cal. Dec. 4, 2018) ....................... 11

*Mill Bridge V, Inc. v. Benton*,
    496 F. App'x 170 (3d Cir. 2012) .................................................................... 12

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ........................................................................ 24

*Palladin Partners v. Gaon,*
    No. 05-CV-3305 (WJM), 2006 WL 2460650 (D.N.J. Aug. 22, 2006) ....................... 23, 25

*Phillips v. LCI Int'l, Inc.*,
    190 F.3d 609 (4th Cir. 1999) ........................................................................ 21

*Rizzo v. MacManus Grp., Inc.*,
    158 F. Supp. 2d 297 (S.D.N.Y. 2001) ............................................................. 11

*Rothberg v. Rosenbloom,*
    771 F.2d 818 (3d Cir. 1985) ........................................................................ 11

*S.E.C. v. Wyly*,
    788 F. Supp. 2d 92 (S.D.N.Y. 2011) ............................................................... 12

*Shaev v. Saper,*
    320 F.3d 373 (3d Cir. 2003) ...................................................................... 9, 13

*Shah v. Zimmer Biomet Holdings Inc.,*
    348 F. Supp. 3d 821 (N.D. Ind. 2018) ............................................................. 13

*Stanley Black & Decker, Inc. v. Gulian*,
    70 F. Supp. 3d 719 (D. Del. 2014) ................................................................. 23

*Stewart v. Wilmington Tr. SP Servs., Inc.*,
    112 A.3d 271 (Del. Ch. 2015),
    *aff'd*, 126 A.3d 1115 (Del. 2015)........................................................................ 4

*Strougo v. Mallinckrodt Pub. Ltd. Co.*,
    No. CV 20-10100, 2022 WL 17740482 (D.N.J. Dec. 16, 2022) ...................................... 25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................................................ 18

*Thomas v. Magnachip Semiconductor Corp.*,
    167 F. Supp. 3d 1029 (N.D. Cal. 2016) ....................................................... 14, 23

*Turocy v. El Pollo Loco Holdings, Inc.*,
    No. SA CV 15-1343-DOC (KESx), 2018 WL 3343493 (C.D. Cal. July 3, 2018) ........... 22

*United Ass'n Nat'l Pension Fund v. Carvana Co.*,
    759 F. Supp. 3d 926 (D. Ariz. 2024),
    *reconsideration denied*, No. CV-22-02126-PHX-MTL,
    2025 WL 371717 (D. Ariz. Feb. 3, 2025) .......................................................... 14

**Statutes**

15 U.S.C. § 78.............................................................................. 10, 16, 17, 22

17 C.F.R. § 240.10b5-1 .................................................................................. 19

I.      **NATURE AND STAGE OF THE PROCEEDINGS**[1]

The case arises from misstatements and omissions in connection with Cerevel's offering of $500 million of stock in October 2023 (the "October Offering") and AbbVie's subsequent acquisition of the Company. Undisclosed to investors, the October Offering was orchestrated to allow Cerevel's inside shareholders Bain and Perceptive to acquire more than six million shares of Cerevel common stock at a deep discount while in possession of material nonpublic information regarding AbbVie's merger interest. These insiders unlawfully profited more than $140 million when AbbVie announced just 51 days later that it was acquiring Cerevel for nearly double the offering price.

The Complaint asserts violations of Sections 10(b), 14(a), 20A and 20(a) of the Exchange Act against, variously, Cerevel, Cerevel's controlling shareholders Bain and Pfizer, inside shareholder Perceptive, Cerevel CEO Renaud, and certain members of Cerevel's Board:

| Defendant(s) | Summary of Claims |
|---|---|
| Cerevel (D.I. 46) | Cerevel is liable under Sections 10(b) and 14(a) for making misstatements and omitting material facts in various public statements from the October Offering through the Proxy regarding the timing of AbbVie's merger interest and the fairness of the Merger. |
| Bain, Gordon, Koppel (the "Bain Defendants") (D.I. 45) | Bain is liable under Section 20A for purchasing more than five million Cerevel shares while in possession of material, nonpublic information regarding AbbVie's merger interest. Bain, Cerevel's largest shareholder, is also liable under Section 20(a) as a control person of Cerevel and Renaud. Defendants Gordon and Koppel, senior executives at Bain, served as Cerevel Board members and are liable under Section 20(a) as control persons of Cerevel. |
| Perceptive, Giordano (D.I. 53) | Perceptive is liable under Section 20A for purchasing 876,808 Cerevel shares while in possession of material nonpublic information regarding AbbVie's merger interest. Defendant |

---

[1] Capitalized terms undefined herein shall have the same meaning as in the Consolidated Class Action Complaint ("Complaint") [D.I. 19]. Citations to "¶__" refer to paragraphs in the Complaint. All emphasis is added and internal citations omitted unless otherwise noted.

|  | Giordano, a Perceptive Managing Director, served as a Cerevel Board member and is liable under Section 20(a) as a control person of Cerevel. |
|---|---|
| Pfizer (D.I. 40) | Pfizer is liable as a control person under Section 20(a) of Cerevel because Pfizer and Bain at all times jointly controlled Cerevel. |
| Renaud (D.I. 57) | Renaud, who served both as Cerevel's CEO and a Senior Advisor at Bain during the Class Period, is liable under Section 10(b) for making misstatements and omitting facts regarding the October Offering and the timing of AbbVie's merger interest. Renaud is also liable under Section 20(a) as a control person of Cerevel. |
| Patrick, Baron, Varma, and McKernan (the "Director Defendants") (D.I. 55) | Each of the Director Defendants was a member of the Cerevel Board, had some affiliation with Bain and/or Pfizer, and are liable under Section 20(a) as control persons of Cerevel. |

In an apparent effort to induce the Court to look at the claims in the Complaint on a fractionalized (rather than holistic) basis as required by operative Third Circuit law,[2] Defendants made six separate motions to dismiss. This opposition addresses the motion filed by the Bain Defendants, which raises many of the same arguments already rejected at the motion to dismiss stage in *SEIU Pension Plans Master Trust v. Bain Capital Investors, LLC*, No. 2024-1274-JTL (Del. Ch.).[3] While this opposition focuses on the facts and arguments related to the Bain Defendants, Plaintiffs incorporate by reference herein each of the other opposition briefs.

## II.    SUMMARY OF ARGUMENT

Section 20A of the Exchange Act was enacted to prevent precisely the wrongdoing alleged against Bain here. On October 16, 2023, Bain purchased 5,480,052 Cerevel shares at just $22.81 per share while in possession of material nonpublic information regarding merger discussions between AbbVie and Cerevel. ¶¶9-11. For example, (1) Bain was aware that as early as March of 2023 AbbVie and Cerevel were in discussions about a strategic partnership and that by September

---

[2] *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009) .

[3] The Chancery Court's October 2, 2025 Telephonic Rulings are cited herein as "Chancery Tr. __". The full transcript is attached as Exhibit A to the Declaration of Michael J. Farnan in Support of Plaintiffs' Oppositions to Defendants' Motions to Dismiss.

