**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE CEREVEL THERAPEUTICS HOLDINGS, INC. SECURITIES LITIGATION | Case No. 25-cv-417-GBW<br><br>**FILED UNDER SEAL** |

## ANSWERING BRIEF IN OPPOSITION TO DEFENDANT CEREVEL THERAPEUTIC HOLDINGS, INC.'S MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT (D.I. 46)

Dated: December 17, 2025

Brian E. Farnan (Bar No.  4089)
Michael J. Farnan (Bar No.  5165)
**FARNAN LLP**
919 North Market Street, 12th Floor
Wilmington, DE 19801
Tel.: (302) 777-0300
Fax: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

***Counsel for Lead Plaintiffs and the Class***
[Additional counsel listed on signature block]

**TABLE OF CONTENTS**

I.      NATURE AND STAGE OF THE PROCEEDINGS ............................................................ 1

II.     SUMMARY OF ARGUMENT ....................................................................................... 2

III.    STATEMENT OF FACTS ............................................................................................. 5

        A.    Bain and Pfizer Form and Control Cerevel Therapeutics ....................................... 5

        B.    AbbVie Conducts Due Diligence into Cerevel for a Regional Partnership ............ 6

        C.    AbbVie Shifts its Interest to a Whole Company Acquisition of Cerevel ................ 7

        D.    Bain and Perceptive Increase their Positions through the October Offering
              in Advance of the Lucrative AbbVie Acquisition .................................................... 8

        E.    Cerevel Agress to Be Acquired for Nearly Double the October Offering
              Price, Locking in Over $140 Million in Profits for Bain and Perceptive .............. 8

        F.    Defendants Issue a Misleading Proxy Statement to Obtain Shareholder
              Approval of the AbbVie Acquisition ....................................................................... 9

IV.     LEGAL STANDARD ................................................................................................. 10

V.      ARGUMENT ............................................................................................................. 10

        A.    Plaintiffs Plead a Section 10(b) Claim ................................................................. 10

              1.    Plaintiffs Adequately Plead a Strong Inference of Scienter ...................... 11

              2.    Plaintiffs Plead Pre-Merger Announcement Misrepresentations and
                    Omission of Facts Cerevel Had a Duty to Disclose ................................. 15

              3.    The Pre-Merger Announcement Misrepresentations and Omissions
                    were Material ....................................................................................... 17

              4.    The Post-Merger Announcement Statements are Actionable ................... 21

              5.    Plaintiffs' Section 10(b) Claim Pleads Loss Causation ........................... 22

        B.    The Complaint Pleads a Section 14(a) Claim ....................................................... 24

              1.    The Complaint Pleads Misstatements and Omissions of Material
                    Facts in the Proxy ................................................................................. 24

              2.    Plaintiffs' Section 14(a) Claim Pleads Loss Causation ........................... 24

VI.     CONCLUSION .......................................................................................................... 25

i

## TABLE OF AUTHORITIES

**Cases**

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)........................................................................................ 17, 18, 20

*Blanchard v. EdgeMark Fin. Corp.*,
    No. 94 C 1890, 1999 WL 59994 (N.D. Ill. Feb. 3, 1999)............................................. 4, 16

*Boluka Garment Co., Ltd. v. Canaan Inc.*,
    547 F. Supp. 3d 439 (S.D.N.Y. 2021) ................................................................ 21

*Carmignac Gestion, S.A. v. Perrigo Co. PLC*,
    No. 17-10467, 2019 WL 3451523 (D.N.J. July 31, 2019)................................................ 11

*Castellano v. Young & Rubicam, Inc.*,
    257 F.3d 171 (2d Cir. 2001) ........................................................................ 16

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
    713 F. Supp. 2d 378 (D. Del. 2010), *aff'd*, 442 F. App'x 672 (3d Cir. 2011)................... 11

*Del. Cnty. Emps. Ret. Sys. v. AdaptHealth Corp.*,
    606 F. Supp. 3d 124 (E.D. Pa. 2022) ................................................................. 17

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)................................................................................. 23

*Emps. Ret. Sys. of R.I. v. Williams Cos., Inc.*,
    889 F.3d 1153 (10th Cir. 2018) ..................................................................... 20

*Gray v. Wesco Aircraft Holdings, Inc.*,
     847 F. App'x 35 (2d Cir. 2021) .................................................................... 25

*GSC Partners CDO Fund v. Washington*,
    368 F.3d 228 (3d Cir. 2004) ....................................................................... 11

*Healey v. Catalyst Recovery of Pa., Inc.*,
    616 F.2d 641 (3d Cir. 1980) ....................................................................... 23

*In re AOL Inc.*,
    No. 11204–VCG, 2018 WL 1037450 (Del. Ch. Feb. 23, 2018) ................................... 22, 24

*In re Cambrex Corp. Sec. Litig.*,
    No. 03–CV–4896 (WJM), 2005 WL 2840336 (D.N.J. Oct. 27, 2005)........................... 11

*In re Focus Fin. Partners*,
    No. 23-1466 (MN), 2025 WL 961488 (D. Del. Mar. 31, 2025) .................................. 25

ii

*In re Gen. Motors Class E Stock Buyout Sec. Litig.*,
    694 F. Supp. 1119 (D. Del. 1988) ................................................................. 20

*In re Heckmann Corp. Sec. Litig.*,
    869 F. Supp. 2d 519 (D. Del. 2012) ................................................. 10, 22, 25

*In re Moody's Corp. Sec. Litig.*,
    599 F. Supp. 2d 493 (S.D.N.Y. 2009) ......................................................... 11, 12

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.*,
    311 F.3d 198 (3d Cir. 2002) ........................................................................ 10

*In re Shanda Games Limited Sec. Litig.*,
    128 F.4th 26 (2d Cir. 2025) ......................................................................... 14

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006) ........................................................................ 10

*In re Wilmington Tr. Sec. Litig.*,
    29 F. Supp. 3d 432 (D. Del. 2014) ............................................................. 10

*Institutional Invs. Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009) .......................................................................... 2

*Lane v. Page*,
    727 F. Supp. 2d 1214 (D.N.M. 2010) ......................................................... 25

*Macquarie Infrastructure Corp. v. Moab Partners, L. P.*,
    601 U.S. 257 (2024) ..................................................................................... 17

*Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*,
    576 F.3d 172 (4th Cir. 2009) ...................................................................... 12

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ....................................................................................... 21

*McCormick* v. *Fund Am. Cos.*,
    26 F.3d 869 (9th Cir. 1994) ........................................................................ 16

*Melcher v. Fried*,
    No. 16-cv-2440-BAS-BGS, 2018 WL 6326334 (S.D. Cal. Dec. 4, 2018) ....... 20

*Mendell v. Greenberg*,
    927 F.2d 667 (2d Cir. 1990),
    *amended*, 938 F.2d 1528 (2d Cir. 1990) ............................................... 22, 24

*Merritt v. Colonial Foods, Inc.*,
    499 F. Supp. 910 (D. Del. 1980) ................................................................ 23

iii

*Mill Bridge V, Inc. v. Benton*,
  496 F. App'x 170 (3d Cir. 2012) ................................................................. 20

*Mills v. Electric Auto-Lite Co.*,
  396 U.S. 375 (1970) .................................................................................... 24

*Nash v. Qualtrics Int'l Inc.*,
  2024 WL 231870 (D. Del Jan. 22, 2024) .................................................... 19

*Oran v. Stafford,*
  226 F.3d 275 (3d. Cir. 2000) ...................................................................... 15

*Rich v. Shrader*,
  No. 09–CV–0652–MMA (WMc), 2010 WL 3717373 (S.D. Cal. Sept. 17, 2010) ........... 21

*Rizzo v. MacManus Grp., Inc.*,
  158 F. Supp. 2d 297 (S.D.N.Y. 2001) ......................................................... 20

*Rothberg v. Rosenbloom*,
  771 F.2d 818 (3d Cir.1985) ......................................................................... 20

*S.E.C. v. Geon Indus., Inc.*,
  531 F.2d 39 (2d Cir. 1976) ..................................................................... 16, 18

*S.E.C. v. Wyly*,
  788 F. Supp. 2d 92 (S.D.N.Y. 2011) ........................................................... 20

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
  351 F. Supp. 3d 874 (E.D. Pa. 2018) .......................................................... 11

*Semerenko v. Cendant Corp.*,
  223 F.3d 165 (3d Cir. 2000) ....................................................................... 21