23, 2023, AbbVie had shifted its interest to a whole company acquisition, and (2) that AbbVie's interest was discussed at a Board meeting on September 27, 2023, at which time Centerview (the Company's financial advisors) provided a detailed Board presentation and afterwards prepared a response for Renaud (Cerevel's CEO and a Bain Senior Advisor) to engage with AbbVie consistent with the discussion at the Board meeting. ¶7, 66-74. Shortly thereafter, Cerevel set up a transaction data room. ¶¶7, 75. Internal company documents confirm that Renaud ███████████ ████████████████████████████████ ¶74. With knowledge imputed from three of its most senior employees on the Board that Cerevel's stock price was set to dramatically rise because AbbVie intended to acquire Cerevel for a significant premium, Bain—who had not participated in Cerevel's prior two public offerings—purchased more than 5 million shares in direct violation of the federal securities laws. ¶¶7-9.

The secondary stock offering in which Bain and Perceptive participated on October 16, 2023 was not approved by the Board until October 10, 2023, well after Bain and the Board had knowledge of AbbVie's whole-company merger interest. In fact, on October 19, 2023, AbbVie sent a written offer to acquire Cerevel at $35 per share. The merger ultimately closed at $45 per share with Bain reaping a profit of more than $120 million on its $22.81 per share purchases. ¶¶12-13. Public shareholders (the "Insider Trading Class") were immediately harmed by selling shares at an informational disadvantage contemporaneously with Bain's purchases and thus Bain should be forced to disgorge the $120 million short-term swing profit made through its tainted insider transaction. ¶¶9-10, 181-185.

Bain co-founded Cerevel with Pfizer and they maintained control of Cerevel after it became a public company and throughout the period described above. ¶¶3-5. Bain and Pfizer together owned the majority of Cerevel's stock, they together nominated, employed and/or formerly

employed the vast majority of Cerevel's Board, and the Shareholder Rights Agreements gave Bain and Pfizer the right to cause Cerevel to conduct secondary offerings and guaranteed that they could maintain their controlling stake in Cerevel stock. ¶¶4-5. It is no surprise then that Bain instigated a Company sale of stock at a price far lower than actual value after learning about AbbVie's interest in pursuing an acquisition.

Confronted with these straightforward, well-plead facts, Bain offers a series of previously rejected arguments to attempt to escape Section 20A liability.

1.      Bain argues the nonpublic information concerning AbbVie was not material. However, the facts demonstrate AbbVie's interest at the time of the October Offering was highly material because, among other reasons described below, AbbVie was a credible bidder, had already conducted "meaningful" diligence, and Merger discussions were occurring at Cerevel's most senior levels, including the Board and CEO level. Indeed, the Chancery Court rejected Bain's same materiality argument, finding there was "a reasonable inference that AbbVie's proposal to acquire the company was material nonpublic information." Chancery Tr. 21:18-22:19. Bain's related argument that it did not "possess" the nonpublic information ignores that, pursuant Delaware law, an employee's knowledge (such as that of Defendants Koppel, Gordon, and Renaud) is imputed to an employer (such as Bain) where the employee is acting within the scope of their authority. *Stewart v. Wilmington Tr. SP Servs., Inc.*, 112 A.3d 271, 302–03 (Del. Ch. 2015), *aff'd*, 126 A.3d 1115 (Del. 2015).

2.      Bain's arguments seek to impose new requirements on plaintiffs pursuing Section 20A claims. For instance, Bain argues that, because its purchases were directly from Cerevel, the Insider Trading Class does not have standing and/or cannot prove a predicate violation. But the plain language of Section 20A provides claims to "contemporaneous" traders and courts have

routinely held that, for this reason, privity is not required. Similarly, Bain argues Plaintiffs have not pled a predicate violation, ignoring that any violation of the Exchange Act (whether pled as a separate claim in the Complaint or not) can serve as a predicate violation for Section 20A, including Bain's alleged violations of Section 20(a) as a control person as well as Section 10(b) for both insider trading and omitting material facts from the October Offering Documents.

3.    Bain argues that Plaintiffs have failed to plead scienter. But Bain's scienter argument is irrelevant here because Plaintiffs allege a Section 20(a) control person predicate violation that does not have a state of mind requirement and, thus, Plaintiffs are not required to plead scienter. In any event, Bain's scienter is more than established by it having actual knowledge that it was trading while in possession of material nonpublic information and its massive, $120 million financial motivation to purchase discounted shares in advance of the AbbVie merger. And Bain's "dilution" and other arguments are highly speculative and rely on assumptions that are not as compelling as the inferences created by the facts alleged in the Complaint.

4.    The Bain Defendants argue they are not liable as control persons of Cerevel or Renaud, but the facts regarding stock ownership, board designees, and the Shareholder Rights Agreement more than amply demonstrate that the Bain Defendants both individually and collectively with Pfizer had control of Cerevel and Renaud.

## III.    STATEMENT OF FACTS

### A.    Bain and Pfizer Form and Control Cerevel

Bain and Pfizer jointly created Cerevel as a private company in July 2018. ¶38. After Cerevel became public, Bain and Pfizer continued to jointly control the Company. Bain and Pfizer (with certain of Cerevel's management) owned over 68% of Cerevel's outstanding stock immediately following the de-SPAC merger and entered into Shareholder Rights Agreements that

5

provided them with the right to nominate directors based on their percentage ownership of Cerevel stock, which enabled Bain and Pfizer to nominate the majority of the Cerevel Board. ¶¶46-48.

Bain and/or Pfizer had an affiliation or relationship with 11 of the 12 Cerevel Board members, including: (i) Cerevel CEO Ron Renaud, a Bain Senior Advisor (and former Bain Partner); (ii) Chris Gordon, Co-Head of Bain's North American Private Equity Business and Global Head of the Healthcare Vertical; (iii) Adam Koppel, Managing Director of Bain Capital Life Science; (iv) Deval Patrick (a former Bain Partner); (v) Dr. Ruth McKeran (a Bain nominee and former Pfizer executive); (vi) Gabrielle Sulzberg (a Bain nominee and former Bain employee); (vii) Marijn Dekkers (a Bain nominee and served as a director on other Bain-funded companies); (viii) Norbert Reidel (a Bain nominee); (iv) Douglas Giordano (a former Pfizer employee); (v) Deborah Baron (a Pfizer employee); and (vi) Suneet Varma (a Pfizer employee). ¶55.

In addition to controlling the Board, the Shareholder Rights Agreements provided Bain and Pfizer the right to direct Cerevel to conduct stock offerings and gave Bain and Pfizer the right to purchase their *pro rata* share of those offerings, essentially guaranteeing that Bain and Pfizer could maintain their control of Cerevel. ¶¶49-50. For these reasons, Cerevel was a "controlled company" under the NASDAQ listing rules that acknowledged Bain and Pfizer "have significant influence over us and may have interests different from [investors]." ¶54.

### B. Pharmaceutical Giant AbbVie Pursues a Regional Partnership with Cerevel and Conducts "Meaningful" Due Diligence

Starting in early 2023, Cerevel engaged in discussions with other companies to potentially work together as strategic regional partners to help produce and market abroad its lead asset, a schizophrenia and Alzheimer treatment known as emraclidine. ¶57. AbbVie, a pharmaceutical giant, executed a confidentiality agreement with Cerevel on March 28, 2023. ¶57. In connection

6

with those partnership discussions, AbbVie conducted what Cerevel itself described as "meaningful" due diligence and noted was more than any other party. ¶¶57, 64.