*Shaev v. Saper*,
  320 F.3d 373 (3d Cir. 2003) ....................................................................... 10

*Shaw v. Digital Equip. Corp.*,
  82 F.3d 1194 (1st Cir. 1996) ....................................................................... 16

*Smith v. Robbins & Myers, Inc.*,
  969 F. Supp. 2d 850 (S.D. Ohio 2013) ........................................................ 25

*Staffin v. Greenberg*,
  672 F.2d 1196 (3d Cir. 1982) ...................................................................... 16

*Stewart v. Wilmington Tr. SP Servs., Inc.*,
  112 A.3d 271 (Del. Ch. 2015), *aff'd*, 126 A.3d 1115 (Del. 2015) ................... 14

iv

*Strougo v. Mallinckrodt Pub. Ltd. Co.,*
No. 20-10100 (MAS) (TJB), 2022 WL 17740482 (D.N.J. Dec. 16, 2022) ...................... 13

*Taylor v. First Union Corp. of S.C.,*
857 F.2d 240 (4th Cir. 1988) ........................................................................................... 20

*TSC Indus., Inc. v. Northway, Inc.,*
426 U.S. 438 (1976) ................................................................................................... 17, 22

*Vladimir v. Bioenvision Inc.,*
606 F. Supp. 2d 473 (S.D.N.Y. 2009) .............................................................................. 16

*Wight v. BankAmerica Corp.,*
219 F.3d 79 (2d Cir. 2000) .............................................................................................. 14

*Williams v. Globus Med., Inc.,*
869 F.3d 235 (3d Cir. 2017) ............................................................................................ 17

*Wilson v. Great Am. Indus., Inc.,*
979 F.2d 924 (2d Cir. 1992) ............................................................................................ 23

*Zhengyu He v. China Zenix Auto Int'l Ltd.,*
Civ. No. 2:18-15530 (KM-JAD), 2020 WL 3169506 (D.N.J. June 12, 2020) ................. 13

I.    **<u>NATURE AND STAGE OF THE PROCEEDINGS</u>**[1]

The case arises from misstatements and omissions in connection with Cerevel's offering of $500 million of stock in October 2023 (the "October Offering") and AbbVie's subsequent acquisition of the Company. Undisclosed to investors, the October Offering was orchestrated to allow Cerevel's inside shareholders Bain and Perceptive to acquire more than six million shares of Cerevel common stock at a deep discount while in possession of material nonpublic information regarding AbbVie's merger interest. These insiders unlawfully profited more than $140 million when AbbVie announced just 51 days later that it was acquiring Cerevel for nearly double the offering price.

The Complaint asserts violations of Sections 10(b), 14(a), 20A and 20(a) of the Exchange Act against, variously, Cerevel, Cerevel's controlling shareholders Bain and Pfizer, inside shareholder Perceptive, Cerevel CEO Renaud, and certain members of Cerevel's Board:

| Defendant(s) | Summary of Claims |
|---|---|
| Cerevel (D.I. 46) | Cerevel is liable under Sections 10(b) and 14(a) for making misstatements and omitting material facts in various public statements from the October Offering through the Proxy regarding the timing of AbbVie's merger interest and the fairness of the Merger. |
| Bain, Gordon, Koppel (the "Bain Defendants") (D.I. 45) | Bain is liable under Section 20A for purchasing more than five million Cerevel shares while in possession of material, nonpublic information regarding AbbVie's merger interest. Bain, Cerevel's largest shareholder, is also liable under Section 20(a) as a control person of Cerevel and Renaud. Defendants Gordon and Koppel, senior executives at Bain, served as Cerevel Board members and are liable under Section 20(a) as control persons of Cerevel. |
| Perceptive, Giordano (D.I. 53) | Perceptive is liable under Section 20A for purchasing 876,808 Cerevel shares while in possession of material nonpublic information regarding AbbVie's merger interest. Defendant Giordano, a Perceptive Managing Director, served as a Cerevel |

---

[1] Capitalized terms undefined herein shall have the same meaning as in the Consolidated Class Action Complaint ("Complaint") [D.I. 19]. Citations to "¶__" refer to paragraphs in the Complaint. All emphasis is added and internal citations omitted unless otherwise noted.

| | Board member and is liable under Section 20(a) as a control person of Cerevel. |
|---|---|
| Pfizer (D.I. 40) | Pfizer is liable as a control person under Section 20(a) of Cerevel because Pfizer and Bain at all times jointly controlled Cerevel. |
| Renaud (D.I. 57) | Renaud, who served both as Cerevel's CEO and a Senior Advisor at Bain during the Class Period, is liable under Section 10(b) for making misstatements and omitting facts regarding the October Offering and the timing of AbbVie's merger interest. Renaud is also liable under Section 20(a) as a control person of Cerevel. |
| Patrick, Baron, Varma, and McKernan (the "Director Defendants") (D.I. 55) | Each of the Director Defendants was a member of the Cerevel Board, had some affiliation with Bain and/or Pfizer, and are liable under Section 20(a) as control persons of Cerevel. |

In an apparent effort to induce the Court to look at the claims in the Complaint on a fractionalized (rather than holistic) basis as required by operative Third Circuit law,[2] Defendants made six separate motions to dismiss. This opposition addresses the motion filed by Defendant Cerevel (D.I. 46). While the main facts and arguments related to Cerevel are included in this opposition, Plaintiffs incorporate by reference herein each of the other opposition briefs.

## II.    SUMMARY OF ARGUMENT

From page one of its Motion, Cerevel paints itself as an innocent corporate actor that is far removed from what it describes as Plaintiffs' "conspiracy theories." The problem for Cerevel is that the Complaint's allegations of a scheme that allowed Cerevel's controlling shareholders Bain and Perceptive to unlawfully profit from insider transactions are logical, well-supported by internal Cerevel documents, and much more plausible than Cerevel's explanation that depends on entirely ignoring the context of the Complaint's allegations. Far from the innocent bystander it pretends to be with disparate interests from Bain and Pfizer, Cerevel was a "controlled company" under NASDAQ rules that was controlled by its founders and majority stockholders Bain and Pfizer, led

---

[2] *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009).

at the highest level by a former Bain partner and current Bain Senior Advisor, CEO Renaud, and directed by a Board dominated and controlled by Bain, Pfizer, and Perceptive appointees.

In September 2023, after conducting months of "meaningful" diligence related to a long-discussed regional partnership, AbbVie informed Cerevel that, based on that diligence, it was now interested in a whole-company acquisition of Cerevel. While Cerevel was awaiting the term sheet promised by AbbVie, it held a Board meeting on September 27, 2023 with its financial advisors to discuss the AbbVie offer and other strategic alternatives, including working together with its banker, Centerview, to prepare talking points for Cerevel CEO Renaud to respond to AbbVie. Cerevel and its bankers also began to prepare a deal-related data room.

It is in this context that the Court must consider Cerevel's actions when Bain and its allies caused Cerevel to conduct a secondary offering in which Bain could increase its position at a discounted valuation in advance of the lucrative merger with AbbVie. At this point, Cerevel and its CEO Renaud had a choice between their two constituencies: lawfully disclose AbbVie's interest in a Merger to level the playing field for public investors or allow Bain and Perceptive to increase their share ownership while in possession of the material nonpublic information about (among other things) AbbVie's merger interest, strategic alternatives, financial analyses, and valuations prepared by Centerview for the Board. Cerevel and Renaud chose the latter, concealing AbbVie's merger interest while engaging in the October Offering that facilitated the unlawful trades at a deeply discounted $22.81 per share.

On December 6, 2023, Cerevel agreed with AbbVie to a $45 per share Merger price, nearly double the price at which Bain and Perceptive acquired more than six million shares in the October Offering. The Merger price locked in a $140 million profit for Bain and Perceptive based only on the shares they purchased less than two months earlier. In order to finalize the transaction and

3

realize that unlawful profit for its inside shareholders, Cerevel issued a false and misleading Proxy statement, obfuscating the true timing of AbbVie's interest in a merger, concealing the real reason for the October Offering, omitting critical financial analyses indicating Cerevel was worth substantially more than the Merger price, and creating an overall misleading narrative that the Merger process was fair when in reality the process was driven by Bain and Perceptive's desire to quickly lock in their profits from their deeply discounted purchases in the October Offering.

Faced with these well-pleaded facts, each of Cerevel's arguments seeking dismissal of the Section 10(b) and 14(a) counts against it fails.