Bain appointed its former partner Ron Renuad as Cerevel's CEO in the summer of 2023, replacing former CEO and chairman Mr. Anthony Coles. ¶58. During an earnings call in the summer of 2023, Renaud and Coles both spoke, and Coles denied any merger rumors, stating, "[t]here are no strategic conversations underway, so I can dispense with that" and confirmed Cerevel was focused on "partnerships and regional collaborations" because Cerevel had $825 million in cash and marketable securities with a "runway comfortably into 2025." ¶¶60-63.

### C.    Bain Learns AbbVie Shifted its Interest from a Regional Partnership to a Whole Company Acquisition of Cerevel

Cerevel's Board, and by extension Bain, knew no later than the end of September 2023 that AbbVie had shifted its interest from a regional Japanese partnership to a whole-company acquisition of Cerevel. ¶66. On September 23, 2023, a Cerevel Officer sent Centerview (Cerevel's financial advisor) an "Updated Tracker" that indicated AbbVie had "███████████████ ██████████████████████" and AbbVie had ████████████████████ ¶67. The tracker indicated the "█████████" were "███████████████████████████████." ¶67. Contrary to this evidence, the Proxy stated that on September 25, 2023, AbbVie formally notified Cerevel that it was withdrawing its interest in a Japanese partnership and purportedly did *not* indicate its interest in a whole company acquisition. ¶68.

On September 27, 2023, Cerevel's Board met with Centerview to discuss "potential strategy paths forward" and "M&A themes and trends." ¶69. At the meeting, Pfizer's Board designees Baron and Varma agreed to be recused from certain discussions because Pfizer could itself be an "interested party" regarding a "potential acquisition of Cerevel." ¶70. At the meeting, Centerview advised the Cerevel Board that in the last few years a "significant majority of M&A

transactions have been initiated through partnership discussions," such as the AbbVie-Cerevel Japanese partnership discussions. ¶71.

Following the meeting, Centerview prepared proposed talking points for Renaud to respond to AbbVie, which included stating that Renaud was "███████████████████ and that he had "███████████████████████████████████." ¶74. By October 5, 2023, Cerevel started to put together a whole-company data room in response to AbbVie's merger interest. ¶75.

**D.      Bain and Perceptive Increase their Positions through the October Offering in Advance of the Lucrative AbbVie Acquisition**

On October 10, 2023, the Bain and Pfizer-dominated Cerevel Board approved the October Offering. ¶¶77-78. Cerevel issued two press releases and the Preliminary Prospectus Statement regarding the October Offering that did not disclose AbbVie's indication of interest in a whole-company transaction. ¶¶79-84.

Bain acquired 5,480,052 shares of common stock in the October Offering with the full knowledge of AbbVie's interest in Cerevel, the ongoing dialog between the entities, and Cerevel's creation of a data room—not to mention Bain's ability to control Cerevel's sale process and approve any proposed Merger with Pfizer. ¶86. The October Offering was conducted at just $22.81 per share, approximately half of the ultimate $45 per share Merger price. ¶85.

Notably, Bain purchased enough shares to jointly maintain control of Cerevel with Pfizer. ¶87. Following the October Offering, Bain and Pfizer owned 51.6% of Cerevel's common stock and, according to Bain's own Schedule 13-D disclosing its purchases in the October Offering, as a result of certain "voting arrangements," Bain and Pfizer "may be deemed to be a group for purposes of Section 13(d) under the Securities Exchange Act of 1934, as amended." ¶87.

     **E.**     **With Bain's Support, Cerevel Agrees to Be Acquired by AbbVie for Nearly Double the October Offering Price**

On October, 17, 2023, the day after the October Offering, a senior AbbVie officer emailed Cerevel " ██████████ " regarding their previous discussion. ¶92. Two days after that, on October 19, 2023, AbbVie made a written, nonbinding indication of interest to acquire Cerevel for $35 per share. ¶93. The offer represented a 53% premium to the October Offering price. ¶93.

After meetings between Bain Senior Advisor, Renaud, and the chairman of AbbVie's Board, AbbVie increased its offer to $40 per share. ¶97. The Bain/Pfizer-controlled Cerevel Board quickly finalized the sale of the Company to AbbVie because they could lock in an enormous profit on the discounted shares Bain had just acquired in the October Offering (and on Pfizer's prior investments in Cerevel).

On December 6, 2023, just 51 days after the October Offering, AbbVie and Cerevel issued a joint press release announcing that the companies had reached an agreement where AbbVie would acquire Cerevel for $45 per share. ¶103. The price of Cerevel's stock increased to $41.13 per share immediately upon the announcement. ¶105. In connection with the proposed Merger, Bain entered into a support agreement indicating that it would vote all its 65,679,781 shares (approximately 36.2% of the total outstanding shares) in favor of the transaction. ¶106. On August 1, 2024, AbbVie announced that it closed its acquisition of Cerevel.

**IV.**     <u>**LEGAL STANDARD**</u>

In assessing the sufficiency of the Complaint under Rule 12(b)(6), courts must consider Plaintiffs' allegations accepting all well-pled allegations and drawing all inferences in Plaintiffs' favor. *Shaev v. Saper*, 320 F.3d 373, 378 (3d Cir. 2003). "A court may not dismiss the complaint unless it appears beyond doubt that the plaintiffs can prove no set of facts in support of their claims

that would entitle them to relief." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 236 (3d Cir. 2004).

While Plaintiffs' Section 10(b) claims must satisfy the heightened pleading standards of Rule 9(b) and the PSLRA, "[t]here is some dispute as to whether causes of action under Section 20A are subject to the pleading requirements of Federal Rule of Civil Procedure 8, or the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA." *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 255 (S.D.N.Y. 2007).

## V.    ARGUMENT

### A.    Plaintiffs Plead a Section 20A Claim (Count II)

Plaintiffs allege that Bain violated Section 20A of the Exchange Act by purchasing Cerevel common stock from the October Offering while in possession of material, nonpublic information regarding Cerevel's merger discussions with AbbVie. Section 20A expressly provides that "[a]ny person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable" to contemporaneous purchasers. 15 U.S.C. § 78t-1.[4]

#### 1.    The AbbVie Merger Interest Was Material

Bain argues the nonpublic information was not "material" because AbbVie's merger interest was "preliminary" and only evidenced by a single tracking spreadsheet. No so.

As detailed in Plaintiffs' Opposition to Cerevel's Motion to Dismiss (which Plaintiffs fully incorporate herein), Plaintiffs allege numerous details evidencing the information's materiality, including that AbbVie was a credible bidder, its expression of interest came after months of "meaningful" diligence, Cerevel's banker advised a significant amount of M&A activity in the

---

[4] Attached as Appendix A is a chart summarizing the allegations and relevant facts for each claim.

pharmaceutical space start as similar partnership discussions, and discussions were serious enough that Cerevel was already awaiting a term sheet. ¶¶57, 67, 71. Cerevel's reaction to AbbVie's interest is also relevant to the materiality of the discussions. As detailed in the Complaint, Cerevel quickly shared AbbVie's interest with its financial advisors, immediately held a Board meeting (and recused Pfizer's Board designees because Pfizer could also be interested in an acquisition), had Centerview prepare talking points for Renaud to respond to AbbVie based on the Board discussion, and started to put together a whole-company data room. ¶¶67-75.