1.      Cerevel argues Plaintiffs do not adequately allege scienter for the Section 10(b) claims, ignoring that Cerevel's most senior executive, Renaud, indisputably had *actual knowledge* of AbbVie's merger interest at the time of the alleged false and misleading statements in connection with the October Offering documents. Actual knowledge is and has always been the most straightforward demonstration of scienter and this knowledge is imputed to Cerevel. Cerevel further argues Plaintiffs' theory is illogical because "it would mean Cerevel intentionally offered its stock for *less* than its worth," but that is exactly the point. Plaintiffs allege that Bain and Renaud controlled Cerevel and caused Cerevel to offer its stock at a deflated price so that Bain could increase its stock position in advance of the AbbVie merger. *See,* § V.A.1., *infra*.

2.      Cerevel argues that it did not make any misrepresentations or have a duty to disclose any of the omitted facts. But Cerevel itself concedes a duty to disclose material facts is triggered "where there is insider trading." Here, not only did Cerevel itself sell shares in the October Offering while in possession of material nonpublic information, but Cerevel also knowingly allowed Bain and Perceptive to engage in unlawful insider purchases at the expense of public shareholders. *See Blanchard v. EdgeMark Fin. Corp.*, 1999 WL 59994, at *9-10 (N.D. Ill. Feb. 3, 1999) (corporate

defendant has a duty to disclose under Rule 10b-5 when controlling insiders engage in trading while in possession of material nonpublic information). *See,* § V.A.2., *infra*.

3.      Cerevel argues that both the pre-Merger and post-Merger announcement misrepresentations and omitted facts were immaterial, arguments rarely appropriate at the motion to dismiss stage and, here, already rejected by the Court of Chancery that found there was "a reasonable inference that AbbVie's proposal to acquire the company was material nonpublic information."[3] Chancery Tr. 21:18-22:19. *See,* § V.A.3; § V.A.4., *infra*.

4.      Cerevel argues that loss causation is not properly alleged for the post-Merger announcement statements. The Complaint's theory that shareholders were induced to sell their shares and/or forgo available statutory appraisal rights based on the misleading merger announcement and Proxy is a recognized theory of loss causation. *See,* § V.A.3; § V.A.5., *infra*.

5.      Cerevel challenges the Section 14(a) proxy claims (which of course do not require a showing of *scienter*), largely repeating the same materiality and loss causation arguments discussed above. For the reasons explained herein, those arguments fail in law and fact and must be rejected. *See,* § V.B.1; § V.B.2, *infra*.

For the reasons set forth herein, Cerevel's Motion should be denied in its entirety.

## III.    <u>STATEMENT OF FACTS</u>

### A.    **Bain and Pfizer Form and Control Cerevel Therapeutics**

Bain and Pfizer jointly created Cerevel in July 2018 and took it public in July 2020 by merging with a SPAC sponsored by Defendant Perceptive Advisors. ¶¶38, 42.

---

[3] Citations herein to "Chancery Tr. __" are to the October 2, 2025 Telephonic Rulings of the Court on Defendants' Motion to Dismiss in *SEIU Pension Plans Master Trust v. Bain Capital Investors, LLC*, No. 2024-1274-JTL (Del. Ch.) which is attached as Exhibit A to the Declaration of Michael J. Farnan in Support of Plaintiffs' Oppositions to Defendants' Motions to Dismiss.

Although Cerevel was a public company post-de-SPAC, Bain and Pfizer continued to jointly control the Company. In addition to initially owning (with certain of Cerevel's management) over 68% of Cerevel's outstanding stock, Bain and Pfizer entered into various Shareholder Rights Agreements that provided them with the right to nominate directors based on their percentage ownership of Cerevel's securities. ¶¶46-48. This allowed Bain and Pfizer to nominate the majority of the Cerevel Board. In addition, in the summer of 2023, Bain installed one of its former partners, Ron Renaud, as Cerevel's CEO. ¶29.

Critically, the Shareholder Rights Agreements provided Bain and Pfizer the right to cause Cerevel to conduct stock offerings and provided Bain and Pfizer the right to purchase their *pro rata* share of those offerings, essentially guaranteeing that Bain and Pfizer could maintain their control of Cerevel. ¶¶49-50. For these reasons, Cerevel disclosed that it was a "controlled company" under the NASDAQ listing rules and warned investors that Bain and Pfizer "have significant influence over us and may have interests different from yours." ¶54.

**B.     AbbVie Conducts Due Diligence into Cerevel for a Regional Partnership**

Starting in early 2023, Cerevel engaged in discussions with other companies to potentially work together as regional partners to help produce and market abroad its lead asset, a schizophrenia and Alzheimer treatment known as emraclidine. ¶57. AbbVie, a pharmaceutical giant, executed a confidentiality agreement with Cerevel on March 28, 2023. ¶57. In connection with those partnership discussions, AbbVie conducted what Cerevel itself described as "meaningful" due diligence. ¶¶57, 64.

Cerevel made clear to investors in the summer of 2023 that it was focused on regional partnerships rather than a sale of the entire company because Cerevel had $825 million in cash and marketable securities with a "runway comfortably into 2025." ¶¶60-63.

6

### C.  AbbVie Shifts its Interest to a Whole Company Acquisition of Cerevel

By no later than the end of September 2023, Cerevel's Bain, Pfizer, and Perceptive controlled Board learned that AbbVie had shifted its interest from a regional partnership to a whole-company acquisition of Cerevel. ¶66. On September 23, 2023, a senior Cerevel officer emailed Cerevel's financial advisor, Centerview, an "Updated Tracker" titled "Cerevel BD Contact Log_2023.09.15_CD comments" that indicated AbbVie had "completed meaningful diligence, more than any other party" and AbbVie had "Indicated interest in whole co." ¶67. The tracker dated September 15, 2023, indicated the "Next Steps" were "Await term sheet, discuss next steps once received." ¶67. Contrary to the September 15, 2023 tracker, and "updated" and re-circulated to the bankers on September 23, 2023 indicating AbbVie was interested in a "whole co" transaction and that Cerevel was awaiting a term sheet, the Proxy stated only on September 25, 2023 AbbVie formally notified Cerevel that it was withdrawing its interest in a Japanese partnership and that as of that date AbbVie did *not* indicate its interest in a whole company acquisition. ¶68.

On September 27, 2023, Cerevel's Board met with Centerview to discuss "potential strategic paths forward" and "M&A themes and trends." ¶69. Pfizer's Board designees Baron and Varma agreed to be recused from certain discussions at the meeting because Pfizer could also be an "interested party" regarding a "potential acquisition of Cerevel." ¶70. Centerview advised Cerevel Board members that in the last few years a "significant majority of M&A transactions have been initiated through partnership discussions," such as the recent AbbVie-Cerevel partnership discussions. ¶71.

Following the meeting, Centerview prepared talking points for Renaud to respond to AbbVie's interest, including that Renaud was "Flattered by interest in Cerevel" and that he "Discussed your communication of a whole co proposal with the board." ¶74. By October 5, 2023, Cerevel had started to create a merger-related data room for AbbVie's review. ¶75.

7

**D.      Bain and Perceptive Increase their Positions through the October Offering in Advance of the Lucrative AbbVie Acquisition**

On October 10, 2023, the Bain and Pfizer controlled Cerevel Board approved the October Offering. ¶¶77-78. Cerevel issued two press releases and a Prospectus Statement regarding the October Offering (the "October Offering Materials") but did not mention AbbVie's indication of interest in a whole company transaction or the related Board actions. ¶¶79-84. Possessing nonpublic knowledge of AbbVie's whole-company acquisition interest and the Cerevel Board's response, Bain nonetheless acquired 5,480,052 shares of common stock and Perceptive acquired 876,808 shares of common stock from the October Offering. ¶¶86, 91. The October Offering was conducted at just $22.81 per share, barely half of the $45 per share Merger price. ¶85.

Following the October Offering, Bain and Pfizer collectively owned 51.6% of Cerevel's common stock and, as a result of certain "voting arrangements" (*i.e.,* the Shareholder Rights Agreements), Bain and Pfizer "may be deemed to be a group for purposes of Section 13(d) under the Securities Exchange Act of 1934, as amended." ¶87.

**E.      Cerevel Agress to Be Acquired for Nearly Double the October Offering Price, Locking in Over $140 Million in Profits for Bain and Perceptive**

On October 19, 2023, just three days after the October Offering closed, AbbVie made a written indication of interest to acquire Cerevel for $35 per share. ¶93. The offer represented a 53% premium to the October Offering price. ¶93.