Based on the same facts, the Court of Chancery concluded in denying Bain's motion to dismiss that "***when you put all this together, this looks like the AbbVie approach was real and that the company and its management team knew it was real***" (Chancery Tr. 23:23-24:1). Federal courts have also found similar fact patterns demonstrated materiality. *See*, *e.g.*, *Melcher v. Fried*, 2018 WL 6326334, at *13 (S.D. Cal. Dec. 4, 2018) (merger negotiations were material when "the upper levels of [the company] were directly involved" and the companies had "sustained talk . . . pre-dat[ing] the merger talks"); *Rizzo v. MacManus Grp., Inc.*, 158 F. Supp. 2d 297, 304 (S.D.N.Y. 2001) (withheld merger negotiations material where target had hired bankers, had been approached by suitors and had commenced top-level discussions).

Notably, the Supreme Court recognized that "trading (and profit making) by insiders can serve as an indication of materiality." *Basic Inc. v. Levinson*, 485 U.S. 224, 240 n.18 (1988); *Rothberg v. Rosenbloom*, 771 F.2d 818, 821 (3d Cir. 1985) ("The best proof of the materiality of that information is that the . . . experienced investors, found it to be sufficiently material . . . to purchase [the] stock."). Here, Bain not only traded on the insider information, but Bain and Pfizer controlled Cerevel and thus "they could be confident that they could effectuate any planned sale, enhancing the probability that it would occur." *S.E.C. v. Wyly*, 788 F. Supp. 2d 92, 123 (S.D.N.Y.

11

2011). Accordingly, based on the nature of AbbVie's interest after months of due diligence and Cerevel's immediate action in response, coupled with Bain's trades on the information and ability to control the sales process to effectuate the Merger, Plaintiffs have adequately plead AbbVie's merger interest was material at the time of the October Offering.

Bain relies heavily on *Mill Bridge V, Inc. v. Benton*, an inapposite summary judgment decision that turned on the fact that the parties had not yet conducted *any* official due diligence and the target had not even informed its board of directors of the merger interest. 496 F. App'x 170 (3d Cir. 2012). Of course, by contrast here, Cerevel's own documents reveal AbbVie had completed "meaningful" diligence (¶67) and confirm Renaud had "█████████████" ¶74.

### 2. Bain Had Actual Possession of the Material, Nonpublic Information

Bain's argument that the Complaint fails to plead "what, if any, information regarding the alleged expression of interest was actually 'possessed' by Bain itself prior to its purchase in the Offering" (D.I. 45 at 9) is flat out wrong. The Complaint plainly alleges that, "at the time of the October 16, 2023 purchases, Bain and Perceptive, through their ownership of Cerevel and Board designees, knew that: AbbVie had already conducted meaningful due diligence into Cerevel and was interested in a whole-company acquisition; Cerevel was 'awaiting a term sheet' from AbbVie; Cerevel's Board had already met with Centerview to discuss AbbVie's interest and strategic alternatives; Defendant Renaud had discussed 'talking points' for responding to AbbVie; and Cerevel had begun pulling together a data room for a whole-company transaction." ¶182. The Complaint also discusses, among other things, that Bain knew of Centerview's September 2023 valuation that valued Cerevel at $53 per share. ¶72.

Plaintiffs' allegation that the Cerevel Board, including Bain's appointees and designees, knew about AbbVie's merger interest are confirmed by Centerview's proposed talking points for

12

Renaud dated September 29, 2023, which suggest that Renaud acknowledge to AbbVie that he had

"█████████████████████████████████████████████████." ¶74.[5] Accordingly, Bain's argument that "Plaintiffs do not allege what information was shared with Bain's Board designees"[6] is without merit.

Bain also suggests that, somehow, the information its Board designees knew cannot be imputed to Bain. Bain's argument rests on its self-characterization of the Board members as simply its "designees," ignoring that at least three Board members held active, senior positions at Bain at the time of the October Offering. Specifically, (i) Defendant Gordon served as Co-Head of Bain's North American Private Equity Business and Global Head of the Healthcare Vertical; (ii) Defendant Koppel served as a Managing Director of Bain Capital Life Science; and (iii) Defendant Renaud was Partner at Bain immediately before becoming Cerevel CEO, and remained at Bain as a Senior Advisor throughout the Class Period. ¶¶29-31, 58, 120.

There can be no dispute that Defendants Gordon, Koppel, and Renaud possessed the material nonpublic information as Board members, and there is no dispute these Defendants were working for Bain at the time.[7] Accordingly, possession of the information is imputed from Gordon,

_____

[5] Bain argues the "talking points" were to "confirm to AbbVie the Company's lack of interest given its focus on ongoing capital raise strategies." (D.I. 45 at 10). The other obvious inference from the document is, as the Chancery Court put it, "that this was simply the expected next move in the negotiation dance. When somebody makes an initial proposal, the good negotiating strategy is to initially say you're not interested." (Chancery Tr. 10:18-11:10). At this stage, the Court must "draw all inferences in Plaintiffs' favor." *Shaev*, 320 F.3d at 378.

[6] For the same reason, *Shah v. Zimmer Biomet Holdings Inc.*, misses the point as there was "no allegation that any information related to [the omitted problems] was in fact shared with" the defendants. 348 F. Supp. 3d 821, 849 (N.D. Ind. 2018). Similarly, in *In re Silver Lake Group, LLC Sec. Litig.*, there was just an alleged inference the "Board was likely kept in the loop." 108 F.4th 1178, 1191-1192 (9th Cir. 2024). By contrast, here documents confirm Renaud "████████ ██████████████████████████████████." ¶74.

[7] In addition to Bain's Board designees, two additional Bain Capital representatives, Will Cozean and Ricky Sun, also attended the September 27th Board meeting. ¶70.

13

Koppel, and Renaud to their employer, Bain. *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 496 (3d Cir. 2013) ("imputation to an employer is proper based on 'acts committed by one of its agents within his actual or apparent scope of authority'") (citation omitted); *BrandRep, LLC v. Ruskey*, 2019 WL 117768, *5 (Del. Ch. Jan. 7, 2019) (where "a defendant secondary actor is an entity, the knowledge of an individual fiduciary or agent may be imputed to that entity"); *see also Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1051 (N.D. Cal. 2016) (holding that complaint sufficiently pleaded that majority shareholder had inside information as required to state a Section 20A claim by alleging that shareholder's appointees to corporation's board of directors, who were also shareholder's employees, had knowledge).[8] Indeed, *Albert v. Alex. Brown Management Services, Inc.*, which Bain cites and describes as "summarizing Delaware law of imputed knowledge of agents," makes Plaintiffs' point. 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005). In that case, the court imputed knowledge to an entity because its "employees, acting within the scope of their employment, had knowledge of the underlying factual allegations." *Id.*[9]

---

[8] Bain cites *In re Kosmos Energy Ltd. Sec. Litig.*, but that case concerned control person allegations (not imputation) and turned on a lack of facts *beyond* mere stock ownership and board appointments. 955 F. Supp. 2d 658 (N.D. Tex. 2013). Here, Cerevel's own SEC filings acknowledged Bain and Pfizer's control, and the Complaint alleges Bain caused the October Offering for its own benefit pursuant to its rights under the Shareholder Rights Agreements. Bain also relies on *United Association National Pension Fund v. Carvana Co.*, but that also had nothing to do with imputation and the 20A claim was dismissed because the defendant only was alleged to have "attended Board meetings" and the complaint "lack[ed] any allegations detailing what information [defendant] specifically obtained." 759 F. Supp. 3d 926, 985 (D. Ariz. 2024), *reconsideration denied*, 2025 WL 371717 (D. Ariz. Feb. 3, 2025). Here, the Complaint is crystal clear that all of Bain's designees (including three Bain employees) learned no later than the September 27, 2023 Board meeting that AbbVie was interested in a whole-company acquisition.