Because they could lock in an enormous profit on the discounted shares Bain and Perceptive had just acquired in the October Offering, the controlled Cerevel Board quickly pushed forward with a sale of the Company to AbbVie. On December 6, 2023, AbbVie and Cerevel issued a joint press release announcing the companies had reached an agreement where AbbVie would acquire for $45 per share. ¶¶102-103.

8

### F.   Defendants Issue a Misleading Proxy Statement to Obtain Shareholder Approval of the AbbVie Acquisition

On January 18, 2024, Cerevel issued the Proxy "By Order of the Board of Directors" and signed by Defendant Renaud, recommending that shareholders vote "FOR" the Merger. ¶141. The Proxy continued to mislead investors about several critical aspects of the Merger process.

*First*, the Proxy indicated that on September 25, 2023, when AbbVie and Cerevel discussed the Japanese partnership, "AbbVie did not indicate that an offer to acquire Cerevel would be forthcoming" and AbbVie's initial October 19, 2023 offer was an "unsolicited offer." ¶¶142-143. These statements were misleading because by no later than September 23, 2023, AbbVie had indicated to Cerevel it was interested in a whole-company acquisition and Cerevel was expecting a term sheet at that time. Moreover, by no later than September 27, 2023, the Cerevel Board met to discuss AbbVie's merger interest and to start the merger process. ¶144.

*Second*, the Proxy omitted that AbbVie expressed interest in a whole-company acquisition *before* the October Offering. ¶145. This omission not only concealed from investors the real reason for the October Offering but also that Bain and Perceptive's motive after the October Offering was to quickly close a merger and lock in an enormous premium on the shares they had just purchased. In addition, the Proxy's obfuscation of the real timing of AbbVie's interest concealed from investors the full extent of AbbVie's head start over other potential bidders.

*Third*, the Proxy contained misrepresentations and omissions concerning the financial analyses provided by Cerevel's financial advisor, Centerview. Specifically, the Proxy omitted that in September 2023, Centerview presented to the Board an "Illustrative M&A Scenario" that valued Cerevel at $53 per share, that on November 8, 2023, Centerview presented a discounted cash flow model to the Board that implied Cerevel was worth $50-62 per share, and that on November 11, 2023, Centerview advised the Board that a large pharmaceutical company such as AbbVie had the

9

ability to pay up to $67 per share for Cerevel. ¶148. Tellingly, Bain and Perceptive had the benefit of Centerview's non-public September 2023 analysis valuing Cerevel at $53 per share at the time of the October Offering.

## IV.     LEGAL STANDARD

In assessing the sufficiency of the Complaint under Rule 12(b)(6), courts must consider Plaintiffs' allegations accepting all well-pled allegations and drawing all inferences in Plaintiffs' favor. *See Shaev v. Saper*, 320 F.3d 373, 377–78 (3d Cir. 2003). A court may not dismiss the complaint unless "it appears beyond doubt that the plaintiffs can prove no set of facts in support of their claims that would entitle them to relief." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 215-16 (3d Cir. 2002). While Plaintiffs' Section 10(b) claims must satisfy the heightened pleading standards of Rule 9(b) and the PSLRA, their Section 14(a) claims must only satisfy the liberal pleading standard of Rule 8. *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006); *In re Heckmann Corp. Sec. Litig.*, 869 F. Supp. 2d 519, 536–38 (D. Del. 2012).

## V.     ARGUMENT

### A.     Plaintiffs Plead a Section 10(b) Claim

To state a claim for violation of Section 10(b) of the Exchange Act and Rule 10b-5(b), a plaintiff must plead "(1) a material misrepresentation or omission by the defendant [i.e. falsity]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 444 (D. Del. 2014).[4]

---

[4] Attached as Appendix A is a chart summarizing the allegations and facts relevant to each claim.

### 1.      **Plaintiffs Adequately Plead a Strong Inference of Scienter**

Cerevel's "lead" argument—that the Section 10(b) claim fails to plead scienter as to Cerevel—completely ignores the critical fact that Plaintiffs allege with particularity that Cerevel's CEO, Defendant Renaud, and the entire Cerevel Board had *actual knowledge* of the alleged false and misleading statements and omissions of material facts at the time of the October Offering and the Proxy. *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 905 (E.D. Pa. 2018) ("Where fraud is based on non-disclosure, scienter may be shown through evidence that defendants had actual knowledge of the information"); *In re Cambrex Corp. Sec. Litig.*, 2005 WL 2840336, at *14 (D.N.J. Oct. 27, 2005) (scienter element satisfied where plaintiff alleged that defendants had actual knowledge of the loss of the contract at the time of the alleged non-disclosure).

Scienter exists where "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Carmignac Gestion, S.A. v. Perrigo Co. PLC*, 2019 WL 3451523, at *13 (D.N.J. July 31, 2019). "It is sufficient for plaintiffs to allege that defendants had knowledge of facts or access to information that contradicts their statements." *Cambrex*, 2005 WL 2840336, at *11. "In a non-disclosure situation, any required element of scienter is satisfied where ... the defendant had actual knowledge of the material information." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 239 (3d Cir. 2004).

Because Cerevel is a corporate defendant, scienter can be alleged by "a showing that at least one individual officer who made, or participated in the making of, a false or misleading statement did so with scienter." *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 403 (D. Del. 2010), *aff'd*, 442 F. App'x 672 (3d Cir. 2011); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 515–16 (S.D.N.Y. 2009) ("scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants."). Notably, "the individual making an alleged misstatement and the one with scienter do not have to be one and the

11

same." *Id; see also Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 182, 189–90 (4th Cir. 2009) (recognizing that "corporate liability derives from the actions of its agents" even if they did not make an actionable misstatement).

Here, Plaintiffs allege that Cerevel's very top management, *i.e.,* CEO Renaud and the Cerevel Board, had actual knowledge of AbbVie's interest at the time of the October Offering and (i) knowingly omitted that fact from the October Offering Materials (and affirmatively misstated the reason for the October Offering); and (ii) made material misstatements and omissions in the Proxy to obfuscate AbbVie's advantage in the sales process and conceal that the deal price was inadequate and not fair or in the best interests of shareholders. The Complaint's allegations are drawn from specific internal Cerevel documents. *First*, a spreadsheet attached to a September 23, 2023 email from a Cerevel officer to Centerview indicated that AbbVie had informed Cerevel that it was interested in a whole-company acquisition of Cerevel and Cerevel had noted the "next step" was to "await term sheet." ¶67. *Second*, on September 27, 2023, the Cerevel Board met with Centerview to discuss strategic options, including merger and acquisition opportunities, and even recused Pfizer's representatives from the meeting because Pfizer might be interested in acquiring Cerevel. ¶¶69-70. *Third*, on September 29, 2023, Centerview emailed Renaud "talking points" for a follow up meeting with AbbVie, including a recommendation that Renaud acknowledge that he had "***Discussed your communication of a whole co proposal with the board***." ¶74. *Fourth,* by October 5, 2023, Cerevel employees were starting to pull together whole co data room structure to allow AbbVie to conduct additional due diligence. ¶75. *Finally*, Cerevel's Board was presented with at least **three** Centerview analyses showing the deal price was inadequate which were omitted from the Proxy. ¶113.

12

Tellingly, Cerevel does not even attempt to argue that Renaud or the Cerevel Board lacked knowledge of the allegedly omitted facts. Instead, Cerevel's scienter arguments are a litany of red herrings that ignore the fact that Cerevel's most senior management had actual knowledge. As an initial matter, Cerevel argues that there can be no scienter because the Complaint does not allege it "sought to artificially deflate its own share price." D.I. 46 at 6. But financial motive is not strictly required to plead scienter. *Zhengyu He v. China Zenix Auto Int'l Ltd.*, 2020 WL 3169506, at *10 (D.N.J. June 12, 2020) (although "motive and opportunity can give rise" to a scienter inference, all that "is necessary is to plead facts that give rise to an inference of conscious wrongdoing."). And Plaintiffs do plead financial motive: Cerevel's primary controller, Bain, sought to lowball the October Offering price so it could purchase shares at a discount in advance of the Merger. ¶¶2, 9.