[9] The court in *Albert* declined to impute knowledge from one corporate entity (AB Management) to Deutsche Bank but that was because the allegations of "ownership alone" were insufficient to infer AB Management were Deutsche Bank's agent in connection with the management and sale of certain funds. 2005 WL 2130607, at *10.

14

### 3.    Bain's Predicate Violation and Deceptive Conduct Arguments Are Wrong

Plaintiffs allege at least two separate and independent predicate violations against Bain: Section 20(a) control person liability and Section 10(b) violations.

*First*, Bain's control person liability under Section 20(a) of the Exchange Act serves as predicate violation. Bain cites *Refco* for the proposition that the Section 20A predicate violation "must be an act of insider trading," (D.I. 45 at 7) but *Refco* instead found "the required 'predicate violation' may be of any section of the Exchange Act," including control person liability. *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 666 (S.D.N.Y. 2007). The *Refco* court reasoned that "[i]f § 10(b) were the only provision that could serve as the basis for liability, Congress could have simply identified § 10(b) and the rules enforcing it as the basis for liability," and the court held that insider trading claims can be predicated on control person claims. *Id.*; *see also Eastwood Enters., LLC v. Farha*, 2009 WL 3157668 (M.D. Fla. Sept. 28, 2009) (Section 20(a) control person claim can serve as predicate violation for Section 20A claim). Indeed, "Defendants' argument that the predicate violation *must* be an insider trading violation is directly contradicted by Third Circuit precedent." *In re Valeant Pharms. Int'l, Inc., Sec. Litig.*, 2019 WL 2724075, at *6 (D.N.J. June 30, 2019). Accordingly, Bain's alleged violation of Section 20(a) control-person liability independently satisfies the predicate violation requirement for the Section 20A claim against it.

*Second*, Bain's insider trading is itself also a predicate violation under Section 10(b) sufficient for pleading the Section 20A claim.[10] *Valeant*, 2019 WL 2724075, at *6 (sufficient

---

[10] Even assuming, *arguendo*, that Section 20A requires a separate and distinct Section 10(b) claim to serve as a predicate violation (which it does not given Bain's control person liability), Plaintiffs do not need to allege it as a formal cause of action. *See Johnson v. Aljian*, 490 F.3d 778, 783 (9th Cir. 2007) ("That the predicate violation need not itself be actionable is . . . supported by the statutory language of other provisions of the Exchange Act"). Indeed, here Bain violated Section 10(b) not only by insider trading but also by omitting material facts it had a duty to disclose for

15

plaintiffs alleged "Section 20A with the predicate violation being an insider trading violation"). A plaintiff makes a *prima facie* case for Section 10(b) insider trading liability "merely by showing that the defendant was '*aware* of the material nonpublic information' when he made the purchase or sale of the securities." *In re Enron Corp. Sec. Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 592 (S.D. Tex. 2003); *see also In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 143 (S.D.N.Y. 1999) ("an insider trading violation 'occurs when a trade is conducted in' knowing 'possession of material nonpublic information.'").

Bain cites a series of Second Circuit cases to support its argument that the insider trading Section 10(b) violation cannot be a predicate violation here because Cerevel was the counterparty for all of Bain's purchases. But each of those cases was decided *before* Congress enacted Section 20A in 1988, which specifically provides a private right of action to "contemporaneous" purchasers or sellers. 15 U.S.C. § 78t-1.

When enacting Section 20A, Congress removed the privity requirement underlying Defendants' pre-Section 20A enactment cases, making it completely irrelevant that Bain's purchases were directly from Cerevel and not from Class members. *See Fujisawa Pharm. Co. v. Kapoor*, 115 F.3d 1332, 1337 (7th Cir. 1997) ("[T]he purpose of section 20A was to extend the protections of the existing insider-trading prohibition to persons not in privity with the insider."); *Gordon v. Sonar Cap. Mgmt. LLC*, 92 F. Supp. 3d 193, 203 (S.D.N.Y. 2015) ("Section 20A defines those who may sue as anyone who traded contemporaneously with, and opposite to, the defendant, even if they traded on an impersonal market and therefore cannot prove that they actually bought shares from the defendant or sold shares to the defendant.").

_____

the same reasons Cerevel and Renaud are liable for omitting material facts in connection with the October Offering Documents under Section 10(b).

16

Under the current law, what matters is that Bain purchased shares while in possession of material nonpublic information and Class members sold contemporaneously and were harmed by not having the benefit of that information. *See, e.g., Silver Lake*, 108 F.4th at 1190 (the contemporaneous trading rule "merely requires that the seller and buyer engaged in transactions close in time, not with each other," finding that the legislative history indicates Congress "did not intend to limit liability to transactions with direct privity."); *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 177 (S.D.N.Y. 2021) (sustaining Section 20A claim where defendant's stock sales were in a buyback transaction directly with the company).

### 4.    Although Not Required, Plaintiffs Allege Bain's Scienter

Bain devotes a large portion of its Motion to arguing that the Complaint fails to plead a strong inference of scienter. But Bain's argument is based on an incorrect assumption that scienter is even required here. The Private Securities Litigation Reform Act's "heightened pleading requirement" only applies to "any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant *acted with a particular state of mind.*" 15 U.S.C. 78u-4(b)(2)(A). As discussed above, Section 20(a) is an independent "predicate violation" for Section 20A. Neither Section 20(a) nor Section 20A has a state of mind requirement. 15 U.S.C. 78t-1. Accordingly, because Plaintiffs satisfy the predicate violation requirement by pleading Bain's violations of Section 20(a), the Court does not need to address the issue of scienter.

To the extent the Court analyzes scienter at all, the Complaint pleads a strong inference of scienter against Bain both through its actual knowledge of the omissions and enormous financial motive to engage in the unlaw trades. Scienter is alleged through "either reckless or conscious behavior." *Avaya*, 564 F.3d at 276. Recklessness is conduct that represents "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."

17

*Id.* at 267 n.42. When assessing scienter, courts consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 267-68, 272. The inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences" but must merely be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

*First*, scienter for corporate defendants can be shown through management-level employees. *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 515–16 (S.D.N.Y. 2009) ("scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants."). Bain's senior employees, Defendants Koppel, Gordon, and Renaud, had personal knowledge of the misstatements and omitted facts, as well as knowledge that Bain was trading while in possession of the material nonpublic information. *Carmignac Gestion, S.A. v. Perrigo Co. PLC*, 2019 WL 3451523, at *13 (D.N.J. July 31, 2019) (finding scienter where "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation."); *GSC Partners*, 368 F.3d at 239 ("In a non-disclosure situation, any required element of scienter is satisfied where ... the defendant had actual knowledge of the material information.").