Cerevel next argues that scienter is not pled against it because scienter is not adequately alleged against Cerevel's CEO, Defendant Renaud. D.I. 46 at 7-10. Again, Cerevel focuses on the competing inferences regarding Renaud's financial motive (which at this stage must be drawn in Plaintiffs' favor), ignoring that financial motive is not required to plead scienter, particularly here where the Complaint alleges concrete facts establishing Renaud's actual knowledge of the false and misleading statements and omissions of material facts. *Strougo v. Mallinckrodt Pub. Ltd. Co.*, 2022 WL 17740482, at *7, *9 n.9 (D.N.J. Dec. 16, 2022) (scienter where defendants had "knowledge of facts . . . contradicting the public statements" and noting "motive is neither sufficient nor necessary to finding scienter.").

In any event, Cerevel's financial interest arguments regarding Renaud are wrong. Cerevel's claim that it is illogical that Renaud would remain "loyal to his former employer, Bain" (D.I. 46 at 8-9) wholly disregards that while serving as Cerevel CEO Renaud "***remained at Bain as a Senior Advisor***" (¶58) and was therefore "***at all times affiliated with Bain and incentivized to***

13

*maximize Bain's profit from its investment in Cerevel*." ¶120. Cerevel's argument Renaud would not have wanted to depress Cerevel's stock price because it would "diminish his own net worth" (D.I. 46 at 9) ignores that Renaud maintained an ongoing position as a Senior Advisor with Bain and was motivated to omit the AbbVie merger interest from the October Offering Materials to enable Bain to purchase discounted shares. *In re Shanda Games Limited Sec. Litig.*, 128 F.4th 26, 52–53 (2d Cir. 2025) (allegations conflicted corporate insiders with loyalties to both the target company and its acquiror were motivated to seek a low purchase price adequate to allege scienter against the target company). Renaud's personal ownership of Cerevel shares does not undermine this inference because Renaud understood that the October Offering would have a positive impact on Cerevel's valuation and would motivate Bain to consummate a transaction quickly. ¶¶115, 118, 119. In other words, Renaud—who in a recent Board meeting saw Centerview's 2023 "Illustrative M&A Scenario" valuing Cerevel at $53 per share—knew that the undervalued October Offering price was only temporary and that the news of the AbbVie merger would cause a significant increase in the stock price. Put simply, the undervalued October Offering price helped Renaud on the Bain side and had no impact on his personal holdings as Defendants incorrectly assert. Finally, Cerevel argues that it cannot be held liable for Renaud's actions because he might have been acting "adversely to *Cerevel's* interests." D.I. 46 at 9-10. But the "adverse interest exception" line of cases cited by Cerevel apply New York state law and, in any event, do not apply here because the alleged misstatements and omissions were issued *by Cerevel* and there is no claim by Cerevel that Renaud "totally abandoned" Cerevel's interests. *Wight v. BankAmerica Corp.*, 219 F.3d 79, 87 (2d Cir. 2000) ("The adverse interest exception, however, is narrow and applies only when the agent has 'totally abandoned' the principal's interests"); *Stewart v. Wilmington Tr. SP Servs., Inc.*, 112 A.3d 271, 303 (Del. Ch. 2015), *aff'd*, 126 A.3d 1115 (Del. 2015) ("The adverse interest exception, if

14

applied correctly, should cover only the 'unusual' case in which the allegations support a reasonable inference of 'the type of total abandonment of the corporation's interests' that is characteristic of, for example, outright stealing from the corporation.").

### 2. Plaintiffs Plead Pre-Merger Announcement Misrepresentations and Omission of Facts Cerevel Had a Duty to Disclose

Cerevel's statements from October 11, 2023 to just prior to the Merger announcement were false and misleading and omitted material facts regarding the merger discussions between Cerevel and AbbVie. ¶173. Cerevel and Renaud had a duty to disclose the truth regarding AbbVie's merger interest and Cerevel's related launch of a sales process when conducting the October Offering where inside shareholders Bain and Perceptive collectively purchased millions of shares while in possession of the material non-public information. ¶174.

As it must, Cerevel concedes there is a duty to disclose under Rule 10b-5 in three circumstances: "when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure." *Oran v. Stafford,* 226 F.3d 275 at 285-86 (3d. Cir. 2000); D.I. 46 at 11. As alleged in the Complaint (¶174), Cerevel had a duty to disclose the material facts because inside shareholders Bain and Perceptive were purchasing shares in the October Offering with material nonpublic information relating to AbbVie's merger interest, value, and operations and financials. Cerevel and Renaud knowingly allowed Bain and Perceptive to engage in insider trading and, thus, had a duty to disclose the underlying nonpublic information. Indeed, Renaud had dual loyalties to Cerevel (as its CEO) and Bain (as a Senior Advisor) and had actual knowledge of the material nonpublic information. ¶¶58, 74, 120. Likewise, Bain (with Pfizer) controlled Cerevel through its appointment of Renaud, domination of the Board, and collective stock ownership. ¶¶115-116. While Cerevel and Renaud may have had reasons to delay disclosing the ongoing negotiations for other purposes, even "good reasons to delay disclosure"—not present

15

here—"do not justify insider trading." *S.E.C. v. Geon Indus., Inc.*, 531 F.2d 39, 48 (2d Cir. 1976). Because Cerevel and Renaud knew Bain and Perceptive were trading based on the material nonpublic information, they had a duty to disclose it. *Blanchard*, 1999 WL 59994, at \*10 (holding a corporate defendant has a duty to disclose under Rule 10b-5 when insiders engage in trading while in possession of material nonpublic information).

Making matters worse, Cerevel itself as the issuer in the October Offering also traded while in possession of material nonpublic information and thus had a duty to disclose. *See Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 179 (2d Cir. 2001) ("Specifically, under § 10(b) and Rule 10b-5, closed corporations that purchase their own stock have a special obligation to disclose to sellers all material information. . . . It logically follows that just as knowledgeable corporate insiders have a fiduciary duty to disclose material facts when entering stock deals with outsiders, so do closed corporations buying their own stock."); *McCormick* v. *Fund Am. Cos.,* 26 F.3d 869, 876 (9th Cir. 1994) ("Numerous authorities have held or otherwise stated that the corporate issuer in possession of material nonpublic information, must, like other insiders in the same situation, disclose that information to its shareholders or refrain from trading with them."); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1203–04 (1st Cir. 1996) ("Courts . . . have treated a corporation trading in its own securities as an 'insider' for purposes of the 'disclose or abstain' rule.").

Accordingly, because of its knowledge of Bain's, Perceptive's, and its own unlawful trades while in possession of nonpublic information, Cerevel had a duty to disclose all material facts.[5]

In addition to abdicating its duty to disclose given the insider trading, Cerevel's statements in the October Offering are actionable for a second, independent reason: they were impermissible

---

[5] Defendants' cases, *Staffin v. Greenberg*, 672 F.2d 1196, 1203 (3d Cir. 1982) and *Vladimir v. Bioenvision Inc.*, 606 F. Supp. 2d 473, 486 (S.D.N.Y. 2009), are not helpful because neither involved *any* allegation of insider trading.

16

"half-truths." The Supreme Court has held "[h]alf-truths . . . are 'representations that state the truth only so far as it goes, while omitting critical qualifying information.'" *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 258 (2024). Plaintiffs allege the October Offering Materials included a misleading section titled "Use of Proceeds" that indicated the purported use was to "support our ongoing and planned clinical trials and other research and development activities, and for working capital and other general corporate purposes, including to extend our cash runway into 2026." ¶¶124, 132. These statements were misleading "half-truths" because they omitted the October Offering was also to allow Bain and Perceptive the opportunity to increase their holdings at a discounted price in advance of the anticipated AbbVie Merger. ¶126. In other words, Cerevel affirmatively represented that the October Offering was being conducted for routine financing purposes, and "[o]nce a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make its disclosure misleading." *Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017); *see also Del. Cnty. Emps. Ret. Sys. v. AdaptHealth Corp.*, 606 F. Supp. 3d 124, 138 (E.D. Pa. 2022) (finding laudatory statements about CEO's experience and importance to the company actionable where the company knew but did not disclose the CEO was under federal investigation).