*Second*, Bain had an enormous financial motive to engage in its insider trades. *Tellabs*, 551 U.S. at 325 ("motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference"). Bain purchased 5,480,052 for just $22.81 per share (approximately $125 million total) while knowing that AbbVie was interested in acquiring Cerevel for a significant premium. Indeed, the purchases were just *three days* before AbbVie made a formal offer to acquire Cerevel for $35 per share and *51 days* before the Merger was announced at $45

18

per share. *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 278 (3d Cir. 2006) (finding scienter where "[t]he timing of the sales was also suspect in that they occurred just six weeks before [the corrective disclosure]."). At $45 per share, the 5,480,052 shares Bain had just purchased were worth $246,602,340. In other words, ***Bain profited $121.6 million in just 51 days***.

Bain argues the "opposing inference" is that the real reason for the October Offering was to extend Cerevel's cash runway, not to improperly allow it to purchase shares. But even if that is true, it does not explain Bain's decision to *trade* in the October Offering. That is, even if the reason for the October Offering was well-intentioned, it does not negate Bain's decision to violate the disclose-or-abstain rule by trading while in possession of material nonpublic information. Indeed, the Chancery Court rejected Bain's same scienter argument, finding Bain and Perceptive's participation in the offering supports scienter irrespective of whether the offering itself was legitimate. *See* Chancery Tr. 29:5-21. This is especially true because Bain's purchases from the October Offering departed from its usual course, as Bain did not purchase shares in either of Cerevel's prior public offerings. *Suprema Specialties*, 438 F.3d at 278 (scienter where "[p]laintiffs have plausibly alleged that the sales were not normal our routine").[11]

Bain also argues the Complaint's theory is illogical because it "diluted" Bain's percentage ownership of Cerevel stock, meaning the October Offering resulted in "net losses" to Bain. But Bain's analysis relies completely on a "hypothetical" scenario of a sale to AbbVie without the October Offering, which Bain concedes "assumes" AbbVie would have paid $8.2 billion for

---

[11] Bain's argument that the timing of the October Offering is not suspicious and akin to a pre-schedule trade through a 10b5-1 plan lacks all credibility. Indeed, the timing could not possibly be more suspicious: it took place almost immediately after the Board learned of AbbVie's merger interest and just three days before AbbVie sent a formal acquisition offer. Moreover, a 10b5-1 trading plan is in no way analogous to a secondary offering for many reasons, including that a trading plan would require a 30 to 90 day "cooling off" period, the purpose of which is to prevent trading immediately after learning material nonpublic information. *See* 17 C.F.R. § 240.10b5-1.

Cerevel. For example, Bain assumes that the $499 million offering only increased Cerevel's valuation by the same amount, ignoring that it made Cerevel much more valuable by removing the financing overhang, as well as providing Cerevel leverage in negotiations because it no longer needed cash to survive. Notably, those benefits would have inured to Cerevel even had Bain not purchased in the October Offering based on non-public information.

In addition, Bain assumes the October Offering caused AbbVie to pay $499 million more for Cerevel, ignoring that AbbVie was negotiating with Cerevel on a *per share* basis, meaning the per-share consideration to Cerevel shareholders may have been unaffected by the October Offering. Put another way, Bain's analysis assumes AbbVie would have paid $48.08 per share *without* the October Offering, a completely speculative assumption. This ignores that, because they were negotiating on a *per share* basis, it is at least equally as logical the Merger price would have been $45 per share regardless of the October Offering. If the Merger price was $45 per share, Bain profited $121 million through its purchases in the October Offering. As the Chancery Court concluded, Bain's dilution analysis "may be too simplistic." Chancery Tr. 26:13-27:4.

The Chancery Court also reasoned that Bain's purchases might have been "defensive." In other words, Bain had not participated in prior offerings, but here Bain knew the October Offering was "seriously underpriced" because Bain "had a credible indication from a sophisticated third-party bidder suggesting that the company's value, at least in a whole company sale situation, was significantly higher." Then, Bain "participated in this offering as a defensive measure. In other words, they wanted to minimize the amount of their dilution so as to protect themselves and capture the maximum amount of value they could." Chancery Tr. 27:12-28:6.

Bain relies on *In re Worlds of Wonder Sec. Litig.*, but in that case, the court found the fact that individual defendants *not selling* their shares before announcing bad news negates an inference

20

of scienter. 35 F.3d 1407, 1424 (9th Cir. 1994). Here, Plaintiffs allege the opposite: Bain, secretly knowing good news (the AbbVie merger) was coming (and a volume of other material nonpublic valuation, financial and operational information through their control of the Company), *purchased* 5.4 million additional shares. Likewise, Bain's reliance on *Phillips v. LCI International, Inc.* fails for the same reason. 190 F.3d 609, 623 (4th Cir. 1999). In that case, the court found there was no scienter because there was no logical reason for an executive that owned two million shares to seek to artificially depress the share price. *Id.* Indeed, the *Phillips* court even noted that—if alleged—"insider trading by the defendant" would have "support[ed] a claim of motive." *Id.*

Finally, Bain argues that the "absolute size" of its purchases in the October Offering compared to its overall ownership of Cerevel shares negates scienter. This argument ignores that Bain is alleged to have unlawfully profited *$121 million*, an unquestionably significant amount.[12]

### 5.    Plaintiffs Traded Contemporaneously with Bain

Bain is liable pursuant to Section 20A to the Insider Trading Class, consisting of persons or entities who sold Cerevel common stock contemporaneously with the purchases by Bain. ¶185. As set forth in the certification attached to the Complaint, Plaintiff Atlas Diversified Master Fund, Ltd. sold Cerevel common stock on October 16, 2023, the same day of Bain's alleged unlawful inside purchases, making its trades "contemporaneous" under any definition. ¶24.

As discussed above (*see* §V.A.3), Section 20A does not require privity (trading with one another), only trading "contemporaneously" (trading at the same time). Courts have explained "the plain language of the 20A statute only requires trading 'contemporaneously,' and contemporaneous is a temporal word meaning 'existing, occurring, or originating during the same

---

[12] The Chancery Court also noted those engaging in insider trading commonly avoid "really big" trades and instead "trade enough to make profits, but not enough so that it looks really bad." Chancery Tr. 28:7-21.

time.'" *Turocy v. El Pollo Loco Holdings, Inc.*, 2018 WL 3343493, at *14 (C.D. Cal. July 3, 2018); *see also Basile v. Valeant Pharm. Int'l, Inc.*, 2015 WL 7352005, at *9 (C.D. Cal. Nov. 9, 2015) (rejecting argument that contemporaneous purchasers lacked standing where defendant purchased options in private transaction with third party); *Aegean Marine*, 529 F. Supp. 3d at 177 (public shareholders had 20A claim against company insider that sold shares directly to the company); *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, 2015 WL 2250472 (D.N.J. May 13, 2015) (rejecting privity requirement for 20A claims).