### 3. The Pre-Merger Announcement Misrepresentations and Omissions were Material

Cerevel's argument that the misrepresentations and omissions concerning the merger negotiations at the time of the October Offering were immaterial is wrong. D.I. 46 at 13-15. In securities actions, an undisclosed fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

17

As explained in *Basic*, materiality in the context of merger discussions depends on "the probability that the event will occur" and the "magnitude of the transaction." *Id.* "[T]o assess the probability that the event will occur, a factfinder will need to look to indicia of interest in the transaction at the highest corporate levels," such as "board resolutions, instructions to investment bankers, and actual negotiations between principals or their intermediaries." *Id.* at 239. Because a forthcoming merger in which a corporation is "bought out" is the "most important event [in] a small corporation's life," inside information regarding a merger "become[s] material at an earlier stage than would be the case as regards lesser transactions—and this even though the mortality rate of mergers in such formative stages is doubtless high." *Id.* (quoting *Geon*, 531 F.2d at 47-48).

Here, far from the "tidbits" Cerevel claims are alleged, the facts indicate in detail that AbbVie was a credible bidder, entered into a confidentiality agreement early, conducted months of "meaningful diligence" into two of Cerevel's four lead drugs in connection with the potential Japanese partnership, and expressed it was no longer interested in a regional partnership but was interested in a whole-company transaction and would soon be providing a term sheet. Cerevel responded by immediately meeting with its financial advisors (and recusing the Pfizer-sponsored board members from the meeting as Pfizer was also a potential acquiror), launching a Merger process with AbbVie, and creating a whole-company Merger-related data room. Indeed, the Court of Chancery concluded "when you put all this together, this looks like the AbbVie approach was real and that the company and its management team knew it was real" (Chancery Tr. 23:23-24:1). The timeline of the events demonstrating the materiality of AbbVie's interest is set forth below:

- On March 28, 2023, Cerevel and AbbVie executed a confidentiality agreement and AbbVie commenced a lengthy due diligence process into Cerevel, and two of its lead drug candidates, emraclidine and tavapadon. ¶57.

- On May 3, 2023, former Cerevel CEO Athony Coles stated on an earnings call that "[t]here are no strategic transaction conversations underway, so I can dispense with

18

that." ¶61. *See Nash v. Qualtrics Int'l Inc.*, 2024 WL 231870 (D. Del Jan. 22, 2024) (statements denying an active sales process relevant to materiality).

- On September 23, 2023, Cerevel sent Centerview a tracker dated September 15, 2023 indicating AbbVie had "indicated interest in whole co." ¶67. The Chancery Court noted this reflected "*a credible bidder, with the ability to finance a deal, indicating that it has interest in an acquisition. It's a statement attributed to somebody within the company who has real heft. It's directed to the likely person at the company to whom a serious inquiry would be made. And there's a reference to the idea that a term sheet would be forthcomin*g." Chancery Tr. 8:14-8:21.

- On September 25, 2023, AbbVie informed Cerevel it would not be improving its bid for the regional partnership and reiterated its interest in a whole company acquisition. ¶68. The Chancery Court noted that "*I think at this stage one can infer that when you combine that with a signal that you're interested in a wholeco, you are sending the message that you are more interested in the wholeco acquisition*." Chancery Tr. 8:22-9:6.

- On September 27, 2023, Cerevel's Board of Directors met with Centerview to discuss M&A trends and noted that a significant number of M&A transactions had resulted from partnership discussions. ¶71. As the Chancery Court put it "*In other words, what was happening here was consistent with a meaningful approach from a credible bidder*." Chancery Tr. 9:7-15.

- On September 29, 2023, Centerview sent Renaud "talking points" for an upcoming conversation with AbbVie's executive vice president, referencing that they discussed AbbVie's interest with the Board. ¶74. Vice Chancellor Laster concluded "*That's more evidence that the proposal was inbound*." Chancery Tr. 10:2-8[6].

- On October 5, 2023, Cerevel began putting together a whole company Merger-related data room. ¶75. The Vice Chancellor noted "*You don't do that if you're not actually thinking about it*." Chancery Tr. 11:11-17.

---

[6] Defendants argue the "talking points" were created so that Renaud could let "AbbVie down easy" (D.I. 46 at 14). As discussed by the Chancery Court, "One possible inference is that this was sincere and that they were saying no to a deal. Another possible inference is that this was simply the expected next move in the negotiation dance. When somebody makes an initial proposal, the good negotiating strategy is to initially say you're not interested. That then results, ideally, in the other side bidding against themselves or improving the offer to try to get you interested. At least at this stage, I don't think that their comments about refusing the proposal establish that there was no interest in the proposal or that the company was necessarily remaining in stand-alone mode." Chancery Tr. 10:18-11:10.

- On October 17, 2023, the day after the October Offering closed, AbbVie's chief business and strategy officer emailed Cerevel's Burgess to "follow up." As the Chancery Court put it, "*That is obviously consistent with the idea that everyone knew an offer was coming.*" Chancery Tr. 12:23-13:5.

Applying the Supreme Court's test in *Basic,* Courts have found similar fact patterns material. For example, in *Melcher v. Fried*, the Court found merger negotiations were material when "the upper levels of [the company] were directly involved" and the companies had "sustained talk . . . pre-dat[ing] the merger talks." 2018 WL 6326334 (S.D. Cal. Dec. 4, 2018); *see also Rizzo v. MacManus Grp., Inc.*, 158 F. Supp. 2d 297, 304 (S.D.N.Y. 2001) (withheld merger negotiations material where target had hired bankers, had been approached by suitors, and had commenced top-level discussions). The Supreme Court has also explicitly recognized that "trading (and profit making) by insiders can serve as an indication of materiality." *Basic* 485 U.S. at 240, n.18; *Rothberg v. Rosenbloom*, 771 F.2d 818, 821 (3d Cir.1985) ("The best proof of the materiality of that information is that the ... experienced investors, found it to be sufficiently material ... to purchase [the] stock."). Bain's insider trading is particularly relevant to materiality here because Bain controlled Cerevel and thus "could be confident that they could effectuate any planned sale, enhancing the probability it would occur." *S.E.C. v. Wyly*, 788 F. Supp. 2d 92, 123 (S.D.N.Y. 2011).

Cerevel cites a litany of inapposite cases that found early-stage merger negotiations are immaterial (D.I. 46 at 13-14), but such facts are not present here. In *Mill Bridge V, Inc. v. Benton*, 496 F. App'x 170 (3d Cir. 2012), the parties had not yet conducted *any* official due diligence and the target had not even informed its board of directors of the merger interest.[7]

---

[7] Likewise, in *Employees' Retirement System of Rhode Island v. Williams Cos., Inc.*, 889 F.3d 1153, 1172 (10th Cir. 2018), the negotiations were at such a preliminary stage it "involved no confidentiality agreements" and "no exchanges of financial information." In *In re General Motors Class E Stock Buyout Sec. Litig.*, 694 F. Supp. 1119, 1128 (D. Del. 1988), the complaint did not "state the level of corporate involvement, who did the negotiating and whether the Board was involved." Even more tenuous is *Taylor v. First Union Corp. of S.C.*, 857 F.2d 240 (4th Cir. 1988),

Unlike Defendants' cases, here the parties had already conducted what Cerevel described as "meaningful" due diligence, were having discussions about the merger at the CEO and Board levels, and were awaiting AbbVie's imminent term sheet (which AbbVie ultimately provided just three days after the October Offering closed). Given these facts, a reasonable jury can find the negotiations were material.

### 4.   The Post-Merger Announcement Statements are Actionable

Plaintiffs allege Cerevel and Renaud made misstatements in the December 6, 2023 Merger announcement and Proxy: (a) concealing and affirmatively misstating the real timing of AbbVie's interest in the Merger, including stating in the Proxy that, on September 25, 2023, AbbVie discussed with Cerevel the Japanese partnership and "did not indicate that an offer to acquire would be forthcoming"; and (b) providing a detailed Centerview financial opinion but omitting critical Centerview analyses that indicated the Merger price was inadequate. ¶¶139-146.

Tellingly, Cerevel does not contest that these post-Merger announcement statements were misleading nor that the facts were omitted. Instead, Cerevel argues the misrepresentations and omissions were not "material." D.I. 46 at 16-20. As noted above, materiality is "generally best left to the trier of fact." *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 178 (3d Cir. 2000) ("the issue of materiality typically presents a mixed question of law and fact"). It is not subject to any heightened pleading standard. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

---

where the court found the potential merger was immaterial and highly speculative because "the Supreme Court had yet to rule on the constitutionality of interstate banking, and no merger could take place until enabling legislation was enacted both in North Carolina and South Carolina." In *Boluka Garment Co., Ltd. v. Canaan Inc.*, 547 F. Supp. 3d 439 (S.D.N.Y. 2021), the materiality question concerned a speculative, nonbinding agreement that was only a "strategic cooperation framework" for the sale of some equipment – far from the magnitude of a full takeover. Finally, in *Rich v. Shrader*, 2010 WL 3717373 (S.D. Cal. Sept. 17, 2010), there were not even merger "negotiations" at issue but only an allegation the board of directors had "tasked" an executive "to explore strategic options."