Defendants cite *In re Able Laboratories. Sec. Litig.*, 2008 WL 1967509, at *27 (D.N.J. Mar. 24, 2008) and *Copland v. Grumet*, 88 F. Supp. 2d 326, 338 (D.N.J. 1999), but those cases found a plaintiff's trades are contemporaneous for Section 20A purposes if they occurred on the "same day" as defendants' trades.[13] In other words, those cases used the "*purpose* behind the contemporaneous trading requirement—weeding out individuals who could not have possibly traded with the sellers—to define its temporal scope," *i.e.* "what length of time (*e.g.* days, weeks or months) between transactions constitutes 'contemporaneous' trading," but nothing in Section 20A "limit[s] liability to transaction with direct privity." *Silver Lake*, 108 F.4th 1178.

### B.    Plaintiffs Plead a Section 20(a) Claim (Count IV) Against Bain, Gordon, and Koppel

Section 20(a) of the Exchange Act imposes liability on those who "directly or indirectly" control a primary violator of the federal securities laws. 15 U.S.C. § 78t(a). To prove a Section 20(a) claim, Plaintiffs must show (i) a primary securities law violation by the controlled entity, (ii)

---

[13] Defendants also cite *Buban v. O'Brien*, but in that case the court found the trades not contemporaneous because the plaintiff's trades occurred *three days after* the defendant traded shares, reasoning "the market had already absorbed defendant's shares prior to plaintiff's purchase of [the] stock," precluding a conclusion that the plaintiff traded at an informational disadvantage with the defendant. 1994 WL 324093, at *3-4 (N.D. Cal. June 22, 1994).

the Section 20(a) defendant's control, and (iii) the Section 20(a) defendant's culpable participation in the securities law violation. *See Stanley Black & Decker, Inc. v. Gulian*, 70 F. Supp. 3d 719, 731 (D. Del. 2014).

"Control person claims are not subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) or the Reform Act." *In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*, 2007 WL 81937, at *5 (E.D. Pa. Jan. 9, 2007). So long as the allegations "support a reasonable inference that [defendants] had the potential to influence and direct the activities of the primary violator," Plaintiffs' Section 20(a) claim will survive a motion to dismiss. *Palladin Partners v. Gaon,* 2006 WL 2460650, at *16 (D.N.J. Aug. 22, 2006).

The Complaint alleges that Bain, Gordon, and Koppel each controlled Cerevel and that Bain controlled Renaud. ¶194. Each of these allegations is easily established by the facts here.

***Bain controlled Cerevel*** through its appointment of Renaud (a Bain Senior Advisor) as CEO, its nomination or current or former employment of 8 of Cerevel's 12 Board members, its at least 36% ownership of Cerevel's common stock, and its rights pursuant to the Shareholder Rights Agreement. The Complaint further alleges that Bain used this control to push through the sale to AbbVie. *See Magnachip*, 167 F. Supp. 3d at 1049 (control where majority shareholder "used its control of [company] to cash out its investments").

***Bain and Pfizer collectively controlled Cerevel*** through their domination of the Board, ownership of the majority of Cerevel's outstanding shares, and rights pursuant to the Shareholder Rights Agreements. Indeed, Cerevel's 2023 Form 10-K (filed February 27, 2024) stated it was a "controlled company" under NASDAQ listing rules and warned investors that Bain and Pfizer "have significant influence over us and may have interests different from yours." *See, e.g.*, *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 979 (N.D. Cal. 2009) (admission in Form 10-Ks

that defendant minority shareholder and other entities "have significant influence over our management and affairs" raised "intensely factual questions" rendering dismissal inappropriate).

In addition, Bain's October 18, 2023 Schedule 13D noted that, as a result of certain "voting arrangements," Pfizer and Bain "may be deemed to be a group for purposes of Section 13(d) under the Securities Exchange Act of 1934, as amended." Based on these facts, Bain and Pfizer had collective control of Cerevel under Section 20(a). *City of Southfield Fire & Police Ret. Sys. v. Hayward Holdings, Inc.*, 2025 WL 1577315 (D.N.J. June 4, 2025) (control where two minority shareholders collectively held majority of voting power and the Company was a controlled company under stock exchange rules); *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.,* 320 F.3d 920, 945-46 (9th Cir. 2003) (allegations that two outside entities that together controlled approximately 57.4% of company's total voting power, had the power to elect a majority of company's directors and committees established by the Board, and had some of their own officers seated on the Board were sufficient to show that they were "controlling persons"); *In re SolarWinds Corp. Sec. Litig.*, 595 F. Supp. 3d 573, 592 (W.D. Tex. 2022), *order clarified*, 2022 WL 3699429 (W.D. Tex. Aug. 19, 2022) (private equity firms, which each owned 40% of the company's stock, acted in concert to control the primary defendant).[14]

***Gordon and Koppel controlled Cerevel*** as Bain-designated Board members. Among other things, the Complaint alleges the Board, including Gordon and Koppel, approved the October

---

[14] Far from the allegations here that the Bain controlled Cerevel Board orchestrated and approved the October Offering, ran Cerevel's sale process and approved the misleading Proxy, the Defendants' cases each turned on a lack of allegations beyond mere stock ownership and board designees. *Kosmos,* 955 F. Supp. 2d 658 (N.D. Tex. 2013) ("[s]tatus alone . . . is legally insufficient"); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 2000 WL 1727405 (N.D. Cal. Sept. 29, 2000) (failure to allege "that the individual defendants played a role in the alleged nondisclosures"); *In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546 (D. Del. 2002) (same); *In re Gupta Corp. Sec. Litig*, 900 F. Supp. 1217 (N.D. Cal. 1994) (status of defendants as outside directors or as a minority shareholder with a board designees alone insufficient for control).

Offering and that the false and misleading Proxy was issued "By Order of the Board of Directors." *See Palladin,* 2006 WL 2460650, at * 16 (finding control well-pled where plaintiffs alleged that defendants served as directors and signed the SEC filings at issue in the case).

The Bain Defendants also argue Plaintiffs fail to plead culpable participation, but "the 'overwhelming trend' in the Third Circuit is that culpable participation need not be pled to survive a motion to dismiss." *Strougo v. Mallinckrodt Pub. Ltd. Co.*, No. CV 20-10100 (MAS) (TJB), 2022 WL 17740482, at *11 (D.N.J. Dec. 16, 2022). Consistent with that trend, courts in this circuit have recognized that culpable participation facts are typically within the defendant's exclusive possession and therefore need not be pled before discovery. *Dutton v. Harris Stratex Networks, Inc.*, 270 F.R.D. 171, 180–81 (D. Del. 2010). Regardless, here, culpable participation is more than adequately plead through Bain's purchases of more than five million shares while in possession of material nonpublic information in a public offering Bain (through its control of the Cerevel Board) allegedly orchestrated itself. For Koppel and Gordon, culpable participation is met where, as here, plaintiffs allege that defendants were responsible for reviewing allegedly fraudulent SEC filings. *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 741 (S.D.N.Y. 2015).

## VI.    CONCLUSION

For the reasons set forth herein the Motion should be denied in its entirety.