Cerevel, therefore, bears the heavy burden of showing that no set of facts could allow a jury to find "a substantial likelihood that a reasonable shareholder would consider [the misrepresentations and omissions] important in deciding how to vote." *See TSC Indus.*, 426 U.S. at 449.

The post-Merger announcement misrepresentations and omissions were material because they created the false impression that AbbVie was on a level playing field with other bidders and that Centerview's financial analyses supported the $45 Merger price. ¶¶145,148. Accurate disclosures regarding a sales process are important to investors because the persuasiveness of the deal price as evidence of fair value depends on the reliability of the sale process. *See, e.g.*, *In re AOL Inc.*, 2018 WL 1037450, at *8 (Del. Ch. Feb. 23, 2018).

The post-Merger announcement misrepresentations and omissions were also material because they concealed the real reason for the October Offering and obfuscated Bain and Perceptive's motivation to quickly sell Cerevel. ¶¶115, 117. As the Chancery Court found, "[i]t's reasonably conceivable that the omission would have been material because its inclusion would have suggested that the fast sale process was an effort to capture value through the October Offering. It's inferable that this disclosure would have revealed a conflict about the defendants and their decision to approve the merger and recommend it to stockholders, which is something that stockholders should have known." (Chancery Tr. 32:8-17); *see also Mendell v. Greenberg,* 927 F.2d 667, 675 (2d Cir. 1990), *amended*, 938 F.2d 1528 (2d Cir. 1990) ("motivation of a controlling shareholder for favoring a course proposed in a proxy statement must be disclosed when there is a substantial likelihood that its disclosure will have a significant bearing on a reasonable shareholder's assessment of the recommended course of action").

### 5.    **Plaintiffs' Section 10(b) Claim Pleads Loss Causation**

The Complaint also easily satisfies the Rule 8 notice-pleading standard for loss causation. *See Heckmann*, 869 F. Supp. 2d at 541 (Rule 8(a) applies to loss causation under Sections 14(a)

and 10(b)). To satisfy that standard, Plaintiffs need only make "a short and plain statement" giving "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

Plaintiffs allege the truth was partially revealed on December 6, 2023, when AbbVie and Cerevel announced the proposed transaction at $45 per share, revealing to the market that Cerevel and Renaud's prior statements were misleading and omitted the ongoing Merger discussions. ¶153. Plaintiffs further allege that the December 6, 2023 Merger announcement and Proxy continued to mislead investors about the full truth, fraudulently inducing class members to sell Cerevel shares at prices that were below their actual value and foregoing available statutory appraisal rights. *Id.*

The Second Circuit recently confirmed Plaintiffs' theory of loss causation, explaining in *In re Shanda Games Ltd. Sec. Litig.*: "loss causation may be established when a proxy statement prompts a shareholder to accept an unfair exchange ratio for his shares rather than recoup a greater value through a state appraisal." 128 F.4th 26, 57 (2d Cir. 2025) (quoting *Wilson v. Great Am. Indus., Inc.*, 979 F.2d 924, 931 (2d Cir. 1992)). *Shanda Games* is consonant with long-standing Third Circuit law likewise recognizing a plaintiff may plead loss causation by alleging that defendants' misrepresentations caused investors to forgo state-law remedies such as appraisal. *See Healey v. Catalyst Recovery of Pa., Inc.*, 616 F.2d 641, 646 (3d Cir. 1980) ("the harm to the plaintiff from the omission was deprivation of a state remedy" and the "deprivation of state rights and remedies often forms the basis for federal claims"); *Merritt v. Colonial Foods, Inc.*, 499 F. Supp. 910, 914 (D. Del. 1980) (causation where misstatements affected shareholder's "investment decisions" including "whether to accept the offer, seek an appraisal, or institute proceedings in an attempt to enjoin the merger").

23

**B.    The Complaint Pleads a Section 14(a) Claim**

A plaintiff pleads a Section 14(a) violation by alleging that (1) the proxy statement contained a material misrepresentation or omission, which (2) caused plaintiffs injury, and (3) the proxy solicitation was "an essential link in the accomplishment of the transaction." *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 385 (1970).

**1.    The Complaint Pleads Misstatements and Omissions of Material Facts in the Proxy**

Cerevel does not dispute that its statements were false but instead argues the misrepresentations are "immaterial as a matter of law" because at the time the Proxy was issued investors already knew AbbVie had offered $45 per share and the Proxy disclosed all terms of the Merger. D.I. 46 at 22-23. Cerevel's argument entirely misses the point. Plaintiffs do not allege the Proxy somehow confused investors about the Merger price or deal terms; rather, Plaintiffs allege the misrepresentations and omissions in the Proxy created a false impression of the robustness of the deal process, of Bain and Perceptive's motives to quickly close a transaction given their unlawful purchases in the October Offering, and of the fair value Cerevel's shares. ¶¶115, 117, 142-145, 148. As the Chancery Court found on the same facts (Chancery Tr. at 31:24-32:17), statements regarding deal process and motives of controlling shareholders are material. *See, e.g.*, *AOL*, 2018 WL 1037450, at *8; *Mendell*, 927 F.2d at 675.

**2.    Plaintiffs' Section 14(a) Claim Pleads Loss Causation**

Cerevel's loss causation arguments related to the Section 14(a) claim largely mirror their arguments against Plaintiffs' Section 10(b) claim. As discussed above, Plaintiffs allege the misrepresentations and omissions in the Proxy induced Plaintiffs to forgo available statutory appraisal rights, a recognized loss causation theory. *See*, § V.A.5, *supra*.

24

Cerevel also adds that the Complaint "pleads no fact" demonstrating, and that it is too "speculative" that, "Cerevel was far more valuable that the Merger price." But this is wrong both legally and factually. *Legally*, Plaintiffs need only plead "a causal chain from the misrepresentations to the transaction, to the alleged damages" (*Lane v. Page*, 727 F. Supp. 2d 1214, 1231 (D.N.M. 2010))—which they have done by alleging that the Proxy's misstatements directly prevented them from invoking their appraisal rights. The suggestion that Plaintiffs must definitively plead the outcome of an appraisal proceeding misunderstands the "minimal hurdle" for pleading loss causation. *Heckmann*, 869 F. Supp. 2d at 542.

*Factually*, the Complaint alleges that Centerview valued Cerevel significantly higher than the Merger price in at least three undisclosed valuations, and the Complaint also alleges that Bain and Perceptive were more concerned with closing a deal quickly than maximizing shareholder value. ¶¶115, 117. Furthermore, had Bain and Perceptive been excluded from participating in the October Offering, the total consideration to the public shareholders would have been higher because less merger consideration would have been diverted to Bain and Perceptive through the October Offering.[8] This is more than sufficient given Plaintiffs have "not yet been afforded an opportunity to obtain necessary damage discovery, including discovery and expert reports to establish a specific damages number," and Rule 8 does not require more at this stage. *Smith v. Robbins & Myers, Inc.*, 969 F. Supp. 2d 850, 868-69 (S.D. Ohio 2013).

## VI.   **CONCLUSION**

For the reasons stated herein, Cerevel's motion to dismiss should be denied in its entirety.

---

[8] Defendants rely on *In re Focus Financial Partners*, 2025 WL 961488 (D. Del. Mar. 31, 2025) and *Gray v. Wesco Aircraft Holdings, Inc.*, 847 F. App'x 35 (2d Cir. 2021), but neither of those cases involved allegations of controlling shareholders looking to close a transaction as quickly as possible nor allegations of insider trading that unfairly diverted merger consideration to insiders.