25

Dated: December 17, 2025

Respectfully submitted,

**FARNAN LLP**

By: *Brian E. Farnan*
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Emails:  bfarnan@farnanlaw.com
        mfarnan@farnanlaw.com

*Counsel for Lead Plaintiffs and the Class*

**ENTWISTLE & CAPPUCCI LLP**
Andrew J. Entwistle (*pro hac vice*)
Callie Crispin (*pro hac vice*)
500 W. 2nd Street, Suite 1900
Austin, Texas 78701
Telephone: (512) 710-5960
Emails:  aentwistle@entwistle-law.com
        ccrispin@entwistle-law.com

**ENTWISTLE & CAPPUCCI LLP**
Vincent R. Cappucci (*pro hac vice*)
Robert N. Cappucci (*pro hac vice*)
Andrew M. Sher (*pro hac vice*)
Jessica A. Margulis (*pro hac vice*)
230 Park Avenue, 3rd Floor
New York, New York 10169
Telephone:  (212) 894-7200
Facsimile:  (212) 894-7272
Emails:  vcappucci@entwistle-law.com
        rcappucci@entwistle-law.com
        asher@entwistle-law.com
        jmargulis@entwistle-law.com

*Counsel for Lead Plaintiffs and the Class*

26

**Appendix A**

**Summary Chart of Bain Defendants' Alleged Wrongdoing**

I.      **Section 20A Insider Trading Claim Against Bain**

To state a claim for a violation of Section 20A, plaintiffs must allege "(1) a predicate violation of the Exchange Act; (2) that the plaintiff traded contemporaneously with the insider; and (3) that the insider was in possession of material nonpublic information." *In re Valeant Pharms. Int'l, Inc., Sec. Litig.*, 2019 WL 2724075, at *5 (D.N.J. June 30, 2019)

| Element | Facts Plead |
|---|---|
| Predicate Violation | Although only one is required, Bain committed at least three predicate violations:<br><br>• Section 20(a) control person liability (Count IV)<br><br>• Section 10(b) insider trading violation<br><br>• Section 10(b) for omitting material facts in the October Offering documents |
| Contemporaneous purchasing or selling stock | The complaint pleads Bain contemporaneously traded with Plaintiffs:<br><br>• Bain purchased 5,480,052 shares of Cerevel common stock on October 16, 2023. ¶86<br><br>• Plaintiff Atlas Diversified Master Fund, Ltd. sold Cerevel common stock on October 16, 2023. ¶24 |
| Possession | The Complaint pleads Bain had possession of material nonpublic information regarding merger discussions with AbbVie through its employees serving on the Cerevel Board:<br><br>• On September 27, 2023, the Cerevel Board met with Centerview to discuss "▮▮▮▮▮▮▮▮" and M&A ▮▮▮▮▮▮▮" and recused Pfizer's Board members because Pfizer could be interested in an acquisition of Cerevel. ¶¶69-70<br><br>• Centerview's "talking points" for Renaud confirmed he ▮▮▮▮▮▮▮▮▮▮▮▮▮" ¶74 |

A-1

| Element | Facts Plead |
|---|---|
| | • Cerevel Board members Gordon, Koppel and Renaud were employees of Bain. ¶¶29-31, 58, 120. Their knowledge is thus imputed to their employer, Bain. ¶182. |
| Material Nonpublic Information | The information Bain possessed regarding AbbVie's merger discussions prior to the October Offering were material because:<br><br>• AbbVie executed a confidentiality agreement to commence due diligence in March 2023. ¶57<br><br>• A Cerevel tracker circulated September 23, 2023, indicated AbbVie had "███████████," AbbVie had completed "meaningful" diligence, and Cerevel was "████████." ¶124<br><br>• On September 25, 2023, AbbVie informed Cerevel it would not be improving its bid for a partnership. ¶68<br><br>• On September 27, 2023, Cerevel's Board met with Centerview to discuss M&A related issues and recused Pfizer's designees because of a potential conflict. ¶71<br><br>• On September 29, 2023, Centerview sent Renaud "talking points" for a conversation with AbbVie's executive vice president. ¶74<br><br>• On October 5, 2023, Cerevel began putting together a whole company data room. ¶75<br><br>• On October 17, 2023, AbbVie emailed Cerevel ███████ ██." AbbVie sent a formal acquisition offer just three days after the October Offering, and the deal was announced 51 days after the October Offering. ¶¶12, 13, 92 |

A-2

## II.    Section 20(a) Control Person Claim Against Bain

To prove a Section 20(a) claim, Plaintiffs must show (i) a primary securities law violation by the controlled entity, (ii) the Section 20(a) defendant's control, and (iii) the Section 20(a) defendant's culpable participation in the securities law violation. *See Stanley Black & Decker, Inc. v. Gulian*, 70 F. Supp. 3d 719, 731 (D. Del. 2014). However, "the 'overwhelming trend' in the Third Circuit is that culpable participation need not be pled to survive a motion to dismiss." *Strougo v. Mallinckrodt Pub. Ltd. Co.*, 2022 WL 17740482, at *11 (D.N.J. Dec. 16, 2022).

| Element | Facts Plead |
|---|---|
| Primary securities law violation by controlled entity | • Cerevel violated Section 10(b) and 14(a) of the Exchange Act. (Counts I and III)<br><br>• Renaud violated Section 10(b) of the Exchange Act. (Count 1) |
| Control | Bain controlled Cerevel through:<br><br>• Appointment of its former Partner and current Senior Advisor Renaud as CEO. ¶¶5, 29<br><br>• Nomination or current or former employment of 8 of Cerevel's 12 Board members, and with Pfizer some affiliation with 11 of 12 Board members. ¶55<br><br>• At least 36% ownership of Cerevel's common stock, and with Pfizer at all times more than 51% ownership of Cerevel common stock. ¶87<br><br>• Shareholder Rights Agreements that provided Bain and Pfizer the right to, among other things, maintain members of the Cerevel Board, cause Cerevel to conduct secondary stock offerings and purchase their *pro rata* share of future offerings. ¶¶46-50<br><br>• Cerevel's SEC filings disclosed that it was a "controlled company" and that Bain and Pfizer "have significant influence over us." ¶54<br><br>Bain controlled Renaud:<br><br>• Renaud was a Partner at Bain immediately prior to becoming Cerevel's CEO and remained at Bain as a Senior Advisor during the entire Class Period. ¶29 |

### III.   Section 20(a) Control Person Claim Against Gordon and Koppel

To prove a Section 20(a) claim, Plaintiffs must show (i) a primary securities law violation by the controlled entity, (ii) the Section 20(a) defendant's control, and (iii) the Section 20(a) defendant's culpable participation in the securities law violation. *See Stanley Black & Decker, Inc. v. Gulian*, 70 F. Supp. 3d 719, 731 (D. Del. 2014). However, "the 'overwhelming trend' in the Third Circuit is that culpable participation need not be pled to survive a motion to dismiss." *Strougo v. Mallinckrodt Pub. Ltd. Co.*, 2022 WL 17740482, at *11 (D.N.J. Dec. 16, 2022).

| Element | Facts Plead |
|---------|-------------|
| Primary securities law violation by controlled entity | Cerevel violated Section 10(b) and 14(a) of the Exchange Act. (Counts I and III) |
| Control | Koppel and Gordon had the ability to control and did control Cerevel through:<br><br>• Serving on Cerevel's Board. ¶¶30-31<br><br>• Approving the October Offering without the disclosure of the merger discussions with AbbVie and knowing Bain was purchasing in the Offering. ¶77<br><br>• Ordering the issuance of the Proxy. ¶141<br><br>• Recommending in the Proxy that shareholders vote to approve the Merger. ¶106 |