Dated: December 17, 2025

Respectfully submitted,

**FARNAN LLP**

By: *Brian E. Farnan*
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Emails:  bfarnan@farnanlaw.com
   mfarnan@farnanlaw.com

*Counsel for Lead Plaintiffs and the Class*

**ENTWISTLE & CAPPUCCI LLP**
Andrew J. Entwistle (*pro hac vice*)
Callie Crispin (*pro hac vice*)
500 W. 2nd Street, Suite 1900
Austin, Texas 78701
Telephone: (512) 710-5960
Emails:  aentwistle@entwistle-law.com
   ccrispin@entwistle-law.com

**ENTWISTLE & CAPPUCCI LLP**
Vincent R. Cappucci (*pro hac vice*)
Robert N. Cappucci (*pro hac vice*)
Andrew M. Sher (*pro hac vice*)
Jessica A. Margulis (*pro hac vice*)
230 Park Avenue, 3rd Floor
New York, New York 10169
Telephone:  (212) 894-7200
Facsimile:  (212) 894-7272
Emails:  vcappucci@entwistle-law.com
   rcappucci@entwistle-law.com
   asher@entwistle-law.com
   jmargulis@entwistle-law.com

*Counsel for Lead Plaintiffs and the Class*

26

**Appendix A**

**Summary Chart of Cerevel Therapeutics Holdings, Inc. Alleged Wrongdoing**

I.      **Section 10(b) Claim**

To state a claim for violation of Section 10(b) of the Exchange Act and Rule 10b-5(b), a plaintiff must plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 444 (D. Del. 2014).

| Element | Facts Plead |
|---|---|
| Misstatements or omissions | Plaintiffs allege Cerevel made false and misleading statements and/or omitted material facts regarding (i) the timing and extent of AbbVie's merger interest; (ii) the purpose of the October Offering; and/or (iii) the financial analyses presented to the Board by Centerview, in the following documents:<br><br>• October 11, 2023 Form 8-K and Press Release. ¶121 (omission of AbbVie merger discussions)<br><br>• October 11, 2023 Preliminary Prospectus Supplement. ¶124 (omission of AbbVie merger discussions and misrepresentation of real reason for the October Offering)<br><br>• October 12, 2023 Form 8-K and Press Release. ¶¶127-128 (omission of AbbVie merger discussions and misrepresentation of real reason for the October Offering)<br><br>• October 12, 2023 Prospectus Supplement. ¶¶132-133 (omission of AbbVie merger discussions and misrepresentation of real reason for the October Offering)<br><br>• November 1, 2023 Earnings Call. ¶136. (omission of AbbVie merger discussions and misrepresentation of real reason for the October Offering)<br><br>• December 6, 2023 Form 8-K ¶139. (continued to omit that AbbVie was interested prior to the October Offering)<br><br>• January 18, 2023 Proxy Statement. ¶¶142-147 (misrepresentation of timing of AbbVie's interest, the robustness of the sales process, and omission of critical Centerview analyses). |

A-1

| Element | Facts Plead |
|---|---|
| Materiality | The omission of AbbVie's merger discussions prior to the October Offering were material because: <br><br>• AbbVie executed a confidentiality agreement to commence due diligence in March 2023. ¶57 <br><br>• A Cerevel tracker circulated September 23, 2023, indicated AbbVie had "indicated interest in whole co" and Cerevel was "awaiting term sheet." ¶67 <br><br>• On September 27, 2023, Cerevel's Board met with Centerview to discuss M&A related issues and recused Pfizer's designees because of a potential conflict. ¶70 <br><br>• On September 29, 2023, Centerview sent Renaud "talking points" for a conversation with AbbVie's executive vice president, which confirmed Renaud shared AbbVie's interest with the Board. ¶74 <br><br>• On October 5, 2023, Cerevel began putting together a whole company data room. ¶75 <br><br>• On October 17, 2023, AbbVie emailed Cerevel "following up." AbbVie sent a formal offer to acquire Cerevel just three days after the October Offering, and the deal was announced just 51 days after the October Offering. ¶¶92-93, 103 <br><br>Even after the Merger was announced, the misrepresentations in the Proxy were material because: <br><br>• They hid from investors that Bain and Perceptive's interests were not aligned with public shareholders because of their baked-in profits from the October Offering in a Merger closed. ¶110. <br><br>• They concealed from investors the extent of AbbVie's timing advantage, creating a misleading impression of the robustness of the outreach to other bidders. ¶145 <br><br>• Centerview's financial analyses omitted from the Proxy indicated Cerevel was more valuable than the deal price. ¶148 |

A-2

| Element | Facts Plead |
|---|---|
| Scienter | As a corporate defendant, scienter can be alleged by showing at least one corporate officer acted with scienter.<br><br>• Cerevel's CEO, Renaud, acted with scienter because he had actual knowledge of the misrepresented and omitted facts. ¶76<br><br>• Renaud also had a financial motive as a Senior Advisor at Bain to facilitate Bain's inside purchases. ¶120<br><br>• Renaud personally benefited because, after the October Offering, Bain pushed through the AbbVie Merger which allowed Renaud to cash-out his equity at a large premium. ¶120 |
| In connection with the purchase or sale of a security | • The Fraud Claim Class that brings the Section 10(b) claims "sold or otherwise disposed of the publicly traded common stock during the period from October 11, 2023 through August 1, 2024, inclusive." ¶156 |
| Reliance | • The market for Cerevel's common stock was efficient at all times during the Class Period. ¶¶163-167<br><br>• Lead Plaintiffs and other members of the Class sold or otherwise disposed of Cervel stock relying on the integrity of the market price of Cerevel's common stock and market information relating to Cerevel. ¶¶163, 176 |
| Economic Loss | • During the Class Period Cerevel's stock traded artificially deflated prices caused by the material misrepresentations and/or omissions. ¶¶163-164<br><br>• The Fraud Claim Class suffered economic damages by being induced to sell shares at such artificially deflated prices. ¶¶164, 177-178 |
| Loss Causation | • The price of Cerevel common stock significantly increased when Defendants' misrepresentations and omissions were revealed to the market. ¶152<br><br>• On December 6, 2023, the misrepresentation and omissions were partially corrected when AbbVie and Cerevel jointly announced the proposed transaction at $45 per share. ¶153 |

A-3

| Element | Facts Plead |
|---|---|
|  | • The full truth was not disclosed until after the Merger when Cerevel shares no longer publicly traded. However, had investors known the full truth prior to the Merger they would not have been induced to sell at deflated prices and could have secured fair value of their shares through appraisal. ¶153 |

## Section 14(a) Claim

A plaintiff pleads a Section 14(a) violation by alleging that (1) the proxy statement contained a material misrepresentation or omission, which (2) caused plaintiffs injury, and (3) the proxy solicitation itself, rather than the particular defect in the solicitation materials, was "an essential link in the accomplishment of the transaction." *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 385 (1970).

| Element | Facts Plead |
|---|---|
| Misrepresentation/Omission | The Proxy misrepresented or omitted the following: <br><br> • On September 25, 2023, AbbVie and Cerevel had a conversation and that "[t]he conversation focused on Cerevel's retention of commercial rights in Japan and AbbVie did not indicate that an offer to acquire Cerevel would be forthcoming." ¶142. This omitted that by September 25, 2023, AbbVie had indicated interest in a whole company acquisition. <br><br> • The Proxy stated that AbbVie's initial offer on October 19, 2023 was an "unsolicited offer." ¶143. This was misleading because for a month Cerevel had already been awaiting a term sheet. <br><br> • Omitted that AbbVie's initial interest in a whole company acquisition came prior to the October Offering. ¶145 <br><br> • Centerview's financial analysis in the Proxy excluded important financial analyses presented to the Board by Centerview that did not support the Merger price. First, the Proxy omitted that in September 2023—days before the October Offering—it had presented to the Board an "Illustrative M&A Scenario" that valued the Company at $53 per share. Second, the Proxy also omitted that on November 8, 2023, Centerview presented a financial analysis to the Board that included a discounted cash flow model, based on management's financial projection, implying the Company was worth between $50 per share and $62 per share. Third, the |

A-4

| Element | Facts Plead |
|---------|-------------|
| | Proxy omitted that on November 11, 2023, Centerview calculated that a large pharmaceutical company like AbbVie had the ability to pay up to $67 per share for Cerevel. It was entirely misleading for the Proxy to include certain analyses, including discounted cash flow analyses while omitting other Centerview analyses presented to the Board which indicated that the Merger price was inadequate. ¶148 |
| Caused Plaintiffs' Injury | • Had investors known the full truth prior to the Merger they would not have been induced to sell at deflated prices and could have secured fair value of their shares through appraisal. ¶153 |
| Essential Link | • As a result of the false and misleading Proxy, Lead Plaintiffs and the Proxy Claim Class were induced to vote their shares and accept inadequate consideration in connection with the AbbVie Merger. ¶189 |